**SMITH & SMITH**
GERALD K. SMITH AND JOHN C. SMITH
LAW OFFICES, PLLC
ATTORNEYS AT LAW

6720 E. Camino Principal, Suite 203
Tucson, AZ 85715
Tel: (520) 722-1605
Fax: (520) 844-8070

John C. Smith, State Bar No. 023008
Email:  john@smithandsmithpllc.com

*Attorney for Debtor*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| EGAE, LLC, | Case No. 3:23-00169 |
| Debtor. | |

**CHAPTER 11 DEBTOR'S DISCLOSURE STATEMENT FOR PLAN OF
REORGANIZATION DATED JANUARY 4, 2024**

## **Table of Contents**

I.  INTRODUCTION ............................................................................................... 4

    A.  EXECUTIVE SUMMARY .................................................................. 4
    B.  GENERAL INFORMATION ............................................................... 4
    C.  CLASSIFICATION OF CLAIMS AND INTERESTS ............................... 5
    D.  VOTING ....................................................................................... 5
    E.  CONFIRMATION HEARING ............................................................. 6

II.  OVERVIEW OF DEBTOR AND EVENTS PRECIPITATING BANKRUPTCY ......... 6

    A.  DEBTOR'S PROPERTY .................................................................... 6
    B.  DEBTOR'S CORPORATE HISTORY ................................................... 7
    C.  SECURED DEBT ............................................................................ 7
    D.  LITIGATION AND PENDING FORECLOSURE ..................................... 9
    E.  STATUS OF THE PROPERTY ......................................................... 13
    F.  CURRENT MANAGEMENT AND OPERATIONS .................................. 13

III.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 ...................................... 14

    A.  INITIAL FILING .......................................................................... 14
    B.  BANKRUPTCY SCHEDULES .......................................................... 14
    C.  INITIAL STEPS ........................................................................... 14
    D.  2004 EXAMINATIONS .................................................................. 15

IV.  EXISTENCE/NON-EXISTENCE OF AVOIDABLE TRANSFERS ......................... 15

V.  SUMMARY OF THE PLAN .............................................................................. 15

    A.  OVERVIEW ................................................................................. 15
    B.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 15
    C.  UNCLASSIFIED CLAIMS ............................................................... 16
        1.  *Administrative Expenses* ..................................................... 16
    D.  CLASSIFIED CLAIMS ................................................................... 17
        1.  *Priority Claims* .................................................................. 17
        2.  *Secured Claims* ................................................................. 18
        3.  *Unsecured Claims* .............................................................. 19
        4.  *Ownership Interests* ........................................................... 20

VI.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................... 20

    A.  ASSUMPTION OF CONTRACTS AND LEASES. ................................... 20
        1.  *Cure Payments* .................................................................. 21
        2.  *Objections to Assumption or Proposed Cure Payments* .............. 21
        3.  *Resolution of Claims Relating to Assumed Agreements.* .............. 22
    B.  REJECTION OF CONTRACTS AND LEASES ...................................... 22
        1.  *Identification of Rejected Agreements* .................................... 22
        2.  *Rejection Damages - Bar Date for Rejection Damage Claims.* ...... 22

VII. MEANS FOR EXECUTING AND IMPLEMENTING THE PLAN ............................ 23

    A.  MEANS OF FUNDING THE PLAN—NEW EQUITY CONTRIBUTION ....... 23
    B.  CAUSES OF ACTION .................................................................... 23
    C.  MANAGEMENT ........................................................................... 23
    D.  OBJECTIONS TO CLAIMS AND INTERESTS ..................................... 244
    E.  TAX COMPLIANCE ...................................................................... 24

F.    Vesting ..................................................................................... 24

VIII.    DISTRIBUTIONS UNDER THE PLAN ............................... 24

A.    Manner of Cash Payments under the Plan. .......................... 24
B.    No De Minimis Distributions. ................................................ 25
C.    No Distribution With Respect to Disputed Claims. ............. 25
D.    Delivery of Distributions and Undeliverable/Unclaimed Distributions. .......... 25
    1.    Delivery of Distributions in General ............................... 25
    2.    Undeliverable and Unclaimed Distributions ................... 25
E.    Claims Bar Date ..................................................................... 26

IX.    EFFECT OF PLAN ON CLAIMS ...................................... 26

A.    Effect of Confirmation .......................................................... 26
B.    Reorganized Debtor's Authority to Compromise and Settle .............. 27
C.    Right of Setoff ....................................................................... 27

X.    LIQUIDATION ANALYSIS ............................................. 27

XI.    RISK ANALYSIS ............................................................ 28

A.    General .................................................................................... 28
B.    Projections .............................................................................. 28
    1.    Projected Income and Expense .......................................... 28
C.    Post-Consummation Capital Structure of Reorganized Debtor .......... 28
D.    Going Concern Prospects. - Risks Related To Our Business And Industry ..... 28
E.    Risks Related to an Investment in Reorganized Debtor ......... 29

XII.    ALTERNATIVES TO THE PLAN ..................................... 29

XIII.    TAX CONSEQUENCES ................................................... 30

XIV.    CONFIRMATION PROCESS ........................................... 30

**EXHIBITS**

EXHIBIT A        Plan of Reorganization
EXHIBIT B        Liquidation Analysis
EXHIBIT C        Pro Forma Income and Expense Projection

EGAE, LLC hereby submits the following Chapter 11 Debtor's Disclosure Statement for Plan of Reorganization Dated January 5, 2024 (the "**Disclosure Statement**") in connection with the Chapter 11 Debtor's Plan of Reorganization dated January 5, 2024 (the "**Plan**").

## I.    INTRODUCTION

### A.    Executive Summary

Debtor owns and manages a multifamily property in Anchorage, Alaska that leases apartments primarily to Alaska residents and military members.  Debtor engaged Smith & Smith, PLLC as chapter 11 counsel to facilitate a reorganization.  Towards this end, Debtor submits the Plan of Reorganization, a copy of which is attached to this Disclosure Statement as **Exhibit A**.  In brief, the Plan provides for the restructuring of the senior and junior liens and payment of unsecured creditors over time.

### B.    General Information

Debtor hereby submits this Disclosure Statement to holders of Claims against and Interests in Debtor for the purpose of soliciting acceptance of the Plan.

Debtor believes this Disclosure Statement contains the material, important, and necessary information for creditors to arrive at an informed decision in exercising their right to vote for acceptance or rejection of the Plan.

Most words or phrases in this Disclosure Statement have their usual and customary meanings. Certain capitalized terms have the same meaning as defined in the Plan.  If not otherwise defined, certain terms in this Disclosure Statement have the meaning provided in the Bankruptcy Code or Bankruptcy Rules.

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning Debtor, including assets and liabilities, have been prepared from information submitted by Debtor and professionals retained by Debtor.  Debtor's counsel, and other professionals employed by Debtor, have used all relevant, non-privileged information in the possession of Debtor in preparing this Disclosure Statement and Plan.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant.  For that reason, Debtor does not warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy.  To the extent practicable, the information has been prepared from Debtor's financial books and records and effort has been made to ensure that all such information is accurate.

The Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to Section 1125(b). Once approved, the Disclosure Statement will be distributed with the proposed Plan. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of Debtor's Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy. Creditors may vote on the Plan once the Disclosure Statement is approved by the Bankruptcy Court. An approved Disclosure Statement and Ballot will be mailed to holders of claims and interests.

Finally, no representations concerning the Debtor or the Plan are authorized other than as set forth in this Disclosure Statement.

C.      Classification of Claims and Interests

The following table designates the Classes of Claims and Interests in the Debtor and specifies the Classes that are impaired by the Plan and entitled to vote to accept or reject the Plan. A detailed description of the Classes of Claims and Interests is provided in Section VI below.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Tax Claims | Yes | No |
| 2 | Unsecured Priority Non-Tax Claims | Yes | No |
| 3 | Secured Claim MidCap Funding Investment X LLC | Yes | Yes |
| 4 | Secured Claim of Carol Holder | Yes | Yes |
| 5 | Secured Claim of City Scape Capital Group, LLC | Yes | Yes |
| 6 | General Unsecured Claims | Yes | Yes |
| 7 | Ownership Interest in EGAE, LLC | Yes | Yes |

D.      Voting

As a creditor, your vote is important. All holders of Claims are encouraged to vote. All creditors entitled to vote must cast their vote by completing, dating, and signing the ballot mailed to them with the Disclosure Statement once it is approved. The ballot will contain instructions concerning the deadline for submitting the ballot and the address where the ballot should be mailed.

The Court will confirm the Plan if the requirements of Section 1129 are met. The Court must determine whether the Plan has been accepted by each impaired class entitled to vote. Impaired classes entitled to vote are those classes of claims and interests whose legal, equitable or contractual rights are altered, as defined by Section 1124. In determining acceptance, only those votes submitted by a

5

creditor with a claim listed as undisputed, non-contingent, and liquidated, or who has timely filed a proof of claim or proof of interest, will be counted.

Pursuant to Section 1126(c), for a class of claims to accept the Plan, there must be acceptance by holders of: (a) at least two-thirds of the dollar amount of the Allowed Claims of such class that actually vote on the Plan; and (b) more than one-half in number of the Allowed Claims of such class that actually vote on the Plan. An impaired class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds in amount of the allowed interests who vote on the Plan. Failure to vote does not constitute either an acceptance or a rejection of the Plan.

The Plan may be confirmed under Section 1129(b) even if each class of creditors does not accept the Plan, so long as one impaired class of creditors accepts the Plan. Only the votes of creditors or interested parties whose ballots are timely received will be counted in determining acceptance of the Plan. Ballots must be received by counsel for the Chapter 11 Debtor no later than 5:00 p.m., Alaska time, on February 5, 2024, at the following address:

Gerald K. Smith and John C. Smith Law Offices, PLLC
6720 E. Camino Principal, Suite 203
Tucson, AZ 85715

E.     Confirmation Hearing

In accordance with Section 1128 and Bankruptcy Rule 3017(c), a hearing will be held before the Honorable Gary Spraker, United States Bankruptcy Court, 605 W. 4th Ave., #138, Anchorage, Alaska 99501, at a time and date to be set by this Court and noticed out to all interested parties, to consider whether the requirements for confirmation have been met and whether the Plan has received the requisite acceptance, or whether the Plan can be confirmed pursuant to Section 1129(b). At the Confirmation Hearing, Debtor will request confirmation of the Plan, as it may be modified.

## II.     OVERVIEW OF DEBTOR AND EVENTS PRECIPITATING BANKRUPTCY

A.     Debtor's Property

EGAE, LLC owns the McKinley Tower Apartments, a 100- unit mid-rise apartment complex (the "**Property**") built in the 1950s and renovated in approximately 2006. It is located at 337 East 4th Avenue, Anchorage, Alaska 99501. This apartment complex contains an average unit size of approximately 544 square feet. The Property is near downtown Anchorage and offers a selection of floor plans and modern conveniences to its residents.

Aside from the Property, Debtor is the owner of miscellaneous personal property that it uses in the operation of its business and maintenance of the Property.

6

B.    Debtor's Corporate History

EGAE, LLC was formed by filing Articles of Organization on November 22, 2002.    The Marlow Family Exempt Perpetual Trust holds a 100% interest in the Debtor and Mr. Marc Marlow is the manager.

C.    Secured Debt

1)    Carol Holder

In 1999, Marc Malow purchased the Property in the amount of $400,000 from Mr. and Mrs. Duane Holder. The transaction was an owner carry back; however, the Holders never recorded their interest in the property.  Mr. Holder passed away, but Mrs. Holder is paid monthly on the loan in the amount of $250.00.  Originally, Marc Marlow purchased the Property from the Holders in his individual capacity; however, in the early 2000s, he transferred the property to the Debtor, and the Debtor was transferred into the Marlow Family Exempt Perpetual Trust.

2)    City Scape Capital Group, LLC

On or about October 1, 2012, Debtor entered into a promissory note with City Scape Capital Group, LLC, in the principal amount of $223,512 at 8% interest per annum.  The note was secured through a Development Agreement dated July 13, 2006, for City Scape's consultancy in renovating the top ten floors of a 14-story historic 1952 vintage apartment building, containing 100 apartment units, commonly referred to as the McKinley Tower Apartments, located at 337 East 4th Avenue, Anchorage, Alaska 99501.  No payments have been made to City Scape Capital Group and City Scape has a secured claim of $712,000.

3)    MidCap Funding Investment X LLC

On or about March 8, 2005, Debtor entered into a promissory note with CW Capital LLC ("**Original Lender**"), in the principal amount of $8,067,000 (the "**Note**") to facilitate the renovation of the top ten floors of a 14-story historic 1952 vintage apartment building, containing 100 apartment units, commonly referred to as the McKinley Tower Apartments, located at 337 East 4th Avenue, Anchorage, Alaska 99501. The Loan was insured by the U.S. Department of Housing and Urban Development (HUD).

The Note was secured by a Deed of Trust against the Property, duly recorded with the Anchorage Recording District on March 8, 2005, under Recording No. 2005-014347-0 ("**Deed of Trust**"). On the same date, a Partial Release, Modification, and Partial Assumption Agreement ("**Deed of Trust Modification**") was recorded under 2005-014353-0, which modified the legal description

7

for the collateral described in the Deed of Trust by limiting it to Unit A and all Common Elements of the McKinley Tower Apartments.

On March 24, 2008, a Loan Modification Agreement **("Loan Modification")** was recorded under Recording No. 2008-015688-0, which further modified the description of the Property encumbered by the Deed of Trust. As a result of the Deed of Trust, the Deed of Trust Modification, and the Loan Modification, the Property is presently legally described as: Unit A of McKinley Tower, a common interest community, as shown on the Floor Plans filed under Plat No. 2005-26, Records of the Anchorage Recording District, Third Judicial District, State of Alaska, and as described in the Declaration of McKinley Tower, recorded on the 8th day of March, 2005, at Reception No. 2005-014348-0, Anchorage Recording District, Third Judicial District, State of Alaska, and in the First Amendment to the Declaration of McKinley Tower, recorded on the 24th day of March, 2008, at Reception No. 2008-015687-0, Anchorage Recording District, Third Judicial District, State of Alaska.

The Note was also secured by a Security Agreement dated March 8, 2005, pursuant to which Debtor pledged certain property of EGAE, LLC ("**Security Agreement**") as additional collateral for the Note. The aforementioned documents are collectively referred to hereinafter as the "Loan Documents," and the secured loan evidenced and secured thereby is referred to hereinafter as the "Loan."

On or about August 5, 2013, Walker & Dunlop Capital, LLC, a Massachusetts limited liability company (fka CW Capital LLC), assigned the Loan to Walker & Dunlop, LLC, a Delaware limited liability company, including the Note and Deed of Trust.

On or about May 29, 2019, Walker & Dunlop, LLC assigned the Loan to the Secretary of Housing and Urban Development ("HUD"), including the Note and Deed of Trust. An Assignment of Deed of Trust was recorded on May 29, 2019, assigning the Deed of Trust from Walker & Dunlop, LLC to HUD.

MidCap Financial Trust, a Delaware statutory trust ("**MidCap Financial Trust**") purchased the Loan from HUD on December 6, 2022 (the "**Loan Purchase**"). That same day, HUD endorsed the Note, and assigned the Deed of Trust and other Loan Documents to MidCap Financial Trust. The Assignment of Deed of Trust was recorded on December 19, 2022, Recording No. 2022-044249-0.

On or about December 15, 2022, MidCap Financial Trust assigned the Note, the Deed of Trust and other Loan Documents to MidCap Funding Investment X LLC (MidCap, the secured creditor in this case), which was recorded on December 21, 2022, Recording No. 2022-044522-0.

D.     Litigation and Pending Foreclosure

1.     The Debtor's relationship with HUD originated in the early 2000's. At that time, Debtor began the process of applying for a HUD-backed mortgage loan for the Property in or around 2004, during which process it was advised that it would need a "no-action" letter from Alaska's State Historic Preservation Office ("SHPO"), to ensure that the development of the Project would not affect the preservation of historic property.

2.     Unfortunately, however, the SHPO informed the Debtor that historic preservation criteria would require the Debtor to change the redevelopment plan in order to preserve the original look of the project – but that by complying, the Project would earn Historic Tax Credit ("HTC") incentives, pursuant to 16 U.S.C. §§ 470, 470-1, and 470h-2, *inter alia*, which incentives would allow the Debtor to offset these extensive rehabilitation costs.

3.     In reliance upon these statements, the Debtor then altered the design and generated budgets for the Project, in consultation with historic architectural and HTC consultants, and expected to be able to recoup the full amount of its investment in the HTC.

4.      HUD agreed to insure the development loan for the project, pursuant to Section 221d4 of the National Housing Act, 12 U.S.C. § 1701, *et seq*. On March 8, 2005, the Debtor executed a Regulatory Agreement with HUD.

5.     The Regulatory Agreement reflected the agency's agreement to insure the loan that was, at that time, owned by CW Capital, LLC, pursuant to the documents encumbering the Property.

6.     Thereafter, Debtor set to work rehabilitating the property, as required by the National Park Service, and as necessary to accrue HTC in the project.  Ultimately, Debtor expended over Twelve Million Dollars ($12,000,000) rehabilitating the Property, in reasonable reliance on the investment-backed expectations created by NPS' HTC program and other federal statutes, resulting in tax credits worth $2,451,779.

7.     In March 2006, Marc Marlow approached HUD's legal counsel in Anchorage with a draft proposal for a master lease, to affiliate Bank of America ("BofA") as an investor with the Project, for the purposes of BofA's purchasing the HTC at the then- prevailing market rate.

8.     Sean Gallagher, a HUD Production Chief, later testified that although HUD had been contemporaneously undergoing a review to develop policies to deal with this specific issue, HUD's Multifamily Director in Washington, D.C., Joe Lloyd, instructed Mr. Gallagher that the Debtor's master lease proposal could not be accepted by HUD or utilized to sell the HTC to BofA. Mr. Lloyd stated to Mr. Gallagher that until HUD had completed developing a policy, to which any subsequent

proposals could be conformed, all proposals for two-tier master lease proposals were to be rejected outright. Neither Mr. Gallagher nor the Debtor had any recourse with respect to that decision, the reasoning for which amounted to "because the policy hadn't been issued so it couldn't comply, it wouldn't be allowed."

9.      Although HUD had apparently begun this process as of April 2006, and although the HTC program had been a part of federal law for decades already, HUD apparently did not complete its review until late 2009, when it issued Mortgagee Letter 2009-40.

10.     The Debtor did not have the option in 2006 to challenge HUD's denial, because while the HTC could not, as a practical matter, be sold before construction was complete and a cost certification audit performed, the HTC were *required* to be sold before tenants moved into such a project, in order to be eligible for sale.

11.     As a result of HUD's denial, Debtor was forced to convey to BofA an ownership interest in the Project, under a one-tier structure, in order to move forward. This resulted in the HTC being diminished in value in connection with the sale to BofA, to roughly eighty percent (80%) of their former value – it is undisputed that the Debtor was deprived of $459,000 as a result.

12.     Notwithstanding HUD's treatment of the Project, Debtor is aware of only one (1) other instance in which HUD attempted to force a multi-family residential developer to close an HTC transaction under a one-tier structure, and in that instance, HUD ultimately relented. The developer in question there was named Marcel Wisznia, who operated an apartment building in New Orleans, Louisiana. Mr. Wisznia was required to engage in discussions with HUD for well over a year before they permitted him to use the two-tiered structure that the Debtors had sought to utilize.

13.     As HUD ultimately acknowledged, however, "[m]aster leases are used to maximize the benefits" of HTC, among other sources of tax credit equity, and "are advantageous to investors and developers participating in these programs by providing maximum leverage for project financing and premium pricing for equity, while reducing the need for additional debt."

14.     Notwithstanding HUD's devaluation of Debtor's HTC, the impacts upon the Project did not even begin to be precipitated for several years, when a local property tax exemption that the Debtor had negotiated for the Project expired.

15.     Because HUD initially failed to include a property tax reserve as one of the underwriting requirements for the loan, the Debtor was required by the lender who had purchased the note, Walker Dunlop, LLC, to use the 2017 mortgage payments as payments towards the 2017 tax bill from the Municipality of Anchorage.

16.    As a result, and because the devaluation of Debtor's HTC had cost it $459,000 in liquid capital, the use of the mortgage payments toward payment of the tax bill resulted in Debtor defaulting on the mortgage as of August 1, 2018.

17.    Following the default, and pursuant to the lender's request, the loan was assigned to HUD in 2019.

18.    Prior to the time of the Assignment, from 2016-2019, the Debtor frequently proposed various resolutions, including a re-finance of the Mortgage Loan, or other pre-payment of same. Due to Debtor's purported default in the Regulatory Agreement, however, HUD has refused to allow Debtor to satisfy the Mortgage Loan and clear its ownership of the Property.

19.    Since the time of the Assignment, and during related proceedings, HUD has suggested that it intended to foreclose the outstanding Mortgage Loan.

20.    At this time, however, HUD has purported to sell the Mortgage Loan to a third-party purchaser, MidCap Financial, instead of pursuing foreclosure proceedings itself.

21.    Specifically, on August 29, 2022, HUD issued correspondence to the Debtor, as the owner of the Property, indicating that the Mortgage Loan would be sold, along with several others, in an "upcoming loan sale," *i.e.*, an auction of multifamily mortgage loans, but did not specify the date upon which the sale or closing was to take place (the "Loan Sale Letter").

22.    The Loan Sale Letter also stated that "[t]he details of the sale will be published in the Sale Announcement after a loan sale date is determined. You will be able to view the Sale Announcement on the HUD website at Asset Loan Sales Information." Although a Sale Announcement was published in the Federal Register, it does not appear that any information on the loan sale was subsequently published on HUD's website.

23.    Although dated August 29, 2022, no individual or entity acting on behalf of EGAE had notice of the matters set forth in the Loan Sale Letter, until such time as Mr. Marlow opened an envelope and read the Loan Sale Letter on September 22, 2022.

24.    As set forth in the Loan Sale Letter, EGAE, as well as any of its affiliates, were expressly prohibited from participating in the bidding process, and sale of the loan extinguished Debtor's interest in the Regulatory Agreement.

25.    The Loan Sale Letter requested no comment on the part of the Debtor, and further, provided no opportunity to participate in the process of formulating the Loan sale; it only requested that EGAE provide certain documents that HUD claimed were necessary to conduct its due diligence

with respect to the Property, and indicated that the mortgagor may need to provide access to the Property in order to conduct an appraisal.

26.     Subsequently, on October 12, 2022, HUD published notice of its intended loan sale in the Federal Register, Vol. 87, No. 196. This notice contains a great deal of additional information that had not been set forth in the Loan Sale Letter, including the date of the sale, which was announced to be November 16, 2022.

27.     As indicated in the Federal Register notice, the loan sale at issue was denominated MHLS 2023-1, and described the noticed action as a sale of "sixteen (16) unsubsidized mortgage loans…consisting of…one (1) first lien multifamily note secured by a multifamily property located in Alaska."

28.     Were it not for HUD's explicit exclusion of EGAE and any of its affiliates from the bidding process, and for its lack of notice of the matters published on the Federal Register, the Debtor would have proceeded to timely submit a bid to participate in the sale of the Mortgage Loan, as the Federal Register notice indicates was required. *See id*.

29.     Pursuant to that exclusion, however, the requisite terms of "Bidder Eligibility" for participation in the loan sale contained various criteria which explicitly prohibited any such individuals or entities from bidding. Moreover, Debtor did not receive timely notice of the matters contained in the Federal Register notice.

30.     As set forth in the Federal Register notice, subsequent to the "competitive, sealed bid process" scheduled for November 16, "HUD anticipates that an award or awards will be made on or before November 21, 2022." Moreover, "[c]losing is expected to take place **on a specified date** between November 29 and December 7, 2022." To the Debtor's knowledge, however, no subsequent notice was given before the sale and transfer of the Mortgage Loan were closed.

31.     Instead, on December 6, 2022, Respondent MidCap Trust sent to Debtor, via electronic mail and overnight mail, a notice indicating that "[t]his is to inform you that effective December 6, 2022, the referenced mortgage loan has been sold, transferred and assigned" by HUD to MidCap Trust, and that all future payments should be made to MidCap Trust, through its servicer, MidCap Financial Services, LLC.

32.     The Debtor, through undersigned counsel, sent correspondence to HUD's counsel on December 13, 2022, requesting that HUD and MidCap Trust agree to set aside the sale of the Mortgage Loan, for the reasons set forth herein, and making HUD aware of certain of the defects in its announced sale of the Mortgage Loan.  HUD has never provided a response to that correspondence, and Debtor

has been unable to reach an amicable resolution of the loan balance with MidCap Trust and/or MidCap Funding.

33. The Debtor has received from MidCap Trust's counsel a document believed to reflect the assignment of the Mortgage Loan from HUD to MidCap Trust, dated December 6, 2022.

34. Debtor has also been advised that as of December 21, 2022, the Mortgage Loan at issue was assigned from MidCap Trust to MidCap Funding and has received from MidCap Funding's counsel a document believed to be an Assignment of Deed of Trust dated December 21, 2022.

35. HUD's sale of the Mortgage Loan to MidCap Trust as a third party purchaser, and the latter's apparent assignment to MidCap Funding thereafter, would ultimately result in an incalculable loss of *at least* $9 million to the Debtor, when the Mortgage Loan is inevitably foreclosed by the holder of the Mortgage Loan – setting aside the injuries to the Debtor's interests in real property and to its constitutional rights that have already occurred.

36. The Debtor eventually sued to set aside the sale. Unfortunately, on September 23, 2023, Judgment was issued against the Debtor and a pending foreclosure was set for October 6, 2023. Currently, the Debtor is appealing the final judgment to the Ninth Circuit Court of Appeals.[1]

37. Pursuant to Bankruptcy Rule 2004, the Debtor requested certain information, communications, and files from MidCap. It appears from those disclosures that MidCap purchased the Promissory Note from HUD for approximately $2.8 million dollars.

38. As of December 2023, MidCap alleges they are owed over $10.7 million dollars, an absolute windfall for MidCap.

39. The Debtor intends to object to MidCap's claim and argue at a minimum that MidCap's claim be offset by no less than $1,425,954. This is based on HUD's denial to allow the Debtor to utilize the master lease proposal or sell the HTC to Bank of America, as discussed at length above. *See* paragraphs 1-35.

E. Status of the Property

The property is currently nearly 100% leased and continues to improve under the management of Mr. Marlow.

F. Current Management and Operations

As referenced above, the Property is managed by Marc Marlow.

---

[1] *EGAE, LLC v. MARCIA FUDGE, in her official capacity as Secretary of the United States Department of Housing & Urban Development, et al.,* Case No. 23-24389.

13

**III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11**

A.    Initial Filing

Faced with MidCap's pending foreclosure set for October 6, 2023, Debtor filed its bankruptcy petition.  The voluntary Chapter 11 petition was filed on October 5, 2023.

B.    Bankruptcy Schedules

EGAE filed schedules of assets and liabilities and a statement of financial affairs.  These are available upon request or at the bankruptcy court. And on November 20, 2023, EGAE amended its schedules and master mailing list.

In summary, the schedules reflect the Property and its associated assets – tenant receivables, the buildings, furniture, fixtures and equipment.  The Debtor will retain an appraiser to provide an expert appraisal report concerning the value of the Property and will supplement this Disclosure Statement with an appraisal prior to the hearing. The Property is valued at $9.5 million in Debtor's Schedules.  The Schedules also reflect the liabilities and ownership interests discussed below.

C.    Initial Steps

EGAE sought and was granted permission to retain Smith & Smith PLLC as bankruptcy counsel.

On November 9, 2023, Debtor attended the Section 341 Meeting of the Creditors and was examined by the U.S. Trustee.

In general, Debtor and MidCap agreed that the existing manager would manage the Property, use cash collateral pursuant to a budget, and periodically account to the parties, the United States Trustee, and the Court. To that end, beginning on October 17, 2023, Debtor and EGAE have entered into interim stipulations permitting Debtor to use MidCap's cash collateral under a budget approved by Midcap.  A continued hearing on the interim use of cash collateral is currently set for January 24, 2024.

On October 25, 2023, Debtor filed an Application to Employ Dennis Winans to (1) analyze and review Debtor's financials, schedules, statement of financial affairs, disclosure statement, and plan of reorganization; (2) prepare an expert report related to feasibility, plan confirmation and related issues; and (3) provide expert testimony.  The application was approved on November 2, 2023.

On November 20, 2023, Debtor filed an Application to Employ Jennifer Platnico of Accounting Independence, LLC, to provide bookkeeping services, tax preparation, and accounting assistance to the Debtor in the general course of Debtor's business.  The application was approved on November 27, 2023.

14

On December 28, 2023, Debtor filed an Application to Employ Brian Riekkola of North Star Law Group to provide legal services in the general course of Debtor's business on an as-needed basis to represent the Debtor in eviction proceedings.  The application is pending.

D.    2004 Examinations

Debtor conducted Rule 2004 Examinations of MidCap.  Currently, MidCap's disclosures of over 13,000 pages of documents was neither organized nor responsive to Debtor's requests.  Counsel is currently trying to work through these improper disclosures with counsel for MidCap.

## IV.    EXISTENCE/NON-EXISTENCE OF AVOIDABLE TRANSFERS

Bankruptcy law provides that certain preferential payments, or payments made without fair consideration in the 90 days before the bankruptcy filing (or within one year to related parties), can be recovered from the payee by the estate to be used to proportionately pay all creditors. Debtor does not believe that there are transfers avoidable under federal or state law such as preference payments or fraudulent transfers.

Debtor has and will examine, analyze, and where appropriate, seek recovery of avoidable transfers.  Debtor also retains its rights to avoid payments or distributions to any other recipients made within the preference period.  Debtor also retains the right to avoid any liens that a creditor may have attempted to perfect in the 90 days before the bankruptcy or after the bankruptcy filing.

## V.    SUMMARY OF THE PLAN

THE FOLLOWING IS ONLY A SUMMARY OF THE PLAN OF REORGANIZATION.  IN THE EVENT OF ANY INCONSISTENCY, THE EXPRESS TERMS OF THE PLAN SHALL GOVERN.

A.    Overview

The goal of the Plan is to pay creditors to the fullest extent possible through the revenues generated by Debtor over time.  The Plan will be funded by a new value contribution from the current equity owner of the Debtor, the Marlow Family Exempt Perpetual Trust, via funds advanced to EGAE. The Plan further proposes that MidCap's secured claim and other secured claims will be restructured according to the terms described below.  Unsecured creditors will be paid in a fair and equitable manner, receiving payments over the life of the Plan.

B.    Classification and Treatment of Claims and Interests

All claims and interests, except administrative expense and priority tax claims, are placed into classes as set forth below.  A claim or interest is placed in a particular class, only to the extent that the claim or interest falls within the description of that class and is classified in all other classes to the extent that any portion of the claim or interest falls within the description of such other class.

A claim or interest is placed into a particular class for all purposes, including voting on this Plan, confirmation, and receiving distributions pursuant to this Plan, only to the extent that such claim or interest is an Allowed Claim in that class, and such claim has not been paid, released, or otherwise settled prior to the Effective Date.  The establishment of particular Classes or categories of Unclassified Priority Claims does not mean or imply that there are any Allowed Claims that fall into each such Class or category, and the Reorganized Debtor, as the successor to Debtor, may later contend there are no such Allowed Claims in any given Class or category.

Although the following is not a substitute for a careful reading of the Plan, it is a general discussion of the treatment of Allowed Claims and Interests under the Plan.  Through the Plan, Debtor intends to allow for payments to allowed prepetition claims based on the revenues earned from Debtor in the post-petition operation of its business.

C.    Unclassified Claims

Pursuant to Section 1123(a)(1), Administrative Expenses pursuant to Section 507(a)(2) and Priority Tax Claims pursuant to Section 507(a)(8) are not classified under the Plan.  These Claims are not considered impaired, and holders of such Claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.

1.    Administrative Expenses

Administrative Expenses are costs or expenses of administering the Chapter 11 case that are allowed under Section 507(a)(2).  The holders of Administrative Expenses shall receive cash on account and in the amount of such Administrative Expenses.  At the option of Debtor, payment of Administrative Expenses shall be made in cash: (a) on the Effective Date; or (b) when due in accordance with the terms of any agreement between Debtor and the holder of the administrative claim.  Any sums due more than 10 days without payment will accrue interest at a rate of 5% until paid in full. Professionals employed at the expense of the Estate and entities who may be entitled to reimbursement or the allowance of fees and expenses from the Estate pursuant to Section 503(b)(2)-(6) shall receive cash in the amount awarded to such professionals and entities at such times and only in accordance with a Final Order entered pursuant to Sections 330 or 503(b)(2)-(6).

Any application for payment of an Administrative Expense shall be filed within 45 days of the Effective Date (the "**Administrative Expenses Bar Date**") or shall be forever barred.

The anticipated Administrative Expenses on the Effective Date include Debtor's counsel's outstanding fees in the approximate amount of $60,000.00 and costs in the approximate amount $1,500.00, the allowed fees and costs of Debtor's financial expert witness, Mr. Dennis Winans,

16

Debtor's accountant, Jennifer Platnico, an appraiser for the Debtor, and Debtor's eviction counsel, North Star Law Group. The anticipated Administrative Expenses are an estimate, and Debtor reserves all rights to submit additional Administrative Expenses to the Court for approval for, among other reasons, work that will be done between the filing of the Plan and Disclosure Statement and the Confirmation Hearing.  Post-confirmation, the Reorganized Debtor's counsel will continue to incur fees, and it is anticipated an accountant will be employed and will incur fees related to tax accounting.

Notwithstanding any provision in the Plan to the contrary, all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.

D. Classified Claims

1. Priority Claims

a. Class 1 – Priority Tax Claims

According to Debtor's Schedule E, no sums are owed to governmental entities for past due taxes.

All valid, enforceable liens securing repayment of the Class 1 Claims shall be retained notwithstanding confirmation of the Plan or occurrence of the Effective Date.  Such Allowed Claims shall be paid in full, in cash, plus interest at the statutory rate from the Petition Date, over three years, with the last payment due on the third anniversary of the Petition Date.  Payments shall be in quarterly installments, beginning on the Distribution Date.  Subsequent payments shall be made on the 20th day of the month every 90 days thereafter, until maturity.  Post-petition taxes will be paid when due in the ordinary course of business, without the necessity of filing a proof of claim.

Class 1 is impaired.

b. Class 2 – Unsecured Priority Non-Tax Claims

This Class shall consist of Allowed Claims entitled to priority under Section 507(a), other than Priority Tax Claims.  Pursuant to Debtor's Schedule E, there are no claims entitled to priority under Section 507(a)(4).

Certain creditors are entitled to Section 503(b)(9) administrative priority, which are the Allowed Claims of creditors who delivered goods in the ordinary course of business and received by Debtor within 20 days before the petition date and which are otherwise legally entitled to such status. All allowed claims entitled to administrative priority pursuant to this section of the Bankruptcy Code will be paid in full on the later of the Effective Date or on the allowance of the claim.

Class 2 is impaired.

17

2. Secured Claims

    a. Class 3 – MidCap Secured Claim

The Claim of MidCap secured by the Property shall remain secured after the Effective Date by the same property and in the same priority as was the case on the Petition Date.

As alleged by MidCap, its Claim exceeds the value of the collateral, including the Property and associated personalty. Debtor believes the value of the Property is approximately $8.8 million.

The Allowed Class 3 Claim shall be impaired under Section 1124(a). The holder of a Class 3 Claim shall retain its liens against the Property and will be treated as follows:

Valuation

The Court shall determine pursuant to Section 506(a) the value of the lien held by MidCap on Debtor's interest in its property. The amount so determined shall be the Allowed Secured Claim.

No Section 1111(b) Election

If MidCap does not make the election under § 1111(b) to have the Class 3 Claim treated as fully secured, then Debtor shall pay the Allowed Secured Claim in full as follows:

(A) The Allowed Secured Claim shall bear interest from the Effective Date of the Plan at an amount determined by the Court to satisfy Section 1129(b)(2)(A)(i)(II). Debtor proposes a rate of 6.5%.

(B) On the Effective Date until the earlier of (1) the maturity date of the Loan, which will be the twenty-fourth anniversary of the Effective Date (the "Maturity Date"), or (2) the sale or refinance of the Property, Debtor shall make interest only payments in Year 1 and monthly principal and interest payments with principal based on a 35-year amortization for the remaining years of the Plan

(C) All unpaid principal and interest shall be payable upon the Maturity Date or any earlier sale or refinance.

Section 1111(b) Election

In the event that MidCap elects to be "fully secured" by asserting an election to be treated under Section 1111(b), then MidCap's claim shall be treated in the following manner: (i) MidCap shall forego and waive any unsecured deficiency claim and shall have no Class 6 Claim; (ii) under the Section 1111(b) election, Maturity Date for Class 3 shall be extended to occur not later than the 15th anniversary of the Effective Date, at the end of which time the entire unpaid amount of the Class 3 claim must be fully satisfied; and (iii) the Allowed Class 3 Claim shall be deemed satisfied in full when the gross amount of distributions made to MidCap under the Plan (whether principal or interest) equals the Allowed Class 3 Claim. The Debtor retains the right to prepay the loan.

Class 3 is impaired.

        b.     Class 4 – Secured Claim of Carol Holder

This class consists of the prepetition unperfected secured claim of Ms. Carol Holder via a promissory note for the purchase of the property located at 337 East 4th Avenue, Anchorage, Alaska 99501. The note is in the amount of $400,000, bears interest at 0% and is payable in monthly installments of $250.00 until paid in full.

The Class 4 secured claim shall be perfected post-confirmation and shall retain its prepetition security.  The Class 4 claim will be paid by the Reorganized Debtor in full, re-amortized on the Effective Date, in monthly installments of $1,223.00, with interest imputed at 2.0% until paid in full.

Class 4 is impaired.

        c.     Class 5 – Secured Claim of City Scape Capital Group, LLC

This class consists of the prepetition secured claim of City Scape Capital Group, LLC via a promissory note for the renovation of the property located at 337 East 4th Avenue, Anchorage, Alaska 99501.  The original note was in the amount of $223,512, bears interest at 8% and was to be paid in full on the earlier of October 1, 2013, or when Debtor transferred the property. No payments on the note have been made, and City Scape Capital Group, LLC has a secured claim in the amount of $712,000.

The Class 5 secured claim shall be perfected post confirmation and shall retain its prepetition security.  The Class 5 claim will be paid by the Reorganized Debtor in full, re-amortized on the Effective Date, in monthly installments of $4,302.00, with interest at 6.5% until paid in full.

Class 5 is impaired.

        3.     Unsecured Claims.

        a.     Class 6 - General Unsecured Claims

This Class shall consist of Allowed Claims without statutory priority or security.  This Class is estimated at $927,000, excluding disputed claims and excluding a deficiency from Classes 3, 4 and 5, based on Debtor's Schedule F.

If MidCap does not make the election under § 1111(b) to have its Class 3 Claim treated as fully secured, Class 6 shall receive the following payments commencing on the Distribution Date and continuing annually until the fifth anniversary of the Effective Date: $35,000 in Year 1; $40,000 in Years 2-4; and $45,000 in Year 5. In the event MidCap elects to be "fully secured" by asserting an election to be treated under Section 1111(b), Class 6 shall receive payments in five equal annual installments of $20,000. Payments shall commence on the Distribution Date and continue annually

19

until the fifth anniversary of the Effective Date. All remaining amounts of Class 6 Claims shall be discharged. Payments will be made from Debtor's post-confirmation cash flow and equity contributions.

Class 6 is impaired.

4.    Ownership Interests

a.    Class 7 – Ownership Interest in EGAE, LLC

EGAE, LLC's prepetition equity holder will continue its ownership of the Debtor post-confirmation and shall contribute the sums necessary for occurrence of the Effective Date of the Plan.

Class 7 is impaired.

## VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumption of Contracts and Leases

Reorganized Debtor shall assume as of the Effective Date each Executory Contract and Unexpired Lease (i) on EGAE's rent roll on the Effective Date or for future rentals, or (ii) listed by Debtor in its Schedule G, but not any executory contract or unexpired lease listed on the Schedule of Rejected Contracts filed by Debtor within 10 days of the hearing on the proposed Disclosure Statement as that Schedule may be amended from time to time.

Entry of the Confirmation Order shall constitute approval of the rejections and assumptions contemplated hereby pursuant Sections 365 and 1123 as of the Effective Date, without prejudice to Debtor's right to modify this portion of the Plan by amending the Schedule of Assumed Contracts and Schedule of Rejected Contracts and Leases prior to the Distribution Date in accordance with Section 1127(b).

Each executory contract or unexpired lease that is to be assumed and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts and unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interest in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to any order of the Court that may be entered prior to the Effective Date, including the Confirmation Order.

1.      Cure Payments.

Reorganized Debtor shall honor, without change, its contractual and other obligations to tenants of the Property. As to all other Executory Contracts and Unexpired Leases, to the extent arrearages remain unpaid, Section 365(b)(1)(A) or (B) requires payment of those sums to such parties in order to cure defaults under the executory contracts and unexpired leases to be assumed under the Plan ("**Cure Payments**").  If any non-debtor party to an executory contract or lease contends that defaults exist and must be cured under such party's executory contract or lease, then that party must comply with the Plan.  As required by Section 365(b)(1), any and all monetary defaults under each executory contract and unexpired lease to be assumed under the Plan will be satisfied on the Distribution Date, unless subject to a pending dispute on that date.

If a dispute arises regarding (a) the amount of any proposed Cure Payments; (b) whether Reorganized Debtor provided adequate assurance of future performance under an executory contract or unexpired lease to be assumed, to the extent required under the Bankruptcy Code; or (c) any other matter pertaining to a proposed assumption, then any required Cure Payments will be made by the later of the Distribution Date or 14 days after entry of a Final Order resolving the dispute and approving the assumption.  If there is either a dispute as to the Cure Amount, or the non-debtor party otherwise objects to assumption, then Reorganized Debtor shall have the right to abandon the assumption of such contract or agreement listed on the Schedule of Assumed Agreements, and to treat such contract or agreement as rejected under the Plan at any time during the pendency of such dispute or upon resolution of such dispute.

2.      Objections to Assumption or Proposed Cure Payments.

Any entity that is a party to an executory contract or unexpired lease that will be assumed under the Plan, and either contends that the proposed Cure Payment described above is incorrect or otherwise objects to the contemplated assumption, must file with the Court a written statement and supporting declaration of facts stating the basis for its objection.  This statement and declaration must be filed and served by the later of (a) ten days before the Confirmation Hearing, or (b) five Business Days after Debtor files and serves any Plan modification with respect to an executory contract or unexpired lease to be assumed.  Any entity that fails to timely file and serve such statement and declaration will be deemed to waive and release any and all objections to the proposed assumption and the proposed Cure Payments.

3. Resolution of Claims Relating to Assumed Agreements.

Payment of any Cure Payments required by Court Order with respect to executory contracts or unexpired leases that are assumed under the Plan shall be deemed to satisfy, in full, any prepetition arrearage or other damage claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the Cure Payment is less than the amount set forth in such proof of Claim or the Schedules.  Upon the tendering of the Cure Payment, such Claim shall be Disallowed without further order of the Court or action by any party.

B. Rejection of Contracts and Leases.

1. Identification of Rejected Agreements

As of the Effective Date, Debtor shall reject any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and any not identified on the Schedule of Assumed Agreements filed by Debtor within 10 days of the hearing on the Disclosure Statement, as that Schedule may be amended from time to time, to the extent that these agreements constitute executory contracts or unexpired leases under Section 365, as well as any contracts or leases previously rejected pursuant to a Court order.

Debtor reserves the right to amend the Plan at any time before the Effective Date to (a) provide for assumption and assignment of any executory contract or unexpired lease under the Plan, or (b) delete any executory contract or unexpired lease from the Schedule of Assumed Agreements and thus provide for its rejection under the Plan, pursuant to Section 1127(b), provided, however, that any such amendments may be made only before substantial consummation of the Plan, and provided further that any such amendments shall meet the requirements of Sections 1122 and 1123 of the Bankruptcy Code.  Debtor shall provide notice of any modification to the Plan to the party or parties to the executory contracts or unexpired leases affected by the amendment.

The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of any and all executory contracts and unexpired leases not assumed under the Plan.

2. Rejection Damages – Bar Date for Rejection Damage Claims.

Any Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be filed and served upon Reorganized Debtor by the Rejection Claims Bar Date. Any such Claims that are not timely filed and served will be entitled to distribution from Reorganized Debtor only after full payment of all timely filed Class 1 through 6 allowed claims.

All timely filed Claims for rejection damages shall be classified as unsecured claims and treated in accordance with the Plan.

## VII.    MEANS FOR EXECUTING AND IMPLEMENTING THE PLAN

### A.    Means of Funding the Plan – New Equity Contribution

On the Effective Date, the Marlow Family Exempt Perpetual Trust shall contribute $200,000 to the Reorganized Debtor in order to retain the equity of the Reorganized Debtor.  Debtor believes that this is a new substantial infusion of money that is necessary for a successful reorganization and is at least equivalent to the interest received on account of such contribution. In addition, the Debtor's management company, Kenco Building Services, LLC, will have a variable payment plan with a management fee based on 5% of total revenues paid after payment of claims to creditors which will allow for an effective guarantee in the event the Debtor has any operating losses during the course of the Plan of Reorganization.  Stated more succinctly, and as demonstrated by the cash flow projections, management will support cash flow by reducing its management fee and by contributions as required in order to ensure feasibility.

In addition, the Debtor voluntarily waives its exclusivity to file a Plan of Reorganization under 11 U.S.C.§ 1121(b) to allow an opportunity to any party in interest to compete in the marketplace by proposing an alternative plan of reorganization and thus allow for the market's scrutiny of the Debtor's proposed Plan of Reorganization and test the valuation of Equity's contribution to the Plan of Reorganization.

### B.    Causes of Action

Pursuant to Section 1123(b)(3), the Reorganized Debtor shall retain all of Debtor's Causes of Action, including any avoidance causes of action relating to or in connection with payments made or transfers to insiders or affiliates of Debtor and violations of the automatic stay.

### C.    Management

From and after the Effective Date, Reorganized Debtor shall continue to be managed by Marc Marlow, which management may subsequently be modified to the extent provided by Reorganized Debtor's articles of organization, by-laws, and operating agreement (as amended, supplemented, or modified). On and after the Effective Date, the appropriate managers or members of Reorganized Debtor are authorized to issue, execute, deliver, and consummate the transactions contemplated by or described in the Plan in the name of and on behalf of Reorganized Debtor without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule, or any requirements of further action, vote, or other approval or authorization by any Person.

D.     Objections to Claims and Interests

At any time before the expiration of 60 days after the Effective Date, the Reorganized Debtor or any other party in interest may object to any Claim that was not scheduled, or was scheduled as disputed, contingent, or unliquidated, that has not been allowed by a Final Order of the Bankruptcy Court.   Any Claim that was not scheduled and for which no Proof of Claim was filed will be disallowed.

Except with regard to Administrative Expenses, objections to Claims and Interests shall be filed and served upon the holder of such Claim or Interest no later than the Claims Objection Bar Date.

There shall be no distribution to the holder of a Disputed Claim until the Objection to the Claim has been resolved by a Final Order of the Bankruptcy Court and the Claim has become an Allowed Claim.   Payments and distributions on account of each Disputed Claim that is Allowed shall be made in accordance with the provisions of the Plan relating to the class of creditors to which the holder belongs.

E.     Tax Compliance

Debtor shall comply with all tax withholding and reporting requirements, including with regard to all distributions and receipts pursuant to this Plan, as applicable.   All holders of Allowed Claims and Interests shall have sole responsibility for any tax obligation imposed by any governmental unit pursuant to a distribution received under the Plan.

F.     Vesting

Except as provided for in the Plan or Confirmation Order, on the Effective Date, Debtor shall be vested with the remaining property or assets from the Estate, free and clear of all claims, liens, charges, and other interests of creditors arising prior to the filing date, except as provided by the Plan, to be liquidated in the ordinary course of business.

**VIII.   DISTRIBUTIONS UNDER THE PLAN**

A.     Manner of Cash Payments Under the Plan

With respect to distributions, cash payments to domestic entities holding Allowed Claims will be tendered in U.S. Dollars and will be made by checks drawn on a domestic bank, or at Reorganized Debtor's option, by wire transfer from a domestic bank.   Payments made to foreign creditors holding Allowed Claims may be paid in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

B.     No De Minimis Distributions

Notwithstanding anything to the contrary in the Plan, no cash payment of less than $5.00 will be made to any entity holding an Allowed Claim for less than such amount. No consideration will be provided in lieu of the de minimis distributions that are not made under this Section.

C.     No Distribution with Respect to Disputed Claims

Notwithstanding any other provisions of the Plan governing distributions, no payments of cash or distributions of other property or other consideration of any kind shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim.  The presence of a Disputed Claim in any Class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes, so long as a reserve is created for the Disputed Claim.  Any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution within 10 Business Days after the date that such Claim becomes an Allowed Claim.  Unless otherwise specifically provided for in the Plan or as otherwise required by Code § 506(b), interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

D.     Delivery of Distributions and Undeliverable/Unclaimed Distributions

1.     Delivery of Distributions in General

Reorganized Debtor shall serve as the Disbursing Agent for all payments due on the Effective Date and shall make distributions to each holder of an Allowed Claim by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to Reorganized Debtor after the date of any related proof of Claim; and (c) at the address reflected in the Schedules if no Proof of Claim is filed and Reorganized Debtor has not received a written notice of a change of address.

2.     Undeliverable and Unclaimed Distributions

If the distribution to the holder of any Allowed Claim is returned to Reorganized Debtor as undeliverable, no further distribution shall be made to such holder unless and until Reorganized Debtor is notified in writing of such holder's then current address.  Undeliverable distributions shall remain in the possession of Reorganized Debtor until such time as a distribution becomes deliverable, or the obligation to deliver is terminated pursuant to this section of the Plan.  Reorganized Debtor shall hold undeliverable cash distributions in an unsegregated, interest-bearing bank account for the benefit of

the entities entitled to the distributions. These entities will be entitled to any interest actually earned on account of the undeliverable distributions if and when distributions are subsequently made pursuant to this section of the Plan.

Any holder of an Allowed Claim which does not notify Reorganized Debtor in writing of its asserted entitlement to an undeliverable distribution within one year after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against Reorganized Debtor or its property.

Any undeliverable distributions that are not claimed under this section shall be used by Reorganized Debtor to satisfy any remaining obligations under the Plan, and if all such obligations are fully satisfied, shall be retained by Reorganized Debtor free from any restrictions thereon. Nothing contained in the Plan shall require Reorganized Debtor to attempt to locate any holder of an Allowed Claim.

E.    Claims Bar Date

Any Claim filed after (i) the Bar Date for Claims and Interests (and any amendment to such timely-filed Claim or Interest filed no later than the Effective Date), (ii) with respect to Claims for rejection damages, the Rejection Claims Bar Date, or (iii) with respect to Claims that are Administrative Expenses, the Administrative Expenses Bar Date, shall not be recognized, or recorded on the claims register, by Reorganized Debtor and shall be disallowed automatically without the need for any objection from Reorganized Debtor or unless such untimely filing is expressly authorized by an order of the Bankruptcy Court. Nothing herein shall in any way alter, impair, or abridge the legal effect of the order approving the Bar Date for Claims and Interests, and Reorganized Debtor's, and other parties in interests' rights to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

## IX.    EFFECT OF PLAN ON CLAIMS

A.    Effect of Confirmation

Except for continuing liens, claims, rights, and interests of the secured creditors against Debtor, the Estate, and the Property as provided for in the Plan, or in the confirmation order, the confirmation of the Plan is a discharge, on the Effective Date, of any and all debts of Debtor that arose at any time prior to confirmation, including, but not limited to, all principal and all interest accrued thereon, pursuant to Section 1141 of the Bankruptcy Code. Such discharge shall be effective as to each claim,

regardless of whether a proof of claim thereof was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan.

Holders of claims against Debtor may not receive any payment or distribution except as otherwise provided for in the Plan and may not seek any recourse against Debtor or its assets except as provided for in the Plan. After the Confirmation Date, all holders of claims shall be forever enjoined from taking any action against Debtor or its property on account of such claim, including the commencement or continuation of any proceeding, enforcing any judgment or award, creating, perfecting, or enforcing any lien, or any other action inconsistent with the terms of the Plan.

The Reorganized Debtor shall move the Court to close the case once the Plan has been substantially consummated. Until substantial consummation, the Reorganized Debtor shall be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee. Alternatively, the Court may enter a final decree closing the case on its own motion.

B.     Reorganized Debtor's Authority to Compromise and Settle

Pursuant to Bankruptcy Rule 9019(a), Reorganized Debtor may compromise or settle any Claim or Interest, or any cause of action against Debtor or brought by Debtor upon notice and a hearing.

C.     Right of Setoff

Debtor may set off against any payment or distribution made pursuant to an Allowed Claim, a claim of any kind that it may have against the holder of such an Allowed Claim, but Debtor will not be required to do so. The failure to utilize the right of setoff does not constitute a waiver or release of any claim Debtor has against the holder of an Allowed Claim.

## X.     LIQUIDATION ANALYSIS

Pursuant to Section 1129(a)(7), the Plan must provide that creditors not accepting the Plan will receive at least as much under the Plan as they would receive in a liquidation of Debtor under Chapter 7 of the Bankruptcy Code. Attached as **Exhibit B** is a liquidation analysis prepared by Debtor that reflects the estimated recoveries of creditors under a Chapter 7 liquidation. The liquidation analysis shows that in a liquidation, unsecured creditors would receive no payment and only MidCap and administrative claimants would receive payment.

## XI.    RISK ANALYSIS

A.    General

Every holder of a Claim against or Interest in Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

B.    Projections

1.    Projected Income and Expense

Pro forma income and expense projections of Reorganized Debtor for Years 1 through 5 following Plan Confirmation is attached as **Exhibit C**.

C.    Post-Consummation Capital Structure of Reorganized Debtor

The capital structure of Reorganized Debtor is expected to be as follows upon the full capitalization of the entity: EGAE, LLC will be owned by its sole member, the Marlow Family Exempt Perpetual Trust, which will have contributed not less than $200,000 on the Effective Date of the Plan.

D.    Going Concern Prospects – Risks Related to Our Business and Industry

Risks to the ability of continued operations include, but are not limited to, the following:

The Reorganized Debtor anticipates maintaining and improving its occupancy and rental rates, while reducing expenses. The ability to do so is dependent upon the market, management, and the military's continued presence at Joint Base Elmendorf-Richardson and the City of Anchorage.  In addition, the Municipality of Anchorage has a substantial housing shortage, which bodes well for the continuous improvement of the Debtor.

The Reorganized Debtor may not be able to secure additional financing on favorable terms, or at all, to meet future capital needs, including refinancing of the Secured Claim of MidCap. In the future, the Reorganized Debtor may require additional capital to respond to business opportunities, challenges, or unforeseen circumstances and may determine to engage in equity or debt financings or enter into credit facilities for other reasons. The Reorganized Debtor may not be able to timely secure additional debt or equity financing on favorable terms, or at all. If the Reorganized Debtor raises additional funds through the issuance of equity or convertible debt or other equity-linked securities, existing ownership could suffer significant dilution. Any debt financing obtained in the future could involve restrictive covenants relating to capital raising activities and other financial and operational matters, which may make it more difficult to obtain additional capital and to pursue business opportunities. If the Reorganized Debtor is unable to obtain adequate financing or financing on

28

satisfactory terms, when required, the Reorganized Debtor's ability to satisfy debt and maintain occupancy could be negatively affected.

E.   Risks Related to an Investment in Reorganized Debtor

An investment in Reorganized Debtor should be considered a speculative investment, and there is no guarantee of a return of all or any part of an amount invested or earnings thereon.

FUTURE PROFITS FOR REORGANIZED DEBTOR, IF ANY, ARE IMPOSSIBLE TO PREDICT WITH COMPLETE ACCURACY, AND NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE BY REORGANIZED DEBTOR RESPECTING REORGANIZED DEBTOR'S FUTURE PROFIT POTENTIAL.

The issuance of additional shares of membership interests or securities convertible into membership interests could dilute the proportionate ownership and voting power of then-current owners and may result in the dilution of the book value of the Reorganized Debtor's ownership interest.

In the future, Reorganized Debtor may sell additional membership interests to fund the operation and expansion of its business and may grant additional options and warrants. There can be no assurance that the purchase price for future sales of ownership rights or that the exercise price granted in connection with current and future options or warrants will equal or exceed the purchase price of the membership interests. Such future sales will dilute the ownership percentage and voting power of investors acquiring ownership in Reorganized Debtor and the sale of membership interests or exercise of any options or warrants will result in immediate dilution of the book value of the interests issued.

The exercise of any options or warrants will result in immediate dilution of the book value of Reorganized Debtor's ownership interest if the fair market value of the membership interests is greater than the exercise price of the options or warrants. Issuance of additional membership interests may reduce the proportionate ownership and voting power of then existing owners.

XII.   **ALTERNATIVES TO THE PLAN**

If the Plan is not confirmed, several different events could occur:  (1) Debtor or a third party could propose another plan providing for different treatment of Creditors; (2) the Court (after appropriate notice and hearing) could dismiss the Case or convert the Case to chapter 7 liquidation if an alternative plan is not confirmed in a reasonable period of time; (3) the Court could grant MidCap relief from the automatic stay to foreclose its liens on the Property; and/or (4) the Court could approve a sale of all or some of Debtor's remaining assets to a bidder under Bankruptcy Code § 363.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XIII.   TAX CONSEQUENCES

Pursuant to Section 1125(a)(1), the Disclosure Statement is to provide a discussion of the possible material tax consequences of the Plan to Debtor, any successor to Debtor and a hypothetical investor typical of the holders of claims or interests in the case, such that would enable such investor to make an informed judgment about the Plan.  Debtor has not obtained a tax opinion and does not express any opinion as to the tax consequences to the creditors or equity security holders.  Interested parties are encouraged to obtain their own professional counsel to determine the tax consequences of the Plan.  In particular, to the extent any creditor is not paid in full on its Allowed Claim, such creditor should consult with a tax advisor concerning the potential for any write-off of such claim.  It is generally anticipated that any discharge of debt will not have to be recognized as income for Debtor for income tax purposes.

**Because Debtor does not express any tax advice, in no event will Debtor, its counsel, or the professional advisors of Debtor be liable for any tax consequences of the Plan.  Creditors and Equity Interest Holders must look solely to and rely solely upon their own advisors as to the tax consequences of the Plan.**

## XIV.   CONFIRMATION PROCESS

The Plan may be corrected or modified, prior or subsequent to Confirmation, or prior to consummation, after notice to interested parties and by Court order as provided by law.  Debtor further retains all rights to modify the Plan prior to Confirmation as permitted by Section 1127.  The Plan may be amended or modified prior to Confirmation without leave of Court, so long as notice is provided to Creditors.  After Confirmation and with approval of the Court and upon notice to creditors, the Reorganized Debtor may remedy any defect or omission, or may reconcile any inconsistencies in the Plan or Confirmation Order, so long as such modification does not materially alter or adversely affect the interests of Creditors, to the extent it may be necessary to carry out the purposes and intent of the Plan.

The Court will be asked to confirm the Plan as to any class of claims or interests that does not accept the Plan.  In order to do so, the Court must find (1) that the Plan is fair and equitable to each class of claims or interests that is impaired and has not accepted the Plan and that the classification of claims is not discriminatory; and (2) that each claimant or interest holder receives, under the Plan, property of a value as of the Effective Date that is not less than what would be received or retained if the Property were liquidated pursuant to Chapter 7 of the Bankruptcy Code.

The first requirement is satisfied with respect to any class that might not accept the Plan because the classification has not been designed in a discriminatory manner and any similar claims classified separately have been treated in this manner because they are either an administrative classification or arise from a substantially different economic basis. The second requirement is satisfied as demonstrated by the Liquidation Analysis provided.

If a class of secured claims does not accept the Plan, the Code provides that the fair and equitable requirement is satisfied if the class retains its lien and receives deferred cash payments of a present value equal to the value of the claimant's secured interest in the collateral. This requirement may be satisfied as to each class treated as a secured claim because the Plan provides for them to receive the value of their interest in their collateral together with interest.

If a class of unsecured claims does not accept the Plan, the fair and equitable rule requires that (1) each impaired unsecured creditor receives or retains, under the plan, property of a value equal to the amount of its allowed claim, or (2) the holders of claims and interests that are junior to the claims of the dissenting class shall not receive any property under the plan if claims in the dissenting class are not paid in full.

Debtor recommends that the Plan and Disclosure Statement be approved as it is in the best interests of the Estate and all creditors. The alternatives to confirmation of the Plan include dismissal or conversion to Chapter 7 liquidation. Dismissal would result in creditors having to resort to other legal proceedings to collect debts, and Chapter 7 liquidation would delay distributions. For these reasons, Debtor recommends all creditors accept the Plan and return ballots timely so that the votes can be counted.

Dated: January 4, 2024.

**GERALD K. SMITH AND JOHN C. SMITH LAW OFFICES, PLLC**

By */s/ John C. Smith*
  John C. Smith
  *Attorney for Debtor*

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on January 4, 2024, I electronically transmitted the attached document to
the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing
3  and additionally mailed or e-mailed* copies of the attached document to the following:

4   Office of the United States Trustee*
5   700 Stewart Street, Suite 5103
    Seattle, Washington 98101-1271
6   Email: USTPRegion18.ak.ecf@usdoj.gov

7   Kathryn F. Evans*
    Office of the United States Trustee
8   700 Stewart Street, Suite 5103
9   Seattle, Washington 98101-1271
    Email: Kathryn.Evans@usdoj.gov
10  Email: cori.gustafson@usdoj.gov
    Email: young-mi.petteys@usdoj.gov
11  Email: tmaurer@usdoj.gov

12  John Rizzardi*
13  Binah B. Yeung*
    Aditi Paranjpye*
14  Cairncross & Hempelmann
    524 Second Avenue, Suite 500
15  Seatle, Washington 98104-2323
    Email: JRizzardi@cairncross.com
16  Email: byeung@cairncross.com
17  Email: aparanjpye@cairncross.com
    *Attorneys for MidCap Funding Investment X LLC*

18

19   */s/ Kate Manns*
     Kate Manns
20

21

22

23

24

25

26

27

28

EXHIBIT A

PLAN OF REORGANIZATION

**SMITH & SMITH**
GERALD K. SMITH AND JOHN C. SMITH
LAW OFFICES, PLLC
ATTORNEYS AT LAW

6720 E. Camino Principal, Suite 203
Tucson, AZ 85715
Tel: (520) 722-1605
Fax: (520) 844-8070

John C. Smith, State Bar No. 023008
Email:  john@smithandsmithpllc.com

*Attorney for Debtor*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| EGAE, LLC, | Case No. 3:23-bk-00169-GS |
| Debtor. | |

## CHAPTER 11 DEBTOR'S PLAN OF REORGANIZATION
## DATED JANUARY 4, 2024

**TABLE OF CONTENTS**

**I.     INTRODUCTION** ........................................................................................................... **4**

**II.    DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME 4**

    A.   RULES OF CONSTRUCTION ........................................................................ 4
    B.   RULES OF INTERPRETATION ...................................................................... 4
    C.   COMPUTATION OF TIME ........................................................................... 5
    D.   DEFINITIONS ............................................................................................ 5

**III.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ................ **10**

    A.   UNCLASSIFIED CLAIMS .......................................................................... 10
    B.   CLASSIFIED CLAIMS .............................................................................. 11

**IV.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................. **14**

    A.   ASSUMPTION OF CONTRACTS AND LEASES .............................................. 14
    B.   REJECTION OF CONTRACTS AND LEASES ................................................. 16

**V.    MEANS FOR EXECUTING AND IMPLEMENTING THE PLAN** ........................... **17**

    A.   MEANS OF FUNDING THE PLAN ............................................................... 17
    B.   CAUSES OF ACTION ............................................................................... 17
    C.   MANAGEMENT ...................................................................................... 17
    D.   OBJECTION TO CLAIMS AND INTERESTS .................................................. 18
    E.   TAX COMPLIANCE ................................................................................. 18
    F.   VESTING .............................................................................................. 18

**VI.   DISTRIBUTIONS UNDER THE PLAN** .......................................................... **18**

    A.   MANNER OF CASH PAYMENTS UNDER THE PLAN ...................................... 18
    B.   NO DE MINIMIS DISTRIBUTIONS ............................................................. 19
    C.   NO DISTRIBUTIONS TO HOLDERS OF DISPUTED CLAIMS ............................ 19
    D.   DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE/UNCLAIMED DISTRIBUTIONS .......... 19
    E.   CLAIMS BAR DATE ................................................................................ 20

**VII.  EFFECT OF PLAN ON CLAIMS** ................................................................. **20**

    A.   EFFECT OF CONFIRMATION ..................................................................... 20
    B.   REORGANIZED DEBTOR'S AUTHORITY TO COMPROMISE AND SETTLE ........... 21
    C.   RIGHT OF SETOFF .................................................................................. 21

**VIII. OTHER PROVISIONS** ............................................................................... **21**

    A.   BINDING EFFECT ................................................................................... 21
    B.   REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION ........................... 21
    C.   PLAN MODIFICATION ............................................................................. 22
    D.   SEVERABILITY OF PLAN PROVISIONS ...................................................... 22
    E.   PLAN SUPPLEMENT ............................................................................... 22
    F.   CONSEQUENCES OF DEFAULT .................................................................. 23
    G.   POST-CONFIRMATION DEBTOR'S ACTION ................................................ 23
    H.   NON-ALLOWANCE OF PENALTIES OR FINES .............................................. 23
    I.   POST-CONFIRMATION EMPLOYMENT OF PROFESSIONALS ........................... 23
    J.   PAYMENT OF STATUTORY FEES ............................................................... 23
    K.   DOCUMENTATION OF PLAN IMPLEMENTATION .......................................... 23
    L.   NOTICES .............................................................................................. 24

M.   TERMS OF INJUNCTIONS OR STAYS ................................................ 24
N.   GOVERNING LAW............................................................................ 24

IX.   RETENTION OF JURISDICTION .................................................. 25

X.   REQUEST FOR CONFIRMATION AND RECOMMENDATION ............... 26

## I.      INTRODUCTION

EGAE, LLC, the Chapter 11 Debtor, proposes the following plan (the "**Plan**") for the resolution of outstanding Creditor Claims and Equity Interests.  Reference is made to the Disclosure Statement contemporaneously filed with the Plan for a discussion of the Debtor's history, business, properties, results of operations, risk factors, a summary and analysis of the Plan, and other related matters.  The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

This Plan provides for payments to creditors from the revenues generated by Debtor over time and new equity contributions.

All holders of Claims and the holder of the Interests are encouraged to read this Plan and the Disclosure Statement in its entirety before voting to accept or reject this Plan or objecting to the confirmation of this Plan.  Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## II.      DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

a.      Rules of Construction

All definitions set forth below are incorporated in the Plan for all purposes.  Any term used in this Plan that is not defined herein but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural and the singular.

b.      Rules of Interpretation

For purposes of the Plan (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that it shall be substantially in such form or substantially on such terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Articles, Appendices, Schedules, and Exhibits are references to Articles, Schedules, Appendices and Exhibits of or to the Plan; (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

c.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

d.    Definitions

Terms used in this Plan have the meaning specified in the Bankruptcy Code and Rules, if defined therein, unless the following definitions apply or the context clearly requires otherwise.  The following terms have the following meanings whenever used in the Plan:

**1.1    Administrative Expense**:  Any cost or expense of administration incurred in connection with the Debtor's Chapter 11 cases, in accordance with Section 503(b), including, without limitation:

a.    the actual, necessary costs and expenses of preserving Debtor's estates and operating Debtor's business (other than expenses which, by their express terms are not due or payable by the Effective Date);

b.    the full amount of all requests for compensation for legal or other professional services or reimbursement of costs and expenses under Sections 330 and 503(b), or otherwise as allowed by the Bankruptcy Court; and

c.    all fees and charges assessed against Debtor's estates under 28 U.S.C. § 1930.

**1.2    Administrative Claims Bar Date**:  The date established in this Plan of Reorganization and approved by the Court by which all applications for payment of an Administrative Expense must be filed.

**1.3    Allowed**:  A claim (other than an Administrative Expense) is allowed when (a) it is scheduled by Debtor in a set amount or up to a set amount and as undisputed and not contingent; (b) a proof of claim is filed by the Claims Bar Date and no objection is filed by the Objection Bar Date; or (c) allowed by entry of a Final Order.  As to an Administrative Expense, "Allowed" means approval by Final Order, after notice and hearing as required by the Bankruptcy Code, of an application for payment of Administrative Expense filed by the deadline established by the Court, but not including any Administrative Expenses that may have been paid previously.

**1.4    Ballot**:  Each of the ballot forms distributed with the Disclosure Statement to holders of Impaired Claims entitled to vote under Article II hereof in connection with the solicitation of acceptances of the Plan.

**1.5    Bankruptcy Code or Code**:  The Bankruptcy Reform Act of 1978, as amended, codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

5

**1.6    Bankruptcy Court or Court**:  United States Bankruptcy Court for the District of Alaska, sitting in this Case, with respect to any particular proceeding arising under, in, or relating to the Debtor's case, and any other court which may have jurisdiction over such proceeding.

**1.7    Bankruptcy Rules**:  The Rules of Practice and Procedure in Bankruptcy, the Local Rules of the United States Bankruptcy Court for the District of Alaska, and to the extent applicable, the Local Rules of the United States District Court for the District of Alaska.

**1.8    Case**:  Debtor's Chapter 11 bankruptcy case pending before the Bankruptcy Court under the provisions of the Bankruptcy Code, and all adversary proceedings, contested matters, and other litigation arising in or related to it.

**1.9    Cash**:  Legal tender of the United States or equivalents thereof.

**1.10    Chapter 11 Case**:  The Chapter 11 Case of EGAE, LLC.

**1.11    Claim**:  Any "claim" as defined by Section 101(5).

**1.12    Class**:  Any class into which Allowed Claims are classified pursuant to this Plan.

**1.13    Collateral**:  Any property or interest in property of Debtor's estates subject to a lien, including unperfected security interests to secure the payment or performance of a Claim, which lien or unperfected interest is not invalid, unenforceable or subject to avoidance under the Bankruptcy Code or other applicable law.

**1.14    Confirmation**:  Entry by the Bankruptcy Court of the Confirmation Order.

**1.15    Confirmation Date**:  The date the Clerk of the Bankruptcy Court enters the Confirmation Order on the Clerk's docket sheet.

**1.16    Confirmation Hearing**:  The hearing to consider confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.17    Confirmation Order**:  The appealable order of the Court confirming the Plan.

**1.18    Creditor**:  Any person or entity who holds a Claim against Debtor.

**1.19    Debtor**:  EGAE, LLC.

**1.20    Disbursing Agent**:  Reorganized Debtor will serve as the Disbursing Agent and shall make distributions to holders of Allowed Claims under the Plan.

**1.21    Disclosure Statement**:  The Disclosure Statement pertaining to this Plan submitted by the Debtor to the Court for approval pursuant to Section 1125(b), including any amendments or modifications.

**1.22    Disputed Claim**:  A Claim not otherwise Allowed or paid pursuant to the Plan or an Order of the Bankruptcy Court, (a) which has been or hereafter is listed on the Schedules as

unliquidated, contingent, or disputed, and which has not been resolved by written agreement of the parties or an order of the Bankruptcy Court, (b) proof of which was required to be filed by Order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly filed, (c) proof of which was timely and properly filed and which has been or hereafter is listed on the Schedules as unliquidated, disputed or contingent, (d) that is disputed in accordance with the provisions of this Plan, or (e) as to which a party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or is otherwise disputed by a party in interest in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; provided, however, that for purposes of determining whether a particular Claim is a Disputed Claim prior to the expiration of any period of limitation fixed for the interposition of objections to the allowance of Claims, any Claim that is not identified by Debtor as an Allowed Claim shall be deemed a Disputed Claim.

**1.23    Distribution**:  The property required by the Plan and the Confirmation Order to be distributed to holders of Allowed Claims.

**1.24    Distribution Date**: The date fourteen calendar days following the Confirmation Date and the lapse of any stay of the Confirmation Order, including the automatic stay under Bankruptcy Rule 3020(e).  If the date fourteen calendar days following the Confirmation Date falls on a Saturday, Sunday, or legal holiday, then the Distribution Date shall be the following business day.

**1.25    Effective Date**:  The date fourteen calendar days following the Confirmation Date and the lapse of any stay of the Confirmation Order, including the automatic stay under Bankruptcy Rule 3020(e).  If the date fourteen calendar days following the Confirmation Date should fall on a Saturday, Sunday, or legal holiday, then the Effective Date shall be the following business day.

**1.26    Estate Funds**:  The cash generated from the operations or otherwise in possession of Debtor which is not subject to any valid and enforceable liens and the proceeds of any collateral to the extent that such proceeds exceed all Claims secured by valid and enforceable liens on such collateral.

**1.27    Excess Cash Flow**:  Cash flow of the Debtor from business income after deduction of all payments to administrative, priority, and secured creditors.

**1.28    Executory Contract**:  A lease or executory contract within the meaning of Section 365, including without limitation real property leases and/or personal property, but excluding any leases that would be treated as security interests under Uniform Commercial Code § 1-201(37).

7

**1.29    Fair Market Value**:  The price in cash, terms equivalent to cash, or other precisely revealed terms, for which real or personal property would sell after reasonable exposure in the market under conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress.

**1.30    Final Order**:  An order, ruling or other judgment that: (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

**1.31    General Administrative Claim**:  All Claims entitled to priority as expenses of administration under Sections 503 and 507(a)(1).

**1.32    General Unsecured Claim**:  A Claim against Debtor that is not: (a) a Priority Claim; (b) a Secured Claim; or (c) an Unperfected Secured Claim.

**1.33    Impaired**:  When used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.34    Interest**: (a) The legal, equitable, contractual and other rights of any person with respect to any Equity Securities issued by the Debtor, and (b) the legal, equitable, contractual or other rights of any person to acquire or receive any of the foregoing.

**1.35    Lien**:  A charge against or interest in property to secure payment of a debt or performance of any obligation, including without limitation a security interest, as defined in the Bankruptcy Code Section 101(51), whether granted before or after the Petition Date, and including all liens created pursuant to the Bankruptcy Court's Orders.

**1.36    Litigation Claims**:  The claims, causes of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, all of which are to be transferred to Reorganized Debtor pursuant to the Plan.

**1.37    Objection Bar Date**:  The date established in this Plan by which the Reorganized Debtor or any other party-in-interest may object to any Claim that has not been allowed by a Final Order of the Court.

**1.38    Petition Date**:  October 5, 2023, the date upon which Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**1.39    Plan**:  This Plan of Reorganization dated January 5, 2024, submitted by Debtor, including any amendments or modifications made in accordance with the applicable provisions of the Code.

**1.40    Priority Tax Claim**:  Any Claim for taxes entitled to priority under Section 507(a)(8).

8

**1.41    Professional**:  Any professional employed in the Chapter 11 Case pursuant to Sections 327 or 1103 of the Bankruptcy Code or otherwise and the professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.42    Property Tax Claim**:  Claim held by any governmental taxing authority secured by real or personal property of the Debtor's estate.

**1.43    Pro Rata**:  At any time, the proportion that the face amount of a Claim bears to the aggregate face amount of all Claims (including Disputed Claims) in a Class, unless the Plan provides otherwise.

**1.44    Real Property Lease**:  A lease of nonresidential real property within the meaning of Bankruptcy Code Section 365(d).

**1.45    Reorganized Debtor:** Debtor after the Effective Date.

**1.46    Retained Assets**:  The assets described as being retained by Debtor.

**1.47    Schedules**:  The schedules of assets and liabilities and the statements of financial affairs, if any, filed in the Bankruptcy Court by Debtor, as the case may be, as such schedules or statements may be amended or supplemented from time to time in accordance with Fed. R. Bankr. P. 1009 or orders of the Bankruptcy Court.

**1.48    Section.**  Any section of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

**1.49    Secured Claim**:  The Claims of Class 3, 4, and 5 under this Plan.  A Claim, other than a Setoff Claim, that is secured by a security interest, perfected or unperfected in or lien upon property, or the proceeds of the sale of such property, in which Debtor has an interest to the extent of the value, as of the Closing Date or such later date as is established by the Bankruptcy Court, of such interest or lien as determined by a Final Order of the Bankruptcy Court pursuant to Section 506 of the Bankruptcy Code or as otherwise agreed upon in writing by such Debtor or Reorganized Debtor and the holder of such Claim.

**1.50    Setoff Claim**:  A Claim, against Debtor, of a holder that has a valid right of setoff with respect to such Claim, which right is enforceable under Section 553 of the Bankruptcy Code as determined by a Final Order or as otherwise agreed in writing by Reorganized Debtor, to the extent of the amount subject to such right of setoff.

**1.51    Solicitation**:  The solicitation of acceptances or rejections of the Plan pursuant to Section 1126(b) of the Bankruptcy Code

**1.52    Unsecured Claim**:  Any Claim other than an Administrative Expense, Priority Tax Claim, a Secured Claim, or an Unperfected Secured Claim.

**III.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

All Claims and Interests, except administrative expense and priority tax claims, are placed into classes as set forth below.  A Claim or Interest is placed in a particular class, only to the extent that the Claim or Interest falls within the description of that class and is classified in all other classes to the extent that any portion of the Claim or Interest falls within the description of such other class.

A Claim or Interest is placed into a particular class for all purposes, including voting on this Plan, confirmation, and receiving distributions pursuant to this Plan, only to the extent that such Claim or Interest is an Allowed Claim in that class, and such claim has not been paid, released, or otherwise settled prior to the Effective Date.  The establishment of particular Classes or categories of Unclassified Priority Claims does not mean or imply that there are any Allowed Claims that fall into each such Class or category, and Debtor may later contend there are no such Allowed Claims in any given Class or category.

Unclassified Claims

Pursuant to Section 1123(a)(1), Administrative Expenses pursuant to Section 507(a)(2) and Priority Tax Claims pursuant to Section 507(a)(8) are not classified under the Plan.  These Claims are not considered impaired, and holders of such Claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.

Administrative Expenses

Administrative Expenses are costs or expenses of administering the Chapter 11 case that are allowed under Section 507(a)(2).  The holders of Administrative Expenses shall receive cash on account and in the amount of such Administrative Expenses.  At the option of Debtor, payment of Administrative Expenses shall be made in cash: (a) on the Effective Date; or (b) when due in accordance with the terms of any agreement between Debtor and the holder of the administrative claim.  Any sums due more than 10 days without payment will accrue interest at a rate of 5% until paid in full. Professionals employed at the expense of the Estate and entities who may be entitled to reimbursement or the allowance of fees and expenses from the Estate pursuant to Section 503(b)(2)-(6) shall receive cash in the amount awarded to such professionals and entities at such times and only in accordance with a Final Order entered pursuant to Sections 330 or 503(b)(2)-(6).

Any application for payment of an Administrative Expense shall be filed within 45 days of the Effective Date (the "**Administrative Expenses Bar Date**") or shall be forever barred.

10

The anticipated Administrative Expenses on the Effective Date include Debtor's counsel's outstanding fees in the approximate amount of $60,000.00 and costs in the approximate amount $1,500.00, the allowed fees and costs of Debtor's financial expert witness, Mr. Dennis Winans, and its accountant, its eviction counsel, and its appraiser, _____.  The anticipated Administrative Expenses are an estimate and Debtor reserves all rights to submit additional Administrative Expenses to the Court for approval for, among other reasons, work that will be done between the filing of the Plan and Disclosure Statement and the Confirmation Hearing.  Post-confirmation, the Reorganized Debtor's counsel will continue to incur fees.

Notwithstanding any provision in the Plan to the contrary, all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.

a.    Classified Claims

**Priority Claims**

**Class 1 – Priority Tax Claims**

According to Debtor's Schedule E, no sums are owed to governmental entities for past due taxes.

All valid enforceable liens securing repayment of the Class 1 Claims shall be retained not withstanding confirmation of the Plan or occurrence of the Effective Date.  Such Allowed Claims shall be paid in full, in cash, plus interest at the statutory rate from the Petition Date, over 3 years, with the last payment due on the third anniversary of the Petition Date.  Payments shall be in quarterly installments, beginning on the Distribution Date.  Subsequent payments shall be made on the 20th day of the month every 90 days thereafter, until maturity.  Post-petition taxes will be paid when due in the ordinary course of business, without the necessity of the filing of a proof of claim.

Class 1 is impaired.

**Class 2 – Unsecured Priority Non-Tax Claims**

This Class shall consist of Allowed Claims entitled to priority under Section 507(a), other than Priority Tax Claims.  Pursuant to Debtor's Schedule E, there are no claims entitled to priority under Section 507(a)(4).

Certain creditors are entitled to Section 503(b)(9) administrative priority, which are the Allowed Claims of creditors who delivered goods in the ordinary course of business and received by Debtor within 20 days before the petition date and which are otherwise legally entitled to such status. All allowed claims entitled to administrative priority pursuant to this section of the Bankruptcy Code will be paid in full on the later of the Effective Date or the allowance of the claim.

11

Class 2 is impaired.

**Secured Claims**

**Class 3 – MidCap Secured Claim**

The Claim of MidCap secured by the Property shall remain secured after the Effective Date by the same property and in the same priority as was the case on the Petition Date.

MidCap alleges it'sClaim exceeds the value of the collateral, including the Property and associated personalty.  Debtor believes the value of the of the Property is approximately $8.8 million.

The Allowed Class 3 Claim shall be impaired under Section 1124(a).  The holder of a Class 3 Claim shall retain its liens against the Property and will be treated as follows:

Valuation

The Court shall determine pursuant to Section 506(a) the value of the lien held by MidCap on Debtor's interest in its property. The amount so determined shall be the Allowed Secured Claim.

No Section 1111(b) Election

If MidCap does not make the election under § 1111(b) to have the Class 3 Claim treated as fully secured, then Debtor shall pay the Allowed Secured Claim in full as follows:

(A) The Allowed Secured Claim shall bear interest from the Effective Date of the Plan at an amount determined by the Court to satisfy Section 1129(b)(2)(A)(i)(II). Debtor proposes a rate of 6.5%.

(C) On the Effective Date until the earlier of (1) the maturity date of the loan, which will be the  twenty-fourth anniversary of the Effective Date (the "Maturity Date") or (2) the sale or refinance of the Property Debtor shall make interest only payments in Year 1 and monthly principal and interest payments with principal based on a 35-year amortization for the remaining years of the Plan.

(D) All unpaid principal and interest shall be payable upon the Maturity Date or any earlier sale or refinance.

Section 1111(b) Election

In the event that MidCap elects to be "fully secured" by asserting an election to be treated under Section 1111(b), then MidCap's claim shall be treated in the following manner: (i) MidCap shall forego and waive any unsecured deficiency claim and shall have no Class 6 Claim; (ii) under the Section 1111(b) election, Maturity Date for Class 3 shall be extended to occur not later than the 15th anniversary of the Effective Date, at the end of which time the entire unpaid amount of the Class 3 claim must be fully satisfied; and (iii) the Allowed Class 3 Claim shall be deemed satisfied in full

12

when the gross amount of distributions made to MidCap under the Plan (whether principal or interest) equals the Allowed Class 3 Claim.  The Debtor retains the right to prepay the loan.

Class 3 is impaired.

**Class 4 – Secured Claim of Carol Holder**

This class consists of the prepetition unperfected secured claim of Ms. Carol Holder via a promissory note for the purchase of the property located at 337 East 4th Avenue, Anchorage, Alaska 99501. The note is in the amount of $400,000, bears interest at 0%, and is payable in monthly installments of $250.00; until paid in full.

The Class 4 secured claim shall be perfected post confirmation and will retain its prepetition security.  The Class 4 claim will be paid by the Reorganized Debtor in full, re-amortized on the Effective Date, in monthly installments of $1,223.00 with interest imputed at 2.0% until paid in full.

Class 4 is impaired.

**Class 5 – Secured Claim of City Scape Capital Group, LLC**

This class consists of the prepetition secured claim of City Scape Capital Group, LLC via a promissory note for the renovation of the property located at 337 East 4th Avenue, Anchorage, Alaska 99501.  The original note was in the amount of $223,512, bears interest at 8% and was to be paid in full on the earlier of October 1, 2013, or when Debtor transferred the property. No payments on the note have been made, and City Scape Capital Group, LLC has a secured claim in the amount of $712,000.

The Class 5 secured claim shall be perfected post confirmation and shall retain its prepetition security.  The Class 5 claim will be paid by the Reorganized Debtor in full, re-amortized on the Effective Date, in monthly installments of $4,302.00, with interest at 6.5% until paid in full.

Class 5 is impaired.

**Unsecured Claims**

**Class 6 - General Unsecured Claims**

This Class consists of Allowed Claims without statutory priority or security.  This Class is estimated at $927,000, excluding disputed claims and excluding a deficiency from Classes 3, 4 and 5, based on Debtor's Schedule F.

If MidCap does not make the election under § 1111(b) to have its Class 3 Claim treated as fully secured, Class 6 shall receive the following payments commencing on the Distribution Date and continuing annually until the fifth anniversary of the Effective Date: $35,000 in Year 1; $40,000 in Years 2-4; and $45,000 in Year 5. In the event MidCap elects to be "fully secured" by asserting

13

an election to be treated under Section 1111(b),  Class 6 shall receive payments in five equal annual installments of $20,000. Payments shall commence on the Distribution Date and continue annually until the fifth anniversary of the Effective Date.  All remaining amounts of Class 6 Claims shall be discharged. Payments will be made from Debtor's post-confirmation cash flow and equity contributions.

Class 6 is impaired.

**Ownership Interest**

**Class 7 – Ownership Interest in EGAE, LLC**

EGAE, LLC's prepetition equity holder will continue its ownership of the Debtor post-confirmation and shall contribute the sums necessary for occurrence of the Effective Date of the Plan.

Class 7 is impaired.

**IV.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      Assumption of Contracts and Leases

Reorganized Debtor shall assume as of the Effective Date each Executory Contract and Unexpired Lease (i) on the EGAE's rent roll on the Effective Date or for future rentals, or (ii) listed by Debtor in its Schedule G; but not any executory contract or unexpired lease listed on the Schedule of Rejected Contracts filed by Debtor within 10 days of the hearing on the proposed Disclosure Statement as that Schedule may be amended from time to time.

Entry of the Confirmation Order shall constitute approval of the rejections and assumptions contemplated hereby pursuant to Sections 365 and 1123 as of the Effective Date, without prejudice to Debtor's right to modify this portion of the Plan by amending the Schedule of Assumed Contracts and Schedule of Rejected Contracts and Leases prior to the Distribution Date in accordance with Section 1127(b).

Each executory contract or unexpired lease that is to be assumed and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts and unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interest in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected

14

pursuant to any order of the Court that may be entered prior to the Effective Date, including the Confirmation Order.

**1.      Cure Payments.**

Reorganized Debtor shall honor without change its contractual and other obligations to tenants of the Property. As to all other Executory Contracts and Unexpired Leases, to the extent arrearages remain unpaid, Section 365(b)(1)(A) or (B) require payment of those sums to such parties in order to cure defaults under the executory contracts and unexpired leases to be assumed under the Plan ("**Cure Payments**"). If any non-debtor party to an executory contract or lease contends that defaults exist and must be cured under such party's executory contract or lease, then that party must comply with the Plan. As required by Section 365(b)(1), any and all monetary defaults under each executory contract and unexpired lease to be assumed under the Plan will be satisfied on the Distribution Date, unless subject to a pending dispute on that date.

If a dispute arises regarding: (a) the amount of any proposed Cure Payments; (b) whether Reorganized Debtor provided adequate assurance of future performance under an executory contract or unexpired lease to be assumed, to the extent required under the Bankruptcy Code; or (c) any other matter pertaining to a proposed assumption, then any required Cure Payments will be made by the later of the Distribution Date or 14 days after entry of a Final Order resolving the dispute and approving the assumption. If there is either a dispute as to the Cure Amount, or the non-debtor party otherwise objects to assumption, then Reorganized Debtor shall have the right to abandon the assumption of such contract or agreement listed on the Schedule of Assumed Agreements, and to treat such contract or agreement as rejected under the Plan at any time during the pendency of such dispute or upon resolution of such dispute.

**2.      Objections to Assumption or Proposed Cure Payments.**

Any entity that is a party to an executory contract or unexpired lease that will be assumed under the Plan and either contends that the proposed Cure Payment described above is incorrect or otherwise objects to the contemplated assumption must file with the Court a written statement and supporting declaration of facts stating the basis for its objection. This statement and declaration must be filed and served by the later of: (a) ten days before the Confirmation Hearing; or (b) five Business Days after Debtor files and serves any Plan modification with respect to an executory contract or unexpired lease to be assumed. Any entity that fails to timely file and serve such a statement and declaration will be deemed to waive and release any and all objections to the proposed assumption and the proposed Cure Payments.

15

### 3.    Resolution of Claims Relating to Assumed Agreements

Payment of any Cure Payments required by Court Order with respect to executory contracts or unexpired leases that are assumed under the Plan shall be deemed to satisfy, in full, any prepetition arrearage or other damage claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the Cure Payment is less than the amount set forth in such proof of Claim or the Schedules.  Upon the tendering of the Cure Payment, such Claim shall be Disallowed without further order of the Court or action by any party.

B.    Rejection of Contracts and Leases

### 1.    Identification of Rejected Agreements

As of the Effective Date, Debtor will reject any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and any not identified on the Schedule of Assumed Agreements filed by Debtor within 10 days of the hearing on the Disclosure Statement, as that Schedule may be amended from time to time, to the extent that these agreements constitute executory contracts or unexpired leases under Section 365, as well as any contracts or leases previously rejected pursuant to Court orders.

Debtor reserves the right to amend the Plan at any time before the Effective Date to: (a) provide for assumption and assignment of any executory contract or unexpired lease under the Plan, or (b) delete any executory contract or unexpired lease from the Schedule of Assumed Agreements and thus provide for its rejection under the Plan, pursuant to Section 1127(b), provided, however, that any such amendments may be made only before substantial consummation of the Plan, and provided further that any such amendments shall meet the requirements of §§ 1122 and 1123 of the Bankruptcy Code. Debtor shall provide notice of any modification to the Plan to the party or parties to the executory contracts or unexpired leases affected by the amendment.

The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of any and all executory contracts and unexpired leases not assumed under the Plan.

### 2.    Rejection Damages – Bar Date for Rejection Damage Claims.

Any Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be filed and served upon Reorganized Debtor by the Rejection Claims Bar Date. Any such Claims that are not timely filed and served will be entitled to distribution from Reorganized Debtor only after full payment of all timely filed class 1 through 6 allowed claims.

All timely filed Claims for rejection damages shall be classified as unsecured claims and treated in accordance with the Plan.

## V.    MEANS FOR EXECUTING AND IMPLEMENTING THE PLAN

A.    Means of Funding the Plan

On the Effective Date, the Marlow Family Exempt Perpetual Trust shall contribute $200,000 to the Reorganized Debtor in order to retain the equity of the Reorganized Debtor.  Debtor believes that this is a new substantial infusion of money that is necessary for a successful reorganization and is at least equivalent to the interest received on account of such contribution.   In addition, the Debtor's management company, Kenco Building Services, LLC, will have a variable payment plan with a management fee based on 5% of total revenues paid after payment of claims to creditors which will allow for an effective guarantee in the event the Debtor has any operating losses during the course of the Plan of Reorganization. .  Stated more succinctly, and as demonstrated by the cash flow projections, management will support cash flow by reducing its management fee and by contributions as required in order to ensure feasibility.

In addition, the Debtor voluntarily waives its exclusivity to file a Plan of Reorganization under 11 U.S.C.§ 1121(b) to allow an opportunity to any party in interest to compete in the marketplace by proposing an alternative plan of reorganization and thus allow for the market's scrutiny of the Debtor's proposed Plan of Reorganization and test the valuation of Equity's contribution to the Plan of Reorganization.

Causes of Action

Pursuant to Section 1123(b)(3), the Reorganized Debtor shall retain all of Debtor's Causes of Action, including any avoidance causes of action relating to or in connection with payments made or transfers to insiders or affiliates of Debtor and violations of the automatic stay.

B.    Management

From and after the Effective Date, Reorganized Debtor will continue to be managed by Marc Marlow, which management may subsequently be modified to the extent provided by Reorganized Debtor's articles of organization, by-laws, and operating agreement (as amended, supplemented, or modified). On and after the Effective Date, the appropriate managers or members of Reorganized Debtor are authorized to issue, execute, deliver, and consummate the transactions contemplated by or described in the Plan in the name of and on behalf of Reorganized Debtor without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule, or any requirements of further action, vote, or other approval or authorization by any Person.

17

D.      Objection to Claims and Interests

At any time before the expiration of 60 days after the Effective Date, the Reorganized Debtor or any other party in interest may object to any Claim that was not scheduled, or was scheduled as disputed, contingent, or unliquidated, that has not been allowed by a Final Order of the Bankruptcy Court.  Any Claim that was not scheduled and for which no Proof of Claim was filed will be disallowed.

Except with regard to Administrative Expenses, objections to Claims and Interests shall be filed and served upon the holder of such Claim or Interest no later than the Claims Objection Bar Date.

There shall be no distribution to the holder of a Disputed Claim until the Objection to the Claim has been resolved by a Final Order of the Bankruptcy Court and the Claim has become an Allowed Claim.  Payments and distributions on account of each Disputed Claim that is Allowed shall be made in accordance with the provisions of the Plan relating to the class of creditors to which the holder belongs.

E.      Tax Compliance

Debtor shall comply with all tax withholding and reporting requirements, including with regard to all distributions and receipts pursuant to this Plan, as applicable.  All holders of Allowed Claims and Interests shall have sole responsibility for any tax obligation imposed by any governmental unit pursuant to a distribution received under the Plan.

F.      Vesting

Except as provided for in the Plan or Confirmation Order, on the Effective Date, Debtor shall be vested with the remaining property or assets from the Estate, free and clear of all claims, liens, charges, and other interests of creditors arising prior to the filing date, except as provided by the Plan, to be liquidated in the ordinary course of business.

# VI.    DISTRIBUTIONS UNDER THE PLAN

A.      Manner of Cash Payments under the Plan

With respect to distributions, cash payments to domestic entities holding Allowed Claims will be tendered in U.S. Dollars and will be made by checks drawn on a domestic bank, or at Reorganized Debtor's option, by wire transfer from a domestic bank.  Payments made to foreign creditors holding Allowed Claims may be paid in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

18

B.      No De Minimis Distributions

Notwithstanding anything to the contrary in the Plan, no cash payment of less than $5.00 will be made to any entity holding an Allowed Claim for less than such amount. No consideration will be provided in lieu of the de minimis distributions that are not made under this Section.

C.      No Distributions to Holders of Disputed Claims

Notwithstanding any other provisions of the Plan governing distributions, no payments of cash or distributions of other property or other consideration of any kind shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim.  The presence of a Disputed Claim in any Class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes, so long as a reserve is created for the Disputed Claim.  Any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution within 10 Business Days after the date that such Claim becomes an Allowed Claim.  Unless otherwise specifically provided for in the Plan or as otherwise required by Code § 506(b), interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

D.      Delivery of Distributions and Undeliverable/Unclaimed Distributions

**1.    Delivery of Distributions in General**

Reorganized Debtor shall serve as the Disbursing Agent for all payments due on the Effective Date and shall make distributions to each holder of an Allowed Claim by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to Reorganized Debtor after the date of any related proof of Claim; and (c) at the address reflected in the Schedules if no proof of Claim is filed and Reorganized Debtor has not received a written notice of a change of address.

**2.    Undeliverable and Unclaimed Distributions**

If the distribution to the holder of any Allowed Claim is returned to Reorganized Debtor as undeliverable, no further distribution shall be made to such holder unless and until Reorganized Debtor is notified in writing of such holder's then current address.  Undeliverable distributions shall remain in the possession of Reorganized Debtor until such time as a distribution becomes deliverable, or the obligation to deliver is terminated pursuant to this section of the Plan.  Reorganized Debtor will hold undeliverable cash distributions in an unsegregated, interest-bearing bank account for the benefit of

the entities entitled to the distributions.  These entities will be entitled to any interest actually earned on account of the undeliverable distributions if and when distributions are subsequently made pursuant to this section of the Plan.

Any holder of an Allowed Claim that does not notify Reorganized Debtor in writing of its asserted entitlement to an undeliverable distribution within one year after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against Reorganized Debtor or its property.

Any undeliverable distributions that are not claimed under this section will be used by Reorganized Debtor to satisfy any remaining obligations under the Plan, and if all such obligations are fully satisfied, shall be retained by Reorganized Debtor free from any restrictions thereon.  Nothing contained in the Plan shall require Reorganized Debtor to attempt to locate any holder of an Allowed Claim.

E.      Claims Bar Date

Any Claim filed after (i) the Bar Date for Claims and Interests established by the Court (and any amendment to such timely-filed Claim or Interest filed no later than the Effective Date), (ii) with respect to Claims for rejection damages, the Rejection Claims Bar Date, or (iii) with respect to Claims that are Administrative Expenses, the Administrative Expenses Bar Date, shall not be recognized, or recorded on the claims register, by Reorganized Debtor and shall be disallowed automatically without the need for any objection from Reorganized Debtor or unless such untimely filing is expressly authorized by an order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the order approving the Bar Date for Claims and Interests, and Reorganized Debtor's, and other parties in interests' rights to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

## VII.   EFFECT OF PLAN ON CLAIMS

A.      Effect of Confirmation

Except for continuing liens, claims, rights, and interests of the secured creditors against Debtor, the Estate, and the Property as provided for in the Plan, or in the confirmation order, the confirmation of the Plan is a discharge, on the Effective Date, of any and all debts of Debtor that arose at any time prior to confirmation, including, but not limited to, all principal and all interest accrued thereon, pursuant to Section 1141 of the Bankruptcy Code.  Such discharge shall be effective as to each claim,

regardless of whether a proof of claim thereof was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan.

Holders of claims against Debtor may not receive any payment or distribution except as otherwise provided for in the Plan and may not seek any recourse against Debtor or its assets except as provided for in the Plan.  After the Confirmation Date, all holders of claims will be forever enjoined from taking any action against Debtor or its property on account of such claim; including the commencement or continuation of any proceeding; enforcing any judgment or award; creating, perfecting, or enforcing any lien; or any other action inconsistent with the terms of the Plan.

The Reorganized Debtor shall move the Court to close the case once the Plan has been substantially consummated. Until substantial consummation, the Reorganized Debtor will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee.  Alternatively, the Court may enter a final decree closing the case on its own motion.

B.      Reorganized Debtor's Authority to Compromise and Settle

Pursuant to Bankruptcy Rule 9019(a), Reorganized Debtor may compromise or settle any Claim or Interest, or any cause of action against Debtor or brought by Debtor upon notice and a hearing.

C.      Right of Setoff

Debtor may set off against any payment or distribution made pursuant to an Allowed Claim, a claim of any kind that it may have against the holder of such an Allowed Claim, but Debtor will not be required to do so.  The failure to utilize the right of setoff does not constitute a waiver or release of any claim Debtor has against the holder of an Allowed Claim.

**VIII.   OTHER PROVISIONS**

A.      Binding Effect

The Plan shall be binding on and inure to the benefit of Debtor, all present and former holders of Claims against and Interests in Debtor, their respective successors and assigns, including, but not limited to, Debtor, all other parties-in-interest in the Chapter 11 Case, and Reorganized Debtor.

B.      Revocation, Withdrawal, or Non-Consummation

Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount

certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interest in, Debtor or any other person, (b) prejudice in any manner the rights of Debtor or any person in any further proceedings involving Debtor, or (c) constitute an admission of any sort by Debtor or any other person.

C.      Plan Modification

The Plan may be corrected or modified, prior or subsequent to Confirmation, or prior to consummation, after notice to interested parties and by Court order as provided by law.  Debtor further retains all rights to modify the Plan prior to Confirmation as permitted by Section 1127.  The Plan may be amended or modified prior to Confirmation without leave of Court, so long as notice is provided to Creditors.  After Confirmation and with approval of the Court and upon notice to creditors, Reorganized Debtor may remedy any defect or omission, or may reconcile any inconsistencies in the Plan or Confirmation Order, so long as such modification does not materially alter or adversely affect the interests of Creditors, to the extent it may be necessary to carry out the purposes and intent of the Plan.

D.      Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of Reorganized Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

E.      Plan Supplement

Any and all exhibits, lists, or schedules not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to date of the commencement of the Confirmation Hearing.  Upon its filing with the Bankruptcy Court,

the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to Debtor.

F.      Consequences of Default

If Debtor is unable to perform the terms and conditions of this Plan, it shall be in default.  The promissory notes and security agreements held by secured creditors MidCap, Carol Holder, and City Scape, and the Plan itself create legal and enforceable obligations and provide valuable rights and remedies in the event of a default.

G.     Post-Confirmation Debtor's Action

Upon and after the Confirmation Date, Reorganized Debtor shall take such action as is necessary to effectuate this Plan.

H.      Non-allowance of Penalties or Fines

Except as authorized expressly by Final Order of the Bankruptcy Court, no portion of an Allowed Claim shall include, and no distribution shall be made on account of, any fine, penalty, exemplary or punitive damages, late charges or other monetary charge relating to or arising from any default or breach by Debtor.  Any Claim for such amount shall be deemed to be a Disputed Claim regardless of whether an objection is filed.

I.      Post-Confirmation Employment of Professionals

After the Effective Date, Reorganized Debtor shall have the right to employ professionals, including attorneys, accountants, and other advisors, free of any restrictions imposed by the Bankruptcy Code or Rules.  Fees and costs may be paid for post-confirmation services upon approval of the Reorganized Debtor alone; no Bankruptcy Court approval shall be required.

J.      Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation shall be paid on or before the Effective Date.  Debtor shall continue to accrue and pay fees pursuant to 28 U.S.C. § 1930 until the Case is closed, dismissed, or converted.

K.      Documentation of Plan Implementation

In the event any entity that possesses an Allowed Secured Claim or any other lien against any of Debtor's Property for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, Reorganized Debtor may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release

and creation of any necessary and new liens to satisfy the terms of the Plan. For any Creditor asserting a secured interest in any Property of the Debtor, for which no equity exists in the property for the benefit of the Creditor, the Creditor shall immediately upon the Effective Date of the Plan release its asserted secured interest in the Property. If the Reorganized Debtor deems advisable, it may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

L.    Notices

Except as provided otherwise herein, any notice, request, or demand required or permitted to be made or provided to or upon the Debtor or the Reorganized Debtor under the Plan shall be (i) in writing; (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission; and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received by the Debtor and telephonically confirmed.

M.    Terms of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims against, or Interests in, Debtor will be permanently enjoined, on and after the Effective Date, from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the property of the Estate or the proceeds of such property, including without limitation property transferred to a Buyer (except with respect to liabilities expressly assumed by the Buyer), on account of any such Claim or Interest, (ii) creating, perfecting or enforcing any encumbrance of any kind against the property or interest in such property while it remains in the Estate, on account of any such Claim or Interest, and (iii) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest except to the extent the Claim is a Setoff Claim.

N.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) the laws of (i) the State of Alaska shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection

24

with the Plan and (ii) the laws of the state of incorporation of Debtor shall govern corporate governance matters with respect to Debtor, in either case without giving effect to the principles of conflicts of law thereof.

## IX.    RETENTION OF JURISDICTION

Notwithstanding confirmation or the Effective Date having occurred, the Court will retain and have full jurisdiction as is allowed under Title 28 of the United States Code, the Bankruptcy Code, or other applicable law to enforce the provisions, purposes, and intent of the Plan, including, without limitation, any proceedings which relate to:

1.    Determination of the allowability, classification, or priority of claims and interests;

2.    Construing, implementing, enforcing, executing or consummating the Plan, the confirmation order or any other order of the Court, any document attached as an exhibit to the Plan or contemplated by the Plan, or any other matter referred to in the Plan;

3.    Determination of all matters that are pending before the Court in the Chapter 11 Cases prior to the Effective Date or that may arise after the Effective Date;

4.    Determination of any and all applications for allowance or requests for payment of administrative claims, including, without limitation, requests for allowance and payment of compensation and expense reimbursement of professional persons;

5.    Determination of motions for the rejection, assumption or assignment of executory contracts or unexpired leases, and determination of the allowance of any claims resulting from the rejection of executory contracts and unexpired leases;

6.    Determination of all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted prior to the closing of the Chapter 11 Case;

7.    Modification of the Plan pursuant to Section 1127 of the Bankruptcy Code, prior to the Effective Date, remedy of any defect or omission in the Plan or confirmation order, reconciliation of any inconsistency within the Plan and the loan documents, so as to carry out the intent and purpose of the loan documents;

8.    Issuance of injunctions or taking such other actions or making such other orders as may be necessary or appropriate to restrain interference with Debtor by any party with the Plan or its execution or implementation by any person;

9.    Issuance of such orders in aid of consummation of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person, to the full extent authorized by the Bankruptcy Code;

10.     Ordering the assumption or rejection of executory contracts or leases to which Debtor is a party, which has not been previously resolved;

11.     Any determination necessary or appropriate under Section 505 of the Bankruptcy Code or any other determination relating to priority tax claims, taxes, tax refunds, tax attributes, and tax benefits affecting Debtor, its estate, or the Property through the end of the fiscal year in which the Effective Date occurs;

12.     Entry of a final decree closing the Chapter 11 case;

13.     Determination of such other matters and for such other purposes as may be provided in the Confirmation Order.

## X.     REQUEST FOR CONFIRMATION AND RECOMMENDATION

Debtor believes confirmation of this Plan is the best alternative. Accordingly, Debtor recommends that holders of Impaired Claims vote to accept the Plan and return the Ballots as directed in the Plan and Disclosure Statement. Debtor requests confirmation of the Plan pursuant to Section 1129(b) with respect to any impaired Class that does not accept the Plan.

DATED January 4, 2024.

**GERALD K. SMITH AND JOHN C. SMITH
LAW OFFICES, PLLC**

By  *s/ John C. Smith*
    John C. Smith
    *Attorney for Debtor*

26

1

### CERTIFICATE OF SERVICE

2          I hereby certify that on January 4, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing

3   and additionally mailed or e-mailed* copies of the attached document to the following:

4   Office of the United States Trustee*
700 Stewart Street, Suite 5103

5   Seattle, Washington 98101-1271

6   Email: USTPRegion18.ak.ecf@usdoj.gov

7   Kathryn F. Evans*
Office of the United States Trustee

8   700 Stewart Street, Suite 5103
Seattle, Washington 98101-1271

9   Email: Kathryn.Evans@usdoj.gov
Email: cori.gustafson@usdoj.gov

10  Email: young-mi.petteys@usdoj.gov

11  Email: tmaurer@usdoj.gov

12  John Rizzardi*

13  Binah B. Yeung*
Aditi Paranjpye*

14  Cairncross & Hempelmann
524 Second Avenue, Suite 500

15  Seatle, Washington 98104-2323

16  Email: JRizzardi@cairncross.com
Email: byeung@cairncross.com

17  Email: aparanjpye@cairncross.com
*Attorneys for MidCap Funding Investment X LLC*

18

19   */s/ Kate Manns*
Kate Manns

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B

LIQUIDATION ANALYSIS

# MCKINLEY TOWER APARTMENTS
## 337 E 4th Avenue, Anchorage, Alaska 99501
## Liquidation Analysis

### Estimated Proceeds From Immediate Liquidation of Assets:

| | Orderly Liquidation | Market Value As-Is |
|---|---|---|
| Market value | | 7,750,000 |
| Less costs of sale          5.00% | | (387,500) |
| Estimated net sale proceeds | 5,450,000 | 7,362,500 |
| Less MidCap Secured Claim | (5,450,000) | (7,362,500) |
| Net proceeds available for other claims | - | - |

| | | | Discount Factor = 6.50% | |
|---|---|---|---|---|
| | Claim Amount | Orderly Liquidation | NPV of No 1111(b) | NPV With 1111(b) |
| Administrative claims | - | - | - | - |
| Class 1 - Priority Tax Claims | - | - | - | - |
| Class 2 - Unsecured Priority Non-tax Claims | - | - | - | - |
| Class 3 - MidCap Secured Claim | 10,100,000 | 5,450,000 | 7,750,000 | 7,750,897 |
| Class 4 - Secured Claim of Carol Holder | 331,000 | - | 262,201 | 275,545 |
| Class 5 - City Scape Capital Group | 712,000 | - | 712,000 | 712,000 |
| Class 6 - General Unsecured Claims | 927,000 | - | 165,182 | 83,114 |
| | 12,070,000 | 5,450,000 | 8,889,383 | 8,821,556 |

## General Unsecured Claims:

| | % | | | % |
|---|---|---|---|---|
| Ben Holeman | 5.10% | 200,000 | 200,000 | 21.57% |
| David Dorland | 12.17% | 477,000 | 477,000 | 51.46% |
| Carol Holder | 8.44% | 331,000 | - | 0.00% |
| City Scape Capital Group | 18.16% | 712,000 | - | 0.00% |
| Lila Mae Smith Revocable Trust | 6.38% | 250,000 | 250,000 | 26.97% |
| MidCap | 49.74% | 1,950,000 | - | 0.00% |
| | 100.00% | 3,920,000 | 927,000 | 100.00% |
| | 5% = | 196,000 | 92,700 | |

| | | |
|---|---|---|
| MidCap claim | 10,100,000 | |
| Estimated appraisal | 8,150,000 | |
| Unsecured MidCap | 1,950,000 | |

EXHIBIT C

PRO FORMA INCOME AND EXPENSE PROJECTIONS

**MCKINLEY TOWER APARTMENTS**

**337 E 4th Avenue, Anchorage, Alaska 99501**

| | Prior Year Operating Results | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | TTM 11/30/23 | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Year 1 |
| Rentable square feet | | | | | | | | | | | | | | | | | | 54,390 |
| Average rate per square foot | | | | | | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 2.19 | 26.23 |
| Annual income increase | | | | | | | | | | | | | | | | | | 4.41% |
| Gross Potential Rent | | | | | | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 1,426,825 |
| Occupancy - Unit SF | | | | | | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% |
| Economic occupancy | | | | | | 97.50% | 97.50% | 97.50% | 98.00% | 98.00% | 98.00% | 98.50% | 98.50% | 98.50% | 99.00% | 99.00% | 99.00% | 97.08% |
| Annual Expense Increase | | | | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | | | | |
| Gross Potential Rent | 1,033,979 | 1,145,454 | 1,275,877 | 1,366,547 | | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 118,902 | 1,426,825 |
| Less: Management office | | | | | | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (1,414) | (16,970) |
| Less: Economic Vacancy | | - | - | - | | (2,937) | (2,937) | (2,937) | (2,350) | (2,350) | (2,350) | (1,762) | (1,762) | (1,762) | (1,175) | (1,175) | (1,175) | (24,672) |
| Effective Rental Income | 1,033,979 | 1,145,454 | 1,275,877 | 1,366,547 | | 114,551 | 114,551 | 114,551 | 115,138 | 115,138 | 115,138 | 115,726 | 115,726 | 115,726 | 116,313 | 116,313 | 116,313 | 1,385,183 |
| Laundry and vending revenues | - | 570 | 300 | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSF/Late charges/key replacement | 2,893 | 1,029 | (410) | 850 | | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 1,000 |
| Damages and cleaning fees | 910 | 1,880 | 13,917 | 6,740 | | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |
| Cable revenue | 5,946 | 108 | 2,200 | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking revenue | 4,619 | 5,063 | - | 4,327 | | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,800 |
| Pet deposits (non-refundable) | 2,100 | 2,800 | 350 | 3,150 | | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Application fees | 2,750 | 3,465 | 3,985 | 3,915 | | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Other | 10,350 | 3,176 | 2,518 | 3,305 | | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Total Ancillary Income** | 29,568 | 18,091 | 22,859 | 22,287 | | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 19,800 |
| **Total Income** | 1,063,547 | 1,163,545 | 1,298,736 | 1,388,834 | | 116,201 | 116,201 | 116,201 | 116,788 | 116,788 | 116,788 | 117,376 | 117,376 | 117,376 | 117,963 | 117,963 | 117,963 | 1,404,983 |
| **Operating Expenses:** | | | | | | | | | | | | | | | | | | |
| Admi Travel | 591 | 140 | 414 | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Advertising/marketing | 7,001 | 6,465 | 6,141 | 6,192 | | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 6,500 |
| Office supplies and expenses | 11,512 | 18,529 | 10,568 | 12,978 | | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 13,500 |
| Management fees | 88,320 | 88,320 | 88,320 | 88,320 | 5.00% | 5,810 | 5,810 | 5,810 | 5,839 | 5,839 | 5,839 | 5,869 | 5,869 | 5,869 | 5,898 | 5,898 | 5,898 | 70,249 |
| Bookkeeping and accounting | 11,623 | 11,368 | 10,850 | 10,873 | | 917 | 917 | 917 | 917 | 917 | 917 | 917 | 917 | 917 | 917 | 917 | 917 | 11,000 |
| Legal - operating | - | - | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telephone | 9,702 | 8,973 | 8,721 | 9,462 | | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| Computer services | 2,547 | 309 | 3,464 | 772 | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| Misc. / bank fees / credit repts | 388 | 1,850 | 291 | 595 | | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Other | - | 100 | 1,214 | 2,226 | | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Total Administrative | 131,684 | 136,054 | 129,983 | 131,418 | | 9,527 | 9,527 | 9,527 | 9,556 | 9,556 | 9,556 | 9,585 | 9,585 | 9,585 | 9,615 | 9,615 | 9,615 | 114,849 |
| Utiliti Electricity | 75,844 | 63,820 | 61,783 | 58,294 | | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 65,000 |
| Water/sewer | 46,797 | 47,104 | 42,790 | 45,753 | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 |
| Gas | 50,817 | 32,909 | 43,396 | 38,989 | | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| Cable | 15,869 | 5,624 | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Utilities | 189,327 | 149,457 | 147,969 | 143,036 | | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 152,000 |
| Opera Janitorial/Maint payroll | 149,560 | 147,533 | 147,533 | 147,533 | | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 147,600 |
| Janitorial supplies | 535 | - | - | 141 | | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 480 |
| Janitorial contract labor | 7,391 | 3,561 | 330 | 845 | | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Exterminating contract | 700 | 4,275 | 16,850 | 3,400 | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Garbage and trash | 6,672 | 7,025 | 7,277 | 9,748 | | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| Security | 704 | 2,845 | 464 | 426 | | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 500 |
| Grounds maintenance | 23,526 | 16,222 | 5,368 | 3,648 | | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Repair materials | 96,853 | 86,776 | 106,661 | 128,142 | | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 8,083 | 97,000 |
| Repair contract labor | 32,396 | 14,955 | 23,533 | 118,770 | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Elevator maintenance | 17,694 | 15,963 | 18,514 | 19,338 | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Heating / cooling maintenance | 3,129 | (2,007) | - | 726 | | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Snow removal | (3,863) | 2,400 | - | - | | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Decorating contract | 4 | - | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Decorating supplies | 650 | - | 300 | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicle/maint equip repairs | 6,697 | 13,484 | 12,479 | 9,787 | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Miscellaneous | 16,580 | 216 | 1,165 | 2,059 | | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Total Operating & Maintenance | 359,228 | 313,248 | 340,473 | 444,564 | | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 28,148 | 337,780 |
| Property and liability insurance | 15,072 | 41,801 | 43,408 | 43,870 | | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 44,000 |
| Property taxes | 168,177 | 169,984 | 161,091 | 162,909 | | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 166,982 |
| Other | 51 | 88 | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Replacement reserves (included in Operating and Maintenance) | - | - | - | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 183,300 | 211,873 | 204,499 | 206,779 | | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 210,982 |
| Total Operating Expenses and Replacements | | | | | | | | | | | | | | | | | | |
| Total Operating Expenses | 863,538 | 810,633 | 822,925 | 925,797 | | 67,924 | 67,924 | 67,924 | 67,953 | 67,953 | 67,953 | 67,982 | 67,982 | 67,982 | 68,012 | 68,012 | 68,012 | 815,611 |
| Net Operating Income after Replacements | 200,008 | 352,912 | 475,811 | 463,037 | | 48,277 | 48,277 | 48,277 | 48,835 | 48,835 | 48,835 | 49,393 | 49,393 | 49,393 | 49,951 | 49,951 | 49,951 | 589,372 |
| Debt service - secured mortgage | | | | | | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (46,822) | (561,864) |
| Net Cash Flow | | | | | | 1,455 | 1,455 | 1,455 | 2,013 | 2,013 | 2,013 | 2,571 | 2,571 | 2,571 | 3,129 | 3,129 | 3,129 | 27,509 |
| Debt service coverage | | | | | | | | | | | | | | | | | | 1.05 |
| | | | | | | | | | | | | | | | | | | 8419603 |

| | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rentable square feet | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 |
| Average rate per square foot | 27.02 | 27.83 | 28.67 | 29.45 | 30.26 | 31.10 | 31.87 | 32.67 | 33.49 | 34.24 | 35.01 | 35.80 | 36.51 | 37.25 |
| Annual income increase | 3.00% | 3.00% | 3.00% | 2.75% | 2.75% | 2.75% | 2.50% | 2.50% | 2.50% | 2.25% | 2.25% | 2.25% | 2.00% | 2.00% |
| Gross Potential Rent | 1,469,630 | 1,513,719 | 1,559,130 | 1,602,007 | 1,646,062 | 1,691,328 | 1,733,612 | 1,776,952 | 1,821,376 | 1,862,357 | 1,904,260 | 1,947,105 | 1,986,048 | 2,025,769 |
| Occupancy - Unit SF | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% |
| Economic occupancy | 97.50% | 98.00% | 98.25% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% | 98.50% |
| Annual Expense Increase | 3.00% | 3.00% | 3.00% | 2.75% | 2.75% | 2.75% | 2.50% | 2.50% | 2.50% | 2.25% | 2.25% | 2.25% | 2.00% | 2.00% |
| **Income** | | | | | | | | | | | | | | |
| Gross Potential Rent | 1,469,630 | 1,513,719 | ######## | 1,602,007 | 1,646,062 | 1,691,328 | 1,733,612 | 1,776,952 | 1,821,376 | 1,862,357 | ####### | ####### | ####### | ####### |
| Less: Management office | (17,479) | (18,003) | (18,543) | (19,053) | (19,577) | (20,115) | (20,618) | (21,134) | (21,662) | (22,150) | (22,648) | (23,158) | (23,621) | (24,093) |
| Less: Economic Vacancy | (36,304) | (29,914) | (26,960) | (23,744) | (24,397) | (25,068) | (25,695) | (26,337) | (26,996) | (27,603) | (28,224) | (28,859) | (29,436) | (30,025) |
| Effective Rental Income | 1,415,847 | 1,465,801 | ######## | 1,559,209 | 1,602,087 | 1,646,145 | 1,687,298 | 1,729,481 | 1,772,718 | 1,812,604 | ####### | ####### | ####### | ####### |
| Laundry and vending revenues | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSF/Late charges/key replacement | 1,030 | 1,061 | 1,093 | 1,123 | 1,154 | 1,185 | 1,215 | 1,245 | 1,277 | 1,305 | 1,335 | 1,365 | 1,392 | 1,420 |
| Damages and cleaning fees | 5,150 | 5,305 | 5,464 | 5,614 | 5,768 | 5,927 | 6,075 | 6,227 | 6,383 | 6,526 | 6,673 | 6,823 | 6,960 | 7,099 |
| Cable revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking revenue | 4,944 | 5,092 | 5,245 | 5,389 | 5,538 | 5,690 | 5,832 | 5,978 | 6,127 | 6,265 | 6,406 | 6,550 | 6,681 | 6,815 |
| Pet deposits (non-refundable) | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 | 3,133 | 3,203 | 3,275 | 3,341 | 3,407 |
| Application fees | 3,708 | 3,819 | 3,934 | 4,042 | 4,153 | 4,267 | 4,374 | 4,483 | 4,595 | 4,699 | 4,805 | 4,913 | 5,011 | 5,111 |
| Other | 3,090 | 3,183 | 3,278 | 3,368 | 3,461 | 3,556 | 3,645 | 3,736 | 3,830 | 3,916 | 4,004 | 4,094 | 4,176 | 4,259 |
| **Total Ancillary Income** | 20,394 | 21,006 | 21,636 | 22,231 | 22,842 | 23,471 | 24,057 | 24,659 | 25,275 | 25,844 | 26,425 | 27,020 | 27,560 | 28,112 |
| **Total Income** | 1,436,241 | 1,486,807 | ######## | 1,581,440 | 1,624,930 | 1,669,615 | 1,711,356 | 1,754,139 | 1,797,993 | 1,838,448 | ####### | ####### | ####### | ####### |
| **Operating Expenses:** | | | | | | | | | | | | | | |
| Admi Travel | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Advertising/marketing | 6,695 | 6,896 | 7,103 | 7,298 | 7,499 | 7,705 | 7,898 | 8,095 | 8,297 | 8,484 | 8,675 | 8,870 | 9,048 | 9,229 |
| Office supplies and expenses | 13,905 | 14,322 | 14,752 | 15,157 | 15,574 | 16,003 | 16,403 | 16,813 | 17,233 | 17,621 | 18,017 | 18,423 | 18,791 | 19,167 |
| Management fees | 71,812 | 74,340 | 76,763 | 79,072 | 81,246 | 83,481 | 85,568 | 87,707 | 89,900 | 91,922 | 93,991 | 96,105 | 98,028 | 99,988 |
| Bookkeeping and accounting | 11,330 | 11,670 | 12,020 | 12,351 | 12,690 | 13,039 | 13,365 | 13,699 | 14,042 | 14,358 | 14,681 | 15,011 | 15,311 | 15,618 |
| Legal - operating | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telephone | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 | 13,052 | 13,346 | 13,646 | 13,919 | 14,198 |
| Computer services | 1,854 | 1,910 | 1,967 | 2,021 | 2,077 | 2,134 | 2,187 | 2,242 | 2,298 | 2,349 | 2,402 | 2,456 | 2,505 | 2,556 |
| Misc. / bank fees / credit repts | 618 | 637 | 656 | 674 | 692 | 711 | 729 | 747 | 766 | 783 | 801 | 819 | 835 | 852 |
| Other | 1,236 | 1,273 | 1,311 | 1,347 | 1,384 | 1,422 | 1,458 | 1,494 | 1,532 | 1,566 | 1,602 | 1,638 | 1,670 | 1,704 |
| Total Administrative | 117,750 | 121,657 | 125,499 | 129,148 | 132,699 | 136,349 | 139,757 | 143,251 | 146,833 | 150,136 | 153,514 | 156,968 | 160,108 | 163,310 |
| Utiliti Electricity | 66,950 | 68,959 | 71,027 | 72,981 | 74,987 | 77,050 | 78,976 | 80,950 | 82,974 | 84,841 | 86,750 | 88,702 | 90,476 | 92,285 |
| Water/sewer | 46,350 | 47,741 | 49,173 | 50,525 | 51,914 | 53,342 | 54,676 | 56,042 | 57,444 | 58,736 | 60,058 | 61,409 | 62,637 | 63,890 |
| Gas | 43,260 | 44,558 | 45,895 | 47,157 | 48,453 | 49,786 | 51,031 | 52,306 | 53,614 | 54,820 | 56,054 | 57,315 | 58,461 | 59,630 |
| Cable | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Utilities | 156,560 | 161,257 | 166,095 | 170,662 | 175,355 | 180,178 | 184,682 | 189,299 | 194,032 | 198,397 | 202,861 | 207,426 | 211,574 | 215,806 |
| Opera Janitorial/Maint payroll | 152,028 | 156,589 | 161,287 | 165,722 | 170,279 | 174,962 | 179,336 | 183,819 | 188,415 | 192,654 | 196,989 | 201,421 | 205,450 | 209,559 |
| Janitorial supplies | 494 | 509 | 525 | 539 | 554 | 569 | 583 | 598 | 613 | 627 | 641 | 655 | 668 | 681 |
| Janitorial contract labor | 3,090 | 3,183 | 3,278 | 3,368 | 3,461 | 3,556 | 3,645 | 3,736 | 3,830 | 3,916 | 4,004 | 4,094 | 4,176 | 4,259 |
| Exterminating contract | 6,180 | 6,365 | 6,556 | 6,737 | 6,922 | 7,112 | 7,290 | 7,472 | 7,659 | 7,831 | 8,008 | 8,188 | 8,352 | 8,519 |
| Garbage and trash | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 | 13,052 | 13,346 | 13,646 | 13,919 | 14,198 |
| Security | 515 | 530 | 546 | 561 | 577 | 593 | 608 | 623 | 638 | 653 | 667 | 682 | 696 | 710 |
| Grounds maintenance | 7,416 | 7,638 | 7,868 | 8,084 | 8,306 | 8,535 | 8,748 | 8,967 | 9,191 | 9,398 | 9,609 | 9,825 | 10,022 | 10,222 |
| Repair materials | 99,910 | 102,907 | 105,995 | 108,909 | 111,904 | 114,982 | 117,856 | 120,803 | 123,823 | 126,609 | 129,457 | 132,370 | 135,018 | 137,718 |
| Repair contract labor | 30,900 | 31,827 | 32,782 | 33,683 | 34,610 | 35,561 | 36,450 | 37,362 | 38,296 | 39,157 | 40,038 | 40,939 | 41,758 | 42,593 |
| Elevator maintenance | 18,540 | 19,096 | 19,669 | 20,210 | 20,766 | 21,337 | 21,870 | 22,417 | 22,977 | 23,494 | 24,023 | 24,564 | 25,055 | 25,556 |
| Heating / cooling maintenance | 1,236 | 1,273 | 1,311 | 1,347 | 1,384 | 1,422 | 1,458 | 1,494 | 1,532 | 1,566 | 1,602 | 1,638 | 1,670 | 1,704 |
| Snow removal | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 | 3,133 | 3,203 | 3,275 | 3,341 | 3,407 |
| Decorating contract | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Decorating supplies | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicle/maint equip repairs | 12,360 | 12,731 | 13,113 | 13,473 | 13,844 | 14,225 | 14,580 | 14,945 | 15,318 | 15,663 | 16,015 | 16,376 | 16,703 | 17,037 |
| Miscellaneous | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 | 3,133 | 3,203 | 3,275 | 3,341 | 3,407 |
| Total Operating & Maintenance | 347,913 | 358,351 | 369,101 | 379,252 | 389,681 | 400,397 | 410,407 | 420,667 | 431,184 | 440,886 | 450,806 | 460,949 | 470,168 | 479,571 |
| Property and liability insurance | 45,320 | 46,680 | 48,080 | 49,402 | 50,761 | 52,157 | 53,461 | 54,797 | 56,167 | 57,431 | 58,723 | 60,044 | 61,245 | 62,470 |
| Property taxes | 171,991 | 177,151 | 182,465 | 187,483 | 192,639 | 197,937 | 202,885 | 207,957 | 213,156 | 217,952 | 222,856 | 227,870 | 232,428 | 237,076 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Replacement reserves (included in Operating and Maintenance) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 217,311 | 223,830 | 230,545 | 236,885 | 243,400 | 250,093 | 256,346 | 262,754 | 269,323 | 275,383 | 281,579 | 287,914 | 293,673 | 299,546 |
| Total Operating Expenses and Replacements | | | | | | | | | | | | | | |
| Total Operating Expenses | 839,535 | 865,095 | 891,240 | 915,947 | 941,136 | 967,017 | 991,192 | 1,015,972 | 1,041,371 | 1,064,802 | ####### | ####### | ####### | ####### |
| Net Operating Income after Replacements | 596,707 | 621,713 | 644,023 | 665,493 | 683,794 | 702,598 | 720,163 | 738,167 | 756,622 | 773,646 | 791,053 | 808,851 | 825,028 | 841,529 |
| Debt service - secured mortgage | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) | (561,864) |
| Net Cash Flow | 34,843 | 59,849 | 82,159 | 103,630 | 121,931 | 140,735 | 158,300 | 176,304 | 194,758 | 211,782 | 229,189 | 246,988 | 263,165 | 279,665 |
| Debt service coverage | 1.06 | 1.11 | 1.15 | 1.18 | 1.22 | 1.25 | 1.28 | 1.31 | 1.35 | 1.38 | 1.41 | 1.44 | 1.47 | 1.50 |

| | Total Income | Total Operating Expenses | Net Operating Income | Economic Occupancy | Revenue Growth | Expense Growth |
|---|---|---|---|---|---|---|
| Year 1 | ####### | 815,611 | 589,372 | 97.08% | 4.41% | - |
| Year 2 | ####### | 839,535 | 596,707 | 97.50% | 3.00% | 3.00% |
| Year 3 | ####### | 865,095 | 621,713 | 98.00% | 3.00% | 3.00% |
| Year 4 | ####### | 891,240 | 644,023 | 98.25% | 3.00% | 3.00% |
| Year 5 | ####### | 915,947 | 665,493 | 98.50% | 2.75% | 2.75% |
| Year 6 | ####### | 941,136 | 683,794 | 98.50% | 2.75% | 2.75% |
| Year 7 | ####### | 967,017 | 702,598 | 98.50% | 2.75% | 2.75% |
| Year 8 | ####### | 991,192 | 720,163 | 98.50% | 2.50% | 2.50% |
| Year 9 | ####### | ####### | 738,167 | 98.50% | 2.50% | 2.50% |
| Year 10 | ####### | ####### | 756,622 | 98.50% | 2.50% | 2.50% |
| Year 11 | ####### | ####### | 773,646 | 98.50% | 2.25% | 2.25% |
| Year 12 | ####### | ####### | 791,053 | 98.50% | 2.25% | 2.25% |
| Year 13 | ####### | ####### | 808,851 | 98.50% | 2.25% | 2.25% |
| Year 14 | ####### | ####### | 825,028 | 98.50% | 2.00% | 2.00% |
| Year 15 | ####### | ####### | 841,529 | 98.50% | 2.00% | 2.00% |