**SMITH & SMITH**
GERALD K. SMITH AND JOHN C. SMITH
LAW OFFICES, PLLC
ATTORNEYS AT LAW

6720 E. Camino Principal, Suite 203
Tucson, AZ 85715
Tel: (520) 722-1605
Fax: (520) 844-8070

John C. Smith, State Bar No. 023008
Email: john@smithandsmithpllc.com

*Attorney for Debtor*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| EGAE, LLC, | Case No. 3:23-bk-00169-GS |
| Debtor. | |

## DEBTOR'S MODIFIED THIRD AMENDED PLAN OF REORGANIZATION DATED AUGUST 2, 2024

4866-1227-5409, v. 6

# TABLE OF CONTENTS

**I.     INTRODUCTION** ..................................................................................................... **4**

**II.    DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME 4**

    A.   RULES OF CONSTRUCTION ........................................................................ 4
    B.   RULES OF INTERPRETATION ..................................................................... 4
    C.   COMPUTATION OF TIME .......................................................................... 5
    D.   DEFINITIONS ........................................................................................... 5

**III.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ................ **11**

    A.   UNCLASSIFIED CLAIMS ......................................................................... 11
    B.   CLASSIFIED CLAIMS ............................................................................. 12

**IV.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .................................. **14**

    A.   ASSUMPTION OF CONTRACTS AND LEASES ............................................ 14
    B.   REJECTION OF CONTRACTS AND LEASES ............................................... 16

**V.    MEANS FOR EXECUTING AND IMPLEMENTING THE PLAN** .......................... **17**

    A.   MEANS OF FUNDING THE PLAN .............................................................. 177
    B.   CAUSES OF ACTION .............................................................................. 178
    C.   MANAGEMENT ...................................................................................... 18
    D.   OBJECTION TO CLAIMS AND INTERESTS ............................................... 18
    E.   TAX COMPLIANCE ................................................................................ 199
    F.   VESTING ............................................................................................... 199

**VI.   DISTRIBUTIONS UNDER THE PLAN** ............................................................ **19**

    A.   MANNER OF CASH PAYMENTS UNDER THE PLAN .................................... 19
    B.   NO DE MINIMIS DISTRIBUTIONS ........................................................... 19
    C.   NO DISTRIBUTIONS TO HOLDERS OF DISPUTED CLAIMS ........................ 19
    D.   DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE/UNCLAIMED DISTRIBUTIONS .......... 20
    E.   CLAIMS BAR DATE ............................................................................... 21

**VII.  EFFECT OF PLAN ON CLAIMS** ................................................................... **21**

    A.   EFFECT OF CONFIRMATION ................................................................... 21
    B.   REORGANIZED DEBTOR'S AUTHORITY TO COMPROMISE AND SETTLE ..... 22
    C.   RIGHT OF SETOFF ................................................................................. 22

**VIII.  OTHER PROVISIONS** ................................................................................. **22**

    A.   BINDING EFFECT .................................................................................. 22
    B.   REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION ....................... 22
    C.   PLAN MODIFICATION ............................................................................ 23
    D.   SEVERABILITY OF PLAN PROVISIONS .................................................... 23
    E.   PLAN SUPPLEMENT .............................................................................. 23
    F.   CONSEQUENCES OF DEFAULT ............................................................... 23
    G.   POST-CONFIRMATION DEBTOR'S ACTION ............................................. 24
    H.   NON-ALLOWANCE OF PENALTIES OR FINES .......................................... 24
    I.   POST-CONFIRMATION EMPLOYMENT OF PROFESSIONALS ...................... 24
    J.   PAYMENT OF STATUTORY FEES ............................................................ 24
    K.   DOCUMENTATION OF PLAN IMPLEMENTATION ...................................... 244
    L.   NOTICES ............................................................................................... 25

4866-1227-5409, v. 6

M.    TERMS OF INJUNCTIONS OR STAYS ................................................... 25
N.    IN REM RELIEF FROM STAY ........................................................... 276
O.    RELEASE AND COVENANT NOT TO ENFORCE ..................................... 26
P.    GOVERNING LAW ......................................................................... 27

IX.   **RETENTION OF JURISDICTION** ..................................................... **27**

X.    **REQUEST FOR CONFIRMATION AND RECOMMENDATION** ............................ **28**

Exhibit A-1   Binding Term Sheet and Plan Agreement between
                  EGAE LLC and MidCap Funding Investment X LLC
Exhibit A-2   Deed in Lieu of Foreclosure Agreement with exhibits
Exhibit A-3   Form of Joint Escrow Instructions
Exhibit B     Chart of Payments to Class 4 Unsecured Creditors
Exhibit C     Liquidation Analysis
Exhibit D     Income and Operating Expense Projections and
                  Post-Confirmation Budget
Exhibit E     Report of Dennis Winans

## I.    INTRODUCTION

EGAE, LLC, the Chapter 11 Debtor, proposes the following Modified Third Amended Plan (the "**Plan**") for the resolution of outstanding Creditor Claims and Equity Interests.  Reference is made to the Second Amended Disclosure Statement for a discussion of the Debtor's history, business, properties, results of operations, risk factors, a summary and analysis of the Plan, and other related matters.[1]   The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

This Plan provides for payments to creditors from the revenues generated by Debtor over time and new equity contributions. In addition, the Plan incorporates a settlement with its Class 3 creditor, MidCap Funding X LLC ("**MidCap**"), which requires refinancing and payment of MidCap's loan by March 31, 2025.  The terms of the settlement are contained in section III(B) and the Term Sheet, Deed in Lieu Agreement, and Escrow Instructions, attached as Exhibit A-1 through A-3.

All holders of Claims and the holder of the Interests are encouraged to read this Plan and the Disclosure Statement in its entirety before voting to accept or reject this Plan or objecting to the confirmation of this Plan.  Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## II.    DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### a.    Rules of Construction

All definitions set forth below are incorporated in the Plan for all purposes.  Any term used in this Plan that is not defined herein but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural and the singular.

### b.    Rules of Interpretation

For purposes of the Plan (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that it shall be substantially in such form or substantially on such terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c)

---

[1] Debtor has included Exhibits B-E from the Second Amended Disclosure Statement in this Third Amended Plan for ease of reference.

4

unless otherwise specified, all references in the Plan to Articles, Appendices, Schedules, and Exhibits are references to Articles, Schedules, Appendices and Exhibits of or to the Plan; (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**c.**     **Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**d.**     **Plan Definitions**

Terms used in this Plan have the meaning specified in the Bankruptcy Code and Rules, if defined therein, unless any Plan Definition applies or the context clearly requires otherwise.  The following Plan Definitions shall apply to this Plan:

**1.1**     **Administrative Expense**:   Any cost or expense of administration incurred in connection with the Debtor's Chapter 11 cases, in accordance with Section 503(b), including, without limitation:

a.     the actual, necessary costs and expenses of preserving Debtor's estates and operating Debtor's business (other than expenses which, by their express terms are not due or payable by the Effective Date);

b.     the full amount of all requests for compensation for legal or other professional services or reimbursement of costs and expenses under Sections 330 and 503(b), or otherwise as allowed by the Bankruptcy Court; and

c.     all fees and charges assessed against Debtor's estates under 28 U.S.C. § 1930.

**1.2**     **Administrative Claims Bar Date**:   The date established in this Plan and approved by the Court by which all applications for payment of an Administrative Expense must be filed.

**1.3**     **Allowed**:   A claim (other than an Administrative Expense) is allowed when (a) it is scheduled by Debtor in a set amount or up to a set amount and as undisputed and not contingent; (b) a proof of claim is filed by the Claims Bar Date and no objection is filed by the Objection Bar Date; (c) allowed by entry of a Final Order; or is allowed pursuant to this Plan. As to an Administrative Expense, "Allowed" means approval by Final Order, after notice and hearing as required by the Bankruptcy Code, of an application for payment of Administrative Expense filed by the deadline

5

established by the Court, but not including any Administrative Expenses that may have been paid previously.

**1.4**    **Ballot**:  Each of the ballot forms distributed with the Disclosure Statement to holders of Impaired Claims entitled to vote under Article II hereof in connection with the solicitation of acceptances of the Plan.

**1.5**    **Bankruptcy Code or Code**:  The Bankruptcy Reform Act of 1978, as amended, codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

**1.6**    **Bankruptcy Court or Court**:  United States Bankruptcy Court for the District of Alaska, sitting in this Case, with respect to any particular proceeding arising under, in, or relating to the Debtor's case.

**1.7**    **Bankruptcy Rules**:  The Rules of Practice and Procedure in Bankruptcy, the Local Rules of the United States Bankruptcy Court for the District of Alaska, and to the extent applicable, the Local Rules of the United States District Court for the District of Alaska.

**1.8**    **Case**:  Debtor's Chapter 11 bankruptcy case pending before the Bankruptcy Court under the provisions of the Bankruptcy Code, and all adversary proceedings, contested matters, and other litigation arising in or related to it.

**1.9**    **Cash**:  Legal tender of the United States or equivalents thereof.

**1.10**    **Chapter 11 Case**:  The Chapter 11 Case of EGAE, LLC.

**1.11**    **Claim**:  Any "claim" as defined by Section 101(5).

**1.12**    **Class**:  Any class into which Allowed Claims are classified pursuant to this Plan.

**1.13**    **Collateral**:  Any property or interest in property of Debtor's estate subject to a lien, including unperfected security interests to secure the payment or performance of a Claim, which lien or unperfected interest is not invalid, unenforceable, or subject to avoidance under the Bankruptcy Code or other applicable law.

**1.14**    **Confirmation**:  Entry by the Bankruptcy Court of the Confirmation Order.

**1.15**    **Confirmation Date**:  The date the Clerk of the Bankruptcy Court enters the Confirmation Order on the Clerk's docket sheet.

**1.16**    **Confirmation Hearing**:  The hearing to consider confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.17**    **Confirmation Order**:  The appealable order of the Court confirming the Plan.

**1.18**    **Creditor**:  Any person or entity who holds a Claim against Debtor.

**1.19**    **Debtor**:  EGAE, LLC.

6

4866-1227-5409, v. 6

**1.20**     **Deed in Lieu of Foreclosure Agreement or "DIL Agreement:"** That Deed in Lieu of Foreclosure Agreement, between the Debtor and MidCap including all exhibits thereto, providing for, *inter alia*, delivery of a Deed in Lieu of Foreclosure and the other DIL Documents from the Debtor to MidCap or its Designee, which is attached hereto as Exhibit A-2.

**1.21**     **DIL Documents**: Those Documents identified on Exhibit A to the Term Sheet, as modified by the DIL Agreement.

**1.22**     **Distribution Date**: That date that is thirty (30) days after (a) the date the MidCap Claim is fully paid, or (b) March 31, 2025, provided that MidCap has either been fully paid or received the DIL Documents, defined herein.

**1.23**     **Disbursing Agent**: Reorganized Debtor will serve as the Disbursing Agent and shall make distributions to holders of Allowed Claims under the Plan.

**1.24**     **Disclosure Statement**: The Disclosure Statement pertaining to this Plan submitted by the Debtor to the Court for approval pursuant to Section 1125(b), including any amendments or modifications.

**1.25**     **Disputed Claim**: A Claim not otherwise Allowed or paid pursuant to the Plan or an Order of the Bankruptcy Court, (a) which has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed, and which has not been resolved by written agreement of the parties or an order of the Bankruptcy Court, (b) proof of which was required to be filed by Order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly filed, (c) proof of which was timely and properly filed and which has been or hereafter is listed on the Schedules as unliquidated, disputed or contingent, (d) that is disputed in accordance with the provisions of this Plan, or (e) as to which a party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or is otherwise disputed by a party in interest in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; provided, however, that for purposes of determining whether a particular Claim is a Disputed Claim prior to the expiration of any period of limitation fixed for the interposition of objections to the allowance of Claims, any Claim that is not identified by Debtor as an Allowed Claim shall be deemed a Disputed Claim.

**1.26**     **Effective Date**: The date thirty calendar days following the Confirmation Date and the lapse of any stay of the Confirmation Order, including the automatic stay under Bankruptcy Rule

4866-1227-5409, v. 6

3020(e). If the date thirty calendar days following the Confirmation Date should fall on a Saturday, Sunday, or legal holiday, then the Effective Date shall be the following business day.

**1.27** **Escrow:** That "Escrow" as defined in the Term Sheet and DIL Agreement.

**1.28** **Escrow Instructions**: The Escrow Instructions attached hereto as Exhibit A-3.

**1.29** **Estate Funds**: The cash generated from the Debtor's operations or otherwise received by or in possession of Debtor which is not subject to any valid and enforceable liens and the proceeds of any collateral to the extent that such proceeds exceed all Claims secured by valid and enforceable liens on such collateral.

**1.30** **Excess Cash Flow**: Cash flow of the Debtor from business income after deduction of all payments to administrative, priority, and secured creditors.

**1.31** **Executory Contract**: A lease or executory contract within the meaning of Section 365, including without limitation real property leases and/or personal property, but excluding any leases that would be treated as security interests under Uniform Commercial Code §1-201(37).

**1.32** **Fair Market Value**: The price in cash, terms equivalent to cash, or other precisely revealed terms, for which real or personal property would sell after reasonable exposure in the market under conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress.

**1.33** **Final Order**: An order, ruling or other judgment that: (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

**1.34** **General Administrative Claim**: All Claims entitled to priority as expenses of administration under Sections 503 and 507(a)(1).

**1.35** **General Unsecured Claim**: A Claim against Debtor that is not: (a) a Priority Claim; (b) a Secured Claim; or (c) an Unperfected Secured Claim.

**1.36** **Impaired**: When used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.37** **Interest**: (a) The legal, equitable, contractual and other rights of any person with respect to any Equity Securities issued by the Debtor, and (b) the legal, equitable, contractual or other rights of any person to acquire or receive any of the foregoing.

**1.38** **Lien**: A charge against or interest in property to secure payment of a debt or performance of any obligation, including without limitation a security interest, as defined in the

8

Bankruptcy Code Section 101(51), whether granted before or after the Petition Date, and including all liens created pursuant to the Bankruptcy Court's Orders.

**1.39    Litigation Claims**:  The claims, causes of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, all of which are to be transferred to Reorganized Debtor pursuant to the Plan.

**1.40    MidCap:**  MidCap Funding Investment X, LLC.

**1.41    MidCap Released Entities:**  Class 3 claimant, inclusive of MidCap Funding Investment X LLC, MidCap Financial Trust, MidCap Financial Services, LLC, and their respective affiliates, and their respective employees, agents, managers, directors, officers, trustees, advisors, investment managers, servicers, professionals and other representatives, successors and assigns.

**1.42    MidCap Released Claims:** All claims, known or unknown, filed or unfiled, asserted or assertable by EGAE against the MidCap Entities, relating in any way to the Loan or the Real Property as defined in the DIL Agreement, or HUD transaction MHLS 2023-1.

**1.43    Objection Bar Date**:  The date established in this Plan by which the Reorganized Debtor or any other party-in-interest may object to any Claim that has not been allowed by a Final Order of the Court.

**1.44    Personal Property:**  All of Borrower's tangible and intangible personal property as defined in the DIL Agreement.

**1.45    Petition Date**:  October 5, 2023, the date upon which Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**1.46    First Amended Plan**:  This First Amended Plan of Reorganization dated March 29, 2024, submitted by Debtor including any amendments or modifications made in accordance with the applicable provisions of the Code.

**1.47    Plan**: This Modified Third Amended Plan, all attached exhibits, and the Order confirming this Plan.

**1.48    Priority Tax Claim**:  Any Claim for taxes entitled to priority under Section 507(a)(8).

**1.49    Professional**:  Any professional employed in the Chapter 11 Case pursuant to Sections 327 or 1103 of the Bankruptcy Code or otherwise and the professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b)(4) of the Bankruptcy Code.

9

4866-1227-5409, v. 6

**1.50    Property**: All Real Property and Personal Property owned or leased by Debtor, or in which the Debtor has any actual, asserted or claimed ownership interest, including intangibles and the Real Property:

**1.51    Property Tax Claim**:  Claim held by any governmental taxing authority secured by real or personal property of the Debtor's estate.

**1.52    Pro Rata**:  At any time, the proportion that the face amount of a Claim bears to the aggregate face amount of all Claims (including Disputed Claims) in a Class, unless the Plan provides otherwise.

**1.53    Real Property**:  The real property commonly known as the McKinley Tower Apartments located in the McKinley Tower at 337 East 4th Ave., Anchorage, Alaska, and more fully described on Exhibit A to the Deed in Lieu of Foreclosure Agreement as:

> Unit A of McKinley Tower, a common interest community, as shown on the Floor Plans filed under Plat No. 2005-26, Records of the Anchorage Recording District, Third Judicial District, State of Alaska, and as described in the Declaration of McKinley Tower, recorded on the 8th day of March, 2005 at Reception No. 2005-014348-0, Anchorage Recording District, Third Judicial District, State of Alaska, and in the First Amendment to the Declaration of McKinley Tower, recorded on the 24th day of March, 2008, at Reception No. 2008-015687-0, Anchorage Recording District, Third Judicial District, State of Alaska.

The Real Property is (a) a condominium comprised of a portion the McKinley Tower, and (b) a 68% undivided interest in the common areas serving the McKinley Tower.

**1.54    Real Property Lease**:  A lease of nonresidential real property within the meaning of Bankruptcy Code Section 365(d).

**1.55    Reorganized Debtor:** Debtor after the Effective Date.

**1.56    Retained Assets**:  The assets described as being retained by Debtor.

**1.57    Schedules**:  The schedules of assets and liabilities and the statements of financial affairs, if any, filed in the Bankruptcy Court by Debtor, as the case may be, as such schedules or statements may be amended or supplemented from time to time in accordance with Fed. R. Bankr. P. 1009 or orders of the Bankruptcy Court.

**1.58    Section.**  Any section of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

**1.59    Secured Claim**:  A Claim, other than a Setoff Claim, that is secured by a security interest, perfected or unperfected in or lien upon property, or the proceeds of the sale of such property, in which Debtor has an interest to the extent of the value, as of the Closing Date or such later date as is established by the Bankruptcy Court, of such interest or lien as determined by a Final Order of the

10

Bankruptcy Court pursuant to Section 506 of the Bankruptcy Code or as otherwise agreed upon in writing by such Debtor or Reorganized Debtor and the holder of such Claim The Claim of Class 3 under this Plan is a Secured Claim.

**1.60    Setoff Claim**:  A Claim, against Debtor, of a holder that has a valid right of setoff with respect to such Claim, which right is enforceable under Section 553 of the Bankruptcy Code as determined by a Final Order or as otherwise agreed in writing by Reorganized Debtor, to the extent of the amount subject to such right of setoff.

**1.61    Term Sheet**:  That certain Binding Term Sheet and Plan Agreement executed July 6, 2024, between the Debtor and MidCap attached hereto as **Exhibit A-1**.

**1.62    Solicitation**:   The solicitation of acceptances or rejections of the Plan pursuant to Section 1126(b) of the Bankruptcy Code

**1.63    Substantial Consummation**:  The time defined by 11 U.S.C. § 1102(2).

**1.64    Tenants Claims:**  A claim against the Debtor, in the approximate amount of $43,000 for funds misappropriated from the tenants' security deposit account, which has been cured.

**1.65    Unsecured Claim**:  Any Claim other than an Administrative Expense, Priority Tax Claim, a Secured Claim, or an Unperfected Secured Claim.

**III.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

All Claims and Interests, except administrative expense and priority tax claims, are placed into classes as set forth below.  A Claim or Interest is placed in a particular class, only to the extent that the Claim or Interest falls within the description of that class and is classified in all other classes to the extent that any portion of the Claim or Interest falls within the description of such other class.

A Claim or Interest is placed into a particular class for all purposes, including voting on this Plan, confirmation, and receiving distributions pursuant to this Plan, only to the extent that such Claim or Interest is an Allowed Claim in that class, and such claim has not been paid, released, or otherwise settled prior to the Effective Date.   The establishment of particular Classes or categories of Unclassified Priority Claims does not mean or imply that there are any Allowed Claims that fall into each such Class or category, and Debtor may later contend there are no such Allowed Claims in any given Class or category.

**A.    Unclassified Claims**

Pursuant to Section 1123(a)(1), Administrative Expenses pursuant to Section 507(a)(2) and Priority Tax Claims pursuant to Section 507(a)(8) are not classified under the Plan.  These Claims are

4866-1227-5409, v. 6

not considered impaired, and holders of such Claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.

**Administrative Expenses**

Administrative Expenses are costs or expenses of administering the Chapter 11 case that are allowed under Section 507(a)(2).  The holders of Administrative Expenses shall receive cash on account and in the amount of such Administrative Expenses.  At the option of Debtor, payment of Administrative Expenses shall be made in cash: (a) on the Effective Date; or (b) when due in accordance with the terms of any agreement between Debtor and the holder of the administrative claim.  Any sums due more than 10 days without payment will accrue interest at a rate of 5% until paid in full. Professionals employed at the expense of the Estate and entities who may be entitled to reimbursement or the allowance of fees and expenses from the Estate pursuant to Section 503(b)(2)-(6) shall receive cash in the amount awarded to such professionals and entities at such times and only in accordance with a Final Order entered pursuant to Sections 330 or 503(b)(2)-(6).

Any application for payment of an Administrative Expense shall be filed within 45 days of the Effective Date (the "**Administrative Expenses Bar Date**") or shall be forever barred.

The anticipated and estimated Administrative Expenses on the Effective Date include (a) Debtor's counsel's outstanding fees in the approximate amount of $100,000.00 and costs in the approximate amount of $1,500.00, and (b) the allowed fees and costs of Debtor's financial expert witness, Mr. Dennis Winans in the approximate amount of $16,000.  The Debtor reserves all rights to submit additional Administrative Expenses to the Court for approval for Debtor's counsel's services provided between the filing of the Plan and Disclosure Statement and the Confirmation Hearing.  Post-confirmation, the Reorganized Debtor's counsel will continue to incur fees but shall no longer be subject to Court approval as to allowance and payment.

Notwithstanding any provision in the Plan to the contrary, all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Debtor's manager, Mr. Marc Marlow, may pay a portion or all of Debtor's allowed administrative expenses and fees prior to the effective date.

**B.    Classified Claims**

**Priority Claims**

**Class 1 – Priority Tax Claims**

According to Debtor's Schedule E, there are no claims entitled to priority and no sums are owed to governmental entities for taxes due as of the Petition Date.

12

All valid enforceable liens securing repayment of the Class 1 Claims shall be retained not withstanding confirmation of the Plan or occurrence of the Effective Date. Such Allowed Claims shall be paid in full, in cash, plus interest at the statutory rate from the Petition Date, over 3 years, with the last payment due on the third anniversary of the Petition Date. Payments shall be in quarterly installments, beginning on the Distribution Date. Subsequent payments shall be made on the 20th day of the month every 90 days thereafter, until maturity. Post-petition taxes will be paid when due in the ordinary course of business, without the necessity of the filing of a proof of claim.

Class 1 is impaired.

**Class 2 – Unsecured Priority Non-Tax Claims**

This Class shall consist of Allowed Claims entitled to priority under Section 507(a), other than Priority Tax Claims. Pursuant to Debtor's Schedule E, there are no claims entitled to priority under Section 507(a)(4).

Certain creditors are entitled to Section 503(b)(9) administrative priority, which are the Allowed Claims of creditors who delivered goods in the ordinary course of business and received by Debtor within 20 days before the petition date and which are otherwise legally entitled to such status. All allowed claims entitled to administrative priority pursuant to this section of the Bankruptcy Code will be paid in full on the later of the Effective Date or the allowance of the claim.

Class 2 is impaired.

**Secured Claims**

**Class 3 – MidCap Secured Claim**

The Claim of MidCap secured by the Property shall remain secured after the Effective Date by the same Property and in the same priority as was the case on the Petition Date.

The Court approved the stipulation of MidCap and the Debtor that the value of the Real Property is $9.85 million. The value of the Real Property securing MidCap's Claim shall be deemed equivalent to the Claim of MidCap.

The Allowed Class 3 Claim shall be impaired under Section 1124(a). The holder of a Class 3 Claim shall retain its liens against the Property and will be treated in accord with the Term Sheet, the DIL Agreement, and the Escrow Instructions (the "**Settlement Documents**"), attached as Exhibits A-1 through A-3, each of which shall be approved by the Court in the Order Confirming Plan. The Class 3 claim will be treated as undersecured for purposes of the Settlement Documents. The Class 3 claimant shall have no rights to a deficiency claim under Class 4.

Class 3 is impaired.

13

4866-1227-5409, v. 6

**Unsecured Claims**

**Class 4 - General Unsecured Claims**

This Class consists of Allowed Claims without statutory priority or security.  This Class is estimated at $2,066,025.00, excluding disputed claims, based on Debtor's Amended Schedule F.

Class 4 shall receive the following pro rata payments commencing on the Distribution Date and continuing annually until the fifth anniversary of the Effective Date: $30,000 in Years 1-5. Payments shall commence on the Distribution Date and continue annually until the fifth anniversary of the Effective Date.  See chart of payments to Class 4 Creditors attached as Exhibit B. All remaining amounts of Class 4 Claims shall be discharged. Payments will be made from Debtor's post-confirmation cash flow and equity contributions.

Class 4 is impaired.

**Class 5 – Tenants' Unsecured Claims**

This Class shall consist of the allowed collective Section 365 cure claims of the tenants who reside in the McKinley Tower pursuant to leases which the Debtor is assuming under the terms of this Plan.  The Tenant Claims arose prior to the Petition Date when the Debtor used a portion of their security deposits to make repairs to the Property.  The funds have been fully reimbursed by the Debtor. The collective value of the Tenant Claims is estimated at $93,000.  Debtor intends to assume all unexpired tenant leases and satisfy the Class 5 Tenant Claims in full on or before the Effective Date.

Class 5 is not impaired.

**Ownership Interest**

**Class 6 – Ownership Interest in EGAE, LLC**

EGAE, LLC's prepetition equity holder will continue its ownership of the Debtor post-confirmation and shall contribute the sums necessary for occurrence of the Effective Date of the Plan.

Class 6 is impaired.

**IV.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.    Assumption of Contracts and Leases**

As of the Effective Date the Reorganized Debtor shall assume each Executory Contract and Unexpired Lease (i) on EGAE's rent roll on the Effective Date or for future rentals, or (ii) listed by Debtor in its Schedule G; but not any executory contract or unexpired lease listed on the Schedule of Rejected Contracts filed by Debtor prior to Confirmation of the Plan.

Entry of the Confirmation Order shall constitute approval of the rejections and assumptions contemplated hereby pursuant to Sections 365 and 1123 as of the Effective Date, without prejudice to

14

4866-1227-5409, v. 6

Debtor's right to modify this portion of the Plan by amending the Schedule of Assumed Contracts and Schedule of Rejected Contracts and Leases prior to the Distribution Date in accordance with Section 1127(b).

Each executory contract or unexpired lease that is to be assumed and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts and unexpired leases appurtenant to the premises, including: all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interest in real estate or rights in rem related to such premises, and (c) any of the foregoing that are required by MidCap pursuant to the DIL Agreement, unless any of the foregoing agreements have been rejected pursuant to any order of the Court that may be entered prior to the Effective Date, including the Confirmation Order. For the avoidance of doubt the Deed in Lieu of Foreclosure Agreement shall be implemented by the Order confirming the Plan and shall not be rejected by the Debtor.

### 1.    Cure Payments.

Reorganized Debtor shall honor without change its contractual and other obligations to tenants of the Property. As to all other Executory Contracts and Unexpired Leases, to the extent arrearages remain unpaid, Section 365(b)(1)(A) or (B) require payment of those sums to such parties in order to cure defaults under the executory contracts and unexpired leases to be assumed under the Plan ("**Cure Payments**"), including the Tenant Claims.  If any non-debtor party to an executory contract or lease contends that defaults exist (other than the Tenant Claims which will be treated and cured in accordance with Class 5 as set forth above) and must be cured under such party's executory contract or lease, then that party must comply with the Plan.  As required by Section 365(b)(1), any and all monetary defaults under each executory contract and unexpired lease to be assumed under the Plan will be satisfied on the Distribution Date, unless subject to a pending dispute on that date or as otherwise agreed.

If a dispute arises regarding: (a) the amount of any proposed Cure Payments; (b) whether Reorganized Debtor provided adequate assurance of future performance under an executory contract or unexpired lease to be assumed, to the extent required under the Bankruptcy Code; or (c) any other matter pertaining to a proposed assumption, then any required Cure Payments will be made by the later of the Distribution Date or 14 days after entry of a Final Order resolving the dispute and approving

the assumption.  If there is either a dispute as to the Cure Amount, or the non-debtor party otherwise objects to assumption, then Reorganized Debtor shall have the right to treat such contract or agreement as rejected under the Plan at any time during the pendency of such dispute or upon resolution of such dispute.

### 2. Objections to Assumption or Proposed Cure Payments.

Any entity that is a party to an executory contract or unexpired lease that will be assumed under the Plan and either contends that the proposed Cure Payment described above is incorrect or otherwise objects to the contemplated assumption must file with the Court a written statement and supporting declaration of facts stating the basis for its objection.  This statement and declaration must be filed and served by the later of: (a) the Effective Date; or (b) five Business Days after Debtor files and serves any Plan modification with respect to an executory contract or unexpired lease to be assumed.  Any entity that fails to timely file and serve such a statement and declaration will be deemed to waive and release any and all objections to the proposed assumption and the proposed Cure Payments.

### 3. Resolution of Claims Relating to Assumed Agreements

Payment of any Cure Payments required by Court Order with respect to executory contracts or unexpired leases that are assumed under the Plan shall be deemed to satisfy, in full, any prepetition arrearage or other damage claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the Cure Payment is less than the amount set forth in such proof of Claim or the Schedules.  Upon the tendering of the Cure Payment, such Claim shall be Disallowed without further order of the Court or action by any party.

### B. Rejection of Contracts and Leases

### 1. Identification of Rejected Agreements

As of the Effective Date, Debtor will reject any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and any not identified on the Schedule of Assumed Agreements filed by Debtor prior to Confirmation, as that Schedule may be amended from time to time, to the extent that these agreements constitute executory contracts or unexpired leases under Section 365, as well as any contracts or leases previously rejected pursuant to Court orders.

Debtor reserves the right to modify or amend the Plan at any time before the Effective Date to: (a) provide for assumption and assignment of any executory contract or unexpired lease under the Plan, or (b) delete any executory contract or unexpired lease from the Schedule of Assumed Agreements and thus provide for its rejection under the Plan, pursuant to Section 1127(b), provided, however, that any such amendments may be made only before substantial consummation of the Plan,

16

and provided further that any such amendments shall meet the requirements of §§ 1122 and 1123 of the Bankruptcy Code.  Debtor shall provide notice of any modification to the Plan to the party or parties to the executory contracts or unexpired leases affected by the amendment.

The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of any and all executory contracts and unexpired leases not assumed under the Plan.

**2.    Rejection Damages – Bar Date for Rejection Damage Claims.**

Any Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be filed and served upon Reorganized Debtor by the Rejection Claims Bar Date. Any such Claims that are not timely filed and served will be entitled to distribution from Reorganized Debtor only after full payment of all timely filed class 1 through 6 allowed claims.

All timely filed Claims for rejection damages shall be classified as unsecured claims and treated in accordance with the Plan.

**V.    MEANS FOR EXECUTING AND IMPLEMENTING THE PLAN**

**A.    Means of Funding the Plan**

The Debtor intends to continue to operate McKinley Towers and seek refinancing that will resolve and pay the Class 3 claim of MidCap. In the event the refinancing is accomplished pursuant to the Plan's required treatment of Class 3 the Debtor will continue to operate McKinley Towers.

The Debtor's management company, Kenco Building Services, LLC ("**Kenco**"), will have a variable payment plan with a management fee of no more than 5% of total revenues or as otherwise allowed pursuant to the Debtor's post-confirmation budget, paid after payment of claims to creditors which will allow for an effective guarantee in the event the Debtor has any operating losses during the course of the Plan of Reorganization.  This will allow Kenco to pay back any transfers made to it that may be deemed fraudulent after analysis of the Debtor's fraudulent transfers.  Kenco will also waive any right to receive rejection damages arising from the rejection of its pre-confirmation management agreement.  Stated more succinctly, and as demonstrated by the cash flow projections, management will support cash flow by reducing its management fee and by contributions as required in order to ensure feasibility. Attached as Exhibit D-2 is the Debtor's post confirmation budget through the end of 2024.

Finally, the Debtor voluntarily waives its exclusivity to file a Plan of Reorganization under 11 U.S.C.§ 1121(b) to allow an opportunity to any party in interest to compete in the marketplace by proposing an alternative plan of reorganization and thus allow for the market's scrutiny of the Debtor's

17

proposed Plan of Reorganization and test the valuation of Equity's contribution to the Plan of Reorganization.

**B.    Causes of Action**

Pursuant to Section 1123(b)(3), the Reorganized Debtor shall retain all of Debtor's Causes of Action, including any avoidance causes of action relating to or in connection with payments made or transfers to insiders or affiliates of Debtor and violations of the automatic stay.

**C.    Management**

From and after the Effective Date, Reorganized Debtor will continue to be managed by Marc Marlow, which management may subsequently be modified to the extent provided by Reorganized Debtor's articles of organization, by-laws, and operating agreement (as amended, supplemented, or modified) and where permitted by the DIL Agreement. EGAE will execute a post-confirmation management agreement acceptable to MidCap on or about the Effective Date.  On and after the Effective Date, the appropriate managers or members of Reorganized Debtor are authorized to issue, execute, deliver, and consummate the transactions contemplated by or described in the Plan in the name of and on behalf of Reorganized Debtor without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule, or any requirements of further action, vote, or other approval or authorization by any Person.

**D.    Objection to Claims and Interests**

At any time before the expiration of 60 days after the Effective Date, the Reorganized Debtor or any other party in interest may object to any Claim that was not scheduled, or was scheduled as disputed, contingent, or unliquidated, that has not been allowed by a Final Order of the Bankruptcy Court.  Any Claim that was not scheduled and for which no Proof of Claim was filed will be disallowed.

Except with regard to Administrative Expenses, objections to Claims and Interests shall be filed and served upon the holder of such Claim or Interest no later than the Claims Objection Bar Date.

There shall be no distribution to the holder of a Disputed Claim until the Objection to the Claim has been resolved by a Final Order of the Bankruptcy Court and the Claim has become an Allowed Claim.  Payments and distributions on account of each Disputed Claim that is Allowed shall be made in accordance with the provisions of the Plan relating to the class of creditors to which the holder belongs.

18

4866-1227-5409, v. 6

### E.    Tax Compliance

Debtor shall comply with all tax withholding and reporting requirements, including with regard to all distributions and receipts pursuant to this Plan, as applicable.  All holders of Allowed Claims and Interests shall have sole responsibility for any tax obligation imposed by any governmental unit pursuant to a distribution received under the Plan.

### F.    Vesting

Except as provided for in the Plan or Confirmation Order, on the Effective Date, the Reorganized Debtor shall be vested with the remaining property or assets from the Estate, free and clear of all claims, liens, charges, and other interests of creditors arising prior to the filing date, except as provided by the Plan, to be liquidated in the ordinary course of business.

## VI.    DISTRIBUTIONS UNDER THE PLAN

### A.    Manner of Cash Payments under the Plan

With respect to distributions, cash payments to domestic entities holding Allowed Claims will be tendered in U.S. Dollars and will be made by checks drawn on a domestic bank, or at Reorganized Debtor's option, by wire transfer from a domestic bank.  Payments made to foreign creditors holding Allowed Claims may be paid in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### B.    No *De Minimis* Distributions

Notwithstanding anything to the contrary in the Plan, no cash payment of less than $5.00 will be made to any entity holding an Allowed Claim for less than such amount. No consideration will be provided in lieu of the de minimis distributions that are not made under this Section.

### C.    No Distributions to Holders of Disputed Claims

Notwithstanding any other provisions of the Plan governing distributions, no payments of cash or distributions of other property or other consideration of any kind shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim.  The presence of a Disputed Claim in any Class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes, so long as a reserve is created for the Disputed Claim.  Any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution within 10 Business Days after the date that such Claim becomes an Allowed Claim.  Unless otherwise specifically provided for in the Plan or as otherwise required by Code § 506(b), interest shall not accrue or be paid on any Disputed Claim in respect of the

period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### D.   Delivery of Distributions and Undeliverable/Unclaimed Distributions

#### 1.   Delivery of Distributions in General

Reorganized Debtor shall serve as the Disbursing Agent for all payments due on the Effective Date and shall make distributions to each holder of an Allowed Claim by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to Reorganized Debtor after the date of any related proof of Claim; and (c) at the address reflected in the Schedules if no proof of Claim is filed and Reorganized Debtor has not received a written notice of a change of address.

#### 2.   Undeliverable and Unclaimed Distributions

If the distribution to the holder of any Allowed Claim is returned to Reorganized Debtor as undeliverable, no further distribution shall be made to such holder unless and until Reorganized Debtor is notified in writing of such holder's then current address.  Undeliverable distributions shall remain in the possession of Reorganized Debtor until such time as a distribution becomes deliverable, or the obligation to deliver is terminated pursuant to this section of the Plan.  Reorganized Debtor will hold undeliverable cash distributions in an unsegregated, interest-bearing bank account for the benefit of the entities entitled to the distributions.  These entities will be entitled to any interest actually earned on account of the undeliverable distributions if and when distributions are subsequently made pursuant to this section of the Plan.

Any holder of an Allowed Claim that does not notify Reorganized Debtor in writing of its asserted entitlement to an undeliverable distribution within one year after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against Reorganized Debtor or its property.

Any undeliverable distributions that are not claimed under this section will be used by Reorganized Debtor to satisfy any remaining obligations under the Plan, and if all such obligations are fully satisfied, shall be retained by Reorganized Debtor free from any restrictions thereon.  Nothing contained in the Plan shall require Reorganized Debtor to attempt to locate any holder of an Allowed Claim.

4866-1227-5409, v. 6

### E.     Claims Bar Date

Any Claim filed after (i) the Bar Date for Claims and Interests established by the Court (and any amendment to such timely-filed Claim or Interest filed no later than the Effective Date), (ii) with respect to Claims for rejection damages, the Rejection Claims Bar Date, or (iii) with respect to Claims that are Administrative Expenses, the Administrative Expenses Bar Date, shall not be recognized, or recorded on the claims register, by Reorganized Debtor and shall be disallowed automatically without the need for any objection from Reorganized Debtor or unless such untimely filing is expressly authorized by an order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the order approving the Bar Date for Claims and Interests, and Reorganized Debtor's, and other parties in interests' rights to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

## VII.    EFFECT OF PLAN ON CLAIMS

### A.     Effect of Confirmation

Except for continuing liens, claims, rights, and interests of the secured creditors against Debtor, the Estate, the Property and Collateral as provided for in the Plan, or in the confirmation order, the confirmation of the Plan is a discharge, on the Effective Date, of any and all debts of Debtor that arose at any time prior to confirmation, including, but not limited to, all principal and all interest accrued thereon, pursuant to Section 1141 of the Bankruptcy Code.  Such discharge shall be effective as to each claim, regardless of whether a proof of claim thereof was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan.

Holders of claims against Debtor may not receive any payment or distribution except as otherwise provided for in the Plan and may not seek any recourse against Debtor or its assets except as provided for in the Plan.  After the Confirmation Date, all holders of claims will be forever enjoined from taking any action against Debtor or its property on account of such claim; including the commencement or continuation of any proceeding; enforcing any judgment or award; creating, perfecting, or enforcing any lien; or any other action inconsistent with the terms of the Plan.

The Reorganized Debtor shall move the Court to close the case once the Plan has been substantially consummated. Until substantial consummation, the Reorganized Debtor will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee.  Alternatively, the Court may enter a final decree closing the case on its own motion.

4866-1227-5409, v. 6

**B.        Reorganized Debtor's Authority to Compromise and Settle**

Pursuant to Bankruptcy Rule 9019(a), Reorganized Debtor may compromise or settle any Claim or Interest, or any cause of action against Debtor or brought by Debtor upon notice and a hearing.

**C.        Right of Setoff**

Debtor may set off against any payment or distribution made pursuant to an Allowed Claim, a claim of any kind that it may have against the holder of such an Allowed Claim, but Debtor will not be required to do so.  The failure to utilize the right of setoff does not constitute a waiver or release of any claim Debtor has against the holder of an Allowed Claim.

## VIII.    OTHER PROVISIONS

**A.        Binding Effect**

The Plan shall be binding on and inure to the benefit of Debtor, all present and former holders of Claims against and Interests in Debtor, their respective successors and assigns, including, but not limited to, Debtor, all other parties-in-interest in the Chapter 11 Case, and Reorganized Debtor.

**B.        Revocation, Withdrawal, or Non-Consummation**

If Debtor revokes or withdraws this Plan, or if Confirmation or Consummation of this Plan does not occur by August 30, 2024, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interest in, Debtor or any other person, (b) prejudice in any manner the rights of Debtor or any person in any further proceedings involving Debtor, or (c) constitute an admission of any sort by Debtor or any other person. Moreover, if the Order confirming the Plan is not entered before August 30, 2024 or such other date as ordered by the Court or agreed upon by the Parties, the Parties will request that the Court expedite the resetting of those hearings between the Debtor and MidCap that had been set for July 8 and 9, 2024: MidCap's Motion for Relief from Stay as to the Property in the Bankruptcy Case [Dkt. No. 130], Confirmation of the Debtor's Third Amended Plan [Dkt. No. 178] and Debtor's Objection to MidCap's POC [Dkt. No. 202].

4866-1227-5409, v. 6

### C.    Plan Modification

The Plan may be corrected or modified, prior or subsequent to Confirmation, or prior to consummation, after notice to interested parties and by Court order as provided by law.  Debtor further retains all rights to modify the Plan prior to Confirmation as permitted by Section 1127.  The Plan may be amended or modified prior to Confirmation without leave of Court, so long as notice is provided to Creditors.  After Confirmation and with approval of the Court and upon notice to creditors, Reorganized Debtor may remedy any defect or omission, or may reconcile any inconsistencies in the Plan or Confirmation Order, so long as such modification does not materially alter or adversely affect the interests of Creditors, to the extent it may be necessary to carry out the purposes and intent of the Plan.

### D.    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of Reorganized Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.    Plan Supplement

Any and all exhibits, lists, or schedules not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least two (2) Business Days prior to date of the commencement of the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to Debtor.

### F.    Consequences of Default

If Debtor is unable to perform the terms and conditions of this Plan, it shall be in default. MidCap shall retain the right to fully enforce the Settlement Documents or its loan documents

23

including its promissory note, deed of trust, and security agreements as set forth in the DIL Agreement in the event of default under the Plan. Nothing in this paragraph shall modify the default rights of MidCap set forth in the treatment of its Class 3 Claim.

For the avoidance of doubt, any secured creditor's pre-petition loan documents shall remain valid and enforceable under applicable state or federal non-bankruptcy law in the event: (a) this case is dismissed by order of the Court, (b) the Court otherwise no longer has jurisdiction over any of the secured creditors, or (c) in accordance with the DIL Agreement in the event that MidCap files the Deed in Lieu of Foreclosure (Non-Merger) under the terms of the DIL Agreement.

## G. Post-Confirmation Debtor's Action

Upon and after the Confirmation Date, Reorganized Debtor shall take such action as is necessary to effectuate this Plan.

## H. Non-allowance of Penalties or Fines

Except as authorized expressly by Final Order of the Bankruptcy Court, no portion of an Allowed Claim shall include, and no distribution shall be made on account of, any fine, penalty, exemplary or punitive damages, late charges or other monetary charge relating to or arising from any default or breach by Debtor pursuant to 11 U.S.C. § 726(a)(4) and § 1129(a)(7). Any Claim for such amount shall be deemed to be a Disputed Claim regardless of whether an objection is filed.

## I. Post-Confirmation Employment of Professionals

After the Effective Date, Reorganized Debtor shall have the right to employ professionals, including attorneys, accountants, and other advisors, free of any restrictions imposed by the Bankruptcy Code or Rules. Fees and costs may be paid for post-confirmation services upon approval of the Reorganized Debtor alone; no Bankruptcy Court approval shall be required.

## J. Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation shall be paid on or before the Effective Date. Debtor shall continue to accrue and pay fees pursuant to 28 U.S.C. § 1930 until the Case is closed, dismissed, or converted. The Debtor estimates the U.S. Trustee's statutory fees at $5,739 for Year 1 of the Plan.

## K. Documentation of Plan Implementation

In the event any entity that possesses an Allowed Secured Claim or any other lien against any of Debtor's Property for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, Reorganized Debtor may record a copy of this Plan or the Confirmation

24

4866-1227-5409, v. 6

Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary and new liens to satisfy the terms of the Plan. The Reorganized Debtor shall have full authority to approve and execute any DIL Documents. For any Creditor asserting a secured interest in any Property of the Debtor, for which no equity exists in the property for the benefit of the Creditor, and except as provided for in the Plan, the Creditor shall immediately upon the Effective Date of the Plan release its asserted secured interest in the Property. If the Reorganized Debtor deems advisable, it may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

**L.   Notices**

Except as provided otherwise herein, any notice, request, or demand required or permitted to be made or provided to or upon the Debtor or the Reorganized Debtor under the Plan shall be (i) in writing; (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, or (d) first class mail, and (iii) deemed to have been duly given or made when actually delivered.

**M.   Terms of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims against, or Interests in, Debtor will be permanently enjoined, on and after the Effective Date, from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the property of the Estate or the proceeds of such property, including without limitation property transferred to a Buyer (except with respect to liabilities expressly assumed by the Buyer), on account of any such Claim or Interest, (ii) creating, perfecting or enforcing any encumbrance of any kind against the property or interest in such property while it remains in the Estate, on account of any such Claim or Interest, and (iii) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to Debtor or against the property or interests in property of the Debtor on account of any such Claim or Interest except to the extent the Claim is a Setoff Claim.

25

**N.** *In Rem* **Relief from Stay**

In the event the Debtor or other related entity with any interest in the Property files a petition under 11 U.S.C. it is agreed the provisions of 11 USC 362(d)(4)(B) shall apply, authorizing the Court to order the immediate termination of the stay as to all Property. The Court shall also have the power and authority to order the release of the DIL Documents from Escrow and delivered to MidCap and MidCap shall no longer be obligated for payment of the Cooperation Fee or Sale Fee, as such terms are defined in the Term Sheet.

**O.**     **Release and Covenant Not to Enforce**

    **1.**     **Release**.

Upon confirmation of the Plan, and pursuant to the Term Sheet, Debtor and the Reorganized Debtor and including its affiliates, employees, agents, managers, directors, officers, trustees, advisors, professionals and other representatives, successors and assigns will be deemed to have irrevocably and forever released the MidCap Released Entities from the MidCap Released Claims.

Within 14 days' after confirmation of the Plan, Debtor will dismiss with prejudice the MidCap Released Entities from the Pending Proceedings (as defined in the Term Sheet), which include but are not limited to: (i) *EGAE, LLC v. Marcia Fudge, in her Official Capacity as Secretary of the United States Dept. of Housing & Urban Development, MidCap Financial Trust, and MidCap Funding Investment X, LLC*, No. 3:23-cv-00003-JMK (U.S. District Court for the District of Alaska); (ii) *EGAE, LLC v. Fudge, et al.*, No. 23-3489 (Ninth Circuit Court of Appeals); and (iii) *EGAE, LLC v. Tr. Servs. of Alaska, Inc.*, No. 3AN-23-06829 (Alaska Superior Ct.).

    **2.**     **Covenant Not to Enforce**.

For avoidance of doubt, Debtor acknowledges that the releases set forth above will remain in full force and effect notwithstanding the outcome in any litigation between the Debtor and HUD. The Debtor acknowledges that in the event a court enters any ruling affecting the sale of the HUD Loan to MidCap, the Debtor has irrevocably waived any claims against MidCap challenging MidCap's ownership or acquisition of the HUD Loan. The intention hereunder is to not disturb MidCap's ownership of the Loan nor its rights under all Loan Documents. The Debtor would cooperate, as needed by MidCap, to document or otherwise fulfill and confirm the intentions of this subparagraph. Nothing herein shall act to preclude the Debtor from asserting its existing claims against HUD, and neither party admits fault by operation of this paragraph. Nothing in this Plan may be construed to narrow the releases set forth in the Term Sheet.

4866-1227-5409, v. 6

**P.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) the laws of (i) the State of Alaska shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of Debtor shall govern corporate governance matters with respect to Debtor, in either case without giving effect to the principles of conflicts of law thereof.

**IX.      RETENTION OF JURISDICTION**

Notwithstanding confirmation or the Effective Date having occurred, the Court will retain and have full jurisdiction as is allowed under Title 28 of the United States Code, the Bankruptcy Code, or other applicable law to enforce the provisions, purposes, and intent of the Plan, including, without limitation, any proceedings which relate to:

1.      Determination of the allowability, classification, or priority of claims and interests;

2.      Construing, implementing, enforcing, executing or consummating the Plan, or any other matter referred to in the Plan;

3.      Determination of all matters that are pending before the Court in the Chapter 11 Cases prior to the Effective Date or that may arise after the Effective Date;

4.      Determination of any and all applications for allowance or requests for payment of administrative claims, including, without limitation, requests for allowance and payment of compensation and expense reimbursement of professional persons;

5.      Determination of motions for the rejection, assumption or assignment of executory contracts or unexpired leases, and determination of the allowance of any claims resulting from the rejection of executory contracts and unexpired leases;

6.      Determination of all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted prior to the closing of the Chapter 11 Case;

7.      Modification of the Plan pursuant to Section 1127 of the Bankruptcy Code, prior to the Effective Date, remedy of any defect or omission in the Plan or confirmation order, reconciliation of any inconsistency within the Plan and the loan documents, so as to carry out the intent and purpose of the loan documents;

8.      Issuance of injunctions or taking such other actions or making such other orders as may be necessary or appropriate to restrain interference with Debtor by any party with the Plan or its execution or implementation by any person;

4866-1227-5409, v. 6

9.      Issuance of such orders in aid of consummation of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person, to the full extent authorized by the Bankruptcy Code;

10.     Ordering the assumption or rejection of executory contracts or leases to which Debtor is a party, which has not been previously resolved;

11.     Resolve any alleged breach of this Plan by the Debtor or party to this Plan, including the default provisions applicable to the treatment of Class 3.

12.     Any determination necessary or appropriate under Section 505 of the Bankruptcy Code or any other determination relating to priority tax claims, taxes, tax refunds, tax attributes, and tax benefits affecting Debtor, its estate, or the Property through the end of the fiscal year in which the Effective Date occurs;

13.     Entry of a final decree closing the Chapter 11 case; and

14.     Determination of such other matters and for such other purposes as may be provided by the Plan.

## X.      REQUEST FOR CONFIRMATION AND RECOMMENDATION

Debtor believes confirmation of this Plan is the best alternative.   Accordingly, Debtor recommends that holders of Impaired Claims vote to accept the Plan and return the Ballots as directed in the Plan and Disclosure Statement.  Debtor requests confirmation of the Plan pursuant to Section 1129(b) with respect to any impaired Class that does not accept the Plan.


DATED this 2nd day of August 2024.


**GERALD K. SMITH AND JOHN C. SMITH LAW OFFICES, PLLC**

By  *s/ John C. Smith*
        John C. Smith
        *Attorney for Debtor*

4866-1227-5409, v. 6

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing and additionally mailed or e-mailed* copies of the attached document to the following:

Office of the United States Trustee*
700 Stewart Street, Suite 5103
Seattle, Washington 98101-1271
Email: USTPRegion18.ak.ecf@usdoj.gov

Kathryn F. Evans*
Office of the United States Trustee
700 Stewart Street, Suite 5103
Seattle, Washington 98101-1271
Email: Kathryn.Evans@usdoj.gov
Email: cori.gustafson@usdoj.gov
Email: young-mi.petteys@usdoj.gov
Email: tmaurer@usdoj.gov

John Rizzardi*
Binah B. Yeung*
Aditi Paranjpye*
Cairncross & Hempelmann
524 Second Avenue, Suite 500
Seatle, Washington 98104-2323
Email: JRizzardi@cairncross.com
Email: byeung@cairncross.com
Email: aparanjpye@cairncross.com
*Attorneys for MidCap Funding Investment X LLC*

 /s/ Kate Manns
Kate Manns

EXHIBIT A-1

BINDING TERM SHEET AND PLAN AGREEMENT

## BINDING TERM SHEET AND PLAN AGREEMENT

This Binding Term Sheet and Plan Agreement ("**Agreement**") is entered into by and between EGAE. LLC on the one hand ("**Debtor**" or "**EGAE**"), and MidCap Funding Investment X LLC ("**MidCap**") on the other. Collectively, Debtor and MidCap are referred to as the "**Parties.**"

### STIPULATED FACTS

A. Debtor owns real property known as Unit A of the McKinley Tower Apartments, located at 337. East 4th Ave., Anchorage (the "**Property**"). The term Property is further defined in Paragraph B.

B. MidCap is holder of a Deed of Trust Note ("**Loan**") secured by a Deed of Trust and Security Agreement on the Property and related assets ("**Collateral**"). For purposes of this Agreement the term Property shall be inclusive of the real property, related rights (e.g. easements or other rights of use) and all Collateral, as defined in the MidCap loan documents.

C. Debtor initiated a Chapter 11 Bankruptcy Proceeding, Case No. 23-00169 ("**Bankruptcy Case**") on October 5, 2023 ("**Petition Date**").

D. On February 7, 2024, MidCap filed a Proof of Claim ("**POC**") reflecting amounts claimed under the Loan. The Debtor has objected to the POC and MidCap has replied to the objection.

E. Prior to the Petition Date, Debtor initiated various lawsuits ("**Pending Litigation**") relating to the Loan and the Property, including assertion of claims ("**Claims**") against MidCap Financial Trust and MidCap, collectively, the "**MidCap Entities**") as stated in the operative pleadings filed in the Pending Litigation.

F. On February 28, 2024, MidCap filed a Motion for Relief from Stay as to the Property in the Bankruptcy Case (Dkt. 130). On April 12, 2024, Debtor filed a Third Amended Plan (Dkt. 178), to which MidCap objected. The Court set an evidentiary hearing on MidCap's Motion for Relief from Stay and Debtor's Objection to the POC and Plan Confirmation for July 8 and 9, 2024.

G. The Parties engaged in mediation on February 8, 2024, facilitated by Ninth Circuit Court of Appeals mediator Paula Raffaelli ("**Mediator**"). The Parties continued to negotiate and have reached an agreement to resolve all issues and disputes between them relating to the Loan, the Property, and the Pending Litigation, and to cooperate in submitting an agreed Chapter 11 Plan, all consistent with the terms described herein. Until the Plan is confirmed any cash collateral orders will address the use of MidCap's collateral and nothing herein will compromise, limit or waive the Parties' rights as to the administration of the bankruptcy estate.

H. Subject to the provisions of Recital G, above, the purpose of this Agreement is to fully and finally resolve the claim treatment of MidCap, including all issues between the Parties. This Agreement and any related documentation shall be interpreted accordingly.

## AGREED TERMS

1.     This Agreement is binding upon mutual execution, notwithstanding the contemplation of further necessary actions.

2.     Within 14 days of mutual execution of this Agreement, MidCap and the Debtor will file and note for a confirmation hearing an agreed Amended Plan ("**Plan**") which shall contain the terms set forth below ("**Plan Terms**"). The Plan will also contain reasonable, appropriate and customary terms for implementation, including post-confirmation operations, financial issues, the terms of this Agreement and treatment of all claims. The Parties will jointly request the Court expedite the date for the confirmation hearing

3.     The Plan Terms will: (1) provide the Debtor an agreed upon amount of time to secure refinancing of the Property, (2) provide for payment to MidCap of no less than an agreed minimum sum from the refinance transaction by dates certain, (3) provide that in the event Debtor fails in completing a refinance that satisfies the agreed terms there will be the full and complete transfer of title and/or ownership of the Property to MidCap, (4) prevent, resolve and avoid current and further litigation between the Parties or impairment of the Property, including impairment of title.

a)     Debtor shall have until March 31, 2025 to close a refinancing transaction that will pay MidCap $7,250,000, ("**March Settlement Amount**"). MidCap will accept $7,100,000, if payment is received by December 31, 2024 ("**December Settlement Amount**"). The foregoing amounts shall be increased by any advances, costs and fees incurred by MidCap by reason of a default by the Debtor under any cash collateral order, this Agreement or the confirmed Plan and any references to "March Settlement Amount" or "December Settlement Amount" herein shall mean such amounts, as adjusted pursuant to the preceding sentence. For the avoidance of doubt, MidCap will not be required to accept the "March Settlement Amount" or "December Settlement Amount" following an Event of Default (as defined below).

b)     Upon receipt of the earlier of the December Settlement Amount or the March Settlement Amount on or prior to the applicable deadline, MidCap will release its interest under the Deed of Trust, release its interest on Collateral, cancel the Note and the DIL Documents (as defined below) will be returned by the Escrow Agent to Debtor. If the applicable Settlement Amount is received on or prior to the applicable deadline, the Loan will be deemed paid in full as of the date of receipt of the applicable Settlement Amount.

c)     Within 14 days after entry of an Order confirming the Plan, MidCap will provide a letter to Debtor for use with its refinancing efforts. The agreed form of the letter is appended hereto as **Exhibit B**.

d)      The Parties have agreed upon a Stipulated Interim Order Authorizing Continued Use of Cash Collateral ("**CC Order**"), effective from July 9, 2024 to the date of the conclusion of the Plan confirmation hearing, which shall include and incorporate the existing terms in the Stipulated Interim Order Authorizing Continued Use of Cash Collateral (Dkt. 188) and agreed upon additional terms in the CC Order. Subsequent to entry of the Order confirming the Plan the Debtor will continue to make monthly payments to MidCap in the amount set forth in the CC Order and will comply with all conditions in the CC Order and the Loan documents ("**Conditions**"), including reporting requirements, payment of taxes and insurance impounds, insurance premiums, operating expenses and labor and materials benefitting or used on the Property, said Conditions intended to be fully incorporated into the Plan. Moreover, the Debtor shall provide continuing proof of insurance and verification of funding the tax and insurance reserves as required in the CC Order and Loan documents. For the avoidance of doubt, and as required under the Loan documents, the Debtor shall not allow any liens to attach to the Property prior to MidCap being paid in full pursuant to this settlement and the Plan.[1]

4.      Upon confirmation of the Plan, Debtor/EGAE and its affiliates, employees, agents, managers, directors, officers, trustees, advisors, professionals and other representatives, successors and assigns will fully release the MidCap Entities and their respective affiliates, and their respective employees, agents, managers, directors, officers, trustees, advisors, investment managers, servicers, professionals and other representatives, successors and assigns (collectively, the "**MidCap Released Entities**"), from the Claims, and any other claims, known or unknown, asserted or not heretofore asserted, relating in any way to the Loan, the Note or the Property. The Plan will also contain the full release language. Within 14 days' after confirmation of the Plan, Debtor will dismiss the MidCap Released Entities from the Pending Proceedings, which include but are not limited to: (i) *EGAE, LLC v. Marcia Fudge, in her Official Capacity as Secretary of the United States Dept. of Housing & Urban Development, MidCap Financial Trust, and MidCap Funding Investment X, LLC*, No. 3:23-cv-00003-JMK (U.S. District Court for the District of Alaska); (ii) *EGAE, LLC v. Fudge, et al.*, No. 23-3489 (Ninth Circuit Court of Appeals); and (iii) *EGAE, LLC v. Tr. Servs. of Alaska, Inc.*, No. 3AN-23-06829 (Alaska Superior Ct.). Such dismissals shall be with prejudice and Debtor and all of its affiliates will release the MidCap Released Entities from any claims or causes of action that it may have against the Released Entities, in relation to or arising from HUD transaction MHLS 2023-1 including those that have presently been asserted, and any other claims not heretofore asserted.

a)      The Debtor is party to the following matters: (i) *EGAE, LLC v. Marcia Fudge, in her Official Capacity as Secretary of the United States Dept. of Housing & Urban Development, MidCap Financial Trust, and MidCap Funding Investment X, LLC*, No. 3:23-cv-00003-JMK (U.S. District Court for the District of Alaska); (ii) *EGAE, LLC v. Fudge, et al.*, No. 23-3489 (Ninth Circuit Court of Appeals). For avoidance of doubt, Debtor acknowledges that the waivers set forth in the preceding paragraph remain in full force and effect, notwithstanding the outcome in any litigation between the Debtor and HUD. The Debtor acknowledges that in the event a court enters any ruling affecting the sale of the HUD Loan to Midcap, the Debtor has irrevocably waived any claims against

---

[1] This shall not apply to the right to lien by the State of Alaska for any real estate taxes not yet due.

MidCap challenging Midcap's ownership or acquisition of the HUD Loan. The intention hereunder is to not disturb Midcap's ownership of the Loan nor its rights under the Loan Documents. The Debtor would cooperate, as needed by Midcap, to document or otherwise fulfill and confirm the intentions of this subparagraph. Nothing herein shall act to preclude the Debtor from asserting its existing claims against HUD, and neither party admits fault by operation of this paragraph.

5.      Within ten (10) days' prior to the Plan confirmation hearing, Debtor shall fully execute a Deed in Lieu of Foreclosure (Non-Merger) ("**DIL**") and all related and necessary documents transferring title/ownership to, and the operations of, the Property and Collateral (including any remaining reserve and tenant security deposit accounts), as reasonably deemed necessary by MidCap, including but not limited to the documents listed on the attached **Exhibit A** in a mutually agreed form (collectively the "**DIL Documents**") and deposit the DIL Documents into escrow pursuant to mutually agreed Escrow Instructions to Fidelity Title Co. or another mutually agreed upon title company ("**Escrow Agent**") pending performance of the terms of this Agreement and the confirmed Plan. MidCap shall pay for any fees or costs of Escrow. The Escrow Instructions shall provide that (a) if the March Settlement Amount is paid in full on or before March 31, 2025, the DIL Documents shall be returned to Debtor, and (b) if the March Settlement Amount has not been repaid by March 31, 2025, or if the Court confirms any other Default, paragraph 7(b) of this Agreement shall apply.

6.      If the Order confirming the Plan is not entered before August 31, 2024 or such other date as ordered by the Court or agreed upon by the Parties, the Parties will request that the Court expedite the resetting of the hearings currently set for July 8 and 9, 2024.

7.      **Plan Default.** In the event of the occurrence of a default under the terms of this Agreement or the Plan (**"Default"**), and without violation of the automatic stay, MidCap may issue to the Debtor a Notice of Default. The cure period for a Default hereunder shall be ten (10) days, provided, any Default in financial reporting shall have a cure period of twenty (20) days. In the event there is no timely cure of a Default, such Default shall automatically become an "Event of Default" and MidCap may, on no less than ten (10) days' notice, request a hearing from the Court for imposition of an appropriate remedy, including, but not limited to, the remedies of (i) the release of the DIL Documents from the Escrow Agent and delivery to MidCap for recording and (ii) extinguishment of the Cooperation Fee and the Sale Fee set forth below.

    a)      **Default of Failure to Pay Settlement.** Notwithstanding the foregoing, and for the avoidance of doubt, the failure to pay the March Settlement Amount by March 31, 2025 (a "**Settlement Payment Event of Default**" or "**SPEOD**") shall constitute a material breach of the Plan and this Agreement and an immediate Event of Default without any right to cure and without the necessity of obtaining Court confirmation of the SPEOD.

    b)      In the event of an SPEOD, or upon the Court imposing the remedy of ordering Escrow to release the DIL Documents to MidCap following an Event of Default, the Escrow Agent shall be authorized to release and deliver the DIL Documents to MidCap upon MidCap's request. The Escrow Instructions shall incorporate the foregoing term,

authorizing such action by the Escrow Agent.   Thereafter, MidCap shall be entitled to record the DIL and exercise all of its other rights under the DIL Documents.

8.       Upon (a) delivery of all executed DIL Documents from Escrow Agent to MidCap in connection with a SPFOD, (b) the dismissal of the proceedings described above, (c) verification that there have been no liens other than MidCap's lien attaching to the Property or other Collateral, and (d) Debtor verifies there are no events that could give rise to new liens of record (conditions (a) through (d) being referred to collectively as the "**Cooperation Fee Conditions**"), and so long as no Event of Default or uncured Default has occurred at any time, Debtor shall then receive a cooperation fee of $250,000.00 ("**Cooperation Fee**"). If the Cooperation Fee Conditions have been satisfied, the DIL is recorded and the Property is thereafter sold by MidCap and the Sale Proceeds[2] are in excess of $7,750,000.00, and so long as no Event of Default or uncured Default has occurred at any time, Debtor shall receive an additional $250,000.00 to be paid upon closing of the sale ("**Sale Fee**").

9.       In the event the Debtor/EGAE or other related entity with any interest in the Property files a petition under 11 U.S.C. it is agreed the provisions of 11 USC 362(d)(4)(B) shall apply, authorizing the Court to order the immediate termination of the stay as to all Property. The Court shall have the power and authority to order the release of the DIL Documents from Escrow and delivered to MidCap and MidCap shall no longer be obligated for the Cooperation Fee or Sale Fee.

10.      The Bankruptcy Court shall retain jurisdiction to enforce the Terms of this Settlement Agreement and the Plan. In the event the Bankruptcy Case is closed the Parties agree to support and not oppose the reopening the Bankruptcy Case to resolve disputes.

---

[2] "**Sale Proceeds**" shall be defined as the gross proceeds of sale, less all costs of sale, inclusive (if applicable) of non-judicial trustee fees and costs, MidCap's reasonable legal fees related to any sale, outstanding taxes, liens and other advances or prorations allowed under the MidCap Loan Documents.

## Exhibit A

## DIL Documents

The DIL Documents shall include, but shall not be limited to, the following:

- Deed in Lieu Agreement

- Deed in Lieu of Foreclosure (Non-Merger)

- Bill of Sale (tangible personal property)

- Absolute Assignment of Leases and Rents and other intangible assets

- Assignment of Contract Rights

- Indemnification and Release Agreement

- Resignation of Marc Marlow as a director and President of McKinley Tower Association, Inc.

- Copies of all master keys and other access devices for the Property

## Exhibit B

### Content of Letter

Dated: 14 days after Plan Confirmation

As of the date of this letter, MidCap Funding Investment X LLC ("MidCap") confirms that its Borrower, EGAE, LLC has made all payments due to MidCap as of the date of this letter under the terms of that Plan confirmed by the United States Bankruptcy Court for the District of Alaska, Case No. 23-00169 entered on _____, 2024 as Docket No. _____.

(SIGNED BY AN AUTHORIZED REPRESENTATIVE)

## Signature Page to Settlement Agreement
### [EGAE, LLC]

The Parties agree this Agreement may be signed in counterparts. The parties each represent the person signing below has the authority to enter into this Agreement. Signatures that are scanned or transmitted by facsimile or by electronic mail delivery of an electronic version (e.g., .pdf or .tif file) of an executed signature page will be effective. The Parties shall provide the original signature pages to their counsel within seven (7) days of signing.

Executed by:

EGAE, LLC

By: _Marc C. Marlow_

Printed Name: Marc A. Marlow

Title: Manager, EGAE, LLC

**Signature Page to Settlement Agreement**
**[MIDCAP FUNDING INVESTMENT X LLC]**

The Parties agree this Agreement may be signed in counterparts. The parties each represent the person signing below has the authority to enter into this Agreement. Signatures that are scanned or transmitted by facsimile or by electronic mail delivery of an electronic version (e.g., .pdf or .tif file) of an executed signature page will be effective. The Parties shall provide the original signature pages to their counsel within seven (7) days of signing.

Executed by:

**MIDCAP FUNDING INVESTMENT X LLC,**
a Delaware limited liability company

   By:   Apollo Capital Management, L.P., its investment manager

   By:   Apollo Capital Management GP, LLC, its general partner

     By: _____
     Name:   Maurice Amsellem
     Title:   Authorized Signatory

# EXHIBIT A-2

## DEED IN LIEU OF FORECLOSURE AGREEMENT
### (DIL AGREEMENT)

## DEED IN LIEU OF FORECLOSURE AGREEMENT

(MCKINLEY TOWER APARTMENTS)

BY AND BETWEEN

**MIDCAP FUNDING INVESTMENT X LLC,**
as Lender,

AND

**EGAE, LLC**
as Borrower

4893-3559-1632, v. 13

# TABLE OF CONTENTS

1.   DIL DOCUMENTS ...................................................................................................3

2.   PAYMENT OF SETTLEMENT AMOUNT ..........................................................4

3.   DEED IN LIEU OF FORECLOSURE ....................................................................4

4.   COVENANTS PRIOR TO CLOSING ....................................................................5

5.   CLOSING CONDITIONS ........................................................................................7

6.   CLOSING ..................................................................................................................9

7.   REPRESENTATIONS AND WARRANTIES ......................................................13

8.   DEFAULT BY BORROWER; REMEDIES; BANKRUPTCY ...........................16

9.   DAMAGE OR DESTRUCTION ............................................................................17

10.  LIMITATION ON LENDER'S LIABILITY; INDEMNITY ..............................17

11.  NON-MERGER .......................................................................................................18

12.  GENERAL PROVISIONS ......................................................................................19

**Exhibits:**

Exhibit A-1   –   Legal Description
Exhibit A-2   –   Permitted Exceptions
Exhibit B     –   Loan Documents
Exhibit C     –   Deed in Lieu of Foreclosure (Non-Merger)
Exhibit D     –   Bill of Sale and General Assignment with:
       ➢   Schedule of Tangible Personal Property
       ➢   Schedule of Intangible Assets
Exhibit E     –   Assignment and Assumption of Leases, Security Deposits, and Accounts with:
       ➢   Schedule 1 - List of all Leases (Rent Roll)
       ➢   Schedule 2 – List of Accounts
Exhibit F     –   Assignment of Contract Rights with:
       ➢   Schedule of Continuing Service Contracts and other contracts related to the Collateral
Exhibit G     –   Indemnification and Release Agreement
Exhibit H-1   –   Resignation of Marc Marlow as a director and President of the HOA
Exhibit H-2   –   Resignation of Lael Marlow as a director and officer of the HOA
Exhibit I     –   Certificate of Transferor (FIRPTA Affidavit)
Exhibit J     –   Form of Tenant Notice
Exhibit K     –   Certificate of Borrower's Manager with attached:
       ➢   Exhibit A – Borrower's Certificate of Formation
       ➢   Exhibit B – Borrower's Certificate of Good Standing
       ➢   Exhibit C - Borrower's limited liability company agreement and all amendments (collectively, the "***Operating Agreement***"); and
       ➢   Exhibit D – Written Consent of Borrower's Member(s) of authorizing the transactions under this Agreement.

## DEED IN LIEU OF FORECLOSURE AGREEMENT

This DEED IN LIEU OF FORECLOSURE AGREEMENT ("*Agreement*") by and between MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company ("*Lender*"), and EGAE, LLC, an Alaska limited liability company ("*Borrower*").  The Lender is the holder of the Loan Documents (as defined below) under the terms of the Endorsements and Assignments defined on **Exhibit B**.  This Agreement is effective as of the date of the Plan Confirmation (as defined below) (the "*Effective Date*").

## BACKGROUND

A.      Borrower is the fee owner of certain real and personal property commonly known as the McKinley Tower Apartments located in the McKinley Tower at 337 East 4th Ave., Anchorage, Alaska, and more fully described on the attached **Exhibit A-1** (the "*Real Property*").  The Real Property is (a) a condominium comprised of a portion the McKinley Tower, and (b) a 68% undivided interest in the common areas serving the McKinley Tower ("*Common Areas*").  Borrower is one of two members of the McKinley Tower Association, Inc.  (the "*HOA*").

B.      Borrower is indebted to Lender under a Deed of Trust Note (with the endorsements listed on **Exhibit B**, the "*Note*"), dated March 8, 2005, in the original principal amount of $8,067,000.00 ("*Loan*").  The Loan is secured by a Deed of Trust (as defined on **Exhibit B**), Security Agreement, and UCC-1 Financing Statement, covering the Real Property and Borrower's personal property described in the Loan Documents (the "*Personal Property*") and collectively with the Real Property, the "*Property*").  The Note, Deed of Trust, Security Agreement, and other loan documents executed in connection with those documents (collectively, the "*Loan Documents*") are listed on **Exhibit B**.  The Property and all other Borrower assets that secure the Loan are referred to as the "*Collateral*".

C.      Borrower initiated a Chapter 11 Bankruptcy Proceeding, Case No.  23-00169 ("*Bankruptcy Case*") on October 5, 2023, with the United States Bankruptcy Court, District of Alaska ("*Court*").  Borrower has retained control over its assets, including the Property (collectively, the "*Assets*") and continues to operate its business pursuant to §§ 1107 and 1108 of the Bankruptcy Code as Debtor in Possession.  On February 7, 2024, Lender filed a Proof of Claim with the Court reflecting amounts claimed under Loan.

D.      Effective July 6, 2024, Lender and Borrower entered into a Binding Term Sheet and Plan Agreement ("*Term Sheet*") concerning Borrower's treatment of the Property and Lender's Proof of Claim in an agreed Modified Third Amended Plan of Reorganization ("*Plan*").  In accordance with the Term Sheet and this Agreement, Borrower is executing and delivering the DIL Documents (as defined below), and mutually accepted escrow instructions ("*Escrow Instructions*") into an escrow account ("*Escrow*") with a mutually agreed upon escrow agent ("*Escrow Agent*"), within 10 days prior to the hearing at which the Plan is confirmed by the Court ("*Plan Confirmation*").  The Term Sheet, the Escrow Instructions, and this Agreement shall be included in the definition of "*Settlement Documents*" as set forth in Definition 1.61 of the Plan, which term is incorporated herein.

E.      Borrower has submitted the Plan for confirmation by the Court.  If confirmed, Borrower will be in possession and control of the Assets pending the occurrence of events set forth in this Agreement.  Borrower and Lender have agreed to certain covenants, conditions and other operational issues pursuant to Borrower's treatment of Lender's claim, as set forth this Agreement, the Plan and the Term Sheet.

F.      Borrower and Lender are entering into this Agreement in accordance with the Plan and the Term Sheet.

## AGREEMENT

The parties hereby agree as follows.  The above recitals are incorporated into this Agreement.

4893-3559-1632, v. 13

1.      **DIL DOCUMENTS**

    1.1  Notwithstanding Section 5 of the Term Sheet, this Agreement will not be deposited into Escrow, and is effective on the Effective Date.

    1.2  Contemporaneously with the execution and delivery of this Agreement, the parties shall duly execute (and notarize where applicable) and deliver to the Escrow Agent (a) the Escrow Instructions, and (b) the following documents (collectively the "***DIL Documents***") and the other items listed below:

- **Exhibit C** - Deed in Lieu of Foreclosure (Non-Merger) ("***Deed in Lieu***")

- **Exhibit D** - Bill of Sale and General Assignment ("***Bill of Sale***") with attached:
    - ➢ Schedule of Tangible Personal Property
    - ➢ Schedule of Intangible Assets.

- **Exhibit E** - Assignment and Assumption of Leases, Security Deposits and Accounts ("***Assignment of Leases***"), with attached:
    - ➢ Schedule 1- List of all Leases (as defined below) ("***Rent Roll***")
    - ➢ Schedule 2 – List of Accounts

- **Exhibit F** - Assignment of Contract Rights ("***Contracts Assignment***") with attached:
    - ➢ Schedule of Continuing Service Contracts and other contracts related to the Collateral

- **Exhibit G** - Indemnification and Release Agreement ("***Indemnification***")

- **Exhibit H-1** - Resignation of Marc Marlow (" ***Marlow***") as a director and President of McKinley Tower Association, Inc.  ("***Resignation***")

- **Exhibit H-2** - Resignation of Lael Marlow as a director and officer of McKinley Tower Association, Inc.  ("***Resignation***")

- **Exhibit I** - Certificate of Transferor ("***FIRPTA Affidavit***")

- **Exhibit J** - Form of Tenant Notice

- **Exhibit K**- Certificate of Borrower's Manager ("***Borrower Certificate***") with attached:
    - ➢ Exhibit A – Borrower's Certificate of Formation
    - ➢ Exhibit B – Borrower's Certificate of Good Standing
    - ➢ Exhibit C - Borrower's limited liability company agreement and all amendments (collectively, the "***Operating Agreement***"); and
    - ➢ Exhibit D – Written Consent of Borrower's Member(s) of authorizing the transactions under this Agreement.

- Copies of all commercial and residential leases and any other tenancy documentation ("***Leases***")

- Copies of all Service Contracts

- Copies of all master keys and other access devices for the Property

    1.3      Borrower agrees to execute and deliver any other documents or provide any other items reasonably required (a) by Fidelity Title Agency of Alaska, LLC or other title company issuing the Lender's Owners Policy upon recording of the Deed in Lieu ("***Title Company***"), or (b) by the Lender, in order to effect the intent of the transactions described in this Agreement, and such documents shall be included in the definition of "DIL Documents".  Those required documents may include evidence reasonably satisfactory to the Title Company of

Borrowers compliance with all requirements regarding conveying the Property contained in Borrower's Operating Agreement, and in the Plan, this Agreement, and Term Sheet.

1.4    The Plan, the Term Sheet, and this Agreement or any DIL Documents are intended to be read together and construed harmoniously. But in the event of a conflict between the terms of the Plan, the Term Sheet or this Agreement or any DIL Document, such conflict shall be governed first by the Plan, then by this Agreement or the applicable DIL Document, and then by the Term Sheet.

## 2.    PAYMENT OF SETTLEMENT AMOUNT

2.1    In accordance with the terms of the Term Sheet and the Plan, Lender agrees that the Indebtedness shall be deemed paid in full if the Borrower pays to Lender either (a) $7,100,000 plus any Default Costs (as defined below) by December 31, 2024 ("***December Settlement Amount***"), or (b) $7,250,000 plus any Default Costs (as defined below) by March 31, 2025 ("***March Settlement Amount***"). "***Default Costs***" means all advances, costs and fees incurred by Lender by reason of Borrower's default under the Plan, this Agreement, or the Term Sheet. However, MidCap will not be required to accept the December Settlement Amount or the March Settlement Amount following an Event of Default under this Agreement or an "Event of Default" as defined in the Term Sheet ("***Term Sheet Event of Default***").

2.2    So long as no Event of Default under this Agreement or Term Sheet Event of Default has occurred, upon Lender's receipt of the earlier of the December Settlement Amount or the March Settlement Amount on or prior to the applicable deadline, (a) the Indebtedness will be deemed paid in full, (b) Lender will cancel the Note and will release the Deed of Trust and other Collateral, and (c) this Agreement will be deemed terminated and the Escrow Agent will return the original unrecorded Deed in Lieu and DIL Documents to Borrower in accordance with the Escrow Instructions.

2.3    However, this Agreement and the DIL Documents shall remain in full force and effect, and Lender shall be entitled to release of the DIL Documents from Escrow and to exercise its rights under this Agreement and the DIL Documents if one of the following events occurs (each a "***DIL Release Event***"):  (a) Lender does not receive the December Settlement Amount by December 31, 2024, and then does not receive the March Settlement Amount by March 31, 2025, in which case the Lender shall be entitled to automatic release of the DIL Documents from Escrow without Court approval, or (b) an earlier Event of Default under this Agreement or Term Sheet Event of Default has occurred and the Court has approved the release of the DIL Documents from Escrow.  Upon the occurrence of a Event of Default under this Agreement or Term Sheet Event of Default, Lender shall also be entitled to the remedies provided in **Section 8.2**.

## 3.    DEED IN LIEU OF FORECLOSURE

Upon the occurrence of a DIL Release Event, Borrower acknowledges and agrees as follows:

### 3.1    Agreements and Acknowledgements

3.1.1    Borrower is fully liable to Lender for the payment of all amounts owing or to become owing under the Loan Documents ("***Indebtedness***"), and Borrower is in default under the Loan Documents.

3.1.2    Borrower does not have any defense, setoff, claim, counterclaim, action, cause of action or crossclaim to or against the validity or enforcement of the Loan Documents.

3.1.3    Lender has the right to foreclose on the Property under the Deed of Trust.

3.1.4    The consideration to be received by Borrower pursuant to the terms of this Agreement represents full, fair and adequate consideration to Borrower for the conveyance of the Property to Lender. Lender may apply the value of such consideration to the Indebtedness as Lender shall determine, in its sole and absolute

discretion. Borrower shall not receive any additional consideration for transfer of the Property to Lender under the Conveyance Documents (as defined below), except for the Cooperation Fee (as defined in the Term Sheet) which is payable under the Term Sheet in certain circumstances. Borrower agrees that its shall not be entitled to receive any further consideration even if Lender sells the Property for more than the Indebtedness, except for the Sale Fee (as defined in the Term Sheet) which is payable under the Term Sheet in certain circumstances.

          3.1.5    Borrower has forfeited all funds held by Lender for taxes, insurance or otherwise, and Collateral of any kind whatsoever under the Loan Documents, as well as any and all other escrows, reserves, proceeds and funds of any kind or nature, which are held and controlled by Lender pursuant to the Loan Documents, the Term Sheet, this Agreement, or the Plan, and Borrower hereby waives any rights, claims or accountings with respect thereto, including credit to Borrower as a proration under **Section 6.6.3**.

        3.2    **Conveyance of the Property.**  After the occurrence of a DIL Release Event, but no later than the Closing Date, the Escrow Agent shall release and deliver the fully executed original DIL Documents and other escrowed items to Lender. Under the Deed in Lieu, Bill of Sale**,** Assignment of Leases, and Contract Assignment (collectively, the "***Conveyance Documents***"), Borrower shall sell, transfer, set over, assign and convey to Lender and/or Lender's assigns (for purposes of the transactions under the Conveyance Documents, also "***Lender***"), and Lender shall receive from Borrower, all right, title, interest and estate (but not the obligations) of Borrower with respect to the Property. Borrower shall convey and transfer good, clear, recordable, marketable and insurable fee simple title to all of the Property to Lender absolutely free and clear of all liens, encumbrances, rights of redemption (whether at law or in equity), and other claims of every nature and description, including claims of Borrower or anyone claiming by, through or under Borrower, except for the Permitted Exceptions (as defined below).

        3.3    **Fair Market Value Less Than Indebtedness.**  Borrower hereby represents that it has made an independent determination of the fair market value of the Property and has concluded that: (a) the Indebtedness exceeds the fair market value of the Property; (b) the Property is unable to generate sufficient income to repay the Indebtedness in accordance with the terms of the Loan Documents; and (c) the consideration to be received by Borrower pursuant to this Agreement represents full, fair and adequate consideration for the Property.

        3.4    **No Interference with Foreclosure**.  If, after the occurrence of a DIL Release Event, Lender decides to conduct a foreclosure of the Property under the Deed of Trust in accordance with Alaska law (the "***Foreclosure Proceeding***"), whether or not Lender has recorded the Deed in Lieu, Borrower shall stipulate to and not interfere with, nor directly or indirectly contest the validity or enforcement of such Foreclosure Proceedings in any way.

4.        **COVENANTS PRIOR TO CLOSING**

        The parties agree that they shall perform as follows at all times after the Effective Date, including before the occurrence of any DIL Release Event and release of the DIL Documents from Escrow, until Closing or other termination of this Agreement:

        4.1    **Plan and Term Sheet Terms**.  Borrower shall perform all of its obligations and comply with all covenants under the Plan and Term Sheet when due.

        4.2    **Loan Documents**.  The Borrower will perform all obligations and comply with all covenants when due under the Loan Documents, except for the payment obligations which are modified by the Plan, the Term Sheet and this Agreement.

        4.3    **Leases**.  Borrower shall (a) not execute, modify, terminate and/or approve any Leases, contracts or commitments of any kind affecting the Property or any interest therein, without Lender's consent, which consent may be withheld in Lender's sole discretion; and (b) not encumber the Property with any liens, encumbrances or other instruments creating a cloud on title or securing a monetary obligation with the Property. Notwithstanding

the foregoing, Borrower may execute residential leases on current market terms (including rental rate and duration) consistent with past practice without Lender consent.

4.4    **Service Contracts**.  Borrower agrees, at its sole cost and expense, to operate the Property in the same manner as before the making of this Agreement.  Borrower shall not enter into any contract or agreement for the provision of services or products to the Property ("*Service Contracts*"), unless such Service Contract can be completed or terminated prior to the Closing, or Lender, in its sole discretion, agrees in writing to assume such Service Contract as of the Closing Date.

4.4.1    **Continuing Service Contracts.**  Borrower shall cause to have assigned to Lender the following Service Contracts, and any other Service Contracts specified in the Plan as being assigned to Lender (the "*Continuing Service Contracts*"): (a) all Service Contracts which Lender agrees to assume in the Plan, and (b) any other Service Contracts that Lender agrees to assume at Closing.  Borrower agrees that effective as of Closing, all deposits and prepayments with respect to any Continuing Service Contracts shall belong to Lender, and Borrower shall use commercially reasonable efforts to cause all such deposits and prepayments to be transferred to the name of the Lender.

4.4.2    **Non-Continuing Service Contracts.**  Borrower shall terminate, prior to the Closing, all Service Contracts that are not Continuing Service Contracts (the "*Non-Continuing Service Contracts*").  Borrower shall pay to the appropriate vendor(s) all amounts payable by reason of the termination of the Non-Continuing Service Contracts.  Non-Continuing Service Contracts shall include any property management agreement or other agreements between the Borrower or the HOA, and Marlow or any affiliate of Marlow.

4.5    **No Changes to Property**.  Borrower shall not make or affirmatively consent to any capital improvements or any material physical changes to the Property, except for (a) emergency repairs and maintenance needed to protect the safety of the Property, and (b) subject to subsection (a), those permitted under the Deed of Trust, without the Lender's written consent, which consent shall not be unreasonably withheld.

4.6    **Insurance Policies; Premium Pool**

4.6.1    **Policies**.  Borrower shall maintain substantially the same casualty and other insurance on the Property as is required under the Loan Documents and in effect as of the date of this Agreement.  In addition to all insurance requirements under the Loan Documents, Borrower represents and warrants that it has previously provided, or, promptly after the Effective Date shall provide, Lender with evidence of the policies insuring the Property that are in effect as of the Effective Date ("*Policies*").  The amounts and coverages of the Policies must be reasonably acceptable to Lender and name Lender as a loss payee, and comply with the other terms of the Loan Documents, but at no time shall the Policies be for less than the amounts and coverages in effect as of the Effective Date.  As of the Effective Date, Borrower shall authorize all insurance agents to confirm to Lender directly, at any time, that all Policies are in full force and effect and that all requisite conditions, including payment of premiums for the Policies, have been met.

4.6.2    **Premium Pool; Payments.**  Borrower represents and warrants to Lender that it has paid all premiums for the Policies ("*Premiums*") that are due and payable as of the Effective Date.  Within 10 days after the Effective Date, Borrower shall deposit with Lender, the following: (a) proof that Borrower has paid all such Premiums, and (b) three-months' worth of future Premiums payments (the "*Premium Pool*").  However, Borrower shall be responsible for making all Premium Payments, and Lender shall have no obligation to make any Premiums from the Premium Pool.  However, if Lender determines (in its sole discretion) to use the Premium Pool to make any Premium payment that Borrower fails to make, then Lender shall notify Borrower of such payment, and within 10 days of receiving that notice, Borrower shall replenish the Premium Pool to equal three-months' worth of future Premiums.  The funds in the Premium Pool shall be deemed cash collateral of Lender and shall be disbursed in accordance with this Agreement and the Plan.

6

**4.6.3    Default; Use and Replenishment.**  Upon the occurrence of an Event of Default under this Agreement, Lender may elect, in Lender's sole discretion, to apply the funds in the Premium Pool as payment against the Indebtedness.  In that case, Lender promptly shall notify Borrower in writing of the application of such funds.  Within 10 days of such notice, Borrower must replenish the Premium Pool with an amount no less than the amount necessary to make the next two Premium payments.

4.7    **Real Estate Taxes; Tax Pool**

**4.7.1    Tax Impound Account; Payments.**  Borrower represents and warrants to Lender that all real estate taxes ("***Taxes***") currently due and payable against the Real Property have been or will be paid in full as of the Effective Date, including the second 2024 installment of $77,221.53 if the Effective Date does not occur by August 31, 2024.  Within 10 days after the Effective Date, Borrower shall deposit with Lender, (a) proof that Borrower has paid all such Taxes, and (b) the entire balance of Borrower's reserve for the payment of future Taxes (the "***Tax Pool***"), which shall be no less than the amount necessary to make the next scheduled payment of Taxes. Starting on the first day of the month following the Effective Date, and on the same day of each successive month, Borrower shall deposit $15,166.00 into the Tax Pool with Lender for future payments of Taxes, or such other amount as Lender determines is required based on changes in the projected Taxes amount for upcoming periods. Borrower shall notify Lender 30 days in advance of the due date for each Taxes payment and supply Lender with the information needed to make each such Taxes payment from the Tax Pool.  The funds in the Tax Pool shall be deemed cash collateral of Lender and shall be disbursed in accordance with this Agreement and the Plan.

**4.7.2    Default; Use and Replenishment.**  Upon the occurrence of an Event of Default under this Agreement, Lender may elect, in Lender's sole discretion, to post the funds in the Tax Pool as payment against the Indebtedness.  In that case, Lender promptly shall notify Borrower in writing of the application of such funds. Within 10 days of such notice, Borrower must replenish the Tax Pool with an amount at least equal to the amount which Lender applied to the Indebtedness.

4.8    **HOA Obligations.**  Borrower represents and warrants to Lender that any HOA dues and assessments have been paid in full or will be paid as of the Effective Date.  Borrower shall pay all dues and assessments, and perform all of its obligations, when due under condominium Declarations and Bylaws of the HOA.

4.9    **Cooperation**.  Borrower shall reasonably cooperate with Lender in timely providing information with respect to the Property which is requested by Lender in writing and that is readily available to Borrower or within Borrower's control.  Borrower and Lender shall cooperate with each other and exercise commercially reasonably efforts to obtain, as of the Closing Date, all approvals, permits, consents from, and provide all notices to, any third party and any governmental entity which has jurisdiction or control of the Property ("***Governmental Authority***"), which are required in connection with the execution, delivery or performance of this Agreement.

4.10    **No Interference.**  Borrower shall not undertake any act to challenge: (a) the validity, effectiveness or enforceability of this Agreement, any DIL Document, or any transaction contemplated by this Agreement or the DIL Documents, or (b) any right, payment or benefit provided to Lender under this Agreement.  Borrower shall not take any steps to interfere with, impede, delay or prevent the following: (i) the implementation of the Plan, this Agreement or any DIL Document, or the Term Sheet, (ii) the transactions contemplated by this Agreement, or (iii) Lender's ownership, enjoyment or disposition of the Property following Closing.

5.    **CLOSING CONDITIONS**

5.1    **Borrower Closing Conditions.**  Notwithstanding anything in this Agreement to the contrary, Lender's obligation to accept delivery of the Property under the terms of this Agreement shall be subject to the satisfaction or waiver of the following conditions to closing ("***Closing Conditions***"):

5.1.1  **Borrower Performance**.  Borrower must have performed each and every material undertaking and agreement to be performed by Borrower under the Plan, the Term Sheet and this Agreement, including delivery of all DIL Documents and any other documents required to close the transactions contemplated under this Agreement (collectively, the "*Closing Documents*").

5.1.2  **Updated Schedules, Leases and Service Contracts.**  Borrower must have provided to Lender the following schedules to the Conveyance Documents, which have been updated as of the date of the DIL Release Event (collectively, the "*Updated Schedules*"):

(a)  Schedule of Tangible Personal Property for attachment to the Bill of Sale.
(b)  Schedule of Intangible Assets for attachment to the Bill of Sale.
(c)  Rent Roll for attachment to the Assignment of Leases.
(d)  Schedule of Accounts for attachment to the Assignment of Leases.
(e)  Schedule of Service Contracts for attachment to the Contract Assignment.

5.1.3  **Leases and Service Contracts.**  Borrower must have provided to Lender copies of all Leases and Service Contracts, and all amendments, assignments, side letters, letter agreements, subleases, commencement date memoranda, correspondence or similar documents related to those documents, which were not previously delivered to into Escrow (collectively, the "*Updated Leases and Service Contracts*").

5.1.4  **Title Matters**

(a)  Lender must have received a commitment to issue an owner's title policy ("*Title Commitment*") from Fidelity Title of Anchorage or other title company selected by Lender ("*Title Company*") reflecting, among other things, that the Title Company is unconditionally obligated and is prepared to issue an ALTA Owner's Policy of Title Insurance ("*Owner's Policy*") dated as of the Closing Date.  The Owner's Policy must name Lender as the insured, show fee simple title to the Real Property vested in Lender, and contain such other terms, conditions, endorsements and affirmative coverages as are acceptable to Lender in its sole and absolute discretion; subject only to the Deed of Trust and the Permitted Exceptions (as defined below), which shall not include any contractor, subcontractor or supplier liens (including mechanics or materialmen liens).  Without limiting the generality of the foregoing, the Owner's Policy shall not have any creditors' rights or similar exclusions without Lender's prior consent in its sole discretion.

(i)  The legal description included on **Exhibit A-1**, and attached to the Deed in Lieu, shall automatically be revised to reflect the legal description contained in the Title Commitment issued by the Title Company in connection with the Closing.

(ii)  "*Permitted Exceptions*" shall mean those exceptions listed on the attached **Exhibit A-2**, except that "Permitted Exceptions" shall automatically be revised to reflect those Permitted Exceptions which are approved by Lender and contained in the Title Commitment issued by the Title Company in connection with the Closing.  Notwithstanding anything to the contrary contained in this Agreement, the Permitted Exceptions shall not include any monetary liens (other than real estate taxes and assessments that are not delinquent and the Deed of Trust) and Borrower shall have until the Closing to cause the satisfaction and removal of any such monetary liens.

(b)  Title Company must be prepared to issue a non-merger endorsement to Lender's existing lender's policy of title insurance in form and substance acceptable to Lender in its sole and absolute discretion (the "*Non-Merger Endorsement*").

(c)  Lender must have received unconditional lien waivers for all contractor, subcontractor or supplier liens (including mechanics or materialmen liens) (collectively, the "*Lien Waivers*") showing as filed against the Real Property's title in the Title Commitment.

(d)    Except for the Permitted Exceptions, the Property shall be free and clear of all liens, claims and encumbrances, including, without limitation, UCC filings (other than any filed by Lender in connection with the Loan), unpaid sales, ad valorem and other taxes (other than ad valorem taxes not yet due and payable and all subsequent years, not yet due and payable), and any and all other claims of any nature or description, all as determined by Lender in its sole discretion.

5.1.5    **Insurance**.  Borrower must have provided, and the Property's insurance carriers must have approved, information necessary for Lender to insure the Property after Closing, including, without limitation, loss run reports for the Property.

5.1.6    **UCC Searches and Filings.**  Lender must have received Uniform Commercial Code Financing Statement, tax lien and judgment searches of Borrower confirming the existence of no financing statement, tax lien or judgment filed against the Property or Borrower, other than filings running to the Lender, or matters otherwise expressly approved by Lender in writing.

5.1.7    **Borrower Representations and Warranties.**  All representations and warranties of Borrower set forth in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date.

5.1.8    **No Pending Proceedings.**  Other than the Plan, there shall be no bankruptcy, moratorium, reorganization, assignment for the benefit of creditors, or similar action or proceeding, pending against Borrower or affecting the Property.

5.2    **Waiver of Closing Conditions**.  Lender may, at its election, waive in writing the benefit of any of the conditions set forth in **Section 5.1** at any time before Closing.  In any event, Lender's consent to the Closing pursuant to this Agreement shall waive any remaining unfulfilled Closing Conditions for the purposes of Closing, but Lender shall not waive any of its rights against Borrower under this Agreement for Borrower's failure to perform any unsatisfied Closing Condition unless expressly waived by Lender in writing.

5.3    **Failure of Closing Conditions.**  If any Closing Conditions are not fulfilled by Borrower, or waived by Lender, by the Closing Date, then Lender may terminate this Agreement and the Term Sheet upon five-days' written notice to Borrower.  In that case, (a) Borrower shall remain fully obligated under the Loan Documents, (b) neither the Cooperation Fee nor the Sale Fee (as those terms are defined in the Term Sheet) shall be payable to Borrower, and Borrower shall have no rights to either the Cooperation Fee or the Sale Fee, and (c) neither party shall have any further liability under this Agreement or under the Term Sheet except for any obligations that expressly survive the termination of the Term Sheet or this Agreement.  However, if the applicable failure of a Closing Condition is due to an Event of Default by Borrower, then Lender shall also have such rights and remedies as are provided for under **Section 8.2**.

6.    **CLOSING**

6.1    **Closing; Closing Date**.  The closing of the transactions contemplated under this Agreement ("*Closing*") shall occur upon the date that each of the following has occurred (the "*Closing Date*"):

(a)    a DIL Release Event has occurred;

(b)    the Lender is reasonably satisfied that the Closing Conditions have been satisfied;

(c)    the Deed in Lieu has been recorded in the Recorder's Office;

(d)    all documents listed in **Sections 6.2, 6.3, 6.4,** and **6.5** have been delivered by the applicable party;

9

(e)      the Title Company is prepared to issue the Owner's Policy and the Non-Merger Endorsement to Lender; and

(f)      the conveyance and transfer of the Property to Lender, and completion of all other transactions contemplated under this Agreement, have occurred to the Lender's reasonable satisfaction.

6.2      **Escrow Agent Deliveries**.

6.2.1    At Closing, Escrow Agent shall release from Escrow the originals (if available) of the following to Lender, with copies to Borrower, which have been executed (and notarized if applicable) by Borrower, and by Lender where applicable:

(a)      Recorded Deed in Lieu (conformed copy showing all recording information)
(b)      Bill of Sale with Updated Schedules
(c)      Assignment of Leases with Updated Schedules
(d)      Contract Assignment with Updated Schedule
(e)      Indemnification
(f)      Resignation
(g)      FIRPTA Affidavit
(h)      Borrowers Certificate
(i)      All other DIL Documents held by Escrow Agent that are to be delivered at Closing.

6.2.2    Escrow Agent shall deliver to Lender at Closing:

(a)      All escrowed Leases and Service Contracts.
(b)      Copies of all master keys and other access devices for the Property.

6.3      **Borrower's Deliveries**.  At Closing, Borrower shall deliver the following to Escrow Agent:

(a)      Any other Closing Documents that were not deposited into Escrow but that are required by this Agreement or the Title Company to be delivered by Borrower at Closing.

(b)      Updated Schedules.

(c)      Updated Leases and Service Contracts.

(d)      Tenant notice letters for all tenants under the Leases as of the Closing Date, in substantially the form of **Exhibit J,** informing them of (i) the sale of the Property and assignment of the Leases to Lender, and (ii) that all rent payments made after the date of the notice (for both pre- and post-closing periods) shall be paid to Lender.

(e)      Any Lien Waivers.

(f)      Evidence of termination (at no cost to Lender and free of all liens or claims for liens by reason of such terminated agreements) of all Non-Continuing Service Contracts or other agreements relating to the Property, except for any such agreements as Lender expressly assumes in its reasonable discretion.

(g)      To the extent not previously deposited into Escrow, a list of all key codes, and all physical keys and access devices to the Real Property, or a letter executed by Borrower to the holder of the keys directing such holder to deliver the keys and access devices to Lender.

(h)      To the extent not located at the Property, all other items relating to the operation of the Property.

(i)      All documents required by the applicable financial institution to transfer control of and access to all of Borrower's deposit accounts to Lender.  Ownership of all amounts in such deposit accounts shall be transferred to Lender as of the Closing Date in accordance with the Bill of Sale.

(j)      Payment, by wire transfer of same day federal funds, of an amount equal to all security deposits and any other deposits, prepaid rent or other cash or letters of credit or other instruments required to be held by Borrower in connection with the Leases or otherwise in connection with the Property, except to the extent such amounts are held in accounts controlled by or being transferred to Lender by Borrower under this Agreement, together with an accounting of all such amounts and Borrower's certification that such accounting is accurate and complete in all material respects.  This includes all such amounts held in the accounts listed in the Assignment of Leases, plus all such amounts held in any other account.

(k)      Letters (in a form reasonably acceptable to Lender) to the vendors under the Service Contracts (as defined below) informing them, in accordance with the terms hereof, that (a) their services under the Non-Continuing Services Contracts are being terminated, or (b) Lender will be assigned the Continuing Service Contracts.

6.4      **Lender Deliveries.**  At Closing, Lender shall deliver the following:

6.4.1    Any other Closing Documents that were not deposited into Escrow but that are required by this Agreement or the Title Company to be delivered by Lender at Closing.

6.5      **Other Deliveries.**  Each of Lender and the Borrower, as applicable, shall execute and deliver the following at Closing:

(a)      A settlement statement executed by Borrower and Lender, which shall include typical prorations between Lender and Borrower for all unpaid taxes and utilities.

(b)      Such other documents as may be reasonably required by Title Company in order for Title Company to issue the Owner's Policy and the Non-Merger Endorsement to Lender.

(c)      Such other documents as are reasonable and customary, or otherwise required by the Title Company to complete the following: (i) close the transactions contemplated under this Agreement, including recording of the Deed in Lieu, (ii) record the Lien Waivers, (iii) issue the Owner's Policy subject only to the Permitted Exceptions as required under **Section 5.1.4,** and (iv) issue the Non-Merger Endorsement.

(d)      Each party shall deliver its share of the amounts and closing costs described in **Section 6.6** below.

6.6      **Costs**.  At Closing:

6.6.1    **Borrower's Costs.**  The Borrower shall be responsible for paying:

(a)      all of its legal fees and other costs incurred by it in connection with the negotiation and preparation of the Plan, the Term Sheet, this Agreement and the Closing Documents;

(b)      all amounts required to obtain the Lien Waivers, and any costs associated with recording those Lien Waivers; and

(c)      any unpaid property management fees owed to a Borrower affiliate;

(d)      Borrower's cost prorations and allocations under **Section 6.6.3**.

6.6.2 **Lender's Costs.** Lender shall be responsible for paying:

(a)    All recording fees for the Deed in Lieu and all Escrow Fees.

(b)    The premium for the Owner's Policy and Non-Merger Endorsement.

(c)    All of Lender's cost prorations and allocations under **Section 6.6.3**.

However, Lender shall be entitled to add all of the above costs to the Indebtedness if Lender conducts a Foreclosure Proceeding.

6.6.3 **Prorations and Allocations**

(a)    Real estate Taxes and assessments, personal property taxes, if any, utilities, third-party vendor expenses, unpaid property management fees that are not owed to Borrower, Marlow or their affiliates, and all other items of expense with respect to the Property, shall be prorated between Borrower and Lender as of 12:01 a.m. on the Closing Date.  All such items attributable to the period up to the Closing Date shall be charged to Borrower.  All such items attributable to the period on and after the Closing Date shall be charged to Lender.

(b)    Borrower shall not receive any credit at Closing for rents or other amount due under any Leases that have not been collected as of Closing, and shall not be entitled to receive any rents or other amount due under any Leases for pre-Closing periods if collected by Lender after Closing.

(c)    Charges for utilities serving the Property shall be determined as of the Closing Date.  Lender shall be responsible for all utility charges for the period on or after the Closing Date.  Borrower shall be responsible for all utility charges for the period through and including the day preceding the Closing Date.  Lender shall be responsible to ensure that all such utilities are switched over into the name of Lender as of the Closing Date, or as soon as possible thereafter, *provided*, that Borrower shall take all commercially reasonable actions necessary to assist Lender in accomplishing same.  Lender shall indemnify Borrower against any utility charges assessed against Borrower for and after the Closing Date.  Borrower shall indemnify Lender against any utility charges assessed against Lender for periods before the Closing Date.

(d)    As of the Closing Date, all deposits with utility companies and prepayments of utilities for the benefit of Borrower shall belong to Lender, and Borrower shall take all such actions as are necessary to cause all deposits and prepayments to be transferred to the name of the Lender effective as of the Closing Date.

(e)    Lender may, in its sole discretion, direct the Escrow Agent to allocate to Lender at Closing any amounts owed by Borrower under this **Section 6.6**.  In that case, all such amounts will be deducted from any earned Cooperation Fee or Sale Fee.

6.7    **Post-Closing Deliveries, Allocations and Cooperation**

6.7.1    Borrower agrees to generally cooperate in the transition of the Property to the Lender after Closing.   Lender and Borrower agree to execute, acknowledge, and deliver, at or after the Closing Date, such further assurances, instruments and documents as the other may reasonably request in order to fulfill the intent of this Agreement and the DIL Documents.  In addition, each party agrees that it shall provide commercially reasonable assistance to the other party, at the requesting party's expense, as reasonably requested in preparing for, filing, or responding to any audit, examination, investigation, proceeding, dispute, claim, loss, liability, or litigation, whether based on contract, tort, intentional tort, tax, environmental or any other theory brought by a third party.

6.7.2    In the event that an application for a real estate tax abatement or reduction is not filed by Borrower prior to the Closing Date for the tax year in which Closing occurs, then Lender shall have the exclusive right, following Closing, to file and prosecute such application with respect to the year in which Closing occurs.  If

12

such application has been filed by Borrower prior to Closing and Closing occurs prior to the day which marks the midpoint of the tax year, Lender shall also have the exclusive right to continue the prosecution of said application. Notwithstanding anything to the contrary contained in this Agreement, Lender shall be entitled to the entire amount of any abatement or reduction actually obtained, and Borrower shall have no right, title, or interest in any portion of such abatement or reduction, regardless of when the application was filed and/or the proceeds received and there shall be no proration.

7.    **REPRESENTATIONS AND WARRANTIES**

7.1    **Borrower's Representations and Warranties.**  The Borrower hereby warrants and represents to the Lender that the following are accurate and complete as of the Effective Date and as of the Closing Date:

7.1.1    Borrower has delivered to Lender the Lien Waivers for all work done on the Real Property, and neither Borrower nor any contractor, subcontractor or suppliers engaged by Borrower have any rights to file any further liens against the Real Property.

7.1.2    To the best of Borrower's knowledge, the Property is presently insured by a fire and extended coverage policy of insurance in compliance with the requirements of the Loan Documents.

7.1.3    Borrower does not have any claim, defense, counterclaim or right of setoff of any nature whatsoever against Lender with respect to the Loan Documents.  The Deed of Trust is a perfected first-position lien on the Real Property, the Deed of Trust and Security Agreement are perfected first-position liens on the personal property Collateral described therein, and there are no other material encumbrances affecting the Property.  No litigation, investigation, or proceeding of any kind is pending or threatened in writing against Borrower with respect the Property or the common areas of the condominium in which the Property is located.

7.1.4    Borrower owns the Property in fee simple absolute, free and clear of any loan or mortgage, and, other than the Permitted Exceptions, there are no existing liens, encumbrances, agreements, encroachments, overlaps, special assessments, claims, leases, tenancies, other adverse interests or defects upon or affecting the Property.  No other person or persons, firms, corporations or partnerships other than Borrower have any interest, either directly or indirectly, in the Property.  Borrower is not aware of any material defect in the Property or with respect to the common areas of the condominium in which the Property is located.

7.1.5    Borrower (a) is entering into this Agreement, and is executing the Closing Documents, and all other documents contemplated hereby as its free and voluntary act, in good faith, for value and valuable consideration, without duress or undue influence by Lender or any other person; (b) has consulted with legal counsel and accountants of its own choice regarding (and fully understands) the meaning, interpretation and effect of this Agreement, the Closing Documents, and other related documents, and the consequences thereof (including that Borrower's conveyance of the Real Property under the Deed in Lieu will extinguish its entitlement to foreclosure and its right to exercise other rights available generally to debtors, and that such conveyance may result in income tax liability); and (c) has taken all of these factors into consideration in its decision to enter into and perform its obligations under this Agreement and the Closing Documents.

7.1.6    All information and documents previously furnished by Borrower to Lender, or to be furnished to Lender pursuant to this Agreement, are true, accurate, and complete, except as Borrower may have disclosed to Lender in writing.

7.1.7    Borrower has not perpetrated any fraud or made any intentional misrepresentation in connection with or in order to effect conveyance of the Property to Lender.

7.1.8    Borrower is an Alaska limited liability company, and has the full capacity to enter into and carry out the terms and conditions of this Agreement and to execute and deliver all documents which are

13

contemplated by this Agreement, and to take all actions necessary to confer such power and authority upon the persons executing this Agreement, and all documents which are contemplated by this Agreement to be executed, on behalf of Borrower have been taken.  Borrower is not a "foreign person" within the meaning of IRC Section 1445(f)(3).

7.1.9    The execution, delivery and performance of this Agreement and other Closing Documents by Borrower (a) will not result in the creation or imposition of any lien or other encumbrance by any third party upon the assets of Borrower, (b) do not violate, invalidate, accelerate the maturity of, conflict with, result in any breach of, or constitute a default under, any agreement or instrument to which Borrower is a party, or by which the Borrower or its property or assets are bound or may be subject, or any provision of the charter documents of the Borrower; and (c) do not contravene any provisions of any law, statute, rule or regulation, order, writ, injunction or decree of any federal, state or local governmental authority applicable to the Borrower.  Neither this Agreement nor the Deed in Lieu was given as a preference against any other creditors of the Borrower.

7.1.10    Except for Bankruptcy Case , no proceedings under any federal or state bankruptcy or insolvency laws have been commenced by or against Borrower, no general assignment for the benefit of creditors has been made by Borrower, and no trustee or receiver of Borrower's property has been appointed, that have not been terminated.

7.1.11    Borrower has no knowledge of any current, pending, or threatened lawsuit, that has not been otherwise dismissed pursuant to the terms of the Term Sheet and Plan, involving the Property, or any received written notice regarding the Property's violation of any applicable law, rule, regulation, ordinance or government directive from any administrative or governmental authority or any restrictive easements or covenants affecting the Property, or any defects in the buildings or improvement on the Property.

7.1.12    Borrower has no knowledge of any proceeding regarding condemnation, environmental, zoning, or sewer moratorium, or other land-use regulation, which relate to the Property, nor has Borrower received notice of any special assessment proceedings affecting the Property.

7.1.13    Borrower has no knowledge, and has received no written notice, of any order, directive, complaint or other communication, written or otherwise, has been made or issued by any Governmental Authority or any third party alleging the occurrence of any act, event or condition relating to the Property or adjacent properties violating any environmental or hazardous materials laws or demanding payment or contribution for environmental damage or injury.

7.1.14    The schedule of tangible personal property attached to the Bill of Sale, and as updated in the Updated Schedules, is a true, accurate, and correct list of all tangible personal property owned by Borrower. The schedule of other intangible assets attached to the Assignment of Leases, and as updated in the Updated Schedules, is a true, accurate, and correct list of all tangible personal property owned by Borrower.

7.1.15    The Rent Roll attached to the Bill of Sale, and as updated in the Updated Schedules, is a true, accurate, and correct list of all Leases entered into by Borrower.  There are no leases, tenancies, licenses or other occupancy agreements to which Borrower is a party or by which Borrower may be bound for any portion of the Property other than the Leases identified in the Rent Roll.

7.1.16    The list of Service Contracts attached to the Contract Assignment, and as updated in the Updated Schedules, is an accurate and complete list of Service Contracts affecting the Property.  There is no outstanding and uncured claim of default made under any of the Continuing Service Contracts as of the Effective Date or the Closing Date on the part of any party thereto.

4893-3559-1632, v. 13

7.1.17    There are no agreements, contracts, or offers binding on Borrower or the Property with respect to the purchase and sale of the Property, nor any right or option to acquire the Property or any part thereof or interest therein, with any third-party.

7.1.18    There are no commissions or other compensation now or hereafter payable to any broker or other agent under any written or oral agreement or understanding with such broker or agent in relation to any of the Leases or any extension thereof.

7.1.19    All certificates, permits and licenses from any Governmental Authority having jurisdiction over the Property which are necessary to permit the lawful use and operation of the buildings and improvements on the Property as they presently exist, have been obtained (or will be obtained prior to the Closing Date), and are now, and will continue to be at all times before the Closing Date, in full force and effect.

7.1.20    The Property being transferred to Lender represents all of the property, real or personal, owned by Borrower (other than cash on hand to be used to pay Borrower's other liabilities and expenses).  Borrower owns the Property and all of the assets necessary to own and operate the improvements on the Property free and clear of all liens and encumbrances other than the Deed of Trust and taxes not yet due, except for any monetary liens that Borrower will cause to be released by the Closing Date as provided in the definition of Permitted Exceptions.

7.1.21    The transfers and conveyances made to Lender pursuant to this Agreement are not intended in any way to hinder, defraud, or delay any creditors of Borrower.  The transfers and conveyances to be made to Lender are for fair consideration.  Lender is not an insider of Borrower within the meaning of 11 U.S.C. § 31.  Borrower confirms and agrees that the transfers and conveyances to Lender do not constitute preferential transfers within the meaning of any applicable state or federal statute, including 11 U.S.C. § 547.

7.2    **Lender's Representations and Warranties.**  The Lender hereby warrants and represents to the Borrower that the following are accurate and complete as of the Effective Date and as of the Closing Date:

7.2.1    Lender is a Delaware limited liability company, has the full capacity to enter into and carry out the terms and conditions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement, and has taken all actions necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement to be executed on behalf of Lender.

7.2.2    Lender is the sole holder of the Loan Documents by virtue of the Endorsements and Assignments.

7.3    **Anti-Terrorism**.  Each party hereby represents that, to the actual knowledge of such party, neither such party nor any of such party's affiliated entities, is in violation of any laws relating to terrorism or money laundering ("***Anti-Terrorism Laws***"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "***Executive Order***"), and the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law No. 107-56.  Each party hereby further represents that, neither such party, nor to the actual knowledge of such party, any of such party's affiliated entities, or their respective brokers or agents acting or benefiting in any capacity in connection with the purchase of the Property, is any of the following: (a) a person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (b) a person or entity owned or controlled by, or acting for or on behalf of, any Person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity with which Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Laws; (d) a person or entity that commits, threatens, or conspires to commit or supports "terrorism" as defined in the Executive Order; or (e) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its

official website or any replacement website or other replacement official publication of such list. Neither party, nor, to the actual knowledge of either party, any of its brokers or other agents acting in any capacity in connection with the purchase of the Property: (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person as described above; (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any of the Anti-Terrorism Laws.

7.4    **Survival**. The representations and warranties made by any party in this **Section 7** or elsewhere in this Agreement shall survive Closing and shall not merge into any instrument or conveyance delivered at the Closing.

8.    **DEFAULT BY BORROWER; REMEDIES; BANKRUPTCY**

8.1    **Events of Default.** The following events, acts or occurrences constitute events of default by Borrower under this Agreement (each an "*Default*"):

8.1.1    Borrower defaults under this Agreement, the Term Sheet, any applicable terms as to the Class 3 creditor under the Plan, or any other Settlement Document.

8.1.2    Any of Borrower's representations or warranties made to Lender under this Agreement or under the Loan Documents is untrue, inaccurate or incomplete in any material respect on the Effective Date or the Closing Date, unless Borrower discloses the change in writing to Lender and Lender has agreed to accept such change and continue to Closing.

8.1.3    Borrower fails to take such steps as may reasonably be required to facilitate Closing of the transactions contemplated by this Agreement, or seeks any other relief or takes any other action that impedes, interferes with, delays or challenges this Agreement or any transactions contemplated by this Agreement, except as to the exercise of Borrower's rights under this Agreement or as otherwise permitted under this Agreement.

8.1.4    Subject to Lender performing its obligations under this Agreement, Borrower fails to deliver the Deed in Lieu or DIL Documents or items contemplated by this Agreement to Lender in accordance with this Agreement, or Lender is involuntarily divested of any of the Property subsequent to the Closing as the result of Borrower's breach of this Agreement or instrument conveying the Property, including without limitation divestiture of title to the Property before Closing or voidance of the Deed in Lieu or other instrument conveying the Property to Lender.

8.1.5    Subject to Lender performing its obligations under this Agreement, Borrower (a) objects to or challenges the validity, effectiveness or enforceability of this Agreement or any provision of this Agreement, or (b) fails or refuses to perform its obligations under this Agreement in accordance with the terms of this Agreement, except as the exercise of Borrower's rights under this Agreement.

8.1.6    Any payment made by Borrower to Lender or its designee, nominee or assignee is cancelled, rescinded, invalidated, required to be disgorged, or otherwise set aside.

8.2    **Remedies**

8.2.1    **Notice of Default and Applicable Cure Period.** In the event of the occurrence of a Default, and without violation of the automatic stay, MidCap may issue to the Debtor a Notice of Default. The cure period for a Default hereunder shall be ten (10) days, provided, any Default in financial reporting shall have a cure period of twenty (20) days. In the event there is no timely cure of a Default, such Default shall automatically become an "*Event of Default*", If any Event of Default occurs, then all the default provisions under the Settlement Documents shall apply, and MidCap may, on no less than ten (10) days' notice, request a hearing from the Court

for imposition of an appropriate remedy, including, but not limited to, the remedies of (a) the release of the DIL Documents from the Escrow Agent and delivery to MidCap for recording (subject to **Section 8.2.2** below), and (b) extinguishment of the Cooperation Fee and the Sale Fee.

    8.2.2 **Default of Failure to Pay Settlement.** Notwithstanding the foregoing, and for the avoidance of doubt, the failure to pay the March Settlement Amount by March 31, 2025 (a "Settlement Payment Event of Default" or "*SPED*") shall constitute a material breach of the Plan and this Agreement and an immediate Event of Default without any right to cure and without the necessity of obtaining Court confirmation of the SPEOD.

    8.2.3 **Release of Escrow.** In the event of an SPEOD, or upon the Court imposing the remedy of ordering Escrow to release the DIL Documents to MidCap following an Event of Default, the Escrow Agent shall be authorized to release and deliver the DIL Documents to MidCap upon MidCap's request.  The Escrow Instructions shall incorporate the foregoing term, authorizing such action by the Escrow Agent.  Thereafter, MidCap shall be entitled to record the DIL and exercise all of its other rights under the DIL Documents.

   8.3 **Bankruptcy.** If Borrower or other related entity with any interest in the Property files a petition under 11 U.S.C.,  it is agreed the provisions of 11 USC 362(d)(4)(B) shall apply, authorizing the Court to order the immediate termination of the stay as to all Property.  The Court shall have the power and authority to order the immediate release of the DIL Documents from Escrow and delivered to MidCap to proceed to Closing, and MidCap shall no longer be obligated for the Cooperation Fee or Sale Fee.

## 9. DAMAGE OR DESTRUCTION

   9.1 In the event of any material loss or damage to the Real Property occurring before or on the Closing Date, Borrower must send Lender written notice of the occurrence of such material loss or damage (which notice shall state the cost of repair or restoration thereof as opined by an architect).  In such event, Lender may terminate this Agreement by written notice to Borrower and Lender shall have all rights and remedies available to Lender under the Loan Documents.

   9.2 If Lender does not so elect to terminate this Agreement within 30 days after Borrower delivers such written notice to Lender, then Lender shall be deemed to have elected to proceed with Closing.  In that case, Borrower shall, at Lender's option, either (a) perform any necessary repairs at Borrower's expense, in which case Borrower shall be entitled to receive the insurance proceeds paid under Borrower's casualty insurance policies with respect to such loss or damage up to the amount expended by Borrower, and Lender shall promptly sign over to Borrower any insurance proceeds checks that are made payable to both Lender and Borrower for such repairs that are actually made upon Lender's receipt from Borrower of evidence of payment and lien waivers reasonably satisfactory to Lender; or (b) assign to Lender all of Borrower's right, title and interest, if any, in and to any claims and proceeds Borrower may have with respect to any casualty insurance policies or condemnation awards for Lender to apply against the Indebtedness.  If Lender elects to have Borrower perform repairs upon the Property, Borrower shall use reasonable efforts to complete such repairs promptly before the Closing Date, but, at Lender's option (in its sole discretion), the Closing Date may be extended a reasonable time in order to allow for the completion of such repairs if necessary.

   9.3 Upon Closing, full risk of loss with respect to the Property shall pass to Lender.

## 10. LIMITATION ON LENDER'S LIABILITY; INDEMNITY

   10.1 **No Assumption of Liability.** Borrower  acknowledges and agrees that Lender, by its acceptance of title to the Property, does not assume or create any obligations on the part of Lender, past and present nominees, designees, parents, subsidiaries, affiliates, servicers, investment managers, and all of their respective officers, directors, agents, employees, servants, attorneys and representatives, as well as the respective heirs, personal representatives, successors and assigns of any and all of them (collectively, the "*Indemnified Parties*") to third

parties that have claims or liabilities of any kind whatsoever against Borrower or the Property that accrue before the Closing Date.  Borrower further acknowledges and agrees that the Indemnified Parties are not a venturer, co-venturer, insurer, guarantor or partner of Borrower in Borrower' ownership of the Property prior to the Closing.

      10.2    **Indemnity.**  The Borrower agrees to indemnify, defend and hold the  Indemnified Parties free and harmless from and against any and all losses, damages, costs and expenses, including legal expenses and attorneys' fees, incurred by Lender as a direct or indirect result of any of the following:

      10.2.1  any representation or warranty of Borrower contained in the Plan, the Term Sheet, this Agreement or any DIL Document, or any other Settlement Document is found to be untrue, in whole or part, on the Effective Date or the Closing Date;

      10.2.2  Borrower's breach or default by of any of its covenants or agreements under the Plan, the Term Sheet, this Agreement or any DIL Document; or

      10.2.3  as a result of the filing against the Property of mechanic's or construction liens by persons, firms or corporations claiming to have performed work on the Property or supplied materials for the Property prior to the Closing.  Borrower and Lender each agree to give the other notice of any such liens promptly after obtaining knowledge thereof and Borrower shall have the right to defend against said lien or claim of lien.

      10.3    The obligations of the Borrower under this **Section 10** shall survive the Closing or the termination of this Agreement.

## 11.    NON-MERGER

      Borrower acknowledges and agrees that:

      11.1    Notwithstanding Lender's acceptance of the conveyance of the Property to Lender under the terms of the Conveyance Documents, the Note and the Deed of Trust and all other Loan Documents shall remain in full force and effect after the Closing has been consummated, and Lender's liens and security interests are <u>not</u> released nor relinquished.  The parties intend that the interest of Lender in the Property under all the conveyances provided for in the Conveyance Documents shall not merge with the interest of Lender in the Property under the Loan Documents, including any liens or security interest created thereunder, and shall at all times remain separate and distinct.  The liens and security interests evidenced by the Loan Documents shall be and remain at all times valid and continuous liens and security interests on the Property.  If there is any conflict between the terms of this Agreement and the Conveyance Documents, and those of the Note and the Deed of Trust, the terms of the Note and the Deed of Trust shall be controlling in all respects.  Notwithstanding the foregoing, Lender shall have no right to pursue enforcement of the Loan Documents against the Borrower after Closing.

      11.2    For purposes of priority as between (a) intervening or inferior liens or security interests and encumbrances, if any, on or against the Property, and (b) the liens and security interests against the Property benefiting Lender, any and all rights of Lender to exercise its remedies of foreclosure by private power of sale pursuant to nonjudicial foreclosure or by judicial foreclosure and all other remedies are expressly preserved hereby and for purposes of limitations and any other applicable time bar defense, are expressly extended as evidenced by this Agreement.

      11.3    The priority of the liens and security interests against the Property benefiting Lender is intended to be and shall remain in full force and effect and nothing herein or in any instrument executed in connection herewith shall be construed to subordinate the priority of those liens or security interests to any other liens, security interests or encumbrances whatsoever.

12.     **GENERAL PROVISIONS**

12.1     **No Brokerage Commissions and Finder's Fees.**  Each party to this Agreement represents and warrants that they have not engaged any party that would have a claim to any real estate commission, finder's fee, acquisition fee or other brokerage-type compensation (collectively, "***Real Estate Compensation***") in connection with the transactions contemplated by this Agreement.  Each party hereby agrees to indemnify and defend the other against and to hold the other harmless from any and all loss, cost, liability or expense (including but not limited to reasonable attorneys' fees and returned commissions) resulting from any claim for Real Estate Compensation by any person or entity engaged by them based upon such acts.  This Section will survive the Closing.

12.2     **Notices**.  The parties will deliver any notices required or permitted under this Agreement in writing by personal or courier delivery, email (including .pdf documents and/or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), or by registered or certified U.S. Mail, return receipt requested and postage prepaid, to address set forth below or below the parties' signatures or other address specified by a party in writing.  Receipt of notices will be deemed effective as of (a) the date of personal or courier delivery to the applicable address, (b) three business days after the date on the U.S. postmark affixed to the notice, or (c) if by email, when the recipient, by return email or any other method provided for in this Section, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Either party may change its physical or electronic addresses for Notices in writing in accordance with this Section.

     **If to Lender:**

     c/o Mid Cap Financial Services, LLC, as servicer
     7255 Woodmont Avenue, Suite 300
     Bethesda, MD  20814
     Attention:  Account Manager for EGAE/McKinley
     Email: notices@midcapfinancial.com

     *With a copy to, for notice purposes only:*
     c/o Mid Cap Financial Services, LLC, as servicer
     7255 Woodmont Avenue, Suite 300
     Bethesda, MD  20814
     Attention:  General Counsel
     Email: Legalnotices@midcapfinancial.com

12.3     **Expenses; Attorneys' Fees.**  In the event of any dispute arising from or concerning the enforcement or interpretation of this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs incurred in connection with such dispute.

12.4     **Independent Counsel.**  The terms of this Agreement have been mutually negotiated, with each party having the opportunity to seek the advice of independent legal counsel and will not be construed against any party.  Cairncross & Hempelmann, P.S. has represented only the Lender with respect to this Agreement, the DIL Documents, and any other documents and transactions described herein.  Borrower acknowledges that (a) the Lender has recommended that the Borrower obtain independent legal advice regarding this Agreement, and (b) the Borrower has had an adequate opportunity to seek independent legal counsel.

12.5     **Bankruptcy Court Jurisdiction.**  The parties agree that if any dispute arises out of or in connection with this Agreement, the Bankruptcy Court sitting in Anchorage, Alaska, shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Agreement.  The

Bankruptcy Court shall have original and exclusive jurisdiction over such matters and the parties affected thereby and the parties each hereby consent and submit to such jurisdiction.

12.6    **Waiver of Jury Trial**.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.    THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS TRANSACTION.

12.7    **Miscellaneous.**  This Agreement (a) cannot be assigned without the written consent of all parties, (b) will be enforced, governed and construed exclusively under the laws of the State of Alaska and federal bankruptcy law, as applicable, (c) benefits and is binding upon each of the parties and their respective successors and permitted assigns, as applicable, (d) is not intended to benefit any third parties, (e) will remain in full force and effect to the extent possible if any portion of this Agreement is declared invalid by a court having jurisdiction, (f) together with  the Plan, the Term Sheet, the Closing Documents, and all other documents to be delivered under this Agreement, constitutes the entire agreement of the parties, and supersedes all previous written or oral proposals, agreements, and other communications, with regard to its subject matter, (g) may only be amended or waived in writing signed by all parties, and any failure of a party to exercise or enforce any of its rights under this Agreement will not act as a waiver of those rights, and (h) may be signed in two or more counterparts, which together constitute one and the same document.  This Agreement may be executed and delivered by DocuSign, telecopy, .pdf or similar electronic transmittal, each of which shall have the same effect as the delivery of an executed original.

*Signature Page Follows*

*Signature Page to Deed in Lieu of Foreclosure Agreement*

Executed effective as of the Effective Date.

**LENDER:**

MIDCAP FUNDING INVESTMENT X LLC,
a Delaware limited liability company

By:  Apollo Capital Management, L.P.,
its investment manager

By:  Apollo Capital Management GP, LLC,
its general partner

By: _____

Name:   Maurice Amsellem
Title:    Authorized Signatory

Date signed: _____, 2024

**BORROWER:**

EGAE, LLC

By: _____

Name: Marc Marlow
Title: Manager

Date signed:  8 – 2          , 2024

Address: 337 E. 4ᵗ Ave. #1
          Anchorage, Ak 98501

Email: *marlowe @ cdcak.net*

**Exhibit A-1**

**LEGAL DESCRIPTION**

[Subject to replacement with updated Legal Description from the Title Commitment which is approved by Lender.]

The Real Property is situated in the Anchorage Recording District, Third Judicial District, State of Alaska and is described as follows:

Unit A of McKinley Tower, a common interest community, as shown on the Floor Plans filed under Plat No. 2005-26, Records of the Anchorage Recording District, Third Judicial District, State of Alaska, and as described in the Declaration of McKinley Tower, recorded on the 8th day of March, 2005 at Reception No. 2005-014348-0, Anchorage Recording District, Third Judicial District, State of Alaska, and in the First Amendment to the Declaration of McKinley Tower, recorded on the 24th day of March, 2008, at Reception No. 2008-015687-0, Anchorage Recording District, Third Judicial District, State of Alaska.

Together with certain Easements benefitting Lot B, McKay Subdivision, filed under Plat No. 2003-111, for access, maintenance, operation, repair and replacement of a boiler room, boiler and related facilities and underground utilities, recorded under Reception No. 2024-007903-0 and Reception No. 2024-007904-0 on March 29, 2024, in the Anchorage Recording District, Third Judicial District, State of Alaska.

**Exhibit A-2**
# PERMITTED EXCEPTIONS

[Subject to replacement with updated Permitted Exceptions from the Title Commitment which are approved by Lender.]

1. Reservations and exceptions as contained in the United States Patent(s) and/or in Acts authorizing the issuance thereof.
   Lots 1 and 2, Block 23, East Addition to Anchorage Townsite had a patent issued to the State of Alaska under patent No. 50-67-0062; Lot 11, Block 23, East Addition to Anchorage Townsite had a patent issued December 27, 1938, to Mabel Simms; and Lot 12, Block 23, East Addition to Anchorage townsite had a patent issued to Wilson Freeman under Patent No. 922015.

2. Taxes and/or assessments to the Municipality of Anchorage not yet due and payable.

3. Landscape Easement(s) of 6 feet on the Northern and Southern Lot lines and a 20 foot telecommunication and electric easement running through the center of underlying Lot B both being delineated on the plat of McKay Subdivision, Plat 2003-111.

   The 20 foot telecommunication and electrical easement was amended by:
   Encroachment Agreement, including the terms and provisions thereof:
   Executed by:  Anchorage, dba Municipal Light and Power
   Recorded February 2, 2005
   Reception No.:  2005-006871-0

   Note #7 as it pertains to the North/south pedestrian corridor connecting 3rd and 4th Avenues as shown on the plat of McKay Subdivision, Plat No. 2003-111.

   Slope easements as set forth on the plat of McKay Subdivision, Plat No. 2003-111.

4. Notice of Availability of Water Service, including terms and provisions thereof,
   By:  Municipality of Anchorage, Water Utility
   Recorded:  September 21, 1977
   Book/Page:  230/430

5. Amounts not yet due and payable under Resolution No.  AR NO. 97-41, confirming and levying special assessment for service on property specially benefitted in the Downtown Business Improvement District, Special Assessment District, No. ISD97, setting the dates of assessments, and providing for assessment billing, including the terms and provisions thereof,
   Recorded:  December 19, 1997
   Book/Page:  3171/687

6. Easement, including terms and provisions thereof, for the purpose set out therein
   Granted To:  Enstar Natural Gas Company, a division of Semco, Energy Inc.
   For:  Pipelines and Appurtenances
   Recorded:  November 17, 2000
   Book/Page:  3723/339
   Affects:  The North 10 Feet (N 10') of the common area

7. Covenants, conditions, restrictions and/or easements, including terms and provisions thereof, as contained in the Declaration submitting said premises to the Uniform Common Interest Ownership Act (34.08) of the State of Alaska:
   Recorded:  March 8, 2005
   Reception No.:  2005-014348-0

8. Terms, provisions and covenants, of the Amended and Restated By-laws of the Association set out below:
   Association:  McKinley Tower Association, Inc.
   Recorded:  March 8, 2005
   Reception No.:  2005-014349-0

9. Terms, conditions, provisions and future liens of the Uniform Common Interest Ownership Act of the State of Alaska (Chapter AS 34.08) and supplements and amendments thereto.

10. Deed of Trust, including terms and provisions thereof, securing the amount shown to the record of which reference is hereby made:
   Trustor:  EGAE, LLC, an Alaska limited liability company
   Trustee:  Fidelity Title Agency of Alaska, LLC
   Beneficiary:  CW Capital LLC, a Massachusetts limited liability company
   Amount:  $8,067,000.00 together with any other amounts due thereunder
   Dated:  March 8, 2005
   Recorded:  March 8, 2005
   Reception Number:  2005-014347-0

   Modified by agreement, including the terms and provisions thereof, to the record of which reference is hereby made:
   Recorded:  March 8, 2005
   Reception Number:  2005-014353-0

   Modified by agreement, including the terms and provisions thereof, to the record of which reference is hereby made:
   Recorded:  March 24, 2008
   Reception Number:  2008-015688-0

   Beneficial Interest assigned by mesne assignments of record:
   To:  MidCap Funding Investment X LLC, a Delaware limited liability company
   Recorded:  April 26, 2023
   Reception Number:  2023-010068-0

11. Financing Statement, pursuant to the Uniform Commercial Code
   Debtor:  EGAE, LLC
   Secured Party:  Secretary of Housing and Urban Development Recorded:
   October 20, 2020
   Reception No.:  2020-049269-0

   Assignment, pursuant to the Uniform Commercial Code
   Secured Party:  MidCap Financial Trust, as Agent
   Recorded:  April 19, 2023
   Reception Number:  2023-009237-0

   Assignment, pursuant to the Uniform Commercial Code
   Secured Party:  MidCap Funding Investment X LLC, as Agent
   Recorded:  April 28, 2023
   Reception No.:  2023-010289-0

12. Financing Statement, pursuant to the Uniform Commercial Code
   Debtor:  EGAE, LLC
   Secured Party:  Secretary of Housing and Urban Development Recorded:
   October 16, 2020
   Reception No.:  2020-022868-8

   Assignment, pursuant to the Uniform Commercial Code
   Secured Party:  MidCap Financial Trust, as Agent
   Recorded:  February 10, 2023
   Reception Number 2023-002719-5

   Assignment, pursuant to the Uniform Commercial Code
   Secured Party:  MidCap Funding Investment X LLC, as Agent
   Recorded:  February 14, 2023
   Reception No.:  2023-002982-2

**Exhibit B**

**LOAN DOCUMENTS**

1. **Note**. The Loan was originally made to Borrower by CWCapital LLC, subsequently known as Walker & Dunlop Capital, LLC ("***Original Lender***") under the terms of a Deed of Trust Note dated March 8, 2005 ("***Note***"). The Note has been assigned to Lender through the following agreements and endorsements of the Note (collectively, the "***Endorsements***"):

   ➢ Endorsement from the Original Lender to Walker & Dunlop, LLC (updated).

   ➢ Allonge from Walker & Dunlop, LLC assigned the Note to the Secretary of Housing and Urban Development of Washington, D.C. ("***HUD***") dated May 29, 2019,

   ➢ Note Endorsement from HUD to MidCap Financial Trust, dated December 6, 2022, and

   ➢ Allonge from MidCap Financial Trust assigning the Note to Lender, dated on December 15, 2022.

2. **Deed of Trust.** The Indebtedness is secured by that certain Deed of Trust between Borrower, CWCapital LLC, as the original Beneficiary, and Fidelity Title Agency of Alaska, LLC, as "***Trustee***", dated and recorded on March 8, 2005, in the real property records of Recording Dist. 301 - Anchorage, State of Alaska ("***Recorder's Office***"), under Reception No. 2005-014347-0, as amended by (a) the Partial Release, Modification and Partial Assumption Agreement between Borrower, McKinley Tower Association, Inc. (the "***HOA***"), Marlow Manor Downtown LLC, and Original Lender, dated and recorded on March 8, 2005, as Reception No. 2005-014353-0, in the Recorder's Office; and (b) the Loan Modification Agreement between Borrower, Trustee, Original Lender, and HUD, dated and recorded on March 24, 2008, as Reception No. 2008-015688-0, with the Recorder's Office (collectively, the "***Deed of Trust***"). The Deed of Trust is currently held by the Lender as the result the following of Assignments of Deed of Trust recorded in connection with the assignments of the Loan (collectively, the "***Assignments***"):

   ➢ Assignment of Deed of Trust from Walker & Dunlop Capital, LLC (previously known as CWCapital LLC, the original Beneficiary) to Walker & Dunlop LLC, dated August 5, 2013, and recorded on August 15, 2013, as Reception No. 2013-046252-0 with the Recorder's Office

   ➢ Assignment of Deed of Trust from Walker & Dunlop LLC to Secretary of Housing and Urban Development of Washington, D.C. ("***HUD***"), dated May 21, 2019, and recorded on May 29,2019, as Reception No. 2019-017393-0, with the Recorder's Office.

   ➢ Assignment of Deed of Trust from HUD to MidCap Financial Trust, dated December 6, 2022, and recorded on December 19, 2022, as Reception No. 2022-044249-0, with the Recorder's Office.

   ➢ Assignment of Deed of Trust from MidCap Financial Trust to Lender, dated and recorded on December 21, 2022, as Reception No. 2022-044522-0, with the Recorder's Office.

      ○ Corrective Assignment of Deed of Trust from MidCap Financial Trust to Lender, dated and recorded on March 20, 2023, as Reception No. 2022-044522-0, with the Recorder's Office.

      ○ Corrective Assignment of Deed of Trust from MidCap Financial Trust to Lender, dated and recorded on April 19, 2023, as Reception No. 2023-009232-0, with the Recorder's Office.

      ○ Corrective Assignment of Deed of Trust from MidCap Financial Trust to Lender, dated and recorded on April 26, 2023, as Reception No. 2023-0100638-0, with the Recorder's Office.

**Exhibit B**

**LOAN DOCUMENTS (cont.)**

3. **Security Agreement.**  The Indebtedness is also secured by a Security Agreement between Borrower and Original Lender dated March 8, 2005.  The Security Agreement is now held by Lender through the Endorsements and Assignments described above, and through the following Assignment:

 > ➢ Assignment of Security Agreement from Original Lender to HUD, dated May 29, 2019.

4. **UCC-1**.  All UCC-1 Financing Statements with Borrower as Debtor and Lender or its predecessors-in-interest as Secured Party.

5. **Others**.  All other documents signed by the Borrower in connection with the Loan, except the HUD Regulatory Agreement which has been cancelled.

**Exhibit C** – **Deed in Lieu of Foreclosure (Non-Merger)**

Exhibit C
To Deed in Lieu of Foreclosure Agreement

AFTER RECORDING RETURN TO:

MidCap Financial Services, LLC,
7255 Woodmont Avenue, Suite 300
Bethesda, MD 20814
Attn: Pascale B. Centola, Esq.

## DEED IN LIEU OF FORECLOSURE
## WITHOUT MERGER

Grantor: EGAE, LLC, an Alaska limited liability company

Grantee: _____, a _____

Abbreviated Legal: [To insert from Title Commitment]

Additional Legal Description is at **Exhibit A** of Document

Assessor's Tax
Account Parcel
Number: [To insert from Title Commitment]

This DEED IN LIEU OF FORECLOSURE WITHOUT MERGER (the "***Deed in Lieu***") dated _____, 2024, is made entered into among EGAE, LLC, an Alaska limited liability company ("***Grantor***"), having an address at _____, and _____, a _____ ("***Grantee***"), having an address at _____. This Deed in Lieu is entered into in connection with a Deed in Lieu Foreclosure Agreement dated as of _____, 2024 between and among Grantor, MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company ("***Lender***"), and other parties thereto ("***DIL Agreement***"). If Lender and Assignee are not the same party, Lender has assigned it rights with respect to the Deed in Lieu to Assignee as permitted under the DIL Agreement.

1.      **Grant**. In lieu of foreclosure in accordance with the DIL Agreement, Grantor, in good faith and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably and unconditionally grants, bargains, transfers, sells, conveys, assigns, confirms and warrants to Grantee all of Grantor's right, title and interest in, the following real and personal property (collectively, the "***Property***"), subject only to the permitted exceptions set forth on the attached **Exhibit B** ("***Permitted Exceptions***"):

1.1      all of the right, title and interest of Grantor in the real property and improvements thereon (the "***Real Property***") situated in the Anchorage Recording District, Third Judicial District, State of Alaska, as described in the attached **Exhibit A**;

1.2    all units, declarant rights, and any other rights relating to the Real Property, whether now existing or subsequently arising, under any and all laws now existing or later enacted relating to condominiums;

1.3    all appurtenances and other property and interests of any kind or character, whether described in **Exhibit A** or not, that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Real Property;

1.4    all goods, materials, supplies, chattels, appliances, fixtures, equipment, inventory, general intangibles, and machinery of Grantor now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Real Property, whether stored on the Real Property or elsewhere, all of which shall be considered to the fullest extent of the law to be Real Property for purposes of this Deed in Lieu;

1.5    all leases, rental agreements or licenses, whether written or oral, for use of any part of the Real Property by third parties ("***Leases***");

1.6    all income, rents, security or similar deposits, revenues, issues, royalties, profits, leases, earnings, products and proceeds of the Real Property, including, without limitation, all rights to the payment of money, accounts, accounts receivable, reserves, deferred payments, refunds, cost savings, insurance or condemnation proceeds, payments and deposits, including all tenant security deposits held in Grantor's deposit accounts;

1.7    any and all other personal property of any kind whatsoever, whether tangible or intangible, that is used or will be used in construction of, or is or will be placed upon or is derived from or used in any connection with the use, occupancy or enjoyment of, the Land or Improvements;

1.8    all books and records pertaining to any and all of the Property; and

1.9    all licenses, permits, approvals, commitments, designs, plans, specifications, architectural and engineering contracts, construction contracts, surveys, appraisals, listing agreements, warranties, and any and all other work product or general intangibles relating to the Property or any part thereof and now or hereafter owned by Grantor, including, without limitation any and all rights or claims that relate to the construction of improvements on or to the Property that Grantor may have against any person or entity supplying, or who has supplied, labor, materials, or services in connection with the construction of improvements on the Property.

This Deed in Lieu also constitutes (a) a bill of sale transferring to Grantee all of Grantor's right, title and interest in and to all personal property of Grantor included in the Property, and (b) an absolute assignment from Grantor to Grantee of the Leases.

2.    **Absolute Conveyance**

2.1    This Deed in Lieu  is an absolutely conveyance, assignment and transfer of all interests of Grantor in the Property and transfer of all interests of Grantor in the Property and is granted in lieu of the foreclosure of that certain Deed of Trust between Grantor, CWCapital LLC, as the beneficiary ("***Original Beneficiary***"), and Fidelity Title Agency of Alaska, LLC, as "***Trustee***",  dated and recorded on March 8, 2005 in the real property records of Recording Dist. 301 - Anchorage, State of Alaska ("***Recorder's Office***"), under Reception No. 2005-014347-0, as amended by the following documents (collectively, the "***Deed of Trust***"):

2

- Partial Release, Modification and Partial Assumption Agreement between Grantor, McKinley Tower Association, Inc., Marlow Manor Downtown LLC, and Original Beneficiary, dated and recorded on March 8, 2005, as Reception No. 2005-014353-0, in the Recorder's Office; and

- Loan Modification Agreement between Grantor, Trustee, Original Beneficiary and HUD, dated and recorded on March 24, 2008, as Reception No. 2008-015688-0, with the Recorder's Office.

The Deed of Trust subsequently was assigned as follows:

➢ Assignment of Deed of Trust from Walker & Dunlop Capital, LLC (previously known as CWCapital LLC, the original Beneficiary) to Walker & Dunlop LLC, dated August 5, 2013, and recorded on August 15, 2013, as Reception No. 2013-046252-0 with the Recorder's Office

➢ Assignment of Deed of Trust from Walker & Dunlop LLC to Secretary of Housing and Urban Development of Washington, D.C. ("**HUD**"), dated May 21, 2019 and recorded on May 29,2019, as Reception No. 2019-017393-0, with the Recorder's Office.

➢ Assignment of Deed of Trust from HUD to MidCap Financial Trust, dated December 6, 2022, and recorded  on  December 19, 2022 as Reception No. 2022-044249-0, with the Recorder's Office.

➢ Assignment of Deed of Trust from MidCap Financial Trust to Lender, dated and recorded on December 21, 2022 as Reception No. 2022-044522-0, with the Recorder's Office.

  o Corrective Assignment of Deed of Trust from MidCap Financial Trust to Lender, dated and recorded on  March 20, 2023, as Reception No.  2022-044522-0, with the Recorder's Office.

  o Corrective Assignment of Deed of Trust from  MidCap Financial Trust to Lender, dated and recorded on  April 19, 2023, as Reception No. 2023-009232-0, with the Recorder's Office.

  o Corrective Assignment of Deed of Trust from  MidCap Financial Trust to Lender, dated and recorded on  April 26, 2023, as Reception No.  2023-0100638-0, with the Recorder's Office.

2.2     This Deed is intended to convey to Grantee any and all legal, equitable and other rights and interests of the Grantor of any and every nature whatsoever in and to the Property including, but not limited to, any rights Grantors may hereafter acquire and any rights of redemption now or hereafter held by or arising in favor of Grantor or any person or entity by, through or under Grantor.  Without limiting the generality of the foregoing, Grantor hereby waives and forever releases and relinquishes any and all rights of redemption and similar rights of any nature whatsoever which it may have or which may accrue in the future in connection with the Property.

2.3     Grantor waives and releases any and all statutory, common law and other liens available to it or any of them against the Property, including, but not limited to, those based upon labor performed, materials supplied, services rendered or any other act performed with regard to the Property.

3.     **Grantor Warranties and Covenants.**  Grantor hereby warrants and covenants to Lender and Grantee in executing this Deed in Lieu that the following statements are accurate and complete:

3

3.1     Grantor is the is sole owner of the Property, and there are no outstanding unrecorded deeds, deeds of trust, or other exceptions on title to the Property, except the Permitted Exceptions.

3.2     No work has been done on the Property in four months preceding the date of this Deed in Lieu that has not been fully paid for or could give rise to a materialmen's lien.

3.3     The consideration set forth in the DIL Agreement for the execution of this Deed in Lieu is equal to or greater than the fair market value of the Property and includes the fair and reasonable value of Grantor's interest in the Property.

3.4     Grantor has had the opportunity to consult with its attorneys with regard to the provisions of this Deed in Lieu and the DIL Agreement.  This Deed in Lieu is executed voluntarily by Grantor, and not pursuant to duress or threats of any kind.  Furthermore, it is executed and delivered in mutual good faith between Grantor and Grantee, and is not given or intended to hinder, delay, or defraud any creditor, or to contravene any of the bankruptcy laws of the United States or other applicable laws.

3.5     The Grantor holds good and valid title to the Property, free and clear of any deeds of trust, mortgages, judgments, liens, encumbrances, leases, rentals, adverse claims, and impairments to title or ownership, other than the Grantee's Deed of Trust and the Permitted Exceptions, and the Grantor has the right and authority to convey or assign to Grantee all of the Property, and all easements, access rights, rights of way, appurtenances, privileges, licenses, hereditaments, franchises and tenements thereto.

3.6     The Deed in Lieu is not given as security for the payment of money or indebtedness, nor as security of any kind or nature, and there is no agreement or understanding, oral or written, between Grantor and Grantee herein, or any other person, relative to a conveyance of the Property back to Grantor.

3.7     Grantor intends by this Deed in Lieu to vest the absolute and unconditional title to the Property in Grantee, and forever to estop and bar Grantor, and all of Grantor's successors in interest, from having or claiming any right, title or interest of any nature whatsoever, either in law or equity, or in possession or in expectancy, in and to the Property or any part thereof.  In this regard, and in reliance upon this Deed in Lieu and all of Grantor's warranties and representations made herein, Grantee shall be entitled to exercise and enjoy all of the rights, responsibilities, powers and privileges associated with the Property at such time and on such terms as Grantee deems appropriate, and otherwise acting with respect to the Property consistent with the quiet enjoyment and ownership thereof by Grantee.

3.8     Grantor further warrants and represents: (a) that Grantor has full power and authority to execute and deliver this Deed in Lieu, (b) that this conveyance and assignment of the Property is freely and fairly made, (c) that Grantor is not rendered insolvent by this conveyance and assignment, and (d) that there are no agreements, oral or written, other than those reflected in this Deed in Lieu, the DIL Agreement , and any other documents executed in connection therewith.

3.9     The Property has never been used for the production, storage, handling, treatment or disposal of toxic or hazardous substances under any federal, state or local environmental law, and that there are no existing violations of Environmental Laws in, on, or about the Property, and that there are no lawsuits or compliance proceedings pending or threatened regarding the Property.  "***Environmental Laws***" means all laws, statutes, regulations, ordinances, decrees, orders, policies or other requirements of any federal, state or municipal government authority which govern, regulate and/or relate to toxic or hazardous substances and/or other environmental matters or substances, including, without limitation, the Comprehensive Environmental

4

Response, Compensation and Liability Act (42 USCA Section 9601, *et seq*) and the corresponding Washington State laws.

4. **Non-Merger**

4.1     The parties acknowledge and agree that the interest of Lender in the Property under all of the conveyances described in this Deed in Lieu shall **NOT** merge with the interest of Grantee in the Property under the Deed of Trust or loan documents pertinent thereto.  It is the express intention of each of the parties that such interest of Grantee in the Property shall not merge, but shall be and remain at all times separate and distinct, notwithstanding any union of said interest in Grantee at any time by purchase, termination, or otherwise, and that the lien of Grantee in the Property created by the Deed of Trust shall be and remain at all times a valid and continuous lien on the Property.

4.2     It is the express intent of the parties that this deed in lieu shall **NOT** operate to extinguish the Deed of Trust or the Security Agreement dated of even date with the Deed of Trust, and that the Deed of Trust shall not be merged into or otherwise released by the recording hereof. Lender and Grantee, including their successors and assigns, retain the right to proceed with foreclosure actions under the Deed of Trust and any related security agreements against the Property, and all other property and collateral secured by the Deed of Trust, on the basis of existing or future defaults under the obligations secured thereby in the event that a foreclosure is deemed necessary by Lender or Grantor for any reason, including to clear title to the Property of any existing or future encumbrances subordinate to the Deed of Trust.

*Signature Page Follows*

4878-7793-6848, v. 5

*Signature page for Deed in Lieu of Foreclosure*

IN WITNESS WHEREOF, Grantor has executed this Deed in Lieu or has caused the same to be executed by its representatives thereunto duly authorized.

**GRANTOR**:

EGAE, LLC

By: _____

Name: Marc Marlow
Title: Manager

STATE OF _____                    )
                                          )
[COUNTY/_____] OF _____       )

     On this _____ day of _____, 2024, before me personally appeared **MARC MARLOW,** who acknowledged being the Manager of Grantor, and who executed the within and foregoing instrument, and acknowledged said instrument to be his free and voluntary act and deed for the uses and purposes therein mentioned.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

Signature:_____

Name (Print):_____

NOTARY PUBLIC in and for the State of
_____, residing at_____
My appointment expires:_____

6

**EXHIBIT A**
**To Deed in Lieu of Foreclosure without Merger**

## <u>LEGAL DESCRIPTION</u>

[To be updated to match the Legal Description in Lender's Pro Forma Title Policy at time of recording.]

The Real Property is situated in the Anchorage Recording District, Third Judicial District, State of Alaska and is described as follows:

Unit A of McKinley Tower, a common interest community, as shown on the Floor Plans filed under Plat No. 2005-26, Records of the Anchorage Recording District, Third Judicial District, State of Alaska, and as described in the Declaration of McKinley Tower, recorded on the 8th day of March, 2005 at Reception No. 2005-014348-0, Anchorage Recording District, Third Judicial District, State of Alaska, and in the First Amendment to the Declaration of McKinley Tower, recorded on the 24th day of March, 2008, at Reception No. 2008-015687-0, Anchorage Recording District, Third Judicial District, State of Alaska.

Together with certain Easements benefitting Lot B, McKay Subdivision, filed under Plat No. 2003-111, for access, maintenance, operation, repair and replacement of a boiler room, boiler and related facilities and underground utilities, recorded under Reception No. 2024-007903-0 and Reception No. 2024-007904-0 on March 29, 2024 in the Anchorage Recording District, Third Judicial District, State of Alaska.

*[END OF EXHIBIT A]*

4878-7793-6848, v. 5

**EXHIBIT B**
**To Deed in Lieu of Foreclosure without Merger**

## <u>PERMITTED EXCEPTIONS</u>

[To insert from Lender's Pro Forma Title Policy at time of recording, which Lender has approved.]

<u>**Exhibit D**</u> **– Bill of Sale and General Assignment**

**Schedule 1 – List of Tangible Assets**

**Schedule 2 – List of Intangible Assets**

## BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "*Bill of Sale*") dated as of _____ ("*Effective Date*") entered into by and between EGAE, LLC, an Alaska limited liability company ("*Assignor*"), and _____, a(n) _____("*Assignee*"), and Lender (as defined below) if different than Assignee.

### BACKGROUND

A.      Prior to the Effective Date, Assignor was the owner of the real property commonly known as the McKinley Tower Apartments located in the McKinley Tower at 337 East 4th Ave., Anchorage, Alaska (the "*Real Property*").

B.      In connection with the ownership and management of the Real Property, prior to the Effective Date, Assignor is the lawful owner of the following Tangible Property and Intangible Property (together ("*Personal Property*"):

- tangible personal property that is located on or used in the operation of the Real Property, including, but not limited to, those items listed on the Schedule of Tangible Property attached as **Schedule 1** (collectively, "*Tangible Property*") ; and

- intangible personal property related to or used in the operation of the Real Property  itemized in the Schedule of Intangible Property attached as **Schedule 2** (collectively, "*Intangible Property*").

C.      Assignor and MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company ("*Lender*") are parties to a Deed in Lieu of Foreclosure Agreement dated _____, 2024 (the "*Agreement*"), pursuant to which Assignor agreed to sell and convey the Property to Lender or its assigns upon the occurrence of the events, and on the terms and conditions, specified in the Agreement.  In accordance with the Agreement, Assignor is conveying the Property to Assignee by a Deed in Lieu of Foreclosure dated this same date ("*Deed in Lieu*"), by recordation in the real property records of Anchorage, Alaska. Any undefined capitalized terms used in this Bill of Sale are defined as stated in the Agreement.

D.      [As permitted under the Agreement, Lender has assigned it rights with respect to the Deed in Lieu and other Conveyance Documents, including this Bill of Sale, to Assignee.]

E.      In connection with the transfer of the Real Property to Assignee, Assignor is also obligated to assign the Personal Property to Assignee, and Assignor desires to accept, all of Assignor's interest in the Personal Property, under the terms and conditions of this Assignment.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and Incorporating the foregoing Recitals, the parties agree as follows:

1.      **Conveyance and Assignment.**  Effective as of the Effective Date, on the terms and subject to the conditions set forth in the Agreement:

1.1      Assignor hereby conveys, transfers and delivers to Assignee all of Assignor's rights, title and interest in and to the Tangible Property.

1.2      Assignor hereby assigns and transfers to Assignee all of Assignor's rights, title and interest in and to the Intangible Property.  Any consents required for the effective assignment and transfer of the Intangible Property shall be delivered in writing to Assignee prior to the Effective Date.

1

1.3     Assignor shall execute and deliver to Assignee such documents or instruments reasonably requested by Assignee in writing in order to perfect the transfer and assignment of the Personal Property to Assignee.

2.     **Acceptance and Assumption; Limitation on Assignee's Obligations.** Effective as of the Effective Date, on the terms and subject to the conditions set forth in the Agreement, Assignee hereby (a) accepts transfer of all of Assignor's rights, title and interest in and to the Tangible Property, and (b) assumes all of Assignor's rights, title and interest in and to the Intangible Property, except that Assignee shall not be liable for any affirmative duties or obligations of the Assignor under the Intangible Property except as otherwise provided for in the Agreement, or as Assignee expressly elects in writing, in its sole discretion.

3.     **Representations and Warranties.** Assignor represents and warrants that the following statements are accurate and complete:

3.1     Assignor is the lawful owner of all Personal Property, free and clear of all mortgages, liens or encumbrances of any nature whatsoever except for the lien of the Deed of Trust, the Security Agreement, and any other applicable Loan Documents (as those terms are defined in the Agreement).

3.2     There are no outstanding obligations of Assignor, or unpaid payments due from Assignor, with respect to any Personal Property.   Neither Assignor nor any other party to any Lease is in default under outstanding agreements with respect to any Personal Property.

3.3     Assignor has not made any prior sale, assignment, or transfer of any of the Personal Property.

4.     **Indemnity**.  Assignor hereby agrees to indemnify, defend and hold harmless Lender and Assignee and their respective past and present nominees, designees, parents, subsidiaries, affiliates, and all of their respective officers, directors, agents, employees, servicers, investment managers, attorneys and representatives, as well as their respective heirs, personal representatives, successors and assigns of any and all of them (collectively, the "*Indemnified Parties*") from and against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including without limitation, reasonable attorneys' fees and disbursements (with counsel reasonably acceptable to the Indemnified Parties), arising out of or relating to any of the Personal Property, and  arising or occurring prior to the Effective Date.  Assignor's indemnification obligations under this **Section 4** shall include any breach of the representation and warranty made in this Bill of Sale.

5.     **General Provisions**

5.1     **Further Assurances.**  The parties agree to execute such other documents and perform such other acts as may be necessary or desirable to carry out the purposes of this Bill of Sale.

5.2     **Notices**.  The parties will deliver any notices required or permitted under this Bill of Sale in writing by personal or courier delivery, email (including .pdf documents and/or any electronic signature complying with the U.S.  federal ESIGN Act of 2000, e.g., www.docusign.com), or by registered or certified U.S.  mail, return receipt requested and postage prepaid, to address set forth below or below the parties' signatures or other address specified by a party in writing.  Receipt of notices will be deemed effective as of (a) the date of personal or courier delivery to the applicable address, (b) three business days after the date on the U.S.  postmark affixed to the notice, or (c) if by email, when the recipient, by return email or any other method provided for in this Section, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Either party may change its physical or electronic addresses for Notices in writing in accordance with this Section.

**If to Lender:**
c/o Mid Cap Financial Services, LLC, as servicer

7255 Woodmont Avenue, Suite 300
Bethesda, MD  20814
Attention:  Account Manager for EGAE/McKinley
Email: notices@midcapfinancial.com

*With a copy to, for notice purposes only:*
c/o Mid Cap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 300
Bethesda, MD  20814
Attention:  General Counsel
Email: Legalnotices@midcapfinancial.com

5.3      **Expenses; Attorneys' Fees.**  In the event of any dispute arising from or concerning the enforcement or interpretation of this Bill of Sale, the substantially prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs incurred.

5.4      **Independent Counsel**.  The terms of this Bill of Sale have been mutually negotiated, with each party having the opportunity to seek the advice of independent legal counsel and will not be construed against any party.  Cairncross & Hempelmann, P.S. has represented only the Lender with respect to this Bill of Sale, the Agreement, and any other documents and transactions described herein.  Assignor acknowledges that (a) the Lender has recommended that the Assignor obtain independent legal advice regarding this Bill of Sale, and (b) the Assignor has had an adequate opportunity to seek independent legal counsel.

5.5      **Bankruptcy Court Jurisdiction.**  The parties agree that if any dispute arises out of or in connection with this Bill of Sale, the Bankruptcy Court sitting in Anchorage, Alaska, shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Bill of Sale.  The Bankruptcy Court shall have original and exclusive jurisdiction over such matters and the parties affected thereby and the parties each hereby consent and submit to such jurisdiction.

5.6      **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS BILL OF SALE AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS BILL OF SALE.

5.7      **Miscellaneous.**  This Bill of Sale (a) cannot be assigned without the written consent of all parties, (b) will be enforced, governed and construed exclusively under the laws of the State of Alaska and federal bankruptcy law, as applicable, (c) benefits and is binding upon each of the parties and their respective successors and permitted assigns, as applicable, (d) is not intended to benefit any third parties, (e) will remain in full force and effect to the extent possible if any portion of this Bill of Sale is declared invalid by a court having jurisdiction, (f) together with the Agreement and all other documents to be delivered under the Agreement, constitutes the entire agreement of the parties, and supercedes all previous written or oral proposals, agreements, and other communications, with regard to its subject matter, (g) may only be amended or waived in writing signed by all parties, and any failure of a party to exercise or enforce any of its rights under this Bill of Sale will not act as a waiver of those rights, and (h) may be signed in two or more counterparts, which together constitute one and the same document.  This Bill of Sale may be executed and delivered by DocuSign, telecopy, .pdf or similar electronic transmittal, each of which shall have the same effect as the delivery of an executed original.

*Signature Page Follows*

3

*Signature page to Bill of Sale and General Assignment*

Executed effective as of the Effective Date.

**ASSIGNEE:**                                    **ASSIGNOR:**

[_____              EGAE, LLC


By: _____            By: _____

Name: _____          Name: Marc Marlow
Title: _____         Title: Manager

Address: _____       Address: _____
         _____                _____

Email: _____         Email: _____


**LENDER:]**

MIDCAP FUNDING INVESTMENT X LLC,
a Delaware limited liability company

 By:  Apollo Capital Management, L.P.,
its investment manager

 By: Apollo Capital Management GP, LLC,
its general partner


By: _____

Name:  Maurice Amsellem
Title:   Authorized Signatory


4892-2845-2049, v. 5

**SCHEDULE I**
**To Bill of Sale and General Assignment**

## TANGIBLE PROPERTY

[See attached]

EGAE Schedule of Tangible Personal Property

<u>Fixed Assets - Miscellaneous</u>
| | |
|---|---|
| Janitorial Equipment | $      434.70 |
| Computers/Data Processing Equipment | $   3,722.24 |
| Miscellaneous Other | $  19,305.10 |

<u>Fixed Assets – Furnishings</u>
| | |
|---|---|
| Boiler | $114,045.56 |
| Furnishings Other | $153,616.02 |

* Item is included in UBIA for Section 199A calculations. See "UBIA" in lower right corner.

# Depreciation Detail Listing

337 E 4th Ave

(This page is not filed with the return. It is for your records only.)

**2022**
PAGE 1

Name(s) as shown on return: **Marlow Family Exempt Perpetual Trust**

Social security number/EIN: ****4293

| No. | Description | Date | Cost | Basis Adjustment | Business percentage | Section 179 | Bonus depreciation | Depreciable Basis | Life | Method | Rate | Prior Depreciation | Current Depreciation | Accumulated Depreciation | AMT Current |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Furniture & Fixtures | 04162015 | 6,508* | | 100.00 | | | 6,508 | 7 | 200 DB HY | 4.46 | 6,218 | 290 | 6,508 | 167 |
| 2 | DID Special Assessmen | 08122015 | 33,178* | | 100.00 | | | 33,178 | 39 | SL   MM | 2.564 | 5,425 | 851 | 6,276 | 851 |
| 3 | Personal Property | 07202006 | 45,303 | | 100.00 | | | 45,303 | 5 | | 0 | 45,303 | | 45,303 | |
| 4 | Personal Property | 04012007 | 2,916 | | 100.00 | | | 2,916 | 5 | | 0 | 2,916 | | 2,916 | |
| 5 | Furnishings | 08302008 | 2,342 | | 100.00 | | | 2,342 | 5 | | 0 | 2,342 | | 2,342 | |
| 6 | Furnishings | 07012009 | 2,128 | | 100.00 | | | 2,128 | 5 | | 0 | 2,128 | | 2,128 | |
| 7 | Furnishings | 09132010 | 1,441 | | 100.00 | | | 1,441 | 5 | | 0 | 1,441 | | 1,441 | |
| 8 | Furnishings | 09012011 | 1,326 | | 100.00 | | | 1,326 | 5 | | 0 | 1,326 | | 1,326 | |
| 9 | Furnishings | 12162011 | 1,795 | | 100.00 | | | 1,795 | 5 | | 0 | 1,795 | | 1,795 | |
| 10 | Furnishings | 06302012 | 4,245 | | 100.00 | | | 4,245 | 5 | | 0 | 4,245 | | 4,245 | |
| 11 | Refrigerator | 01132013 | 470* | | 100.00 | | | 470 | 5 | | 0 | 470 | | 470 | |
| 12 | Refrigerator | 08132013 | 588* | | 100.00 | | | 588 | 5 | | 0 | 578 | | 578 | |
| 13 | Stove | 08132013 | 470* | | 100.00 | | | 470 | 5 | | 0 | 470 | | 470 | |
| 14 | Boiler | 10132013 | 27,632* | | 100.00 | | | 27,632 | 7 | | 0 | 26,122 | | 26,122 | |
| 15 | Refrigerators | 11132013 | 898* | | 100.00 | | | 898 | 5 | | 0 | 849 | | 849 | |
| 16 | Network Server | 08072013 | 6,539* | | 100.00 | | | 6,539 | 5 | | 0 | 6,539 | | 6,539 | |
| 17 | Furnishings | 07162014 | 14,259* | | 100.00 | | | 14,259 | 7 | | 0 | 14,258 | | 14,258 | |
| 18 | Office Equipment | 02202014 | 2,095* | | 100.00 | | | 2,095 | 5 | | 0 | 2,094 | | 2,094 | |
| 19 | Building NonQRE | 07202006 | 867,950* | | 100.00 | | | 867,950 | 27 | SL   MM | 3.704 | 491,383 | 32,146 | 523,529 | 32,146 |
| 20 | Building QRE | 07202006 | 542,833* | | 100.00 | | | 542,833 | 27 | SL   MM | 3.704 | 293,498 | 20,105 | 313,603 | 20,105 |
| 21 | Building | 01012007 | 376,850* | | 100.00 | | | 376,850 | 27 | SL   MM | 3.704 | 206,498 | 13,957 | 220,455 | 13,957 |
| 22 | Building DF QRE | 07202006 | 1,000,000* | | 100.00 | | | 1,000,000 | 27 | SL   MM | 3.704 | 558,175 | 37,037 | 595,212 | 37,037 |
| 23 | Building Salvage Valu | 07202006 | 3,133,646* | 133,646 | 100.00 | | | 0 | 0 | | 0 | | | | |
| 24 | Building Improvements | 09202014 | 7,470* | | 100.00 | | | 7,470 | 27 | SL   MM | 3.704 | 2,002 | 277 | 2,279 | 277 |
| 25 | Start Up Costs | 07202006 | 183,189* | | 100.00 | | | 183,189 | 15 | | 0 | 183,189 | | 183,189 | |
| 26 | Loan Fees | 08012006 | 506,414* | | 100.00 | | | 506,414 | 40 | SL   MM | 2.5 | 195,176 | 12,660 | 207,836 | 12,660 |
| 27 | Public Relation Resea | 07202006 | 157,968 | | 100.00 | | | 157,968 | 10 | | 0 | 153,935 | | 153,935 | |
| 28 | Organizational Costs | 01012007 | 8,787* | | 100.00 | | | 8,787 | 15 | 150 DB HY | 2.95 | 8,787 | | 8,787 | |
| 29 | Loan Fees | 03012008 | 83,486* | | 100.00 | | | 83,486 | 40 | SL   MM | 2.5 | 28,870 | 2,087 | 30,957 | 2,087 |
| 30 | Building Improvements | 10282016 | 98,955* | | 100.00 | | | 98,955 | 27 | SL   MM | 3.704 | 19,089 | 3,665 | 22,754 | 3,665 |

* Item is included in UBIA
for Section 199A calculations.
See "UBIA" in lower right corner.

# Depreciation Detail Listing

337 E 4th Ave

(This page is not filed with the return. It is for your records only.)

**2022**
PAGE  2

Name(s) as shown on return

Marlow Family Exempt Perpetual Trust

Social security number/EIN

XXXX 4293

| No. | Description | Date | Cost | Basis Adjustment | Business percentage | Section 179 | Bonus depreciation | Depreciable Basis | Life | Method | Rate | Prior Depreciation | Current Depreciation | Accumulated Depreciation | AMT Current |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | Boiler | 01202016 | 16,558* | | 100.00 | | PY 8,279 | 8,279 | 7 | 200 DB MQ | 8.75 | 15,744 | 724 | 16,468 | 724 |
| 32 | Furnishings | 03252016 | 4,025* | | 100.00 | | PY 2,013 | 2,012 | 5 | | 0 | 4,025 | | 4,025 | |
| 33 | Furnishings | 07022016 | 5,241* | | 100.00 | | PY 2,621 | 2,620 | 5 | | 0 | 5,241 | | 5,241 | |
| 34 | Furnishings | 08102016 | 3,263* | | 100.00 | | PY 1,632 | 1,631 | 5 | | 0 | 3,263 | | 3,263 | |
| 35 | Furnishings | 11152016 | 2,062* | | 100.00 | | PY 1,031 | 1,031 | 5 | | 0 | 2,062 | | 2,062 | |
| 36 | Furnishings | 12212016 | 4,652* | | 100.00 | | PY 2,326 | 2,326 | 5 | | 0 | 4,651 | | 4,651 | |
| 37 | Furnishings | 02132017 | 2,441* | | 100.00 | | PY 1,221 | 1,220 | 5 | 200 DB HY | 5.76 | 2,371 | 70 | 2,441 | 70 |
| 38 | Mattresses | 05112017 | 1,945* | | 100.00 | | PY 973 | 972 | 5 | 200 DB HY | 5.76 | 1,889 | 56 | 1,945 | 56 |
| 39 | Furnishings | 11202017 | 1,029* | | 100.00 | | PY 1,029 | 0 | 5 | 200 DB HY | 5.76 | 1,029 | | 1,029 | |
| 40 | Furnishings | 11272018 | 1,995* | | 100.00 | | PY 1,995 | 0 | 5 | 200 DB HY | 11.52 | 1,995 | | 1,995 | |
| 41 | Furnishings | 02072018 | 1,496* | | 100.00 | | PY 1,496 | 0 | 5 | 200 DB HY | 11.52 | 1,496 | | 1,496 | |
| 42 | Furniture | 05302018 | 1,949* | | 100.00 | | PY 1,949 | 0 | 5 | 200 DB HY | 11.52 | 1,949 | | 1,949 | |
| 43 | Mattresses | 06152018 | 3,314* | | 100.00 | | PY 3,314 | 0 | 5 | 200 DB HY | 11.52 | 3,314 | | 3,314 | |
| 44 | Flooring | 06282018 | 4,465* | | 100.00 | | PY 4,465 | 0 | 5 | 200 DB HY | 11.52 | 4,465 | | 4,465 | |
| 45 | Mattresses | 07022018 | 669* | | 100.00 | | PY 669 | 0 | 5 | 200 DB HY | 11.52 | 669 | | 669 | |
| 46 | Flooring | 08022018 | 890* | | 100.00 | | PY 890 | 0 | 5 | 200 DB HY | 11.52 | 890 | | 890 | |
| 47 | Flooring | 08302018 | 1,933* | | 100.00 | | PY 1,933 | 0 | 5 | 200 DB HY | 11.52 | 1,933 | | 1,933 | |
| 48 | Flooring | 02122019 | 5,498* | | 100.00 | | | 5,498 | 5 | 200 DB MQ | 11.01 | 4,211 | 605 | 4,816 | 605 |
| 49 | Flooring | 06172019 | 2,097* | | 100.00 | | | 2,097 | 5 | 200 DB MQ | 11.37 | 1,530 | 238 | 1,768 | 238 |
| 50 | Boiler | 12312019 | 85,200* | | 100.00 | | | 85,200 | 7 | 200 DB MQ | 14.06 | 43,282 | 11,979 | 55,261 | 11,979 |
| | **Totals** | | 7,272,403 | | | | PY 37,836 | 4,100,921 | | | | 2,371,130 | 136,747 | 2,507,877 | 136,624 |

Land Amount
Net Depreciable Cost                    7,272,403

CY 179 and CY Bonus
TOTAL CY Depr including 179/bonus        136,747

ST ADJ:
UBIA:  3,727,317

# Next Year's Depreciation Worksheet

(This page is not filed with the return. It is for your records only.)

**2022**

| | Name(s) as shown on return | | | | | | Tax ID Number |
|---|---|---|---|---|---|---|---|
| | Marlow Family Exempt Perpetual Trust | | | | | | 4293 |

| Form | Multi-Form | Description | Date | Basis | Method | Life | Deduction |
|---|---|---|---|---|---|---|---|
| E | 1 | Furniture & Fixtures | 04-16-2015 | 6,508 | M | 7 | |
| E | 1 | DID Special Assessment | 08-12-2015 | 33,178 | SL | 39 | 851 |
| E | 1 | Personal Property | 07-20-2006 | 45,303 | M | 5 | |
| E | 1 | Personal Property | 04-01-2007 | 2,916 | SL | 5 | |
| E | 1 | Furnishings | 08-30-2008 | 2,342 | SL | 5 | |
| E | 1 | Furnishings | 07-01-2009 | 2,128 | M | 5 | |
| E | 1 | Furnishings | 09-13-2010 | 1,441 | M | 5 | |
| E | 1 | Furnishings | 09-01-2011 | 1,326 | M | 5 | |
| E | 1 | Furnishings | 12-16-2011 | 1,795 | M | 5 | |
| E | 1 | Furnishings | 06-30-2012 | 4,245 | M | 5 | |
| E | 1 | Refrigerator | 01-13-2013 | 470 | M | 5 | |
| E | 1 | Refrigerator | 08-13-2013 | 588 | M | 5 | |
| E | 1 | Stove | 08-13-2013 | 470 | M | 5 | |
| E | 1 | Boiler | 10-13-2013 | 27,632 | M | 7 | |
| E | 1 | Refrigerators | 11-13-2013 | 898 | M | 5 | |
| E | 1 | Network Server | 08-07-2013 | 6,539 | M | 5 | |
| E | 1 | Furnishings | 07-16-2014 | 14,259 | M | 7 | |
| E | 1 | Office Equipment | 02-20-2014 | 2,095 | M | 5 | |
| E | 1 | Building NonQRE | 07-20-2006 | 867,950 | SL | 27 | 32,146 |
| E | 1 | Building QRE | 07-20-2006 | 542,833 | SL | 27 | 20,105 |
| E | 1 | Building | 01-01-2007 | 376,850 | SL | 27 | 13,957 |
| E | 1 | Building DF QRE | 07-20-2006 | 1,000,000 | SL | 27 | 37,037 |
| E | 1 | Building Salvage Value | 07-20-2006 | | NDA | 0 | |
| E | 1 | Building Improvements | 09-20-2014 | 7,470 | SL | 27 | 277 |
| E | 1 | Start Up Costs | 07-20-2006 | 183,189 | A | 15 | |
| E | 1 | Loan Fees | 08-01-2006 | 506,414 | A | 40 | 12,660 |
| E | 1 | Public Relation Research | 07-20-2006 | 157,968 | A | 10 | |
| E | 1 | Organizational Costs | 01-01-2007 | 8,787 | A | 15 | |
| E | 1 | Loan Fees | 03-01-2008 | 83,486 | A | 40 | 2,087 |
| E | 1 | Building Improvements | 10-28-2016 | 98,955 | SL | 27 | 3,665 |
| E | 1 | Boiler | 01-20-2016 | 8,279 | M | 7 | 90 |
| E | 1 | Furnishings | 03-25-2016 | 4,025 | M | 5 | |
| E | 1 | Furnishings | 07-02-2016 | 5,241 | M | 5 | |
| E | 1 | Furnishings | 08-10-2016 | 3,263 | M | 5 | |
| E | 1 | Furnishings | 11-15-2016 | 2,062 | M | 5 | |
| E | 1 | Furnishings | 12-21-2016 | 4,652 | M | 5 | |
| E | 1 | Furnishings | 02-13-2017 | 1,220 | M | 5 | |
| E | 1 | Mattresses | 05-11-2017 | 972 | M | 5 | |
| E | 1 | Furnishings | 11-20-2017 | | M | 5 | |
| E | 1 | Furnishings | 11-27-2018 | | M | 5 | |
| E | 1 | Furnishings | 02-07-2018 | | M | 5 | |
| E | 1 | Furniture | 05-30-2018 | | M | 5 | |
| E | 1 | Mattresses | 06-15-2018 | | M | 5 | |
| E | 1 | Flooring | 06-28-2018 | | M | 5 | |
| E | 1 | Mattresses | 07-02-2018 | | M | 5 | |
| E | 1 | Flooring | 08-02-2018 | | M | 5 | |
| E | 1 | Flooring | 08-30-2018 | | M | 5 | |
| E | 1 | Flooring | 02-12-2019 | 5,498 | M | 5 | 605 |
| E | 1 | Flooring | 06-17-2019 | 2,097 | M | 5 | 238 |
| E | 1 | Boiler | 12-31-2019 | 85,200 | M | 7 | 8,554 |
| | | TOTAL | | | | | 132,272 |

**Schedule 1(B)**
**to Bill of Sale and General Assignment**

**Inventory for furnished apartments**

| | |
|---|---|
| Queen Bed set | 13 |
| TV | 14 |
| TV stand | 10 |
| Dresser | 2 |
| Night stand | 13 |
| Coffee table | 10 |
| end table | 13 |
| floor lamp | 10 |
| table lamp | 23 |
| Dresser | 8 |
| toaster | 10 |
| microwave | 18 |
| dining set | 13 |
| Chair | 8 |
| Love seat | 4 |
| Sofa | 8 |
| irons | 8 |
| ironing board | 8 |
| garbage cans | 10 |
| broom/dustpan | 6 |

**SCHEDULE 2**
**To Bill of Sale and General Assignment**

## INTANGIBLE PROPERTY

The Intangible Property includes, but it is not limited to, the following:

- All architectural, mechanical, engineering, as-built and other plans, specifications, drawings and reports pertaining to the Property (the "***Plans***");

    o [Borrower to List Plans; subject to Lender approval]

- All transferable or assignable warranties and guaranties made by or received from any third party with respect to the Property and any fixture, machinery, equipment or material situated on or comprising a part of the Property, which warranties and guarantees are listed in attached **Schedule 4** (the "***Warranties***");

    o [Borrower to List Warranties; subject to Lender approval]

- All trademarks, service marks, logos and other marks, trade or business names and other intangible personal property used in connection with the ownership, use, leasing or operation of the Property (other than Assignor's name) (the "***Marks***"), including the following:

    o [Borrower to List Marks; subject to Lender approval]

- All transferable or assignable certificate(s) of occupancy, property or equipment permits, consents, authorizations, variances, waivers, licenses, permits, certificates and other approvals from any governmental or quasi-governmental authority with respect to the Property (the "***Approvals***").

- All rights to under any other Intangible Property owned by Borrower.

EGAE Schedule of Intangible Assets
(Start up and Loan Fees)


| | |
|---|---|
| Initial Financing Fee | $  59,428.00 |
| Permanent Placement Fee | $268,591.25 |
| Legal | $  99,021.08 |
| Accumulated Amortization-Finance Fees | $  72,557.20 |
| Accumulated Amortization – Legal | $  20,396.31 |

**Exhibit E** – Assignment of Leases, Security Deposits and Accounts


**Schedule 1** – List of all Leases (as defined below) ("**_Rent Roll_**")

**Schedule 2** – List of Accounts

**Exhibit E**
**To Deed in Lieu of Foreclosure Agreement**

## ASSIGNMENT AND ASSUMPTION OF LEASES, SECURITY DEPOSITS, AND ACCOUNTS

This ASSIGNMENT AND ASSUMPTION OF LEASES, SECURITY DEPOSITS, AND ACCOUNTS ("***Assignment***") is entered into as of _____ ("***Effective Date***"), by and between EGAE, LLC, an Alaska limited liability company ("***Assignor***"), _____, a(n) _____ ("***Assignee***"), and Lender (as defined below) if different than Assignee.

### BACKGROUND

A.      Prior to the Effective Date, Assignor was the owner of the real property commonly known as the McKinley Tower Apartments located in the McKinley Tower at 337 East 4th Ave., Anchorage, Alaska (the "***Real Property***").

B.      In connection with the ownership and management of the Real Property, prior to the Effective Date, Assignor is the lawful owner of the Leases, the Security Deposits and the Accounts (as those terms are defined below).

C.      Assignor and MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company, ("***Lender***") are parties to a Deed in Lieu of Foreclosure Agreement dated _____, 2024 (the "***Agreement***"), pursuant to which Assignor agrees to sell and convey the Property to Assignee upon the occurrence of the events, and on the terms and conditions, specified in the Agreement. In accordance with the Agreement, Assignor is conveying the Property to Assignee by a Deed in Lieu of Foreclosure dated this same date ("***Deed in Lieu***"), by recordation in the real property records of Anchorage, Alaska. Any undefined capitalized terms used in this Assignment are defined as stated in the Agreement.

D.      [As permitted under the Agreement, Lender has assigned it rights with respect to the Deed in Lieu and other Conveyance Documents, including this Assignment, to Assignee.]

E.      In connection with the transfer of the Real Property to Assignee under the Agreement, Assignor is also obligated to assign the Leases,  Security Deposits, and Accounts to Assignee, and Assignor desires to accept, all of Assignor's interest in the Leases, Security Deposits, and Accounts under the terms and conditions of this Assignment.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and incorporating the foregoing Recitals, the parties agree as follows:

1.      **Definitions**

1.1.      "***Leases***" means all leases, rental agreements, and any other tenancy documentation affecting the Property, more particularly described in the rent roll in **Schedule 1** attached to this Assignment ("***Rent Roll***").

1.2.      "***Security Deposits***" means (a) the refundable security and other refundable deposits held by or for Assignor on account of tenants under the Leases, and (b)  any other deposits, prepaid rent or other cash or letters of credit or other instruments required to be held by Assignor in connection with the Leases or otherwise in connection with the Property.  The Security Deposits are also set forth on the Rent Roll.

1.3.      "***Accounts***" means the deposit accounts where the Security Deposits and the Collected Rents are held as listed on **Schedule 2** attached to this Assignment.

1.4.      "***Collected Rents***" means the rents collected under the Leases and held in an Account or by the Assignor as of the Effective Date.

1

2.      **Assignment; Payment**. Effective as of the Effective Date, on the terms and subject to the conditions set forth in the Agreement:

2.1.     Assignor hereby assigns, conveys and  transfers to Assignee all of Assignor's rights, title and interest in and to the Leases; and

2.2.     Assignor hereby assigns, conveys and  transfers to Assignee all of Assignor's rights, title and interest in and to (a) the Security Deposits, (b) the Accounts, (c) the collected rents that reside in the Accounts on the Effective Date, and (d) all unpaid rents due for any period due under the Leases include for periods before the Effective Date.

2.3.     Concurrently with the effectiveness of this Assignment:

2.3.1.    Assignor shall either (a) execute and deliver to Assignee all documents required by the applicable financial institution to transfer control of and access to the Accounts to Assignee, or (b) pay to Assignee, by wire transfer of same day federal funds, of an amount equal to all Security Deposits and all Collected Rents held in any Account not being transferred to Assignee under subsection (a), above.

2.3.2.    Assignor shall deliver to Assignee an accounting of all Security Deposits, Accounts, and Collected Rents, together with Assignor's certification that such accounting is accurate and complete in all material respects ("***Certified Accounting***").  Such accounting shall include an accurate and complete list of (i) each Account name and number, the financial institution at which each Account is located, and the amount in each Account, and (ii) the source and type of the amounts in any payment made to Assignee under **Section 2.3.1(a)**.

2.4.     Assignor shall execute and deliver to Assignee any other such documents or instruments reasonably requested by Assignee in writing in order to perfect the transfer and assignment of the Leases, the Security Deposits, and the Accounts to Assignee.

3.      **Acceptance and Assumption**.  Effective as of the Effective Date, on the terms and subject to the conditions set forth in the Agreement:

3.1.     Assignee hereby assumes all of Assignor's rights, title and interest in and to the Leases, including covenants, agreements and obligations of Assignor as landlord or lessor under the Leases, from and after the Effective Date, but not for any period prior to the Effective Date, except that Assignee shall be entitled to retain any rents that it receives that are attributable to any period prior to the Effective Date; and

3.2.     Assignee hereby accepts transfer of  all of Assignor's rights, title and interest in and to the Security Deposits, Collected Rents, and Accounts.  Upon Assignee's actual receipt of the Security Deposits and completed transfer of the Accounts in which Security Deposits reside, Assignee assumes all liability of Assignor for the proper refund or return of the Security Deposits if, when and as required by the Leases or applicable law.

3.3.     No person or entity, other than Assignor, shall be deemed a beneficiary of the provisions of this **Section 3**.

4.      **Representations and Warranties.**  Assignor represents and warrants that the following statements are true and correct:

4.1.     Assignor is the lawful owner of all Leases, Security Deposits, Collected Rents, and Accounts, free and clear of all mortgages, liens or encumbrances of any nature whatsoever except for the lien of the Deed of Trust, the Security Agreement, and any other applicable Loan Documents (as those terms are defined in the Agreement).

4.2.     There are no outstanding obligations of Assignor, or unpaid payments due from Assignor, under any Lease, including any obligations to construct or fund tenant improvements, or with respect to any Security

Deposit or Account.  Neither Assignor nor any other party to any Lease is in default under such Lease, except for tenant defaults that are disclosed on the Rent Roll.

4.3.     Assignor has not made any prior sale, assignment, or transfer of any of the Leases, Security Deposits, Collected Rents, or Accounts.

5.     **Indemnification**.  Assignor hereby agrees to indemnify, defend and hold harmless Assignee and Lender, and their respective past and present nominees, designees, parents, subsidiaries, affiliates, and all of their respective officers, directors, agents, employees, servicers, investment managers, attorneys and representatives, as well as the respective heirs, personal representatives, successors and assigns of any and all of them (collectively, the "**Indemnified Parties**") from and against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including without limitation, reasonable attorneys' fees and disbursements (with counsel reasonably acceptable to the Indemnified Parties), arising out of or relating to (a) all obligations of the "lessor" or "landlord" under the Leases to the extent such obligations are applicable to the period and required to be performed prior to the Effective Date, and (b) Assignor's breach of any representation and warranty made in this Assignment or under the Certified Accounting.

6.     **General Provisions**

6.1.     **Further Assurances.**  The parties agree to execute such other documents and perform such other acts as may be necessary or desirable to carry out the purposes of this Assignment.

6.2.     **Notices**.  The parties will deliver any notices required or permitted under this Assignment in writing by personal or courier delivery, email (including .pdf documents and/or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), or by registered or certified U.S. mail, return receipt requested and postage prepaid, to address set forth below or below the parties' signatures or other address specified by a party in writing.  Receipt of notices will be deemed effective as of (a) the date of personal or courier delivery to the applicable address, (b) three business days after the date on the U.S. postmark affixed to the notice, or (c) if by email, when the recipient, by return email or any other method provided for in this Section, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Either party may change its physical or electronic addresses for Notices in writing in accordance with this Section.

> **If to Lender:**
> c/o Mid Cap Financial Services, LLC, as servicer
> 7255 Woodmont Avenue, Suite 300
> Bethesda, MD  20814
> Attention:  Account Manager for EGAE/McKinley
> Email: notices@midcapfinancial.com
>
> *With a copy to, for notice purposes only:*
> c/o Mid Cap Financial Services, LLC, as servicer
> 7255 Woodmont Avenue, Suite 300
> Bethesda, MD  20814
> Attention:  General Counsel
> Email: Legalnotices@midcapfinancial.com

6.3.     **Expenses; Attorneys' Fees.**  In the event of any dispute arising from or concerning the enforcement or interpretation of this Assignment, the substantially prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs incurred.

6.4.     **Independent Counsel**.  The terms of this Assignment have been mutually negotiated, with each party having the opportunity to seek the advice of independent legal counsel and will not be construed against any party.  Cairncross & Hempelmann, P.S. has represented only the Lender with respect to this Assignment, the

3

Agreement, and any other documents and transactions described herein. Assignor acknowledges that (a) the Lender has recommended that the Assignor obtain independent legal advice regarding this Assignment, and (b) the Assignor has had an adequate opportunity to seek independent legal counsel.

6.5.    **Bankruptcy Court Jurisdiction.**  The parties agree that if any dispute arises out of or in connection with this Assignment, the Bankruptcy Court sitting in Anchorage, Alaska, shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Assignment.  The Bankruptcy Court shall have original and exclusive jurisdiction over such matters and the parties affected thereby and the parties each hereby consent and submit to such jurisdiction.

6.6.    **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ASSIGNMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS ASSIGNMENT.

6.7.    **Miscellaneous.**  This Assignment (a) cannot be assigned without the written consent of all parties, (b) will be enforced, governed and construed exclusively under the laws of the State of Alaska and federal bankruptcy law, as applicable, (c) benefits and is binding upon each of the parties and their respective successors and permitted assigns, as applicable, (d) is not intended to benefit any third parties, (e) will remain in full force and effect to the extent possible if any portion of this Assignment is declared invalid by a court having jurisdiction, (f) together with the Agreement and all other documents to be delivered under the Agreement, constitutes the entire agreement of the parties, and supercedes all previous written or oral proposals, agreements, and other communications, with regard to its subject matter, (g) may only be amended or waived in writing signed by all parties, and any failure of a party to exercise or enforce any of its rights under this Assignment will not act as a waiver of those rights, and (h) may be signed in two or more counterparts, which together constitute one and the same document.  This Assignment may be executed and delivered by DocuSign, telecopy, .pdf or similar electronic transmittal, each of which shall have the same effect as the delivery of an executed original.

*Signature Page Follows*

*Signature page to Assignment and Assumption of Leases, Security Deposits and Accounts*

Executed effective as of the Effective Date.

**ASSIGNEE:**

[_____

By: _____

Name: _____

Title: _____

Address: _____

_____

Email: _____

**ASSIGNOR:**

EGAE, LLC

By: _____

Name: Marc Marlow

Title: Manager

Address: _____

_____

Email: _____

**LENDER:**]

MIDCAP FUNDING INVESTMENT X LLC,
a Delaware limited liability company

By:  Apollo Capital Management, L.P.,
its investment manager

By: Apollo Capital Management GP, LLC,
its general partner

By: _____

Name:  Maurice Amsellem

Title:    Authorized Signatory

5

**SCHEDULE 1**
**To Assignment and Assumption**
**of Leases, Security Deposits and Accounts**

**RENT ROLL**

[Attached]

# Copy of Rent Roll Rent plus Parking 072520

**Exported On:** 07/25/2024 02:17 PM

**Properties:** McKinley Tower Apartments - 337 E. 4th Ave. Anchorage, AK
**Units:** Active
**GL Accounts:** 5100: Rent revenue and 5960: Parking Revenue
**As of:** 07/25/2024

| Unit | Total | Rent revenue | Parking Revenue |
|---|---|---|---|
| **McKinley Tower Apartments - 337 E. 4th Ave. Anchorage, AK 9950** | | | |
| 50 | 1,160.00 | 1,125.00 | 35.00 |
| 51 | 1,310.00 | 1,275.00 | 35.00 |
| 52 | 1,285.00 | 1,250.00 | 35.00 |
| 53 | 950.00 | 950.00 | 0.00 |
| 54 | 1,385.00 | 1,350.00 | 35.00 |
| 55 | 995.00 | 960.00 | 35.00 |
| 56 | 1,350.00 | 1,350.00 | 0.00 |
| 57 | 1,275.00 | 1,275.00 | 0.00 |
| 58 | 950.00 | 950.00 | 0.00 |
| 59 | 1,310.00 | 1,275.00 | 35.00 |
| 60 | 1,125.00 | 1,125.00 | 0.00 |
| 61 | 1,350.00 | 1,350.00 | 0.00 |
| 62 | 1,300.00 | 1,300.00 | 0.00 |
| 63 | 950.00 | 950.00 | 0.00 |
| 64 | 1,250.00 | 1,250.00 | 0.00 |
| 65 | 890.00 | 890.00 | 0.00 |
| 67 | 1,375.00 | 1,375.00 | 0.00 |
| 68 | 910.00 | 910.00 | 0.00 |
| 69 | 1,275.00 | 1,275.00 | 0.00 |
| 70 | 1,125.00 | 1,125.00 | 0.00 |
| 71 | 1,385.00 | 1,350.00 | 35.00 |
| 72 | 1,335.00 | 1,300.00 | 35.00 |
| 73 | 900.00 | 900.00 | 0.00 |
| 74 | 1,200.00 | 1,200.00 | 0.00 |
| 75 | 905.00 | 870.00 | 35.00 |
| 76 | 1,410.00 | 1,375.00 | 35.00 |
| 77 | 1,375.00 | 1,375.00 | 0.00 |
| 78 | 950.00 | 950.00 | 0.00 |
| 79 | 1,325.00 | 1,325.00 | 0.00 |
| 80 | 1,125.00 | 1,125.00 | 0.00 |
| 81 | 1,335.00 | 1,300.00 | 35.00 |
| 82 | 1,300.00 | 1,300.00 | 0.00 |
| 83 | 935.00 | 935.00 | 0.00 |

| | | | |
|---|---|---|---|
| 84 | 1,275.00 | 1,275.00 | 0.00 |
| 85 | 910.00 | 910.00 | 0.00 |
| 86 | 1,420.00 | 1,420.00 | 0.00 |
| 87 | 1,435.00 | 1,400.00 | 35.00 |
| 88 | 985.00 | 950.00 | 35.00 |
| 89 | 1,310.00 | 1,275.00 | 35.00 |
| 90 | 1,125.00 | 1,125.00 | 0.00 |
| 91 | 1,385.00 | 1,350.00 | 35.00 |
| 92 | 1,385.00 | 1,350.00 | 35.00 |
| 93 | 950.00 | 950.00 | 0.00 |
| 94 | 1,275.00 | 1,275.00 | 0.00 |
| 95 | 950.00 | 950.00 | 0.00 |
| 96 | 1,510.00 | 1,475.00 | 35.00 |
| 97 | 1,500.00 | 1,500.00 | 0.00 |
| 98 | 935.00 | 935.00 | 0.00 |
| 99 | 1,175.00 | 1,175.00 | 0.00 |
| 100 | 1,150.00 | 1,150.00 | 0.00 |
| 101 | 1,385.00 | 1,350.00 | 35.00 |
| 102 | 1,385.00 | 1,350.00 | 35.00 |
| 103 | 935.00 | 935.00 | 0.00 |
| 104 | 1,275.00 | 1,275.00 | 0.00 |
| 105 | 945.00 | 910.00 | 35.00 |
| 106 | 1,450.00 | 1,450.00 | 0.00 |
| 107 | 1,445.00 | 1,375.00 | 35.00 |
| 108 | 960.00 | 925.00 | 35.00 |
| 109 | 1,550.00 | 1,550.00 | 0.00 |
| 110 | 1,200.00 | 1,200.00 | 0.00 |
| 111 | 1,350.00 | 1,350.00 | 0.00 |
| 112 | 1,385.00 | 1,350.00 | 35.00 |
| 113 | 1,050.00 | 1,050.00 | 0.00 |
| 114 | 1,250.00 | 1,250.00 | 0.00 |
| 115 | 950.00 | 950.00 | 0.00 |
| 116 | 1,410.00 | 1,375.00 | 35.00 |
| 117 | 1,425.00 | 1,425.00 | 0.00 |
| 118 | 1,005.00 | 935.00 | 70.00 |
| 119 | 1,475.00 | 1,475.00 | 0.00 |
| 120 | 1,200.00 | 1,200.00 | 0.00 |
| 121 | 1,325.00 | 1,325.00 | 0.00 |
| 122 | 1,535.00 | 1,500.00 | 35.00 |
| 123 | 1,025.00 | 1,025.00 | 0.00 |
| 124 | 1,275.00 | 1,275.00 | 0.00 |
| 125 | 990.00 | 990.00 | 0.00 |
| 126 | 1,420.00 | 1,350.00 | 70.00 |
| 127 | 1,350.00 | 1,350.00 | 0.00 |

| | | | |
|---|---|---|---|
| 128 | 950.00 | 950.00 | 0.00 |
| 129 | 1,210.00 | 1,175.00 | 35.00 |
| 130 | 1,160.00 | 1,125.00 | 35.00 |
| 131 | 1,385.00 | 1,350.00 | 35.00 |
| 132 | 1,435.00 | 1,400.00 | 35.00 |
| 133 | 1,050.00 | 1,050.00 | 0.00 |
| 134 | 1,275.00 | 1,275.00 | 0.00 |
| 135 | 890.00 | 890.00 | 0.00 |
| 136 | 1,510.00 | 1,475.00 | 35.00 |
| 137 | 1,450.00 | 1,450.00 | 0.00 |
| 138 | 935.00 | 935.00 | 0.00 |
| 139 | 1,475.00 | 1,475.00 | 0.00 |
| 140 | 1,250.00 | 1,200.00 | 50.00 |
| 141 | 1,420.00 | 1,350.00 | 70.00 |
| 142 | 1,410.00 | 1,375.00 | 35.00 |
| 143 | 925.00 | 925.00 | 0.00 |
| 144 | 1,275.00 | 1,275.00 | 0.00 |
| 145 | 975.00 | 940.00 | 35.00 |
| 146 | 1,400.00 | 1,400.00 | 0.00 |
| 147 | 1,475.00 | 1,475.00 | 0.00 |
| 148 | 950.00 | 950.00 | 0.00 |
| 149 | 1,275.00 | 1,275.00 | 0.00 |
| **99 Units** | **120,705.00** | **119,290.00** | **1,380.00** |

**Total Occupancy 99 Units**

EGAE List of Bank Accounts
First National Bank of Alaska
PO Box 100720
Anchorage, AK 99510

- Operating account ending in 2673
- Security Deposit account ending in 3457
- Sweep account ending in 3838
- Utilities Reserve account ending in 9446
- Property Tax Reserve account ending in 9453

**Exhibit F** **– Assignment of Contract Rights**

**Schedule 1 – List of Continuing Service Contracts**

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "***Assignment***") is entered into as of _____, 202__ ("***Effective Date***"), by and between EGAE, LLC, an Alaska limited liability company ("***Assignor***"), and _____, a(n) _____ ("***Assignee***"), and Lender (as defined below) if different than Assignee.

### BACKGROUND

A.      Prior to the Effective Date, Assignor was the owner of the real property commonly known as the McKinely Tower Apartments located in the McKinely Tower at 337 East 4th Ave., Anchorage, Alaska (the "***Real Property***").

B.      In connection with the ownership and management of the Real Property, prior to the Effective Date, Assignor is a party to the Continuing Service Contracts (as defined in the Agreement) and other contracts related to the Real Property listed on the attached **Schedule 1** (the "***Contracts***").

C.      Assignor and MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company, ("***Lender***") are parties to a Deed in Lieu of Foreclosure Agreement dated _____, 2024 (the "***Agreement***"), pursuant to which Assignor agreed to sell and convey the Property to Assignee upon the occurrence of the events, and on the terms and conditions, specified in the Agreement.  In accordance with the Agreement, Assignor is conveying the Property to Assignee by a Deed in Lieu of Foreclosure dated this same date, by recordation in the real property records of Anchorage, Alaska ("***Closing***").  Any undefined capitalized terms used in this Assignment are defined as stated in the Agreement.

D.      [As permitted under the Agreement, Lender has assigned it rights with respect to the Deed in Lieu and other Conveyance Documents, including this Assignment, to Assignee.]

E.      In connection with the transfer of the Real Property to Assignee under the Agreement, Assignor is also obligated to assign the Contracts to Assignee, and Assignor desires to accept, all of Assignor's interest in the Contracts, under the terms and conditions of this Agreement.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and incorporating the foregoing Recitals, the parties agree as follows:

1.      **Assignment of Contracts.**  Effective as of the Effective Date, on the terms and subject to the conditions set forth in the Agreement, Assignor transfers and assigns to Assignee all of Assignor's right, title and interest in and to the Contracts from and after the Effective Date, but not for any period prior to the Effective Date

2.      **Assumption of Contracts.**  Effective as of the Effective Date, on the terms and subject to the conditions set forth in the Agreement, Assignee (a) assumes all of Assignor's rights, title, and interest in, to and under the Contracts, and (b) shall pay, discharge and perform all obligations, liabilities, and covenants of Assignor arising under the Contracts from and after the Effective Date, but not for any period prior to the Effective Date, in accordance with their terms.

3.      **Representations and Warranties.**  Assignor represents and warrants that the following statements are accurate and complete:

3.1     Assignor is the lawful owner of the Contracts, free and clear of all mortgages, liens or encumbrances of any nature whatsoever except for the lien of the Deed of Trust, the Security Agreement, and any other applicable Loan Documents (as those terms are defined in the Agreement).

3.2     There are no outstanding obligations of Assignor, or unpaid payments due from Assignor, under any Contract, except for payments owed for the current payment period which are not yet due.  Neither Assignor nor any other party to any Contract is in default under such Contract.

3.3     Assignor has not made any prior sale, assignment, or transfer of any of the Contracts.

4.     **Indemnification**.   Assignor hereby agrees to indemnify, defend and hold harmless Assignee and Lender and their respective past and present nominees, designees, parents, subsidiaries, affiliates, and all of their respective officers, directors, agents, employees, servicers, investment managers, attorneys and representatives, as well as the respective heirs, personal representatives, successors and assigns of any and all of them (collectively, the "***Indemnified Parties***") from and against all claims, suits, obligations, liabilities, damages, losses, costs, and expenses, including without limitation, reasonable attorneys' fees and disbursements (with counsel reasonably acceptable to the Indemnified Parties), arising out of or relating to (a) all obligations of Assignor under the Contracts to the extent such obligations are applicable to the period and required to be performed prior to the Effective Date, and (b) Assignor's breach of any representation and warranty made in this Assignment.

5.     **General Provisions**

5.1     **Further Assurances.**  The parties agree to execute such other documents and perform such other acts as may be necessary or desirable to carry out the purposes of this Assignment.

5.2     **Notices**.  The parties will deliver any notices required or permitted under this Assignment in writing by personal or courier delivery, email (including .pdf documents and/or any electronic signature complying with the U.S.  federal ESIGN Act of 2000, e.g., www.docusign.com), or by registered or certified U.S.  mail, return receipt requested and postage prepaid, to address set forth below or below the parties' signatures or other address specified by a party in writing.  Receipt of notices will be deemed effective as of (a) the date of personal or courier delivery to the applicable address, (b) three business days after the date on the U.S.  postmark affixed to the notice, or (c) if by email, when the recipient, by return email or any other method provided for in this Section, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Either party may change its physical or electronic addresses for Notices in writing in accordance with this Section.

**If to Lender:**
c/o Mid Cap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 300
Bethesda, MD  20814
Attention:  Account Manager for EGAE/McKinley
Email: notices@midcapfinancial.com

*With a copy to, for notice purposes only:*
c/o Mid Cap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 300
Bethesda, MD  20814
Attention:  General Counsel
Email: Legalnotices@midcapfinancial.com

5.3     **Expenses; Attorneys' Fees.**  In the event of any dispute arising from or concerning the enforcement or interpretation of this Assignment, the substantially prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs incurred.

2

5.4    **Independent Counsel**.  The terms of this Assignment have been mutually negotiated, with each party having the opportunity to seek the advice of independent legal counsel and will not be construed against any party.  Cairncross & Hempelmann, P.S. has represented only the Lender with respect to this Assignment, the Agreement, and any other documents and transactions described herein.  Assignor acknowledges that (a) the Lender has recommended that the Assignor obtain independent legal advice regarding this Assignment, and (b) the Assignor has had an adequate opportunity to seek independent legal counsel.

5.5    **Bankruptcy Court Jurisdiction.**  The parties agree that if any dispute arises out of or in connection with this Assignment, the Bankruptcy Court sitting in Anchorage, Alaska, shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Assignment.  The Bankruptcy Court shall have original and exclusive jurisdiction over such matters and the parties affected thereby and the parties each hereby consent and submit to such jurisdiction.

5.6    **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ASSIGNMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS ASSIGNMENT.

5.7    **Miscellaneous.**  This Assignment (a) cannot be assigned without the written consent of all parties, (b) will be enforced, governed and construed exclusively under the laws of the State of Alaska and federal bankruptcy law, as applicable, (c) benefits and is binding upon each of the parties and their respective successors and permitted assigns, as applicable, (d) is not intended to benefit any third parties, (e) will remain in full force and effect to the extent possible if any portion of this Assignment is declared invalid by a court having jurisdiction, (f) together with the Agreement and all other documents to be delivered under the Agreement, constitutes the entire agreement of the parties, and supercedes all previous written or oral proposals, agreements, and other communications, with regard to its subject matter, (g) may only be amended or waived in writing signed by all parties, and any failure of a party to exercise or enforce any of its rights under this Assignment will not act as a waiver of those rights, and (h) may be signed in two or more counterparts, which together constitute one and the same document.  This Assignment may be executed and delivered by DocuSign, telecopy, .pdf or similar electronic transmittal, each of which shall have the same effect as the delivery of an executed original.

*Signature Page Follows*

3

*Signature page to Assignment and Assumption of Contracts*

Executed effective as of the Effective Date.

**ASSIGNEE:**

[_____

By: _____
Name: _____
Title: _____

Address: _____
        _____

Email: _____

**ASSIGNOR:**

  EGAE, LLC

By: _____
Name: Marc Marlow
Title: Manager

Address: _____
        _____

Email: _____

**LENDER:]**

MIDCAP FUNDING INVESTMENT X LLC,
a Delaware limited liability company

 By:  Apollo Capital Management, L.P.,
its investment manager

 By: Apollo Capital Management GP, LLC,
its general partner

By: _____
Name:   Maurice Amsellem
Title:    Authorized Signatory

4

**SCHEDULE I**
**To Assignment and Assumption of Contracts**

## CONTRACTS

[Parties to update at Closing if required]

### CONTINUING SERVICE CONTRACTS:

| VENDOR | | MONTHLY | |
|---|---|---|---|
| Otis Elevator | $ | 1,648 | maintenance/ New pricing as of March 2024 (paid in advance) |
| Canon Printer | $ | 214 | printer/sca 5/1/2024 - May 2025 |
| Appfolio | $ | 968 | Property Mgmt software/ website/background checks/payment processin |
| Intuit | $ | 24 | Quickbooks Financial Software |
| ATT | $ | 186 | Cell phone |
| Apartments.com | $ | 522 | Advertising |
| Share Service Agreement (Boiler) | | | 43% of the cost to operate and maintain the boiler |

### NON-CONTINUING SERVICE CONTRACTS:

| | | | |
|---|---|---|---|
| Kenco Building Services | $ | 20,536 | Property Management |

4891-8996-8594, v. 4

**<u>Exhibit G</u> – Indemnification and Release Agreement**

## INDEMNIFICATION AND RELEASE AGREEMENT

This INDEMNIFICATION AND RELEASE AGREEMENT ("**Agreement**") is entered into effective as of _____ (the "**Effective Date**") by and between EGAE, LLC, an Alaska limited liability company ("**Borrower**"), MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company ("**Lender**"), and any party signing below as Lender's assignee ("**Assignee**").

### BACKGROUND

A.      Prior to the Effective Date, Borrower was the owner of the real property commonly known as the McKinley Tower Apartments located in the McKinley Tower at 337 East 4th Ave., Anchorage, Alaska (the "**Property**").

B.      Borrower and Lender are parties to a Deed in Lieu of Foreclosure Agreement dated _____, 2024 (the "**DIL Agreement**"), pursuant to which Borrower agrees to sell and convey the Property to Lender, or it assignee, upon the occurrence of the events, and on the terms and conditions, specified in the Agreement.  In accordance with the DIL Agreement, Borrower is conveying the Property to Lender, or its assignee, by a Deed in Lieu of Foreclosure dated as of this same date ("**Deed in Lieu**"), by recordation in the real property records of Anchorage, Alaska.  All undefined capitalized terms used in this Agreement are defined as stated in the DIL Agreement.

C.      [As permitted under the DIL Agreement, Lender has assigned it rights with respect to the Deed in Lieu and other Conveyance Documents to Assignee.]

D.      The parties are entering into this Agreement as a Closing Condition to the transactions contemplated by the DIL Agreement.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and as a material inducement for the parties' agreement to enter into the DIL Agreement and the DIL Documents, and to close the transactions contemplated by the DIL Agreement and the DIL Documents, the parties agrees as follows:

**1.      DEFINITIONS**

1.1      "**Borrower Parties**" collectively means Borrower and its present and former members, managers, partners, employees, agents, trustees, beneficiaries, successors, assigns and representatives.

1.2      "**Claims**" shall mean, collectively, all debts, sums of money, claims, rights, suits, demands, injuries, damages, losses, liens, liabilities, penalties, fines, lawsuits and other proceedings and costs and expenses (including attorneys' fees and costs), or other actions or causes of action, whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, in law or equity which a party or its successors and assigns, heirs, personal representatives and distributees have ever had, or may in the future have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the time, arising out of, or in any way connected with or related to the Loan, the Property and/or the Loan Documents.

1.3      "**Environmental Laws**" means the Federal Resource Conservation and Recovery Act of 1976; the Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980; the Federal Hazardous Materials Transportation Control Act; the Federal Clean Air Act; the Federal Water Pollution Control Act, Federal Clean Water Act of 1977; the Federal Insecticide, Fungicide, and Rodenticide Act, Federal Pesticide Act of 1978; the Federal Endangered Species Act; the Federal Toxic Substances Control Act; the Federal Safe Drinking Water Act; the Washington Hazardous Waste Management Act, RCW Ch. 70.105; the Washington Model Toxics Control Act, RCW Ch. 70.105D; the Washington Water Pollution Control Act, RCW Ch. 90.48; the Washington Clean Air

1

Act, RCW Ch. 70.94; the Washington Industrial Safety and Health Act, RCW Ch. 49.17; the Washington State Environmental Policy Act, RCW Ch. 43.21C; and all other federal, state and local laws, statutes, codes, ordinances, regulations, judgments, orders, injunctions, decrees, covenants, restrictions and standards presently in effect or that may be promulgated in the future relating to the use, release, handling, storage, transportation, clean-up, or other disposal of Hazardous Substances; or relating to the water quality, air quality, soils quality, and other environmental quality of real property and improvements constructed upon real property; or related to the protection of endangered species, as such laws and ordinances may be amended from time to time.

1.4    "***Hazardous Substances***" means any waste, pollutants, contaminants, petroleum or petroleum product, asbestos, tremolite, anthophylite or actinolite, polychlorinated biphenyls, or other chemical, substance, or material that:  (a) after release into the environment and upon exposure, ingestion, inhalation, or assimilation, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, bodily injury, behavior abnormalities, cancer and/or genetic abnormalities, or (b) is now or at any time in the future becomes regulated under, or is defined, classified or designated as hazardous, toxic, radioactive or dangerous, or other similar term or category under any Environmental Laws.

1.5    "***Lender Parties***" means Lender, any Assignee, or any person who subsequently becomes a transferee of the Property from Lender or Assignee ("***Transferee***"), and their respective partners, principals, officers, directors, managers, members, shareholders, employees, investment managers, agents, servicers, representatives, attorneys, consultants, contractors, predecessors, successors, assigns, heirs, personal representatives and distributees.

1.6    "***Nearby Property***" means real property that is adjacent to or near the Property that could reasonably cause contamination of the Property or could become contaminated with Hazardous Substances as a result of construction, operations, or other activities involving Hazardous Substances on, over, or under the Property.

## 2.    RELEASES AND WAIVERS

2.1    **Releases**.  As further consideration for the DIL Agreement, effective upon the Closing Date, and in consideration for, and effective upon, recording of the Deed in Lieu and the execution and delivery of all DIL Documents, delivery of all other items to be delivered at Closing, and satisfaction of all Closing Conditions:

2.1.1    **By Borrower**.  Borrower states and acknowledges that Lender has not breached any of its obligations under the Loan Documents and that Borrower has no Claims against Lender arising out of or related to the Loan or the Loan Documents.  Borrower and each other Borrower Party, jointly and severally, hereby unconditionally release and discharge the Lender Parties, jointly and severally, from any and all Claims.  Borrower Parties agree to not take any action to assert any Claims against any of the Lender Parties, whether by claim or cause of action, offset, counterclaim or defense, or any other action of any kind whatsoever.

2.1.2    **By Lender**.  Lender and each other Lender Party, jointly and severally, hereby fully and unconditionally release and discharge the Borrower Parties, jointly and severally, from all personal liability for repayment of the Indebtedness and with respect to Borrower's other obligations under the Loan Documents,  which does not include the Excluded Claims (collectively, the "***Lender Released Claims***").  Lender Parties agree to not take any action to assert any Lender Released Claims against any of the Borrower Parties, whether by claim or cause of action, offset, counterclaim or defense, or any other action of any kind whatsoever.

2.2    **Excluded Claims.**

2.2.1    Notwithstanding the foregoing, the Lender Parties do not release the Borrower Parties from all obligations under the Loan Documents, the DIL Agreement, or this Agreement with respect to any Claims bought by a third-party that are related directly or indirectly to the Loan, the Property, or the Loan Documents; including, but not limited to, any Claims (a) brought by (i) HUD, (ii) any third-party vendor, or (iii) any person or governmental agency with respect to any environmental issues, (b) covered by the Borrower's indemnification obligations under

2

this Agreement, or (c) related to or arising out of any of Borrower's (i) representations, warranties, covenants or indemnifications that survive under the terms of the DIL Agreement or any of the DIL Documents, or (ii) warranties under the Deed in Lieu or other Conveyance Document (collectively, the "***Excluded Claims***"). By acceptance of this Agreement, the Borrower Parties (i) confirm and ratify the Excluded Claims, (ii) agree that the Excluded Claims shall survive the delivery of the Deed in Lieu by Borrower, and (iii) agree that the Lender Parties reserve the right to sue (including, without limitation, the right to counterclaim against) and obtain and satisfy a judgment against Borrower to the full extent of any such Excluded Claims.

2.3     **Later Information.** The parties acknowledge that they may hereafter discover facts different from, or in addition to, those which they now know or believe to be true with respect to the Claims released hereunder and agrees that the foregoing releases shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery thereof and waive application of any applicable law including any limitation on such release with respect to the Claims released hereunder.

2.4     **Termination of Release.** This Release shall terminate and be of no further force and effect and the obligations of Borrower under the Loan Documents shall be reinstated as if this Release had never been granted if: (a) the Deed in Lieu or any other Conveyance Document is ever rendered void or is rescinded by operation of law, (b) a Lender Party is required  by any judgment, decree or order of any court or administrative body to return the Property, or pay any amount in lieu thereof, to any Borrower Party, or (c) if any payment made to any Lender Parties with respect to the Loan is ever cancelled, invalidated, rescinded, required to be disgorged, or otherwise set aside with the result that any Lender Party  is required to pay all or part of said amount to, or redeliver the Property or its equivalent to, any Borrower Party.

## 3.     INDEMNITIES - GENERALLY

3.1     **Indemnity.** In addition to Borrower's indemnity obligations under the Plan, the Term Sheet, DIL Agreement and any other Settlement Document,  Borrower  shall indemnify, defend and hold harmless the Lender Parties, with counsel selected by Indemnitee in its sole discretion, from and against any and all Claims by third parties that arise from or relate to (a) the Excluded Claims, including the environmental matters in accordance with **Section 3.2**, or (b) the construction, operation, and use of the Property which arise from or relate to periods prior to the Closing Date, or (c) any fraud, gross negligence or willful misconduct of a Borrower Party in connection with the Plan, the Term Sheet, the DIL Agreement, the Conveyance Documents, or any other Settlement Document, or in connection with the Property after the Closing Date.

3.2     **Payments and Defenses.** All amounts payable under  **Sections 3** and **4** of this Agreement shall be payable upon written demand and shall bear interest at 18% from the date of the demand notice until paid in full. In the event that any party asserts a claim against the Lender Parties for which Borrower Parties have agreed to defend and indemnify Lender Parties, the Lender Parties shall have the right to choose their own legal counsel (at Indemnitor's expense) and make all decisions relating to the dispute, including, without limitation, the litigation strategy and the terms of any settlement.

3.3     **Indemnities Unconditional; Survival.** The indemnification obligations under the indemnities in **Sections 3** and **4** are unconditional and shall not be limited by any limitations of liability provided for in any of the Loan Documents, the Plan, the Term Sheet, the DIL Agreement, or any other Settlement Documents.  Furthermore, the indemnification obligations and liabilities of the Borrower Parties  under this Agreement (a) are separate and distinct obligations from the Borrower's obligations under the Loan Documents, the Plan, the Term Sheet, the DIL Agreement, or any other Settlement Documents, (b) are not secured by the Deed of Trust and shall not be discharged or satisfied by delivery of the Deed in Lieu or foreclosure of the liens created by the Deed of Trust or other security documents, (c) shall continue in effect after the Closing Date and fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery

3

of the Deed in Lieu, including, without limitation, any assignment and assumption of Indemnitor's obligations hereunder by an assignee or other transferee.

## 4.    ENVIRONMENTAL INDEMNITY

4.1    **Indemnity**.  Borrower shall indemnify, defend and hold harmless the Lender Parties, with counsel selected by Lender Parties in their sole discretion, from and against any and all Claims that (a) arise from or relate to the presence of Hazardous Substances on the Property, or Nearby Property as a result of Hazardous Substances originating on the Property, or a violation of Environmental Laws not caused solely by the action of any Indemnified Party and occurring prior to the Closing Date; (b) accrue to or are made against or incurred by any the Lender Parties relating to any portion of the Property that has been transferred to a Lender Party pursuant to the Deed in Lieu; and (c) arise directly or indirectly from or out of, or in any way connected with:

4.1.1    the inaccuracy of the representations and warranties contained in any of the Loan Documents relating to Hazardous Substances with respect to the Property;

4.1.2    any spills, releases, discharges, or disposal of Hazardous Substances at or from the Property occurring prior to the Closing Date;

4.1.3    the imposition, recording or filing of any lien with regard to Hazardous Substances prior to the Closing Date or relating to Hazardous Substances that existed on the Property prior to the Closing Date;

4.1.4    any non-compliance with or violation of any Environmental Law with respect to the Property occurring prior to the Closing Date;

4.1.5    any activities on the Property prior to the Closing Date that directly or indirectly result in the Property becoming contaminated with Hazardous Substances or any Nearby Property becoming contaminated with Hazardous Substances as a result of Hazardous Substances originating on the Property; or

4.1.6    the discovery and/or cleanup of Hazardous Substances that were deposited on or were existing on the Property, or any Nearby Property as a result of Hazardous Substances originating on the Property prior to the Closing Date.

4.2    **Clean up Costs.**  Borrower acknowledges that, as between Borrower and the Lender Parties, for those obligations of Borrower described in **Section 4.1**, Borrower will be solely responsible for all costs and expenses relating to the cleanup of Hazardous Substances from the Property, or from any related Nearby Property as a result of Hazardous Substances originating on the Property.  The Lender Parties' knowledge of the presence of Hazardous Substances on the Property shall not limit Borrower's indemnification of Indemnitee under **Section 4.1** or create any defense to Borrower's liability in connection with any claim asserted by the Lender Parties under **Section 4.1** arising from such conditions.

## 5.    GENERAL PROVISIONS

5.1    **Notices**.  The parties will deliver any notices required or permitted under this Agreement in writing by personal or courier delivery, email (including .pdf documents and/or any electronic signature complying with the U.S.  federal ESIGN Act of 2000, e.g., www.docusign.com), or by registered or certified U.S.  mail, return receipt requested and postage prepaid, to address set forth below or below the parties' signatures or other address specified by a party in writing.  Receipt of notices will be deemed effective as of (a) the date of personal or courier delivery to the applicable address, (b) three business days after the date on the U.S.  postmark affixed to the notice, or (c) if by email, when the recipient, by return email or any other method provided for in this Section, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Either party may change its physical or electronic addresses for Notices in writing in accordance with this Section.

4

**If to Lender:**
c/o Mid Cap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 300
Bethesda, MD  20814
Attention:  Account Manager for EGAE/McKinley
Email: notices@midcapfinancial.com

*With a copy to, for notice purposes only:*
c/o Mid Cap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 300
Bethesda, MD  20814
Attention:  General Counsel
5.2        Email: Legalnotices@midcapfinancial.com

5.3    **Expenses; Attorneys' Fees.**  In the event of any dispute arising from or concerning the enforcement or interpretation of this Agreement, the substantially prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs incurred.

5.4    **Independent Counsel**.  The terms of this Agreement have been mutually negotiated, with each party having the opportunity to seek the advice of independent legal counsel and will not be construed against any party.  Cairncross & Hempelmann, P.S. has represented only the Lender with respect to this Agreement, the DIL Documents, and any other documents and transactions described herein.  Borrower acknowledges that (a) the Lender has recommended that the Borrower obtain independent legal advice regarding this Agreement, and (b) the Borrower has had an adequate opportunity to seek independent legal counsel.

5.5    **Bankruptcy Court Jurisdiction.**  The parties agree that if any dispute arises out of or in connection with this Agreement, the Bankruptcy Court sitting in Anchorage, Alaska, shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Agreement.  The Bankruptcy Court shall have original and exclusive jurisdiction over such matters and the parties affected thereby and the parties each hereby consent and submit to such jurisdiction.

5.6    **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS TRANSACTION.

5.7    **Miscellaneous.**  This Agreement (a) cannot be assigned without the written consent of all parties, (b) will be enforced, governed and construed exclusively under the laws of the State of Alaska and federal bankruptcy law, as applicable, (c) benefits and is binding upon each of the parties and their respective successors and permitted assigns, as applicable, (d) is not intended to benefit any third parties, (e) will remain in full force and effect to the extent possible if any portion of this Agreement is declared invalid by a court having jurisdiction, (f) together with the Plan, the Term Sheet, the DIL Documents, the Closing Documents, and all other documents to be delivered under such documents, constitutes the entire agreement of the parties, and supercedes all previous written or oral proposals, agreements, and other communications, with regard to its subject matter, (g) may only be amended or waived in writing signed by all parties, and any failure of a party to exercise or enforce any of its rights under this Agreement will not act as a waiver of those rights, and (h) may be signed in two or more counterparts, which together constitute one and the same document.  This Agreement may be executed and delivered by DocuSign, telecopy, .pdf or similar electronic transmittal, each of which shall have the same effect as the delivery of an executed original.

*Signature Page Follows*

**Exhibit G**
**To Deed in Lieu of Foreclosure Agreement**

*Signature page to Indemnification and Release Agreement*

Executed effective as of the Effective Date.

**LENDER:**                                                    **BORROWER:**

MIDCAP FUNDING INVESTMENT X LLC,              EGAE, LLC
a Delaware limited liability company

 By:  Apollo Capital Management, L.P.,                 By: _____
its investment manager

 By: Apollo Capital Management GP, LLC,            Name: Marc Marlow
its general partner                                             Title: Manager

By: _____              Address:  _____
                                                                         _____
Name:   Maurice Amsellem
Title:    Authorized Signatory                          Email: _____

Address:  _____
                  _____

Email: _____


**[ASSIGNEE (if any)**

_____



By: _____

Name: _____
Title: _____

Address:  _____
                  _____

Email: _____ ]

6

**<u>Exhibit H-1</u> – Resignation of Marc Marlow from the HOA**

**Exhibit H-1**
**To Deed in Lieu of Foreclosure Agreement**

Marc Marlow
2702 Denali St. #1
Anchorage, AK  99503-2747

To Whom It May Concern:

I, Marc Marlow, hereby resign my appointment as

(a) member of the McKinley Tower Association Board of Directors appointed to represent Unit A pursuant to Section 3.1, *et. seq.* of the Restated and Amended Bylaws of McKinley Tower Association, Inc. dated as of March 8, 2005, and recorded as document number 205-014349-0 in the Anchorage Recording District (the "MTA Bylaws"), and

(b) President and any other officer  position of the McKinley Tower Association pursuant to Sections 4.1, *et. seq.* of the MTA Bylaws,

effective as of the date of recording any instrument transferring the interest of EGAE, LLC, an Alaska limited liability company, in Unit A of the McKinley Tower Condominium to MidCap Funding Investment X LLC, a Delaware limited liability company, or its assigns; provided, however, that such transfers take place on or before June 30, 2025.

Dated effective _____.

_____
MARC MARLOW

**Exhibit H-2 – Resignation of Lael Marlow from the HOA**

**Exhibit H-2**
**To Deed in Lieu of Foreclosure Agreement**

Lael Marlow
2702 Denali St. #1
Anchorage, AK 99503-2747

To Whom It May Concern:

I, Lael Marlow, hereby resign my appointment as

    (a)  member of the McKinley Tower Association Board of Directors appointed to represent Unit A pursuant to Section 3.1, *et. seq.* of the Restated and Amended Bylaws of McKinley Tower Association, Inc. dated as of March 8, 2005 and recorded as document number 205-014349-0 in the Anchorage Recording District (the "MTA Bylaws"), and

    (b)  any officer position that I may hold in the McKinley Tower Association pursuant to Sections 4.1, *et. seq.* of the MTA Bylaws,

effective as of the date of recording any instrument transferring the interest of EGAE, LLC, an Alaska limited liability company, in Unit A of the McKinley Tower Condominium to MidCap Funding Investment X LLC, a Delaware limited liability company, or its assigns; provided, however, that such transfer takes place on or before June 30, 2025.

Dated effective _____.


_____
LAEL MARLOW

4861-3957-2691, v. 1

**Exhibit I** – **Certificate of Transferor (FIRPTA Affidavit)**

**Exhibit I**
**To Deed in Lieu of Foreclosure Agreement**

## CERTIFICATE OF TRANSFEROR
### (FIRPTA AFFIDAVIT)

The Certification is provided by EGAE, LLC, an Alaska limited liability company ("***Transferor***") to _____, a(n) _____ ("***Transferee***") in connection with the transfer of certain real property by Transferor to Transferee.

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  Also, for U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.   To inform Transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign limited liability company, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Transferor is not a disregarded entity as defined in Income Tax Regulation §1.1445-2(b)(2)(iii);

3. Transferor's U.S. employer identification number is _____; and

4. Transferor's office address is: _____.

Transferor understands this Certification may be disclosed to the Internal Revenue Service by Transferee, and any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare I have examined this Certification and, to the best of my knowledge and belief, it is true, correct and complete, and I further declare I have authority to sign this document on behalf of Transferor.

Dated and effective as of _____, 202__.

**TRANSFEROR:**

EGAE, LLC

By: _____
Name: Marc Marlow
Title: Manager

**<u>Exhibit J</u> – Form of Tenant Notice**

**Exhibit J**
**To Deed in Lieu of Foreclosure Agreement**

## NOTICE TO TENANT OF SALE

_____, 202__


Re:      McKinely Tower Apartments, Anchorage, Alaska (the "***Property***")

Dear Tenant:

You are hereby notified and advised that as of the date of this letter, EGAE, LLC, an Alaska limited liability company ("***Transferor***"), has conveyed to _____, a(n) _____ ("***Transferee***") all of Transferor's right, title and interest in and to the Property named above including, without limitation, all of Transferor's right, title and interest as the "Landlord," "Lessor" and "Owner" in and to all lease agreements, rental agreements and other tenancies providing for the leasing, rental and other occupancy of space within or upon the Property, and Transferee has assumed all of the obligations of the "Landlord," "Lessor" or "Owner" accruing after the date hereof under all lease agreements, rental agreements and other tenancies related to the Property.  You are hereby directed to make all payments of rent or other amounts due under your lease for any periods for which such payments are due, to the following address, or as the Transferee may otherwise direct from time to time:

[TRANSFEREE NAME]

Address: _____
         _____
Phone: _____

In accordance with the new ownership, you are hereby notified that your security deposit, if any, has been transferred to Transferee as of the date hereof.

All other terms and provisions of your lease shall remain in full force and effect.

*** 

*Signature is on the next page*

*Signature page for Notice to Tenants of the McKinely Tower Apartments*

Sincerely,

EGAE, LLC

By: _____

Name: Marc Marlow
Title: Manager

**<u>Exhibit K</u> – Certificate of Borrower's Manager**


**Exhibit A – Borrower's Certificate of Formation**

**Exhibit B – Borrower Certificate of Good Standing**

**Exhibit C - Borrower's Operating Agreement, as amended**

**Exhibit D – Written Consent of Manager of Borrower**

## CERTIFICATE OF MANAGER
## OF
## EGAE LLC,

_____, 2024

MARC MARLOW, the undersigned manager ("***Manager***") of EGAE LLC, an Alaska limited liability company ("***Borrower***") hereby certifies on behalf of Borrower to MIDCAP FUNDING INVESTMENT X LLC and any assigns ("***Lender***"), as follows, as required under the Deed in Lieu of Foreclosure Agreement between Borrower and Lender dated as of _____, 2024 ("***DIL Agreement***"):

1.      Attached hereto as **Exhibit A** is a true and correct copy of the articles of organization of Borrower (the "***Articles of Organization***"), and such Articles of Organization have not been modified or amended and are in full force and effect as of the date hereof and no action is pending to amend, modify or rescind such Articles of Organization.

2.      Attached hereto as **Exhibit B** is a true and correct copy of a Certificate of Good Standing from the Secretary of State for the State of Alaska attesting to the valid existence of Borrower in the State of Alaska (the "***Certificate of Good Standing***"), and no event has occurred since the date of the Certificate of Good Standing that would adversely affect the existence of Borrower in the State of Alaska.

3.      Attached hereto as (a) **Exhibit C-1** is a true and correct copy of the Third Amended and Restated Operating Agreement of Borrower, and (b) **Exhibit C-2** is a true and correct copy of an amendment to that agreement (together, the "***Operating Agreement***"), and such Operating Agreement has not been modified or amended and is in full force and effect as of the date hereof and no action is pending to amend, modify or rescind such Operating Agreement.

5.      Attached hereto as **Exhibit D** is a true, correct and complete copy of the Joint Written Consent of the Manager and Member(s) of Borrower, dated _____ ("***Borrower's Consent***").  Such Borrower's Consent has not been amended, modified or rescinded and is in full force and effect on the date hereof; no action is pending to amend, modify or rescind such Borrower's Consent; such resolution authorizes the execution, delivery and performance of (a) the Transaction Documents (as defined in the Borrower's Consent); and (b) all other documents related to or required to be executed by Company in connection with the Transaction Documents; and no approvals other than that contained in such Borrower's Consent is required to be obtained pursuant to the Articles of Organization or the Operating Agreement with respect to the execution, delivery and performance of the Transaction Documents and all related documents by Borrower.

*[Remainder of page intentionally left blank]*

1

4883-0010-8755, v. 2

6.      The following person is the duly appoint Manager of the Company, the signature appearing opposite their name is such person's true and genuine signature, and such Manager is duly authorized to execute, deliver and perform the Transaction Documents and all of the documents to be delivered in connection therewith to which the Borrower is party.

| **Name** | **Office** | **Signature** |
|---|---|---|
| Marc Marlow | Manager of the Borrower | |
| | | _____ |

IN WITNESS WHEREOF, this Certificate is executed by the undersigned Manager of Borrower as of the date first above written.


_____

MARC MARLOW, Manager

**EXHIBIT A**

**Articles of Organization**

[*ATTACHED*]

4883-0010-8755, v. 2

File No **78125-D**

# State of Alaska
## Department of Community and Economic Development
## Division of Banking, Securities and Corporations

# CERTIFICATE
## OF
# ORGANIZATION
## Limited Liability Company

The undersigned, as Commissioner of Community and Economic Development of the State of Alaska, hereby certifies that Articles of Organization of

**EGAE, LLC**

have been received in this office and have been found to conform to law.

ACCORDINGLY, the undersigned, as Commissioner of Community and Economic Development, and by virtue of the authority vested in me by law, hereby issues this Certificate of Organization and attaches hereto the original copy of the Articles of Organization.

IN TESTIMONY WHEREOF, I execute this certificate and affix the Great Seal of the State of Alaska on **NOVEMBER 22, 2002**

*Deborah B. Sedwick*

Deborah B. Sedwick
Commissioner of Community
and Economic Development

*Filed for Record*
*State of Alaska*

**NOV 2 2 2002**

*Dept. of Community &*
*Economic Development*

# ARTICLES OF ORGANIZATION
## OF
### EGAE, LLC

The undersigned person, a natural person of lawful age, acting as organizer of a limited liability company under Title 10, Chapter 50 of the Alaska Statutes, hereby adopts the following Articles of Organization:

1.  The name of the limited liability company shall be EGAE, LLC.

2.  The purposes for which the limited liability company is organized include real estate development, as well as any and all lawful business permitted under the laws of the State of Alaska, or under the laws of any state or territory in which the company conducts business.

3.  The name and address of the limited liability company's agent for service of process is Marc A. Marlow, 229 Whitney Rd., Anchorage, Alaska 99501, and the mailing address of the company's registered office is Marc A. Marlow, 229 Whitney Rd., Anchorage, Alaska 99501.

4.  The management of the company shall be vested in certain managers. The name and address of the initial manager is:

| Name | Address |
| --- | --- |
| Marc A. Marlow | 229 Whitney Rd., Anchorage, Alaska 99501 |

5.  A member may own an interest in the company solely in the capacity as a member, or in the capacity as a member who is also a manager of the company, or in both capacities.

6.  These articles may be amended by a unanimous vote of all of the members.

DATED this 14 day November, 2002, at Anchorage, Alaska.


Marc A. Marlow, Organizer

STATE OF ALASKA                          )
                                         ) ss.
THIRD JUDICIAL DISTRICT                  )

     The foregoing instrument was acknowledged before me this *14th* day November, 2002, at Anchorage, Alaska, by Marc A. Marlow, Organizer of EGAE, LLC, an Alaskan limited liability company.

NOTARY PUBLIC in and for Alaska
My Commission Expires: *August 15, 2006*

(SEAL)

Articles of Organization of EGAE, LLC                                    Page 2

**EXHIBIT B**

**Alaska Certificate of Good Standing**

[*ATTACHED*]

Alaska Entity #78125D

## State of Alaska
## Department of Commerce, Community, and Economic Development
## Corporations, Business, and Professional Licensing

# Certificate of Compliance

The undersigned, as Commissioner of Commerce, Community, and Economic Development of the State of Alaska, and custodian of corporation records for said state, hereby issues a Certificate of Compliance for:

**EGAE, LLC**

This entity was formed on November 22, 2002 and is in good standing. This entity has filed all biennial reports and fees due at this time.

No information is available in this office on the financial condition, business activity or practices of this corporation.



IN TESTIMONY WHEREOF, I execute the certificate and affix the Great Seal of the State of Alaska effective **July 29, 2024**.

Julie Sande
Commissioner

**EXHIBITS C-1 and C-2**


**Operating Agreement**


[*ATTACHED*]

**THIRD AMENDED AND
RESTATED OPERATING
AGREEMENT OF
EGAE, LLC**

**AN ALASKA LIMITED LIABILITY
COMPANY**

**INDEX TO**
**EGAE, LLC**

Page

**ARTICLE I**    **Effective Date, Parties, Authorization, and**
**Purpose of This Agreement**                              3
Section 1.1      Effective Date; Parties
Section 1.2      Subsequent Parties; Assent as a
                 Precondition to Becoming a Member or to
                 Obtaining Rights to Become a Member
Section 1.3      Authorization of This Agreement

**ARTICLE II**   **Definitions**                                4

**ARTICLE III**  **Background of This Agreement**               10
Section 3.1      History and Nature of the Company
Section 3.2      Intent of This Agreement
Section 3.3      Invalidity and Unreasonableness of
                 Expectations Not Included in This
                 Agreement
Section 3.4      Advice of Counsel

**ARTICLE IV**   **Relationship of This Agreement to the Default**
**Rules Provided by the LLC Act**                          12

**ARTICLE V**    **Contributions and Capital Accounts**         13
Section 5.1      Initial Contributions
Section 5.2      Additional Contributions
Section 5.3      Enforcement of Commitments
Section 5.4      Maintenance of Capital Accounts
Section 5.5      Distribution of Assets
Section 5.6      Sale or Exchange of Interest
Section 5.7      Revaluation of Partnership Property
Section 5.8      Compliance with Section 704(b) of the
                 Code
**ARTICLE VI**                                             16
                 **Capital Gifts and Withdrawal**
                              **Rights**
Section 6.1      Definitions
Section 6.2      Withdrawal Rights
Section 6.3      Intention

**ARTICLE VII**  **Allocations and Distributions**              19
Section 7.1      Allocation of Net Profits and Net Losses
                 from Operations
Section 7.2      Company Minimum Gain Chargeback
Section 7.3      Member Minimum Gain Chargeback
Section 7.4      Qualified Income Offset
Section 7.5      Interim Distributions
Section 7.6      Limitations on Distributions
Section 7.7      Distributions Upon Termination of the
                 Company
Section 7.8      Distributions in Kind

-i-

**Page**

Section 7.9      Distributions Subject to Set-Off By the Company
Section 7.10     Loans From and Other Transactions With Members

**ARTICLE VIII  Tax Matters**                                            **25**
Section 8.1      Tax Characterization and
Section 8.2      Return
Section 8.3      Accounting Decisions
                 "Tax Matters Partner"

**ARTICLE IX     Governance:  Manager**                                  **25**
Section 9.1      Designation of Manager
Section 9.2      Removal and Resignation of Manager
Section 9.3      Interim Management and Replacement Manager
Section 9.4      Authority of Manager
Section 9.5      Duties of Manager
Section 9.6      No Authority of Members

**ARTICLE X      Limitations on Managerial Powers**                      **27**
Section 10.1     Actions Requiring Unanimous or Supermajority Consent
Section 10.2     Other Provisions Limiting Managerial Authority

**ARTICLE XI     Acts of Members and Member Meetings**                   **27**
Section 11.1     Acts of Members
Section 11.2     Annual Meeting
Section 11.3     Special Meetings
Section 11.4     Notice of Meetings
Section 11.5     Location and Conduct of the Meetings; Adjournments
Section 11.6     Waiver of Notice
Section 11.7     Proxies
Section 11.8     Quorum
Section 11.9     Action Without a Meeting

**ARTICLE XII    Required Records**                                      **30**
Section 12.1     Contents and Location of Required Records
Section 12.2     Access to Required Records

**ARTICLE XIII   Transfer Restrictions**                                 **32**
Section 13.1     Financial Rights
Section 13.2     Complete Membership Interests and Governance Rights

**ARTICLE XIV    Termination of Members Interest; Prohibition Against Resignation**   **32**
Section 14.1     Termination of Members Interest

-ii-

**Page**

**ARTICLE XV     Duration and Dissolution**                                  **33**
    Section 15.1    Duration
    Section 15.2    Dissolution

**ARTICLE XVI   Remedies for Breach**                                       **35**
    Section 16.1    Specific Enforcement
    Section 16.2    Concurrent or Consecutive Causation of
                 Damages
    Section 16.3    Attorney Fees and Other Litigation
                 Expenses

**ARTICLE XVII  Amendments**                                                **36**
    Section 17.1    Requirements for Amendments

**ARTICLE XVIII Alternate Dispute Resolution   ("ADR");**
              **Binding Arbitration**                          **36**
    Section 18.1    Agreement to Use Procedure
    Section 18.2    Initiation of Procedure
    Section 18.3    Direct Negotiations
    Section 18.4    Selection of Mediator
    Section 18.5    Time and Place of Mediation
    Section 18.6    Exchange of Information
    Section 18.7    Summary of Views
    Section 18.8    Parties to be Represented
    Section 18.9    Conduct of Mediation
    Section 18.10   Termination of Procedure
    Section 18.11   Arbitration
    Section 18.12   Fees of Mediation; Disqualification
    Section 18.13   Confidentiality

**ARTICLE XIX   Miscellaneous**                                             **40**
    Section 19.1    Incorporation by Reference
    Section 19.2    Construction
    Section 19.3    Binding Effect
    Section 19.4    Severability
    Section 19.5    Notices
    Section 19.6    Waiver
    Section 19.7    Disclosure
    Section 19.8    Additional Documents and Acts
    Section 19.9    Modifications
    Section 19.10   Multiple Counterparts

**Signatures**
**Notary Blocks**
**Schedule A**

THE LIMITED LIABILITY COMPANY INTERESTS IN **EGAE, LLC**, A LIMITED LIABILITY COMPANY (THE "INTERESTS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT. THE INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER (i) THE ALASKA SECURITIES ACT, AS AMENDED (THE "ALASKA ACT"),(ii) UNDER ANY OTHER STATE SECURITIES LAWS, OR (iii) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"). NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND (1)PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ALASKA ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE ALASKA ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE ALASKA ACT, (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY OTHER APPLICABLE STATE SECURITIES LAWS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH SECURITIES LAWS OR WHICH IS OTHERWISE IN COMPLIANCE WITH SUCH SECURITIES LAWS, AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE FEDERAL ACT.

## RECITALS

WHEREAS, EGAE, LLC was formed under the provisions of the Alaska Revised Limited Liability Act of the State of Alaska for the purposes hereinafter described, and governed by the *Operating Agreement*, effective November 22, 2002;

WHEREAS, effective April 22, 2013, Marc A. Marlow resigned as the Manager of EGAE, LLC;

WHEREAS, on April 22, 2013, the sole member of EGAE, LLC elected Elizabeth A. Marlow as Manager of EGAE, LLC;

WHEREAS; Elizabeth A. Marlow desires to accept her appointment as Manager of EGAE, LLC; and

1

WHEREAS, the parties to this agreement desire to set forth herein their respective rights, duties, obligations and responsibilities with respect to EGAE, LLC.

NOW, THEREFORE, in consideration of the mutual promises, obligations and agreements contained herein, there parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE I

### EFFECTIVE DATE, PARTIES, AUTHORIZATION, AND PURPOSE OF THIS AGREEMENT

**Section 1.1:  Effective Date; Parties.**

This Third Amended and Restated Operating Agreement (the "Agreement") is made this 22nd day of April 2013 and is agreed to by  EGAE, LLC, (the "Company"), the Marlow Family Exempt Perpetual Trust, under Trust Agreement dated June 26, 2000 (the "Trust"), who on that date is the sole Member of the Company, and Elizabeth A. Marlow, who was appointed the Manager of EGAE, LLC by the Trust. This agreement shall be effective as of April 22, 2013.

**Section 1.2.   Subsequent Parties; Assent as a Precondition to Becoming a Member or to Obtaining Rights to Become a Member.**

(a)  No person may become a Member of the Company without first assenting to and signing this Agreement. Any act by the Company to offer or provide Member status, or reflect that status in the Company's Required Records, automatically includes the condition that the person becoming a Member first assent to and sign this Agreement.

(b) If:

(i) the Company offers, makes, or signs a Contribution Agreement or Contribution Allowance Agreement, or any other agreement that permits or requires a person to make a contribution and become a Member, and

(ii) the other party to the Contribution Agreement, Contribution Allowance Agreement, or other agreement is not already a Member and has not already assented to and signed this Agreement, then the Company's action automatically includes the condition that the other party assent to and sign this Agreement before that person actually makes a contribution or

3

becomes a Member.

(c)    The  Company  is  obligated  not  to  accept  a contribution  from,  or  accord  Member  status  to,  any  person  who has  not  first  assented  to  and  signed  this  Agreement.    The Company's  acceptance  of  a  contribution  from  a  person  who  has not  signed  this  Agreement  does  not  waive  that  person's obligation  to  sign  this  Agreement.

(d)    No  transfer  of  a  Membership  Unit  or  the governance  rights  of  any  Membership  Unit  is  effective  unless the  assignment  complies  with  the  relevant  provisions  of  this Agreement  and  the  assignee  has  assented  to  and  signed  this Agreement.

**Section 1.3.    Authorization of This Agreement.**

This  Agreement  is  made  under  Alaska  Statute 10.50.095.

**ARTICLE
I I
DEFINITIONS**

For  purposes  of  this  Agreement,  unless  the  language  or context  clearly  indicates  that  a  different  meaning  is  intended, the  words,  terms  and  phrases  defined  in  this  section  have  the following  meanings:

(1)  **"Act"**  means  Alaska  Statute  10.50.

(2)  **"Act of the members"**  has  the  meaning  stated  in Section 10.1.

(3)  **"Agreement"**  means  this  Second  Amended  and Restated  Operating  Agreement,  as  amended  from  time  to  time under Article XVII.

(4)  **"Book Adjustments"**  means  adjustments  with  respect to  the  Book  Value  of  Partnership  Property  for  depreciation, depletion,  amortization,  and  gain  or  loss,  as  computed  in accordance  with  section  1.704-1(b)(2)(iv)(g)  of  the Regulations.

4

(5)  **"Book Value"** means, with respect to Property Contributed to the Company, the fair market value of the Property at the time of Contribution as adjusted by Book Adjustments; with respect to Partnership Property which has been Revalued, the fair market value of such Partnership Property as adjusted by Book Adjustments.

(6)  **"Capital Account"** means the account maintained for a Member or Assignee determined in accordance with Article V.

(7)  **"Code"** means the Internal Revenue Code of 1986, as amended, and any successor to that Code.

(8)  **"Commitment"** means the obligation of a Member or Assignee to make a Capital Contribution in the future.

(9)  **"Company"** means EGAE, LLC, an Alaska Limited Liability Company, organized under Alaska Statute 10.50.

(10)  **"Company Minimum Gain"** means an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain and increases and decreases in Company Minimum Gain are intended to be computed in accordance with section 704 of the Code the Regulations issued thereunder, as the same may be issued and interpreted from time to time. **A Member's share of Company Minimum Gain** at the end of any Taxable Year equals: the sum of Nonrecourse Deductions allocated to that Member (and to that Member's predecessors in interest) up to that time and the distributions made to that Member (and to that Member's predecessors in interest) up to that time of proceeds of a nonrecourse liability allocable to an increase in Company Minimum Gain minus the sum of that Member's (and of that Member's predecessors in interest) aggregate share of the net decreases in Company Minimum Gain plus their aggregate share

5

of decreases resulting from Revaluations of Company Property subject to one or more Company Nonrecourse Liabilities.

(11) **"Company Nonrecourse Liability"** means a Company Liability to the extent that no Member or Related Person bears the economic risk of loss (as defined in section 1.752-2 of the Regulations) with respect to the liability.

(12) **"Contribution Agreement"** means an agreement between a person and the Company, under which:

(i) the person agrees to make a contribution in the future to the Company;

(ii) the Company agrees that, at the time specified for the contribution in the future, the Company will accept the contribution, reflect the contribution in the Required Records, issue to the person a specified number of Membership Units, and accord the person status as a Member (if the person is not already a Member).

(13) **"Contributing Members"** means members making Capital Contributions as a result of the failure of a Delinquent Member to perform a Commitment as described in Article V.

(14) **"Contribution"** means any contribution of Property made by or on behalf of a new or existing Member or Assignee as consideration for a Membership Interest.

(15) **"Contribution Allowance Agreement"** means an agreement between a person and the Company, under which:

(i) the person has the right, but not the obligation, to make a contribution to the Company in the future; and

(ii) the Company agrees that, if the person makes the specified contribution at the time specified in the future, the Company will accept the contribution, reflect the contribution in the Required Records, issue to the person a specified number of Membership Units, and accord the person status as a Member (if the person is not already a Member).

(16) **"Core business"** means the Company's business involving real estate development.

(17) **"Default Interest Rate"** means the higher of the legal rate or the then-current prime rate quoted by the largest commercial bank in the jurisdiction of the Principal Office plus three percent.

6

(18) **"Default rule"** means a rule stated in the Act:

(i) which structures, defines, or regulates the finances, governance, operations, or other aspects of a limited liability company organized under the Act, and

(ii) which applies except to the extent it is negated or modified through the provisions of a limited liability company's articles of organization or operating agreement.

(19) **"Delinquent Member"** means a Member or Assignee who has failed to meet the Commitment of that Member or Assignee.

(20) **"Disinterested"** means, with respect to a Manager or Member and with respect to a particular transaction or other undertaking, a Manager or Member who (i) is not a party to that undertaking, (ii) has no material financial interest in any organization that is a party to that undertaking, and (iii) is not related by blood or marriage to any person who either is a party to that undertaking or has a material financial interest in any organization that is a party to that undertaking.

(21) **"Financial Rights"** means a Member's rights to share in profits and losses, a Member's rights to receive distributions and a Member's Capital Interest.

(22) **"Fiscal Year"** means the annual period upon which the Company files its federal tax return.

(23) **"Governance Rights"** means all of a Member's rights as a Member in the Company, other than financial rights and the right to assign financial rights.

(24) **"Immediate Family"** means a Member's Immediate Family includes the Member's spouse, children (including natural, adopted and stepchildren), grandchildren, and parents.

(25) **"Initial Contribution"** means the Contribution agreed to be made by the Initial Members as described in Article V.

(26) **"Initial Members"** means those persons identified on Schedule A attached hereto and made a part hereof by this reference who have executed this Company Agreement.

(27) **"LLC Act"** means the Alaska Revised Limited Liability Act, under Alaska Statute 10.50.

(28) **"Manager"** means a person who manages a

7

limited liability company, if the Articles of Organization provide that the company is managed by a manager. A **"manager"** means a person selected pursuant to Article IX to manage the business of the Company, as well as any person who serves in an interim capacity under that Article.

(29) **"Managing Member"** means a member of a limited liability company if the Company's Articles of Organization do not provide that the company is managed by a manager.

(30) **"Majority Consent"** means the consent of the members owning a majority of the membership interests of the company.

(31) **"Member"** means a person who owns an interest in the Company, and whose ownership is reflected in the Required Records.

(32) **"Member Minimum Gain"** means an amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating and then aggregating the separately computed gains. The amount of the Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be interpreted in accordance with section 704 of the Code and the Regulations issued thereunder, as the same may be amended from time to time.

(33) **"Member Nonrecourse Liability"** means any Company Liability to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under section 1.752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

(34) **"Membership Interest"** means the percentage represented by a member's sharing ratio.

(35) **"Net Losses"** means the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company and as reported separately or in

8

the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes.

(36) **"Net Profits"** means the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the tax return of the Company filed for federal income tax purposes. Net Profits includes taxable income, capital gain, and income exempt from taxation.

(37) **"Nonrecourse Liabilities"** means nonrecourse liabilities including Company Nonrecourse Liabilities and Member Nonrecourse Liabilities.

(38) **"Permitted Transferee"** means any member of a Member's Immediate Family, or a trust for the benefit of or an organization controlled by such Member or by members of the Member's Immediate Family.

(39) **"Person"** includes a natural person, domestic or foreign limited liability company, corporation, partnership, limited partnership, joint venture, association, business trust, estate, trust, enterprise, and any other legal or commercial entity.

(40) **"Regulation"** means, except where the context indicates otherwise, the permanent, temporary, proposed or proposed and temporary regulations of Department of Treasury under the Code as such regulations may be lawfully changed from time to time.

(41) **"Required Records"** means those records specified in Section 12.1.

(42) **"Revaluation"** means the adjustment to the Book Value of Partnership Property as provided in Section 5.7 of this Company Agreement.

(43) **"Revaluation Date"** means the date on which the Revaluation Event occurs.

(44) **"Revaluation Event"** means (1) a Contribution (other than a *de minimis* amount), (2) a Liquidating Distribution (other than a *de minimis* amount), or (3) a Liquidation of the Company.

(45) **"Sharing Ratio"** means with respect to any Member, a fraction (expressed as a percentage), the numerator of which is the total of the Member's Capital Account and the denominator is the total of all Capital Accounts of all Members and

9

Assignees.

(46) **"Taxable Year"** means the taxable year of the Company as determined pursuant to section 706 of the Code.

(47) **"Termination of the Company"** means the end of the Company's legal existence, through the process of dissolution, as described in Alaska Statute 10.50.400 through .440.

(48) **"Transfer"** includes an assignment, conveyance, lease, mortgage, security interest, deed, encumbrance and gift.

## ARTICLE III BACKGROUND OF THIS AGREEMENT

**Section 3.1.   History and Nature of the Company.**

The Company was organized in Alaska and will be engaged in the business of real estate development, and any other business its Manager chooses to pursue. As of the date of this Agreement, the Company's principal place of business is Anchorage, Alaska.

**Section 3.2.   Intent of This Agreement.**

(a) The parties to this Agreement have reached an understanding concerning various aspects of (i) their business relationship with each other and (ii) the organization and operation of the Company and its business. They wish to use rights created by statute to record and bind themselves to that understanding.

(b) The parties intend this Agreement to control, to the extent stated or fairly implied, the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up, and termination, as well as the relations among the Company's Members and persons who have signed Contribution Agreements and Contribution Allowance Agreements.

**Section 3.3.   Invalidity and Unreasonableness of Expectations Not Included in this Agreement.**

10

(a) The Members fear the uncertainty and the potential for discord that would exist if:

(i) the unstated expectation of one or more Members can be used to gain advantage through litigation, or

(ii) expectations stated or expressed outside the confines of this Agreement can·become actionable even though not all Members agree with those expectations or have assented to them and even though some Members have expressed or may harbor conflicting expectations.

(b) The Members therefore agree that:

(i) it is unreasonable for any Member to· have or rely on an expectation that is not reflected in this Agreement;

(ii) any Member who has or develops an expectation contrary to or in addition to the contents of this Agreement has a duty to

(A) immediately inform the Managers and all other Members, and

(B) promptly seek to have this Agreement amended to reflect the expectation;

(iii) the failure of a Member who has or develops an expectation contrary to or in addition to the contents of this Agreement to obtain an amendment of this Agreement as provided in Subsection (b)(ii), above, is evidence that the expectation was not reasonable and estops that Member from asserting that expectation as a basis for any claim against the Company or any other Member;

11

(iv) no Member has a duty to agree to an amendment proposed under Subsection (b)(ii), above, if the Member in good faith (A) holds an inconsistent expectation, or

(B) believes that the amendment is not in the best interests of the Company or is contrary to the legitimate self-interests of the Member.

**Section 3.4.    Advice of Counsel.**

Each person signing this Agreement:

(a) understands that this Agreement contains legally binding provisions,

(b) has had the opportunity to consult with a lawyer, and

(c) has either consulted a lawyer or consciously decided not to consult a lawyer.

**ARTICLE IV RELATIONSHIP OF THIS AGREEMENT
TO THE DEFAULT RULES PROVIDED BY THE LLC ACT**

Regardless of whether this Agreement specifically refers to particular default rules:

(a) if any provision of this Agreement conflicts with a default rule, the provision of this Agreement controls and the default rule is modified or negated accordingly, and

(b) if is necessary to construe a default rule as modified or negated in order to effectuate any provision of this Agreement, the default rule is modified or negated accordingly.

12

## ARTICLE V

## CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 5.1. Initial Contributions.** Each Initial Member shall make the Contribution described for that Member on Schedule A at the time and on the terms specified on Schedule A and shall perform that Member's Commitment. If no time for the Contribution is specified, the Contributions shall be made upon the filing of the Articles with the Alaska Department of Commerce and Economic Development. No interest shall accrue on any Contribution and no Member shall have the right to withdraw or be repaid any Contribution except as provided in this Agreement. Each additional Member shall make the Contribution and shall perform the Commitment described in the admission agreement.

**Section 5.2. Additional Contributions.** In addition to the Initial Contributions and Commitments, the Managers may determine from time to time that additional contributions are needed to enable the Company to conduct its business. Upon making such a determination, the Managers shall give Notice to all Members in writing at least ten Business Days prior to the date on which such contribution is due. Such Notice shall set forth the amount of additional contribution needed, the purpose for which the contribution is needed, and the date by which the Members should contribute. Each Member shall be entitled to contribute a proportionate share of such additional contribution. Except to the extent of a Member's unpaid Commitment, no Member shall be obligated to make any such additional contributions. In the event any one or more Members do not make their additional contribution, the other members shall be given the opportunity to make the contributions.

13

Each additional Member shall make the Capital Contribution to which such Member has agreed, at the time or times and upon the terms to which the Managers and the additional Member agree.

**Section 5.3.   Enforcement of Commitments.** In the event any Member (a Delinquent Member) fails to perform the Delinquent Member's Commitment, the Managers shall give the Delinquent Member a Notice of the failure to meet the Commitment.  If the Delinquent Member fails to perform the Commitment (including any costs associated with the failure to demand compliance with the Commitment and interest on such obligation at the Default Interest Rate) within ten Business days of the giving of Notice, the Managers may take such action, including but not limited to enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in this Company Agreement.  Each Member expressly agrees to the jurisdiction of such courts but only for the enforcement of Commitments.  The Managers may elect to allow the other Members to contribute the amount of the Commitment in proportion to such Members' sharing ratios, with those Members who contribute (Contributing Members) additional amounts equal to  any amount of the Commitment not contributed.  The Contributing Members shall be entitled to treat the amounts contributed pursuant to this section as a loan from the Contributing Members bearing interest at the Default Interest Rate secured by the Delinquent Member's interest in the Company.  Until they are fully repaid the Contributing Members shall be entitled to all Distributions to which the Delinquent Member would have been entitled.  Notwithstanding the foregoing, no Commitment or other obligation to make an additional contribution may be enforced by a creditor of the Company or other Person other than the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

**Section 5.4.   Maintenance of Capital Accounts.** The Company shall establish and maintain a Capital Account for each Member and

14

Assignee. Each Member's Capital Account shall be increased by (1) the amount of any money actually contributed by the Member to the capital of the Company, (2) the fair market value of any property (other than money) contributed, as determined by the Company and the Contributing Member at arm's length at the time of contribution (net of liabilities assumed by the Company or subject to which the company takes such property, within the meaning of Section 752 of the Code), and (3) the Member's share of Net Profits and of any separately allocated items of income or gain except adjustments of the Code (including income and gain exempt from tax and adjustments to income and gain as a result of a Revaluation or in connection with Property Contributed in the manner described in section 1.704-1(b)(2)(iv)(g) to reflect the difference between the Book Value and the adjusted basis of Company property, but excluding allocations of income and gain described in section 1.704-1(b)(4)(i) of the Regulations under which such difference is reflected for tax purposes). Each Member's Capital Account shall be decreased by (1) the amount of any money distributed to the Member by the Company, (2) the fair market value of any property distributed to the Member, as determined by the Company and the Member receiving the Distribution at arm's length at the time of Distribution (net of liabilities of the Company assumed by the Member or subject to which the Member takes such property within the meaning of Section 752 of the Code), and (3) the Member's share of Net Losses and of any separately allocated items of Net Loss (including adjustments for depreciation, depletion, amortization, and loss as a result of a Revaluation or in connection with property contributed in the manner described in section 1.704-1(b)(2)(iv)(g) to reflect the difference between the Book Value and the adjusted basis of Company property, but excluding allocations of depreciation, depletion, amortization, and loss described in section 1.704-1(b)(4)(i) of the Regulations under which such difference is reflected for tax purposes).

**Section 5.5.  Distribution of Assets.** If the Company at any time Distributes any of the Company property (other than money)

15

in-kind to any Member, the Capital Account of each Member shall be adjusted to account for the Member's allocable share (as determined under Article VII, below) of the Net Profits or Net Losses that would have been realized by the Company had it sold the assets that were distributed at their respective fair market values immediately prior to their distribution.

**Section 5.6.    Sale or Exchange of Interest.** In the event of a sale or exchange of some or all of a Membership Interest, the Capital Account of the transferring Member shall become the Capital Account of the Assignee, to the extent it relates to the portion of the interest transferred.

**Section 5.7.    Revaluation of Partnership Property.** The Capital Accounts of the Members shall be increased or decreased to reflect a revaluation of Company property (including intangible assets such as goodwill) on the Company's books in connection with a Revaluation Event. Upon such Revaluation: (1) the Book Value of Company property shall be adjusted based on the fair market value of Company property (taking section 7701(g) of the Code into account) on the Revaluation Date; (2) the unrealized income, gain, loss, or deduction inherent in such Company property (that has not been reflected in the Capital Accounts previously) would be allocated among the Members as if there were a taxable disposition of such Company property for such fair market value on the Revaluation Date.

**Section 5.8.    Compliance With Section 704(b) of the Code.** The provisions of this Article V as they relate to the maintenance of Capital Accounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article VII to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of the distributions made and the Contributions. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member or· Assignee to make a Contribution in excess of the Initial

16

Contribution, additional Contribution, and Commitment of the Member or Assignee.

## ARTICLE VI

### CAPITAL GIFTS AND WITHDRAWAL RIGHTS

**Section 6.1. Definitions.**

(a) **"Capital Gift"** shall mean any transfer, to the extent, if any, that it constitutes a gift for federal gift tax purposes, of an interest in the Company to a donee who is or hereafter becomes a Member with respect to that transferred interest, and any capital contribution to the Company if that capital contribution gratuitously increases the Capital Account of another Member (the donee Member with respect to such Capital Gift).

(b) **"Member"** as used in this article includes a member and also a donee assignee who has not been admitted as a Member.

**Section 6.2.**

Immediately following each Capital Gift, the Member whose capital account is gratuitously increased by this Capital Gift (hereinafter referred to as a "donee Member") may withdraw the increase in the donee Member's Capital Account occasioned by this Capital Gift, subject to the limitations, rules, and procedures set forth below.

(a) The maximum amount that a donee Member may withdraw with respect to all Capital Gifts made by the same donor in any calendar year shall not, in any event, exceed the gift tax annual exclusion in effect at the time of each Capital Gift, less the amount of prior gifts to the same donee Member either outright or in trust, by the same donor during the same calendar year, which gifts were eligible for the federal gift tax annual exclusion but not eligible for the federal gift tax marital or charitable deductions.

(b) All gifts to a donee Member that enter into the computation under this Section shall, absent an express direction to the contrary by a donor at or before the time of a Capital Gift, be treated as having been made equally by the donor and the donor's spouse, if the donor was married when the gift was made, and the gift was eligible for gift-splitting under I.R.C. § 2513(a). The

17

limitation under subsection (a), above, with respect to Capital Gifts made by a donor who was married when the Capital Gift was made and which gift was eligible for gift-splitting under I.R.C. section 2513, shall be separately calculated and applied as to each spouse's deemed half of the gift.

(c) All withdrawal rights to which this Section apply shall arise upon the date when the beneficiary receives notice of the Capital Gift. The withdrawal right of a donee Member shall lapse on the date thirty (30) days after date when the beneficiary receives notice of the Capital Gift to which it relates, regardless of whether that date falls within the same calendar year as that in which the Capital Gift was made.

(d) The Manager shall promptly notify each competent donee Member of all Capital Gifts to which that donee Member's withdrawal right relates. The Manager shall notify a Member who is under a legal disability (including minority) (hereafter sometimes referred to as a "disabled donee Member), by notifying:

(i) the legal guardian of the individual's property, who is hereby authorized to exercise the withdrawal

rights; (ii) any living parent of the individual;

(iii) any other person taking care of the individual or with whom the individual resides; or

(iv) any other adult individual whom the Manager shall deem appropriate.

(e) Withdrawal rights under this Section shall be exercisable by a writing delivered to the Manager. The person to whom notice is properly given for a disabled donee Member may decide whether to exercise that disabled donee Member's withdrawal right, unless that person receiving notice is the donor of the contribution to which the withdrawal right relates, in which case the Manager shall designate another appropriate adult individual to make such decision.

(f) The Manager may, by an instrument in writing executed at or before a Capital Gift, exclude one or more donee Members from

18

having withdrawal rights over that Capital Gift or any future Capital Gift or both. The Manager may not, however, limit or alter any rights resulting from prior Capital Gifts.

(g) Notwithstanding any other provision of this Agreement, the Manager may make no distributions of capital or income of the Company that would reduce the available Company capital below the total amount of the then-existing withdrawal rights without advance notice to each Member who is entitled to make a withdrawal or who is, under this Section, entitled to act for a disabled donee Member.

(h) If the Manager shall incorrectly determine the amount that should be distributed to a donee Member under this Section, then within a reasonable period after the correct amount is finally determined, the Manager shall receive from the donee Member or shall pay to the donee Member, as the case may be, an amount equal to the difference between the amount that could properly have been withdrawn and the amount actually withdrawn.

(i) The Manager may without liability assume that no prior gifts to any holder of a withdrawal right under this Section were made by a donor or a donor's spouse other than Capital Gifts, unless the Manager shall have actual notice to the contrary.

(j) All withdrawal amounts shall be paid in cash.

**Section 6.3.   Intention.**

This article is intended to meet the requirements of applicable law so that the original and any subsequent gifts described by this article shall be gifts of a present interest for federal gift tax purposes. All provisions and powers shall be construed and exercised to meet such requirements.

**ARTICLE VII**

**ALLOCATIONS AND DISTRIBUTIONS**

**Section 7.1.   Allocation of Net Profits and Net Losses from**

19

**Operations.** Each Member will have a Membership Interest. A Member may own a Membership Interest in the Member's capacity as a member, or in the capacity as a member who is also a manager of the company, or in both capacities. A Membership Interest means the percentage represented by the Member's Sharing Ratio. Except as may be required by section 704(c) of the Code, and sections 7.2, 7.3, and 7.4 of this Article VII, net profits, net losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to their Sharing Ratios.

Section 7.2. **Company Minimum Gain Chargeback.** If there is a net decrease in Company Minimum Gain for a taxable year, each Member must be allocated items of income and gain for that taxable year equal to that Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding taxable year. A Member's share of any decrease in Company Minimum Gain resulting from a revaluation of Company property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in minimum gain is caused by the revaluation. A Member is not subject to the Company Minimum Gain Chargeback Requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a recourse liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed liability.

Section 7.3. **Member Minimum Gain Chargeback.** If during a taxable year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain ("partner minimum gain" as determined under section 1.704-2(i)(5) of the Regulations) as of the beginning of that taxable year must be allocated items of income and gain for that taxable year (and, if necessary, for

−20

succeeding taxable years) equal to that Member's share of the net decrease in the Company Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of section 1.704(g)(2) of the Regulations. A Member is not subject to this Member Minimum Gain Chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain Chargeback is added to the Member's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain Chargeback to the extent provided under the Regulations issued pursuant to section 704(b) of the Code.

**Section 7.4.    Qualified Income Offset.** Notwithstanding any provision of this Company Agreement to the contrary (other than Sections 6.2 and 6.3, above), in the event that a deficit in a Member's Capital Account is created or increased (taking into account any allocations, adjustments, or distributions described in section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) in excess of such Member's share of Company Minimum Gain and Member Minimum Gain, plus any amount that the Member is obligated to restore to the Company, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of partnership income and gain for such year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

**Section 7.5.    Interim Distributions.** From time to time, the Managers shall determine in their reasonable judgment, and in accordance with their fiduciary duties of care and loyalty, to what extent, if any, the Company's cash on hand exceeds the Company's current and anticipated needs, including, without limitation ,needs for operating capital, debt service, reserves, mandatory distributions, current investment opportunities, and prudent reserves for future investment opportunities, if any. To the

-21

extent such excess exists, the Managers may make distributions to the Members in accordance with their Sharing Ratios. Such distributions shall be in cash or property (which need not be distributed proportionately) or partly in both, as determined by the Managers.

All interim distributions which, when made, exceed the recipient Member's basis on that Member's Membership interest shall be considered advances or drawings against the Member's distributive share of net income. To the extent that it is determined at the end of the taxable year of the Company that the recipient member has not been allocated net income that equals or exceeds the total of such advances or drawings for such year, the recipient Member shall be obligated to restore any such advances or drawings to the Company. Notwithstanding the foregoing sentence, the Member will not be required to restore such advances or drawings to the extent that, on the last day of the taxable year, the recipient Member's basis in the member's interest in the Company has increased from the time of such advance or drawing.

**Section 7.6.    Limitations on Distributions.** No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

**Section 7.7.    Distributions Upon Termination of the Company.**

(a) At the Termination of the Company, and after the Company has satisfied or provided for the satisfaction of all the Company's debts and other obligations, the Company's assets will be distributed in cash to the Members and any dissociated Members whose interests have not been previously redeemed as follows:

(i) first, in discharge of their respective Capital Interests; and

(ii) then, in proportion to their Sharing Ratios as

-22-

determined prior to (i), above.

(b) If the Company lacks sufficient assets to make the distributions described in Subsection (a), above, the Company will make distributions in proportion to the amount in the respective Capital Interests of the Members and dissociated Members whose interests have not been previously redeemed.

**Section 7.8.    Distributions in Kind.**

(a) No Member has a right to any distribution in any form other than money.

(b) The Company may not make a distribution in kind unless

(i) the Member receiving the in-kind distribution consents,

(ii) all Members receive undivided interests in the same property,

(iii) all Members receive, in proportion to their

-23

rights to distribution, interests in substantially equivalent property, or

        (iv) all Members' consent.

    **Section 7.9.   Distributions   Subject   to   Set-Off   by   the Company.**   All distributions are subject to set-off by the Company

    (a) in the case of a Member, for any past-due obligation of the Member to make a contribution to the Company; and

    (b) in the case of an assignee of financial rights, for any past-due obligation owed to the Company by the Member who originally owned the financial rights.

    **Section 7.10.   Loans From and Other Transactions With Members.**

    (a) With the approval of the Managers, the Company may borrow money from and enter into other transactions with a Member.

    (b) The Company may enter into transactions and other undertakings (including borrowing money) with a Manager, whether or not the Manager is a Member, with the written approval of

        (i) a majority of the Disinterested Managers;

        (ii) the Members owning a majority of Membership Units owned by Disinterested Members; or

        (iii) all the Members, whether or not they would ordinarily have voting power.

    To be valid, the approval must be based on all material information concerning both the undertaking and the Interested Manager's relationship to the undertaking. Valid approval under this paragraph constitutes approval under Alaska

Statute 10.50.140.   This paragraph does not apply to the compensation arrangements for Managers.

    (c) On account of loans made, or transactions performed, by a Member under this section, the Managers may increase, temporarily or permanently, a Member's right to share in profits and distributions.

    (d) Borrowing from or engaging in other transactions with one or more Members (whether or not the Member is a Manager) does not obligate the Company to provide comparable opportunities to other Members.

        -24

## ARTICLE VIII

### TAX MATTERS

**Section 8.1.    Tax Characterization and Returns.**

(a) The Members acknowledge that the Company will be treated as a "partnership" for federal and state tax purposes.

(b) Within sixty days after the end of each Fiscal Year, the Managers will cause to be delivered to each person who was a Member at any time during such Fiscal Year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of each Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain or loss, and credits for the Fiscal Year.

**Section 8.2.   Accounting Decisions.**

(a) The Manager will make all decisions as to accounting matters, and

(b) The Manager may cause the Company to make whatever elections the Company may make under the Code, including the election referred to in Section 754 of the Code to adjust the basis of Company assets.

**Section 8.3.    "Tax Matters Partner".**

The Manager will designate a Member or Manager to act on behalf of the Company as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.


## ARTICLE IX

### GOVERNANCE

### BY MANAGER


**Section 9.1. Designation of Manager.**

The Company will be managed by a Manager, Elizabeth A. Marlow. If such person is not able to serve then the successor Manager shall be appointed by the independent trustee of the Marlow Manor Family Exempt Perpetual Trust, under Trust Agreement dated June 26, 2000.

-25-

**Section 9.2        Removal and Resignation of Manager.**

(a) The Manager named in Section 9.1 will serve until they resign or no longer have capacity. They cannot be removed from office. The Members may remove any other Manager, without having to possess, state or prove cause, by an act of one hundred percent of the Membership Interests, other than interests owned by the Manager whose removal is sought. The removal of a Manager without stating or proving cause does not bar a later claim that the Manager engaged in misconduct while a Manager.

(b) The Manager resigns by providing written notice to all Members. The resignation takes effect three days after the date the Manager gives notice to all Members, or at a later date stated in the notice of resignation.

**Section 9.3.    Interim Management and Replacement Manager.**

Once the resignation of the Manager is effective or the Members remove the manager, the Members will elect a Manager at a properly scheduled meeting of the Members. The vote of Members holding one hundred percent of the Membership Interests is necessary to elect a replacement Manager.  If the Members act through a meeting to remove the Manager, the same meeting that votes removal may also elect a replacement Manager.  Once elected, the replacement Manager will have all of the powers and duties of the initial Manager.

**Section 9.4.        Authority of the Manager.**

(a) Subject to Article X, the Manager has sole authority to manage the Company and is authorized to make any contracts, enter into any transactions, and make and obtain any commitments on behalf of the Company to conduct or further the Company's business. No Manager who has contributed stock to the Company may vote such stock if it is stock of a controlled corporation with respect to such Manager, pursuant to I.R.C. § 2036(b).

**Section 9.5.   Duties of Manager.**

(a) The Manager must discharge his, her, or its duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager reasonably believes to be in the best interests

-26

of the Company.

(b) A Manager may rely on information received from other persons if that reliance is consistent with the Manager's duties under Subsection (a), above.

**Section 9.6.    No Authority of Members.**

Except as authorized by the Manager, no Member is an agent of the Company or has the authority to make any contracts, enter into any transactions, or make any commitments on behalf of the Company.

## ARTICLE X

### LIMIATION ON MANAGERIAL POWERS

**Section 10.1.    Actions Requiring Unanimous or Supermajority Consent.**

The Managers have no authority or power to take any of the following actions unless first approved by an act of the Members Owning 100 percent of the Membership Interests:

(a) amend the articles of organization; (b) amend this operating agreement;

(c) dissolve the company.

**Section 10.2.    Other Provisions Limiting Managerial Authority.**

When some other provision of this Agreement states procedures for taking particular actions or accomplishing specified results, that provision states the sole method for taking that action or accomplishing that result.

## ARTICLE XI

### ACTS OF MEMBERS AND MEETINGS

**Section 11.1.            Acts of Members.**

Except to the extent that Alaska Statute 10.50, the articles of organization, or this operating agreement require a vote of a different percentage, if the Members are authorized by the articles of organization or by this operating agreement to act, then such action shall be taken by either:

-27-

(a) a majority vote of the Membership Interests present at a properly called meeting of the Members, when a quorum is present, or

(b) written action without a meeting, as provided in Section 11.9.

If the Members are not authorized by the articles of organization or by this operating agreement to act on a matter, then they can only act on such matter by unanimously voting to amend this agreement.

**Section 11.2.        Annual Meeting.**

The Manager may decide by the adoption of a written resolution to require annual meetings. If so resolved, the annual meeting will be on the first Tuesday in February at 9:00 a.m. The Manager will give notice of this annual meeting, complying with Section 11.4.

**Section 11.3. Special Meetings.**

(a) A special meeting of the Members may be called for any purpose or purposes at any time by an act of the Managers or by one or more Members owning at least ten percent of the Membership Interests the Company entitled to vote.

**Section 11.4. Notice of Meetings**

Written notice of each meeting of the Members stating the date, time, place and, in the case of a special meeting, the purpose or purposes, must be given to every Member at least twenty days and not more than sixty days prior to the meeting. The business transacted at a special meeting is limited to the purpose stated in the notice.

**Section 11.5. Location  and  Conduct  of  the Meetings; Adjournments.**

(a) Each meeting of the Members will be held at the Company's principal place of business or at some other suitable location, as designated by the Managers.

(b) The Managers will select a Manager to chair each meeting of the Members.

(c) Any meeting of the Members may be adjourned from time to time to another date and time and, to another place. If at the

-28-

time of adjournment the person chairing the meeting announces the date, time, and place at which the meeting will be reconvened, it is not necessary to give any further notice of the reconvening.

**Section 11.6.   Waiver of Notice.**

(a) A Member may waive notice of the date, time, place, and purpose or purposes of a meeting of Members. A waiver may be made before, at, or after the meeting, in writing, or by attendance.

(b) Attendance by a Member at a meeting is a waiver of notice of that meeting, unless the Member objects at the beginning of the meeting to the transaction of business because the meeting is not properly called or convened, or objects before a vote on an item of business because the item may not properly be considered at that meeting and does not participate in the consideration of the item at that meeting.

**Section 11.7.   Proxies.**

(a) A Member may cast or authorize the casting of a vote by filing a written appointment of a revocable proxy with the Chief Executive Officer or the Chief Financial Officer of the Company at or before the meeting at which the appointment is to be effective. The Member may sign or authorize the written appointment by telegram, cablegram, e-mail, facsimile, or other means of electronic transmission stating, or submitted with information sufficient to determine, that the Member authorized the transmission. Any copy, facsimile, telecommunication, or other reproduction of the original of either the writing or the transmission may be used in lieu of the original, if it is a complete and legible reproduction of the entire original.

(b) A member may not grant or appoint an irrevocable proxy.

**Section 11.8.   Quorum.**

For any meeting of the Members, a quorum consists of a majority of the Membership Interests. If a quorum is present when a properly called meeting is convened, the Members present may continue to transact business until adjournment, even though the departure of Members originally present leaves less than the

-29

proportion otherwise required for a quorum.

**Section 11.9.  Action Without a Meeting.**

Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting by written action signed by the Members who own the number of Membership Interests equal to the percentage of interests that would be required to take the same action at a meeting of the Members at which all Members were present. The written action is effective when signed by Members owning the required Membership Interests, unless a different effective time is provided in the written action. When written action is taken by less than all Members, the Company will immediately notify all Members of the action's text and effective date. Failure to provide the notice does not invalidate the written action.

## ARTICLE XII

## REQUIRED

## RECORDS

**Section 12.1.  Contents and Location of Required Records.**

The Company will maintain at its principal place of business, or at some other location chosen by the Managers, the following records:

(a)  current and past lists that state. in alphabetical order the full name and last known mailing address of every Member and Manager of the Company;

-30

(b)    a copy of the Company's articles of organization and amendments to the articles, including a signed copy of a power of attorney used by a person who signed articles of amendments for the Company;

(c)    a copy of the Company's federal, state and local income tax returns and financial statements, if any, for the three most recent years or, if the returns and statements are not prepared, a copy of the information and statements provided to, or that should have been provided to, the Members to enable the Members to prepare their federal, state, and local tax returns for the three-year period;

(d)    a copy of any effective operating agreement of the Company, amendments to the agreement, and former operating agreements;

(e)    unless contained in an operating agreement,

(i) a document stating the amount of cash contributed by a Member of the Company, the agreed value of other property or services contributed by a Member, and when a Member is to make additional contributions;

(ii) a document stating the events, if any, that cause the Company to be dissolved and its affairs wound up.

**Section 12.2.  Access to Required Records.**

(a)    After giving reasonable advance notice to the Company, any Member may inspect and review the Required Records and the Company's books and records of account, and may, at the Member's expense, have the Company make copies of any portion or all of the above documents.  However, Member inspection shall be upon written demand stating with reasonable particularity the purpose of the inspection.  Only books and records of account, minutes, and the record of Members directly connected to the stated purpose of the inspection may be inspected or copied.

(b)    Unless the Company agrees otherwise, all Member access to the Required Records and the other documents described above must take place during the Company's regular business hours.  The Company may impose additional reasonable conditions and

-31

restrictions on Members' access to the Required Records and the other documents described above, including specifying the amount of advance notice a Member must give and the charges imposed for copying.

## ARTICLE XIII
### TRANSFER RESTRICTIONS

**Section 13.1.  Financial Rights.**

(a) A Member may assign his, her or its Financial Rights in whole or in part to a permitted transferee or trust for the benefit of a permitted transferee. As to the Company, an assignment of Financial Rights is effective only when the Company has received notice of the assignment and has noted the assignment in the Required Records.

(b) An assignee of a Member's Financial Rights derives its rights exclusively through the Member/assignor. Any assignee takes the assignment subject to any claims or offsets the Company has against the Member, regardless of whether those claims or offsets exist at the time of the assignment or arise afterwards. An amendment to this Agreement may change a Member's rights and consequently affect the rights of an assignee, even if the amendment is made after the assignment.

**Section 13.2.  Complete Membership Interests and Governance Rights.**

(a) A member must have unanimous consent of the members before assigning a complete Membership Interest or any Governance Rights.

(b) An assignment of a complete Membership Interest or any Governance Rights made in violation of Subsection (a), above, is void. Subsection (a) does not limit the right or power of a Member to grant a revocable proxy.

## ARTICLE XIV
### TERMINATION OF MEMBER'S INTEREST;  PROHIBITION AGAINST RESIGNATION

**Section 14.1.  Termination of Member's Interest.**

(a) A Member's interest terminates:  if the Member dies or is

-32

adjudicated incompetent (A.S. 10.50.210); or if the Member is a trust when the trust terminates; or if the Member is an estate when the interest is distributed by the fiduciary (A.S. 10.50.215); or if the Member is a corporation or a separate limited liability company when such entity dissolves (A.S. 10.50.220); or if the person who owns the interest experiences any of the financial events described in A.S. 10.50.225. Upon such termination of a member's interest, the member or the member's successor has the rights of an assignee of the member's interest.

(b) A Member may not resign from the Company before dissolution of the Company. If a Member attempts to resign, in addition to any other remedy otherwise available under applicable law, the Company may recover from the resigning Member damages for breach of this agreement and may offset the damages against the amount otherwise distributed to the Member.

## ARTICLE XV DURATION AND DISSOLUTION

**Section 15.1.  Duration.**

The Company will continue in existence until dissolved.

**Section 15.2.  Dissolution.**

(a) The dissociation of a member will not cause dissolution of the Company.

(b) Dissolution of the Company will occur

(i) if all of the members consent in writing;

(ii) if the Superior Court of the State of Alaska enters a decree for judicial dissolution because the court has determined that it is impossible for the Company to carry on the purposes of the Company.

(c) If the Company is dissolved and its affairs are to be wound up, the Managers shall:

(i) sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members and Assignees in kind),

(ii) allocate any net profit or net loss resulting

-33

from such sales to the Member's and Assignees' capital accounts in accordance with Article VII hereof,

       (iii) discharge (or make provision for) all liabilities of the Company, including liabilities to Member and Assignees who are also creditors, to the extent otherwise permitted by law, other than liabilities to Member and Assignees for distributions and the return of capital, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the capital accounts of the Member and Assignees, the amounts of such reserves shall be deemed to be an expense of the Company),

       (iv) distribute to the Member and Assignees the remaining assets in accordance with the positive balance (if any) of each Member's and Assignee's capital account (as determined after taking into account all capital account adjustments for the Company's taxable year during which the liquidation occurs), either in cash or in kind, as determined by the Managers, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Member and Assignees in respect of their capital accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

       (d) Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member or Assignee has a negative capital account balance (after giving effect to all contributions, distributions, allocations and other capital account adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Assignee shall have no obligation to make any capital contribution, and the negative balance of such Member's or Assignee's capital account shall not be considered a debt owed by such Member or Assignee to the Company or to any other Person for any purpose whatsoever.

       (e) Upon completion of the winding up, liquidation and distribution of the assets in accordance with this Agreement and

-34

the Alaska Act, the Company shall be deemed terminated.

(f) The Managers shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

## ARTICLE XVI

### REMEDIES FOR BREACH

**Section 16.1.   Specific Enforcement.**

All breaches of this Agreement are subject to specific enforcement, without prejudice to the right to seek damages or other remedies.

**Section 16.2.   Concurrent or Consecutive Causation of Damages.**

(a) If two or more Members breach this Agreement and those breaches combine in any way, concurrently or consecutively, to produce harm to the Company, then those Members are jointly and severally liable to the Company for the entirety of the harm. This paragraph precludes a Member who has breached this Agreement from asserting that another Member's prior, contemporaneous, or subsequent breach constitutes a superseding, intervening, or independent cause or in any way releases the breaching Member from liability.

(b) Subsection (a), above, does not preclude breaching Members from seeking contribution or indemnity from each other, or otherwise seeking to allocate among themselves the responsibility and liability for the harm caused to the Company.

**Section 16.3.   Attorney Fees and Other Litigation Expenses.**

If the Company resorts to litigation to remedy a breach of this Agreement by a Member or former Member and the Company prevails in the litigation, in addition to any other remedies available to the Company under this Agreement or the law by the Company may collect its reasonable attorneys fees and other costs and expenses in litigation.

-35

**ARTICLE XVII**
**AMENDMENTS**

Section 17.1.            **Requirements for Amendments.**

To be effective, any amendment to this Agreement must be approved by an act of the Members reflecting approval by Members owning 100 percent of the Membership Interests.

**XVIII**
**ALTERNATIVE DISPUTE RESOLUTION**

Section 18. 1.        **Agreement to Use Procedure**

The Members have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with that same spirit of cooperation that they ledge to attempt to resolve any dispute out the necessity of litigation. Accordingly, they agree if any dispute arises between them relating to this Agreement (the "Dispute") they will first utilize the procedures specified in this section (the "Procedure") prior to any Additional Proceedings.

**Section 18.2    Initiation of Procedure**

The Member seeking to initiate the Procedure (the "Initiating Member") shall give written notice to the other Members, describing in general terms the nature of the Dispute the Initiating Member's claim for relief and identifying one or more individuals with authority to settle the Dispute on  such Member's behalf. The Member(s) receiving such notice (the "Responding Member", whether one or more) shall have five business days within which to designate by written notice to the Initiating Member, one or more individuals with authority to settle the dispute on such Member's behalf. The individuals so designated shall be known as the "Authorized Individuals." The Initiating Member and the Responding Member shall

-36

collectively be referred as the "Disputing Members" or individually "Disputing Member."

### Section 18.3    Direct Negotiations

The Authorized Individuals shall be entitled to make such investigation of the Dispute as they deem appropriate, but agree to promptly, and in no event later than thirty days from the date of the Initiating Member's written notice, meet to discuss resolution of the Dispute. The Authorized Individuals shall meet at such times and places and with such frequency as they may agree. If the Dispute has not been resolved within thirty days from the date of their initial meeting, the Disputing Members shall cease direct negotiations and shall submit to mediation under the following procedure.

### Section 18.4    Selection of Mediator

The Authorized Individuals shall have five business days from the date they cease direct negotiations to submit to each other a written list of qualified attorney-mediators not affiliated with any of the Members. Within five days of receipt of the list, the Authorized Individuals shall rank the mediators in numerical order of preference and shall exchange such rankings. If one or more persons is named on each list, the highest ranking person shall serve as the mediator. If no person is selected under this procedure, the Disputing Members agree to jointly request a State or Federal District Judge of their choosing to supply within ten days a list of potential qualified attorney-mediators. Within five business days of receipt of the list, the Authorized Individuals shall again rank the proposed mediators in numerical order of preference and shall simultaneously exchange such list and shall elect as mediator the highest ranking individual. If such mediator is unable to serve, they shall proceed to contact the mediator who was the next highest in ranking until they are able to select a mediator.

-37

**Section 18.5     Time and Place of Mediation**

In consultation with the mediator selected, the Authorized Individuals shall promptly designate a mutually convenient time and place for the mediation, and unless circumstances require otherwise, such time to be not later than forty-five days after selection of the mediator.

**Section 18.6     Exchange of Information**

In the event any Disputing Member to this Agreement has substantial need for information in the possession of another Disputing Member to this Agreement in order to prepare for the mediation, all Disputing Members shall attempt in good faith to agree to procedures for the expeditious exchange of such information, with the help of the mediator if required.

**Section 18.7   Summary of Views**

At least seven days prior to the first scheduled session of the mediation, each Disputing Member shall deliver to the mediator and to the other Disputing Members a concise written summary of its views on the matter in Dispute, and such other matters required by the mediator.   The mediator may also request that a confidential issue paper be submitted by each Disputing Member to him.

**Section 18.8     Parties to Be Represented**

In the mediation, each Disputing Member shall be represented by an Authorized Individual and may be represented by counsel.   In addition, each Disputing Member may, with permission of the mediator, bring such additional Persons as needed to respond to questions, contribute information, and participate in the negotiations.

**18.9     Conduct of Mediation**

The mediator shall determine the format for the meetings, designed to assure that both the mediator and the Authorized Individuals have an opportunity to hear an oral presentation of each Disputing Member's views on the matter in dispute, and that the authorized parties attempt to negotiate a resolution of the

-38

matter in dispute, with or without the assistance of counsel or others, but with the assistance of the mediator. To this end, the mediator is authorized to conduct both joint meetings and separate private caucuses with the Disputing Members. The mediation session shall be private. The mediator will keep confidential all information learned ·in private caucus with any Disputing Member unless specifically authorized by such Disputing Member to make disclosure of the information to the other Disputing Member. The Disputing Members agree to sign a document agreeing that the mediator shall be governed by such rules as the mediator shall prescribe. The Disputing Members commit to participate in the proceedings in good faith with the intention of resolving the Dispute if at all possible.

**18.10    Termination of Procedure**

The Disputing Members agree to participate in the mediation procedure to its conclusion. The mediation shall be terminated (1) by the execution of a settlement agreement by the Disputing Members, (2) by a declaration of the mediator that the mediation is terminated, or (3) by a written declaration of a Disputing Member to the effect that the mediation process is terminated at the conclusion of one full day's mediation session. Even if the mediation is terminated without a resolution of the Dispute, the Disputing Members agree not to terminate negotiations and not to commence any Additional Proceedings prior to the expiration of five days following the mediation. Notwithstanding the foregoing, any Disputing Member may commence Additional Proceedings within such five-day period if the Dispute could be barred by an applicable statute of limitations.

**18.11    Arbitration**

The parties agree to participate in good faith in the ADR to its conclusion. If the Disputing Members are not successful in resolving the dispute through the ADR, then the Disputing Members

may agree to submit the matter to binding arbitration or a private adjudicator, or either Disputing Member may seek an adjudicated resolution through the appropriate court ("Additional Proceedings").

### Section 18.12. Fees of Mediation; Disqualification.

The fees and expenses of the mediator shall be shared equally by the Disputing Members. The mediator shall be disqualified as a witness, consultant, expert or counsel for any Disputing Member with respect to the Dispute and any related matters.

### Section 18.13    Confidentiality

Mediation is a compromise negotiation for purposes of Federal and State Rules of Evidence. The entire mediation process is confidential, and no stenographic, visual or audio record shall be made. All conduct, statements, promises, offers, views and opinions, whether oral or written, made in the course of the mediation by any Disputing Member, their agents, employees, representatives or other invitees and by the mediator are confidential and shall, in addition and where appropriate, be deemed privileged. Such conduct, statements, promises, offers, views and opinions shall not be discoverable or admissible for any purpose, including impeachment, in any litigation or other proceeding involving the parties, and shall not be disclosed to anyone not an agent, employee, expert, witness, or representative of any of the Members; provided, however, that evidence otherwise discoverable or admissible is not excluded from discovery or admission as a result of its use in the mediation.

### ARTICLE XIX

### MISCELLANEOUS

### Section 19.1.    Incorporation by Reference.

Schedule A, attached to this Agreement and referred to herein is hereby incorporated into this Agreement by reference.

### Section 19.2    Construction

This Agreement shall be interpreted and construed in accordance with

-40

the laws of the State of Alaska. The titles of the sections and subsections herein have been inserted as a matter of convenience and reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein. Throughout this Agreement, wherever the context requires or permits, genders shall be deemed interchangeable, and the single number shall be deemed to include the plural, and vice versa.

**Section 19.3.    Binding Effect.**

This binds all Members and their respective distributees, successors, and assigns and any other person claiming a right or benefit under or covered by this Agreement.

**Section 19.4.    Severability.**

If any provision of this Agreement is held to be illegal, invalid, or unenforceable,

(a) that provision will be fully severable and this Agreement will be construed and enforced as if the illegal, invalid, or unenforceable provision had never been part of this Agreement;

(b) the remaining provisions of this Agreement will remain in full force and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement; and

(c) in the place of the illegal, invalid, or unenforceable provision, there will be added automatically to this Agreement a legal, valid, and enforceable provision that is as similar to the illegal, invalid, or unenforceable provision as possible.

**Section 19.5.    Notices.**

(a) Any notice to be given or made to the Company, its Managers, its Chief Executive Officer, its Chief Financial Officer, or any Member must be in writing and will be considered to have

-41

been given when delivered to the address specified in the Company's Required Records.

(b) A person who wants to change its address as specified in the Required Records may do so by giving written notice of the change to the Company and to each Member. The change takes effect five days after the notice is given.

**Section 19.6.   Waiver.**

No failure by any Member to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any breach or any other covenant, duty, agreement or condition.

**Section 19.7.   Disclosure.**

Each Member acknowledges that such Member (1) has obtained the advice of counsel, (2) has carefully read the provisions of this Agreement, (3) is signing and making this Agreement voluntarily, and (4) hereby voluntarily and expressly waives in this writing any right to disclosure of the Property and financial obligations of the other Members beyond the disclosure provided.

**Section 19.8.   Additional Documents and Acts.**

Each Member agrees to execute and deliver whatever additional documents and to perform such additional acts as may be necessary or appropriate to effectuate and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated by this Agreement.

**Section 19.9.   Modifications.**

No change or modification of this Agreement shall be valid or binding upon a Member, nor shall any term or condition of this Agreement be considered waived by a Member, unless such

-42

change, modification, or waiver is in writing and is signed by such Member.

**Section 19.10. Multiple Counterparts.**

This Agreement may be executed in several counterparts, each of which will be considered an original and all of which will constitute one and the same document. Proving the execution and contents of this document against a party may be done by producing any copy of this Agreement signed by that party.

**[signatures attached on the following pages]**

EGAE, LLC

By: _Elizabeth A. Marlow_

Elizabeth A. Marlow

Its:  Manager

DATED: _4/29/13_


Marlow Family Exempt Perpetual Trust, under Trust  Agreement dated June 26, 2000


By: _____

Dale Houston

DATED: _4 · 22 · 13_    Its:  Independent Trustee

STATE OF HAWAII )

                      ) ss.

COUNTY OF ___MAUI___ )


     THIS IS TO CERTIFY that on this 29ᵗʰ day of April, 2013, before me, the undersigned, a Notary Public in and for the State of Hawaii, duly commissioned and sworn as such, personally appeared Elizabeth A. Marlow, Manager, EGAE, LLC, who executed the foregoing instrument, and acknowledged to me that he signed the same freely and voluntarily.



Notary Public in and for Hawaii

My Commission Expires: _8/1/15_

Date of Doc.: 4/19/13     #Pages: 43
Name: MICHAEL B. JASS    2ⁿᵈ Circuit
Doc. Description: LLC OP AGREEMENT

_____    4/29/13
Notary Signature           Date

**STATE OF ALASKA**              )

                                 ) ss.

**THIRD JUDICIAL DISTRICT** )


    THIS IS TO CERTIFY that on this 22nd day of April, 2013, before me, the undersigned, a Notary Public in and for the State of Alaska, duly commissioned and sworn as such, personally appeared Dale Houston, Independent Trustee, Marlow Family Exempt Perpetual Trust, under Trust Agreement dated June 26, 2000 who executed the foregoing instrument, and acknowledged to me that he signed the same freely and voluntarily.

Notary Public in and for Alaska

My Commission Expires: August 27, 2016

Notary Public
AARON R. SAWYER
State of Alaska
My Commission Expires Aug 27, 2016

**Schedule A**

| Member | Membership Interest Held As A Manager | Membership Interest Held As A Member |
|---|---|---|
| Marlow Family Exempt Perpetual Trust, under Trust Agreement Dated June 26, 2000 | 0% | 100 |

# AMENDMENT TO THIRD AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## EGAE, LLC

Pursuant to the authority of Alaska Statutes 10.50.095, EGAE, LLC hereby adopts the following amendments to the *Third Amended and Restated Operating Agreement of EGAE, LLC*, effective April 29, 2013:

1.      The name of the company is EGAE, LLC.

2.      The Independent Trustee and Manager of EGAE, LLC executed the *Third Amended and Restated Operating Agreement of EGAE, LLC* on April 22, 2013 and April 29, 2013, respectively.

3.      Amendment Adopted:

(a)      Article IX, Section 9.1 of the *Third Amended and Restated Operating Agreement of EGAE, LLC* is amended in its entirety to read as follows:

### Section 9.1. Designation of Manager

The Company will be managed by a Manager, Marc A. Marlow. If such person is not able to serve then the successor Manager shall be appointed by the independent trustee of the Marlow Family Exempt Perpetual Trust, under Trust Agreement dated June 26, 2000.

4.      The foregoing amendment to the *Third Amended and Restated Operating Agreement of EGAE, LLC* was duly approved and unanimously adopted by the Company's Member on August 1, 2024.

DATED this ___/___ day of August, 2024, at Anchorage, Alaska.

MEMBER:

**MARLOW FAMILY PERPETUAL TRUST**

By: _____
Name: Dale A. Houston
Title: Independent Trustee

**EXHIBIT D**

**Written Consent**


[*ATTACHED*]

# UNANIMOUS WRITTEN CONSENT
## OF
## MEMBER AND MANAGER
## OF
## EGAE, LLC

THE UNDERSIGNED, Dale A. Houston, Independent Trustee of the Marlow Family Perpetual Trust (the "***Trust***") and Marc A. Marlow, the Manager of EGAE, LLC (the "Manager") hereby adopt and approve the following resolutions of EGAE, LLC (the "Company"), and each and every action effected thereby with the same force and effect as though adopted at a special meeting of the Company duly called and held:

WHEREAS, Dale A. Houston is the Independent Trustee of the Trust, the sole member of the Company;

WHEREAS, Marc A. Marlow is Manager of the Company by virtue of that *Amendment to Third Amended and Restated Operating Agreement of EGAE, LLC*, dated August 1, 2024, approving the amendment of the Company's Third Amended Operating Agreement to appoint Marc Marlow as the replacement Manager;

WHEREAS, Prior to the Effective Date, Borrower was the owner of the real property commonly known as the McKinley Tower Apartments located in the McKinley Tower at 337 East 4th Ave., Anchorage, Alaska (the "***Real Property***"); and

WHEREAS,  Borrower is indebted to MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company ("***Lender***") under a Deed of Trust Note (with the endorsements listed in the DIL Agreement (as defined below), the "***Note***"), dated March 8, 2005, in the original principal amount of $8,067,000.00 ("***Loan***").  The Loan is secured by a Deed of Trust (as defined in the DIL Agreement), Security Agreement, and UCC-1 Financing Statement, covering the Real Property and Borrower's personal property described in the Loan Documents (the "***Personal Property***" and collectively with the Real Property, the "***Property***").  The Note, Deed of Trust, Security Agreement, and other loan documents executed in connection with those documents (collectively, the "***Loan Documents***") are listed in the DIL Agreement.  The Property and all other Borrower assets that secure the Loan are referred to as the "***Collateral***";

WHEREAS, Borrower initiated a Chapter 11 Bankruptcy Proceeding, Case No.  23-00169 ("***Bankruptcy Case***") on October 5, 2023, with the United States Bankruptcy Court, District of Alaska ("***Court***").  Borrower has retained control over its assets, including the Property (collectively, the "***Assets***") and continues to operate its business pursuant to §§ 1107 and 1108 of the Bankruptcy Code as Debtor in Possession.  On February 7, 2024, Lender filed a Proof of Claim with the Court reflecting amounts claimed under Loan;

WHEREAS, effective July 6, 2024, Lender and Borrower entered into a Binding Term Sheet and Plan Agreement ("***Term Sheet***") concerning Borrower's treatment of the Property and Lender's Proof of Claim in an agreed Modified Third Amended Plan of Reorganization ("***Plan***").  In accordance with the Term Sheet and the DIL Agreement, Borrower agrees to execute and delivering the DIL Documents (as defined below), and mutually accepted escrow instructions ("***Escrow Instructions***") into an escrow account ("***Escrow***") with a mutually agreed upon escrow agent ("***Escrow Agent***"), within 10 days prior to the hearing at which the Plan is confirmed by the Court ("***Plan Confirmation***").  The Term Sheet, the Escrow Instructions, and this Agreement shall be included in the definition of "***Settlement Documents***" as set forth in Definition 1.61 of the Plan, which term is incorporated herein;

WHEREAS, Borrower and Lender have negotiated a Deed in Lieu of Foreclosure Agreement (the "**DIL Agreement**"), pursuant to which Borrower agrees to sell and convey the Property to Lender or its assigns upon the occurrence of the events, and on the terms and conditions, specified in the Plan, the Term Sheet and the DIL Agreement. In accordance with the DIL Agreement, Borrower will convey the Property to Lender or its assigns by a Deed in Lieu of Foreclosure ("**Deed in Lieu**") to be recorded in the real property records of Anchorage, Alaska. Any undefined capitalized terms used in this Written Consent of Manager and Member(s) ("**Consent**") are defined as stated in the DIL Agreement.

WHEREAS, in connection with the origination of (the DIL Agreement by and between the Company and Lender , Lender has required that the Company enter into, execute and deliver to and for the benefit of Lender one or more of the following certain documents (collectively, the "Approved Documents") in the form reviewed by the Independent Trustee of the Trust and the Manager: (

1. Term Sheet
2. Joint Escrow Instructions
3. DIL Agreement
4. Deed in Lieu of Foreclosure (Non-Merger)
5. Bill of Sale and General Assignment
6. Assignment of Contract Rights
7. Indemnification and Release Agreement
8. Resignation of Marc Marlow as a director and President of the HOA
9. Resignation of Lael Marlow as a director and officer of the HOA
10. Certificate of Transferor (FIRPTA Affidavit)
11. All Tenant Notices
12. All other Settlement Documents
13. All other documents required by the Court, the Lender, its assigns, or the Escrow Agent to consummate the transactions contemplated in the above documents.

WHEREAS, the Member and Manager deem it to be in the best interest of the Company that the Company enter into the Approved Agreement and execute the Approved Documents;

NOW, THEREFORE, be it;

RESOLVED, that the Member and Manager hereby consent, direct and authorize the Company to enter into, execute, deliver and perform the Approved Documents and all other documents necessary to effectuate the transaction contemplated thereby;

RESOLVED, that Marc A. Marlow is hereby authorized, empowered and directed, for and on behalf and in the name of the Company in his capacity as Manager of EGAE, LLC to execute, acknowledge and deliver the Approved Documents, to take all further actions, pay any and all such sums, and execute, deliver and, as appropriate, file any and all such agreements, instruments, documents and certificates as required or contemplated by any of the Approved Documents or which Marc A. Marlow otherwise determines to be reasonably related to the purposes of the DIL Agreement, the Approved Documents, or the consummation of the transactions described above, in each case in the name and on behalf of the Company, with each such agreement, instrument, document, and certificate to contain such terms, conditions, changes, additions and amendments thereto, and deletions therefrom, if any, as shall be determined in the sole discretion of Marc A. Marlow to be necessary, appropriate, or desirable, such determination to be conclusively evidenced by Marc A. Marlow's execution and delivery thereof;

RESOLVED, that Marc A. Marlow, in his capacity as the Company's Manager, is, authorized and empowered and directed to make such modifications to, additions, to, deletions from or

changes to the proposed Approved Documents as such officer may deem necessary or appropriate or in the best interest of the Company;

RESOLVED, that the execution and delivery of the Approved Documents and any other documents contemplated by the resolutions set forth above by Marc A. Marlow, in his capacity as the Company's Manager, shall be conclusive evidence of approval thereof, and any such changes, additions, deletions or modifications shall be deemed authorized by the Member of the Company;

RESOLVED, that Marc A. Marlow, in his capacity as the Company's Manager, is authorized, empowered, directed for and on behalf of the Company to do and perform all such acts and things and to enter into, execute, acknowledge, deliver and file all such certificates, agreements, acknowledgments, instruments, contracts, statements and other documents and to take such further actions as it may deem necessary or appropriate to effect the intent and accomplish the purposes of the preceding resolutions; and

FINALLY RESOLVED, that each and every action taken by Marc A. Marlow, in his capacity as the Company's Manager, with respect to the Loan prior to the date and adoption of the foregoing resolutions which would have been authorized by the foregoing resolutions but for the fact that such actions were taken prior to such date, be, and each hereby is ratified, approved, confirmed and adopted.

This Written Consent may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.

**[SIGNATURE PAGES FOLLOW]**

3

IN WITNESS WHEREOF, the undersigned, as the Member and Manager of the Company, have executed this Unanimous Written Consent as of   August  **1**, 2024.

MEMBER:

**MARLOW FAMILY PERPETUAL TRUST**

By: _____

Name: Dale A. Houston
Title: Independent Trustee

MANAGER:
By: _____

Name: Marc A. Marlow
Title: Manager, EGAE, LLC

EXHIBIT A-3

FORM OF JOINT ESCROW INSTRUCTIONS

31

CH&  CAIRNCROSS&HEMPELMANN
ATTORNEYS AT LAW

524 2nd Ave., Suite 500        office 206.587.0700
Seattle, WA 98104              fax 206.587.2308
www.cairncross.com

# JOINT ESCROW INSTRUCTIONS

_____, 2024

**Via Electronic Mail** (_____)

_____, Escrow Agent
_____
_____
_____

      Re:     Joint Escrow Instructions for closing of the transactions under the Deed in Lieu of Foreclosure Agreement regarding the property located at 337 East 4th Ave., Anchorage, Alaska commonly known as the McKinley Tower Apartments (the "***Property***")

Dear _____:

These Joint Escrow Instructions are delivered to you, as Escrow Agent, on behalf of MIDCAP FUNDING INVESTMENT X LLC, a Delaware limited liability company, and any assignee ("***Lender***") and on behalf of EGAE, LLC, an Alaska limited liability company ("***Borrower***"), in connection with the documents attached to and the transactions contemplated in the Deed in Lieu of Foreclosure Agreement between Lender and Borrower dated as of this same date ("***DIL Agreement***"). Any undefined capitalized terms used in these Escrow Instructions are defined as stated in the DIL Agreement.

Borrower initiated a Chapter 11 Bankruptcy Proceeding, Case No. 23-00169 on October 5, 2023, with the United States Bankruptcy Court, District of Alaska ("***Court***"). Effective July 6, 2024, Lender and Borrower entered into a Binding Term Sheet and Plan Agreement ("***Term Sheet***") concerning Borrower's treatment of the Property and Lender's Proof of Claim in an agreed Modified Third Amended Plan of Reorganization ("***Plan***"). Borrower has submitted the Plan for confirmation by the Court. The Term Sheet, the DIL Agreement and DIL Documents are attached as exhibits and made a part of the Plan.

The DIL Agreement provides that if certain conditions occur, the transactions contemplated in the DIL Agreement ("***DIL Transactions***") would close, at Lender's election, through the escrow with you (the "***Escrow***"), as further described below ("***Closing***"). Closing will occur on the date selected solely by Lender ("***Closing Date***") after the earlier of the following (each a "***DIL Release Event***"): (a) the Court issues an order to release the DIL Documents (as defined below) ("***Court Release Order***"), or (b) March 31, 2025 after Borrower's failure to repay the March Settlement Amount by that date ("***Payment Default Release Event***") in which case Lender shall provide Escrow Agent with a certification, under penalty of perjury, that Borrower did not pay the March Settlement Amount by March 31, 2025 ("***Payment Default Certification***").

A copy of the fully executed Term Sheet and DIL Agreement are being delivered to you together with this Agreement. The DIL Agreement provides that if the Term Sheet and DIL Agreement conflict, the DIL Agreement will control.

The Property is legally described in the Litigation Guaranty issued by _____ ("***Title Company***") attached hereto as **Exhibit A** (the "***Litigation Guaranty***").

1.      **DEPOSITS**

The following have been or will be delivered to you by prior to the Closing:

**1.1**     **DIL Documents.**   The following executed but undated documents (collectively the "***DIL Documents***"):

**Recordable DIL Documents:**

a.  Deed in Lieu of Foreclosure (Non-Merger) by Borrower in favor of Lender or its Assignee (as defined below) in a form acceptable for recording with the Alaska Department of Natural Resources Recorder's Office, Anchorage Recording District (the "***Deed in Lieu***").

(collectively, the "Recordable Documents").

**Other DIL Documents:**

a.  Bill of Sale and General Assignment ("***Bill of Sale***") by Borrower in favor of Lender or any Assignee with:
    ➢ Schedule of Tangible Personal Property
    ➢ Schedule of Intangible Assets

b.  Assignment and Assumption of Leases, Security Deposits, and Accounts ("***Assignment of Leases***") between Borrower, Lender, and any Assignee, with:
    ➢ Schedule 1 - List of all Leases (Rent Roll)
    ➢ Schedule 2 – List of Accounts

c.  Assignment of Contract Rights ("***Contracts Assignments***") between Borrower, Lender, and any Assignee, with:
    ➢ Schedule of Continuing Service Contracts and other contracts related to the Collateral

d.  Indemnification and Release Agreement ("***Indemnification Agreement***") between Borrower, Lender, and any Assignee;

e.  The following "***Resignations***":
    ➢ Resignation of Marc Marlow ("***Marlow***") as a director and President of the HOA;
    ➢ Resignation of Lael Marlow as a director and officer of the HOA;

f.  Certificate of Transferor (FIRPTA Affidavit) from Borrower ("***FIRPTA***");

g.  Form of Tenant Notice - blank form signed Borrower in favor of Lender or its assignee;

h.  Certificate of Borrower's Manager ("***Borrower's Certificate***") with:
    ➢ Exhibit A – Articles of Organization of Borrower
    ➢ Exhibit B – Operating Agreement of Borrower and all amendments; and
    ➢ Exhibit C – Certificate of Good Standing of Borrower
    ➢ Exhibit D – executed Joint Written Consent of Borrower's Manager and Member(s) of authorizing the transactions under this Agreement.

The Deed in Lieu, Bill of Sale, Assignment of Leases and the Contracts Assignment are referred to as the "***Conveyance Documents***".

**1.2**    **Other Items**

    ➢ Copies of all commercial and residential leases and any other tenancy documentation ("***Leases***")
    ➢ Copies of all Service Contracts.

> ➢   Copies of all master keys and other access devices for the Property

### 1.3    Funds

All funds from Borrower and Lender necessary to close the DIL Transactions in accordance with DIL Agreement and the approved Preliminary Settlement Statement (as defined below).

## 2.    CONDITIONS PRECEDENT TO CLOSING

You are hereby authorized and instructed to close the Escrow when, but only when, each of the following conditions have been satisfied:

**2.1    DIL Release Event.**   Lender must have provided you with either a copy of the Court Release Order, or a Payment Default Release Certification signed by Lender.  Borrower agrees that Escrow Agent shall be entitled to rely upon Lender's signed Payment Default Release Certification if (a) it is received by Escrow Agent after March 31, 2025, and (b) Borrower does not provide Escrow Agent with conclusive proof before the Closing Date that Borrower has timely paid either the December Settlement Amount or the March Settlement Amount to Lender in accordance with the DIL Agreement.   In such case, Borrower agrees that such Payment Default Release Certification shall be effective without Borrower approval and non-contestable.

**2.2    Cooperation Fee Certification.**   The Term Sheet provides for Lender to pay to Borrower a $250,000 "***Cooperation Fee***" if certain conditions in the Term Sheet are met.  Lender shall provide Borrower and Escrow Agent with a certification ("***Cooperation Fee Certification***") stating whether or not such conditions have been met, and if so met, directing the Escrow Agent to include the Cooperation Fee to the Borrower's credit on the Preliminary Settlement Statement.  Borrower agrees that Escrow Agent shall be entitled to rely upon Lender's signed Cooperation Fee Certification without Borrower approval.

**2.3    Preliminary Settlement Statement.**   You shall have prepared and circulated a preliminary settlement statement reflecting (a) the allocations of costs and prorations to the Borrower and Lender as stated in Section 6 of the DIL Agreement, and (b) any Cooperation Fee to be credited to Borrower under **Section 2.2** above ("***Preliminary Settlement Statement***").  Both Lender and Borrower shall have approved the Preliminary Settlement Statement, and delivered  into Escrow signed signature pages to be affixed to the Final Settlement Statement (as defined in **Section 3.6** below), except that if Lender directs you in writing to allocate all of Borrower's costs and prorations to Lender under Section 6.6.3(e) of the DIL Agreement, then no Borrower approval of or signature page from Borrower shall be required.

**2.4    Lender Determination of Assignee.**   Under the DIL Agreement, Lender may elect (in its sole discretion) to assign its interest in the Conveyance Documents to a third-party assignee ("***Assignee***").  Prior to Closing, Lender will notify you whether or not it intends to assign its interest in the Conveyance Documents to an Assignee, and provide you with completed first pages and signature pages executed by the Assignee (if different than the Lender) for each of the Conveyance Documents. Upon receipt of such completed first pages and signature pages, (a) Borrower and Lender hereby authorize you to replace those existing pages in the Conveyance Documents with those completed first pages and any Assignee signature pages provided by Lender, and (b) you shall have done so and provided Borrower and Lender with copies of such Conveyance Documents compiled with those completed first pages and any Assignee signature pages provided by Lender.

**2.5    Pro Forma Owner's Policy .**   The Title Company must be irrevocably committed to issue to Lender or its Assignee (as directed by Lender) an Owner's Policy of Title Insurance ("***Title Policy***") in the form of a Pro Forma Owner's Policy provided to and approved by Lender before Closing ("***Pro Forma Policy***"), which shall contain such endorsements to the Title Policy as Lender shall require.  Each of the Proforma Policy and the Title Policy shall identify the insured as Lender or its Assignee (if directed by Lender), and be for such coverage amount as Lender shall specify prior to issuance of the Title Policy.  Neither the Proforma Policy nor the Title

Joint Escrow Instructions
_____

Page 4 of 8

Policy shall contain any exceptions other than those exceptions generally contained in an Owner's Policy of Title Insurance and those exceptions not objected to by Lender (collectively, the "***Permitted Exceptions***").

   **2.6**  **Other Conditions**

     2.6.1  You have delivered to each of the undersigned a copy of this letter countersigned to show your acceptance of these instructions.

     2.6.2  You hold all of the documents listed under **Section 1** signed by all parties thereto (and notarized where required), and have confirmed that each is fully completed, signed and acknowledged as appropriate.

     2.6.3  You have received all funds required to close the Escrow in accordance with the approved Preliminary Settlement Statement.

     2.6.4  You have received telephonic or email confirmation from Lender or its counsel that all conditions precedent to Closing have been satisfied or waived by Lender, and you that are authorized to record the Deed in Lieu and close the DIL Transactions.  Borrower agrees that no Borrower approval to Closing shall be required.

**3.**  **CLOSING INSTRUCTIONS**

   You are hereby authorized and instructed to close the Escrow by doing the following in the order stated; provided, however, that you are to take no action with respect to any of the following tasks unless and until you are in a position to do every one of these tasks:

   **3.1**  Attach the Legal Description, in the form attached to the Pro Forma Policy approved by Lender, as Exhibit A to the Deed in Lieu.  Attach the Permitted Exceptions, in the form attached to the Pro Forma Policy approved by Lender, as Exhibit B to the Deed in Lieu.

   **3.2**  Date all undated DIL Documents as of the Closing Date, confirm that all such DIL Documents are properly signed and notarized where appropriate and that all such DIL Documents are complete with legal descriptions and other exhibits where required, and compile all counterpart signature pages and exhibits into the one document of which they are a part;

   **3.3**  Provide each of the undersigned with copies of all signed DIL Documents by email of .pdfs;

   **3.4**  Obtain approval of Lender's Counsel to record the  Recordable Documents, and record the Recordable Documents with the Alaska Department of Natural Resources Recorder's Office, Anchorage Recording District;

   **3.5**  Confirm Closing of the DIL Transactions by emailing each of the undersigned with the recording numbers of the Recordable Documents;

   **3.6**  Convert the Preliminary Settlement Statement into a final Settlement Statement, with such changes as necessary to reflect final amounts as of the Closing Date, with the previously provided signature pages affixed (the "***Final Settlement Statement***"), to be approved by Lender in writing;

   **3.7**  Promptly after Closing, deliver to Lender's Counsel by overnight courier: (a) the originals of the signed DIL Documents, except for the Recordable Documents, (b) conformed copies of the Recordable Documents, (c) a copy of the Final Settlement Statement, and (d) all of the other documents and items deposited with you in the Escrow; and

Joint Escrow Instructions
_____
Page 5 of 8

**3.8** Promptly after Closing, deliver to Borrower's Counsel by email .pdf copies of (a) the recorded Recordable Documents, and (b) the Final Settlement Statement.

**3.9** Issue and provide to Lender or its Assign the Title Policy and endorsements as set forth in the Pro Forma Title Policy, subject only to the Permitted Exceptions, within seven days after Closing.

## 4.    CHARGES AND FUNDS

**4.1** The undersign authorize and direct you to charge to Borrower and Lender the closing costs and prorated amounts as provided in the Loan Documents and as set forth in the Borrower's Settlement Statement.

**4.2** If you receive Borrower's funds prior to the date upon which closing of the Escrow occurs pursuant to these escrow instructions, you are to invest such funds for the account of Borrower.

## 5.    TERMINATION

**5.1** In accordance with Section 8.2 of the DIL Agreement, Lender may (in its sole discretion) terminate the DIL Agreement if an Event of Default by Borrower has occurred under the DIL Agreement.  In such case, Lender shall provide you with written notice of Escrow termination and such election shall be effective without Borrower approval.

**5.2** If you have not received a termination notice from Lender, and Escrow has not been closed on or before 5:00 p.m. local time by [June 30, 2025], then you are to contact Lender's Counsel for further instructions as to whether the Escrow is to be terminated.

**5.3** If the Escrow is terminated, you are to return (a) the documents delivered by Borrower to Borrower's Counsel, and (b) the documents delivered by Lender to Lender's Counsel.  If you require further instructions to close the Escrow or any modifications to these instructions, please contact Lender's Counsel at (206) 254-4462.

*****

Joint Escrow Instructions
_____
Page 6 of 8

       If Escrow is not terminated under **Section 5**, please close the Escrow as soon as possible, or other Closing Date specified by Lender, after you receive either  a copy of the Court Release Order or a Payment Default Release Certification signed by Lender.

       By executing below and returning this letter to each of the undersigned, you acknowledge receipt of this letter and agree to act as closing agent in accordance with the terms and provisions of these instructions.

       Thank you for your assistance with this DIL Transaction.

*Signatures are on the following page.*

*Signature page for Joint Escrow Instructions*

**LENDER'S COUNSEL:**                                **BORROWER'S COUNSEL:**

CAIRNCROSS & HEMPELMANN, P.S.        SMITH AND SMITH PLLC


_____        _____

Eugenie D. Rivers, Esq.                              John Smith, Esq.



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ESCROW AGENT ACKNOWLEDGEMENT:**


On _____, 2024, _____ hereby acknowledges delivery of, and agrees and consents to, the foregoing instructions.

 _____


By: _____

Name: _____

Its: _____

**Exhibit A**
Litigation Guaranty

*See Attached*

EXHIBIT B

PAYMENTS TO CLASS 4 UNSECURED CREDITORS

Exhibit B
Revised Pro Rata Payments to General Unsecured Creditors

| Unsecured Creditor | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total Plan Payments |
|---|---|---|---|---|---|---|
| Ben Holeman | $2,051 | $2,051 | $2,051 | $2,051 | $2,051 | $10,255 |
| Carol Holder | $1,991 | $1,991 | $1,991 | $1,991 | $1,991 | $9,955 |
| City Scape Capital Group, LLC | $8,850 | $8,850 | $8,850 | $8,850 | $8,850 | $44,250 |
| David Dorland | $14,828 | $14,828 | $14,828 | $14,828 | $14,828 | $74,140 |
| Lila Mae Smith Revocable Trust | $2,280 | $2,280 | $2,280 | $2,280 | $2,280 | $11,400 |
| Totals: | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $150,000 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT C

LIQUIDATION ANALYSIS

4866-1227-5409, v. 6

**Estimated Proceeds From Immediate Liquidation of Assets:**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  | Orderly |  |  |
|  |  |  |  |  | Liquidation |  |  |
| Estimated market value ($9,850,000 x 80%) |  |  |  |  | 7,880,000 |  |  |
| Less costs of sale | 5.00% |  |  |  | (394,000) |  |  |
| Estimated net sale proceeds |  |  |  |  | 7,486,000 |  |  |
| Estimated auction value of personal property |  |  |  |  | 72,500 | {Amount estimated} |  |
| Less MidCap Secured Claim |  |  |  |  | (7,558,500) |  |  |
| Estimated net proceeds available from orderly liquidation |  |  |  |  | - |  |  |
| Proceeds available from return of alleged fraudulent transfers |  |  |  |  | - | [1] |  |
| Net proceeds available for other claims |  |  |  |  | - |  |  |

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| [1] | Alleged fraudulent transfers of $857,078 have been claimed. However, no amount has been |  |  |  |  |  |  |
|  | reflected because (a) there are defenses against the allegations that have not been litigated |  |  |  |  |  |  |
|  | and (b) the recipients of said transfers are insolvent entities if Debtor fails to reorganize |  |  |  |  |  |  |
|  | under a Chapter 11 plan of reorganization and a Chapter 7 liquidation is pursued. |  |  |  |  |  |  |

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  | Claim | Orderly | NPV |  |
|  |  |  |  | Amount | Liquidation | 6.50% |  |
| Administrative claims |  |  |  | - | - | - |  |
| Class 1 - Priority Tax Claims |  |  |  | - | - | - |  |
| Class 2 - Unsecured Priority Non-tax Claims |  |  |  | - | - | - |  |
| Class 3 - MidCap Secured Claim |  |  |  | 10,783,942 | 7,558,500 | 9,850,000 |  |
| Class 4 - General unsecured creditors |  |  |  | 2,045,491 | - | 124,670 |  |
|  |  |  |  | 12,829,433 | 7,558,500 | 9,974,670 |  |

EXHIBITS D1 and D2

(1) INCOME AND OPERATING EXPENSE PROJECTIONS AND
(2) POST-CONFIRMATION BUDGET

4866-1227-5409, v. 6

**MCKINLEY TOWER APARTMENTS**
**337 E 4th Avenue, Anchorage, Alaska 99501**
**Operating Projections**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | |
| Gross Potential Rent | | 1,550,896 | 1,628,440 | 1,693,578 | 1,744,385 | 1,796,717 | 1,850,618 | 1,906,137 | 1,958,556 | 2,012,416 | 2,067,757 |
| Less: Management office | | - | - | - | - | - | - | - | - | - | - |
| Less: Economic Vacancy | | (110,501) | (89,564) | (84,679) | (87,219) | (89,836) | (92,531) | (95,307) | (97,928) | (100,621) | (103,388) |
| Effective Rental Income | | 1,440,394 | 1,538,876 | 1,608,899 | 1,657,166 | 1,706,881 | 1,758,087 | 1,810,830 | 1,860,628 | 1,911,795 | 1,964,369 |
| | | | | | | | | | | | |
| Laundry and vending revenues | | - | - | - | - | - | - | - | - | - | - |
| NSF/Late charges/key replacement | | 1,000 | 1,050 | 1,092 | 1,125 | 1,159 | 1,193 | 1,229 | 1,263 | 1,298 | 1,333 |
| Damages and cleaning fees | | 5,000 | 5,250 | 5,460 | 5,624 | 5,793 | 5,966 | 6,145 | 6,314 | 6,488 | 6,666 |
| Cable revenue | | - | - | - | - | - | - | - | - | - | - |
| Parking revenue | | 4,800 | 5,040 | 5,242 | 5,399 | 5,561 | 5,728 | 5,899 | 6,062 | 6,228 | 6,400 |
| Pet deposits (non-refundable) | | 2,400 | 2,520 | 2,621 | 2,699 | 2,780 | 2,864 | 2,950 | 3,031 | 3,114 | 3,200 |
| Application fees | | 3,600 | 3,780 | 3,931 | 4,049 | 4,171 | 4,296 | 4,425 | 4,546 | 4,671 | 4,800 |
| Other | | 3,000 | 3,150 | 3,276 | 3,374 | 3,476 | 3,580 | 3,687 | 3,789 | 3,893 | 4,000 |
| **Total Ancillary Income** | | 19,800 | 20,790 | 21,622 | 22,270 | 22,938 | 23,627 | 24,335 | 25,005 | 25,692 | 26,399 |
| **Total Income** | | 1,460,194 | 1,559,666 | 1,630,521 | 1,679,436 | 1,729,819 | 1,781,714 | 1,835,165 | 1,885,632 | 1,937,487 | 1,990,768 |
| **Operating Expenses:** | | | | | | | | | | | |
| Administrative Expenses | Travel | - | - | - | - | - | - | - | - | - | - |
| | Advertising/marketing | 6,500 | 6,695 | 6,896 | 7,103 | 7,298 | 7,499 | 7,705 | 7,898 | 8,095 | 8,297 |
| | Office supplies and expenses | 13,500 | 13,905 | 14,322 | 14,752 | 15,157 | 15,574 | 16,003 | 16,403 | 16,813 | 17,233 |
| | Management fees | 88,320 | 88,320 | 88,320 | 88,320 | 88,320 | 88,320 | 88,320 | 88,320 | 88,320 | 88,320 |
| | Bookkeeping and accounting | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 |
| | Telephone | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 |
| | Computer services | 1,800 | 1,854 | 1,910 | 1,967 | 2,021 | 2,077 | 2,134 | 2,187 | 2,242 | 2,298 |
| | Misc. / bank fees / credit reqts | 600 | 618 | 637 | 656 | 674 | 692 | 711 | 729 | 747 | 766 |
| | Other | 1,200 | 1,236 | 1,273 | 1,311 | 1,347 | 1,384 | 1,422 | 1,458 | 1,494 | 1,532 |
| | Total Administrative | 131,920 | 133,228 | 134,575 | 135,963 | 137,273 | 138,619 | 140,003 | 141,295 | 142,619 | 143,976 |
| | | | | | | | | | | | |
| Utilities | Electricity | 65,000 | 66,950 | 68,959 | 71,027 | 72,981 | 74,987 | 77,050 | 78,976 | 80,950 | 82,974 |
| | Water/sewer | 45,000 | 46,350 | 47,741 | 49,173 | 50,525 | 51,914 | 53,342 | 54,676 | 56,042 | 57,444 |
| | Gas | 42,000 | 43,260 | 44,558 | 45,895 | 47,157 | 48,453 | 49,786 | 51,031 | 52,306 | 53,614 |
| | Total Utilities | 152,000 | 156,560 | 161,257 | 166,095 | 170,662 | 175,355 | 180,178 | 184,682 | 189,299 | 194,032 |
| | | | | | | | | | | | |
| Operating and Maintenance | Janitorial/Maint payroll | 147,600 | 152,028 | 156,589 | 161,287 | 165,722 | 170,279 | 174,962 | 179,336 | 183,819 | 188,415 |
| | Janitorial supplies | 480 | 494 | 509 | 525 | 539 | 554 | 569 | 583 | 598 | 613 |
| | Janitorial contract labor | 3,000 | 3,090 | 3,183 | 3,278 | 3,368 | 3,461 | 3,556 | 3,645 | 3,736 | 3,830 |
| | Exterminating contract | 6,000 | 6,180 | 6,365 | 6,556 | 6,737 | 6,922 | 7,112 | 7,290 | 7,472 | 7,659 |
| | Garbage and trash | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 |
| | Security | 500 | 515 | 530 | 546 | 561 | 577 | 593 | 608 | 623 | 638 |
| | Grounds maintenance | 5,400 | 5,562 | 5,729 | 5,901 | 6,063 | 6,230 | 6,401 | 6,561 | 6,725 | 6,893 |
| | Repair materials | 90,000 | 92,700 | 95,481 | 98,345 | 101,050 | 103,829 | 106,684 | 109,351 | 112,085 | 114,887 |
| | Repair contract labor | 18,000 | 18,540 | 19,096 | 19,669 | 20,210 | 20,766 | 21,337 | 21,870 | 22,417 | 22,977 |
| | Elevator maintenance | 18,000 | 18,540 | 19,096 | 19,669 | 20,210 | 20,766 | 21,337 | 21,870 | 22,417 | 22,977 |
| | Heating / cooling maintenance | 1,200 | 1,236 | 1,273 | 1,311 | 1,347 | 1,384 | 1,422 | 1,458 | 1,494 | 1,532 |
| | Snow removal | 2,400 | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 |
| | Vehicle/maint equip repairs | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 |
| | Miscellaneous | 2,400 | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 |
| | Total Operating & Maintenance | 314,980 | 324,429 | 334,162 | 344,187 | 353,652 | 363,378 | 373,371 | 382,705 | 392,273 | 402,079 |
| | | | | | | | | | | | |
| Property and liability insurance | | 44,000 | 45,320 | 46,680 | 48,080 | 49,402 | 50,761 | 52,157 | 53,461 | 54,797 | 56,167 |
| Property taxes | | 166,982 | 171,991 | 177,151 | 182,466 | 187,484 | 192,639 | 197,937 | 202,885 | 207,957 | 213,156 |
| Replacement reserves (included in Operating and Maintenance) | | - | - | - | - | - | - | - | - | - | - |
| | | 210,982 | 217,311 | 223,831 | 230,546 | 236,886 | 243,400 | 250,094 | 256,346 | 262,755 | 269,323 |
| | | | | | | | | | | | |
| Total Operating Expenses and Replacements | | | | | | | | | | | |
| | | | | | | | | | | | |
| Total Operating Expenses | | 809,882 | 831,529 | 853,825 | 876,790 | 898,473 | 920,752 | 943,644 | 965,027 | 986,945 | 1,009,411 |
| Net Operating Income after Replacements | | 650,312 | 728,137 | 776,695 | 802,646 | 831,346 | 860,961 | 891,521 | 920,605 | 950,542 | 981,357 |
| | | | | | | | | | | | |
| Debt service - secured mortgage | | (523,810) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) |
| Net Cash Flow | | 126,502 | 140,707 | 189,265 | 215,216 | 243,916 | 273,531 | 304,091 | 333,175 | 363,112 | 393,927 |

**MCKINLEY TOWER APARTMENTS 337**
**E 4th Avenue, Anchorage, Alaska 99501**
 **Budget YE 2024**

| Income | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Total |
|---|---|---|---|---|---|---|---|
| Gross Potential Rent | | | | | | | |
| | | 129,241 | 129,241 | 129,241 | 129,241 | 129,241 | 646,206 |
|  Less: Management office | | - | - | - | - | - | - |
|  Less: Economic Vacancy | | (10,986) | (10,662) | (10,339) | (10,016) | (9,693) | (51,697) |
| Effective Rental Income | | 118,256 | 118,579 | 118,902 | 119,225 | 119,548 | 594,510 |
| | | | | | | | |
| Laundry and vending revenues | | - | - | - | - | - | - |
| NSF/Late charges/key replacement | | 83 | 83 | 83 | 83 | 83 | 417 |
| Damages and cleaning fees | | 417 | 417 | 417 | 417 | 417 | 2,083 |
| Cable revenue | | - | - | - | - | - | - |
| Parking revenue | | 400 | 400 | 400 | 400 | 400 | 2,000 |
| Pet deposits (non-refundable) | | 200 | 200 | 200 | 200 | 200 | 1,000 |
| Application fees | | 300 | 300 | 300 | 300 | 300 | 1,500 |
| Other | | 250 | 250 | 250 | 250 | 250 | 1,250 |
| **Total Ancillary Income** | | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 8,250 |
| **Total Income** | | 119,906 | 120,229 | 120,552 | 120,875 | 121,198 | 602,760 |
| | | | | | | | |
| **Operating Expenses:** | | | | | | | |
| Administrative Expenses | Travel | - | - | - | - | - | - |
| | Advertising/marketing | 542 | 542 | 542 | 542 | 542 | 2,708 |
| | Office supplies and expenses | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 5,625 |
| | Management fees | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 36,800 |
| | Bookkeeping and accounting | 833 | 833 | 833 | 833 | 833 | 4,167 |
| | Legal - operating | - | - | - | - | - | - |
| | Telephone | 833 | 833 | 833 | 833 | 833 | 4,167 |
| | Computer services | 150 | 150 | 150 | 150 | 150 | 750 |
| | Misc. / bank fees / credit repts | 50 | 50 | 50 | 50 | 50 | 250 |
| | Other | 100 | 100 | 100 | 100 | 100 | 500 |
| | Total Administrative | 10,993 | 10,993 | 10,993 | 10,993 | 10,993 | 54,967 |
| | | | | | | | |
| Utilities | Electricity | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 27,083 |
| | Water/sewer | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 18,750 |
| | Gas | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 17,500 |
| | Cable | - | - | - | - | - | - |
| | Total Utilities | 12,667 | 12,667 | 12,667 | 12,667 | 12,667 | 63,333 |
| | | | | | | | |
| Operating and Maintenance | Janitorial/Maint payroll | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 | 61,500 |
| | Janitorial supplies | 40 | 40 | 40 | 40 | 40 | 200 |
| | Janitorial contract labor | 250 | 250 | 250 | 250 | 250 | 1,250 |
| | Exterminating contract | 500 | 500 | 500 | 500 | 500 | 2,500 |
| | Garbage and trash | 833 | 833 | 833 | 833 | 833 | 4,167 |
| | Security | 42 | 42 | 42 | 42 | 42 | 208 |
| | Grounds maintenance | 450 | 450 | 450 | 450 | 450 | 2,250 |
| | Repair materials | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 37,500 |
| | Repair contract labor | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 7,500 |
| | Elevator maintenance | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 7,500 |
| | Heating / cooling maintenance | 100 | 100 | 100 | 100 | 100 | 500 |
| | Snow removal | 200 | 200 | 200 | 200 | 200 | 1,000 |
| | Decorating contract | - | - | - | - | - | - |
| | Decorating supplies | - | - | - | - | - | - |
| | Vehicle/maint equip repairs | 833 | 833 | 833 | 833 | 833 | 4,167 |
| | Miscellaneous | 200 | 200 | 200 | 200 | 200 | 1,000 |
| | Total Operating & Maintenance | 26,248 | 26,248 | 26,248 | 26,248 | 26,248 | 131,242 |
| | | | | | | | |
| Property and liability insurance | | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 18,333 |
| Property taxes | | 13,915 | 13,915 | 13,915 | 13,915 | 13,915 | 69,576 |
| Other | | - | - | - | - | - | - |
| Replacement reserves (included in Operating and Maintenance) | | - | - | - | - | - | - |
| | | 17,582 | 17,582 | 17,582 | 17,582 | 17,582 | 87,909 |
| | | | | | | | |
| Total Operating Expenses and Replacements | | | | | | | |
| | | | | | | | |
| Total Operating Expenses | | 67,490 | 67,490 | 67,490 | 67,490 | 67,490 | 337,451 |
| | | | | | | | |
| Net Operating Income after Replacements | | 52,416 | 52,739 | 53,062 | 53,385 | 53,708 | 265,309 |
| | | | | | | | |
| Debt service - secured mortgage | | (41,000) | (41,000) | (41,000) | (41,000) | (41,000) | (205,000) |
| | | | | | | | |
| Net Cash Flow | | 11,416 | 11,739 | 12,062 | 12,385 | 12,708 | 60,309 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT E
REPORT OF DENNIS WINANS

4866-1227-5409, v. 6



## DENNIS L. WINANS CPA

10908 E. Monument Estates Circle, Tucson, AZ 85748 | Phone: (520) 907-2889 | Email: dwinans3@cox.net

**MCKINLEY TOWER APARTMENTS - EGAE, LLC**
**Case No. 3:23-00169**

1. I have been requested to provide an opinion as to the feasibility of the Plan of Reorganization as provided by EGAE LLC regarding the McKinley Tower Apartments at 337 East 4th Avenue, Anchorage, Alaska 99501. I have also been asked to opine on a fair discount factor to be used in discounting the cash flow stream proposed in the EGAE Plan of Reorganization, as modified, in response to the lender's elections to be treated as fully secured under §1111(b) of the Bankruptcy Code. The fee for my services is $350/hour.

2. I hold a Bachelor of Science degree in Accounting from the University of Arizona (December 1982), and am licensed as a Certified Public Accountant in the state of Arizona. My resume is attached as Exhibit A.

3. From June, 1987 through the present, I have been involved in the real estate and finance industry. For the majority of my career, I have either been employed by or been a consultant to The Schomac Group of Companies ("Schomac") and have been involved in almost all of their financing transactions. Schomac developed over 4,000 apartment units in the Tucson and Las Vegas areas, in addition to 800,000 square feet of retail, office, and medical space including the Cambric Corporate Center and the Tucson Auto Mall. Under the name National Self Storage, Schomac developed 4 million square feet of self-storage space in thirteen states across the nation. The combined value of properties it developed exceeded $400 million. Schomac sponsored over 100 syndicated and private limited partnerships and has joint ventured as many properties with both institutions and private individuals.

In connection with those matters, I have obtained financing secured by unimproved land, multifamily, office, self-storage and other projects. I have also negotiated and/or participated in the restructuring of mortgage indebtedness for multifamily and self-storage properties sponsored by Schomac, with and without the protection of the Bankruptcy Courts. In my capacities as the CFO or CEO of Schomac, it has been my responsibility to underwrite the financings, purchases and sales of all the Company's real estate assets.

As a part of my duties at Schomac, I was involved in the resolution of a number of Chapter 11 reorganizations which included the National Self Storage portfolio (13 debtors with 35 properties), Mission Heights Apartments and Tucson Land Partners. In addition, we worked to modify financings owed by five separate apartment properties to Great American First Savings Bank. I was integrally involved in obtaining over $160 million in real estate financing, and purchasing over $110 million in self-storage, office and multifamily projects and unimproved land. I also negotiated and administered asset sales approximating $365 million, including a 72 property self-storage portfolio, a 7 property apartment portfolio, a 250 unit apartment-to-condo conversion and unimproved land. In connection with these transactions, I obtained bridge, construction loan and permanent financings from various banks and CMBS lenders.

1

4. From October, 2010 through March 2013, I was affiliated with Heritage Advisory Corporation ("Heritage"), a mortgage banking concern in Tucson, Arizona.  Heritage represented 21 life insurance companies and several CMBS lenders.  Through this affiliation, I was active in seeking financing for multifamily, office, retail and self-storage properties, and mobile home communities.

5. I provided services to Chris and Irene Monson, Aberdeen Group LLC, 4415 E. Grant Road LLC and related entities in various Chapter 11 cases administered and confirmed by Judge Hollowell.  The scope of my services included financial consulting relating to 6 self-storage properties and an apartment community known as the La Mirada Apartments.  With respect to those cases (4:10-bk-30713-EWH through 4:10-bk-31122-EWH – joint administration), I was qualified as an expert witness to discuss self-storage and apartment operations, and interest / discount rates.  In the La Mirada case, Judge Hollowell accepted an interest rate of 4.50% on the restructured debt.  One of the cases also involved Sahuarita Self Storage LLC, a debtor owning a self-storage facility in Sahuarita, AZ.  In that case, Wells Fargo Bank elected § 1111(b) status, and Judge Hollowell accepted my testimony regarding the discount rate applied to the proposed deferred payment stream provided in the plan of reorganization.  I have also provided expert testimony in Kaufman Craycroft Gardens LLC (4:11-bk-13209-JMM) and Doug Tebo vs. Countrywide Mortgage (lender fiduciary duty).

6. I have been a financial professional for the last 43 years.  I have experienced the economic downturns of the savings and loan crisis (1989 through 1992), the tech (dot com) bust in the early 2000's, the great Recession from late 2007 – 2009, the impacts of the COVID pandemic, the current economic impacts of the Federal Reserve's interest rate increases in their attempts to control inflation, and the cyclical behavior of real estate through those times.  I believe that our economy and the real estate industry will ultimately find equilibrium, adapt to the changes required and will again normalize.

7. In addition to relying on my personal experience and knowledge, I reviewed the following documents and obtained information from the following sources:

    a. Balance sheets and profit and loss statements for EGAE for the years ended December 31, 2020 – 2022, and the eleven months ended November 30, 2023.
    b. 2021 and 2022 tax returns for the Marlow Family Exempt Perpetual Trust.
    c. Bank statements of EGAE LLC (McKinley Tower Apartments) from First National Bank Alaska 9/2023).
    d. Agreed Order Authorizing Emergency Interim Use of Cash Collateral.
    e. Business Income and Expense Report – October 19, 2023 through February 2024.
    f. Statement of Financial Affairs – Form 207.
    g. Emergency Motion for Interim Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Setting Further Hearings.
    h. Declaration of Mark Marlow in Support of First Day Motions.
    i. Form 206 A/B – Assets – Real and Personal Property.
    j. Form 206 D – Creditors Who Have Claims Secured by Property.
    k. Form 206 E/F – Creditors Who Have Unsecured Claims.
    l. Rent Rolls for October and November 2023 and as of March 25, 2024.
    m. Accounts Receivable Aging for EGAE LLC as of October 31, 2023.
    n. Property Tax History for 337 E. 4th Avenue, Unit 1 from Municipality of Anchorage.
    o. Current Interest Rates as of March 27, 2024 provided by Northmarq Commercial Real Estate and as provided by Colliers Mortgage as of June 26, 2024.

2

- p.  McKinley Tower Unit Mix Schedule.
- q.  Cushman & Wakefield Appraisal dated October 6, 2022.
- r.  North Pacific Advisors LLC Appraisal dated December 5, 2023.
- s.  Historical Occupancy Rates for McKinley Tower Apartments for 2020 through 2023.
- t.  Binding Term Sheet and Plan Agreement dated July 5, 2024.

8. The feasibility of the EGAE Plan of Reorganization is predicated on the following, among other things and along with macro-economic factors:

- a.  The physical condition and quality of the real and personal property at 337 East 4th Avenue, Anchorage, Alaska 99501.
- b.  The location of the property.
- c.  The quality and performance of the staff responsible for the daily operations, maintenance and marketing of the apartment units.
- d.  The historical financial results of operations achieved and the supported projected results to be achieved.
- e.  The ability of the sponsor to obtain new financing during or at the end of loan term, or to repay the project's obligation through either (1) a sale or refinancing of the property or (2) equity contributions from the sponsor.  It has been my experience in §1111(b) cases that the loans are always renegotiated, repaid or refinanced long before the end of the §1111(b) repayment term.
- f.  The reputation and financial strength of the project's sponsor.

9. <u>Physical Quality of the Real and Personal Property</u>:

- a.  In his October 2022 appraisal finding a final market as-is value of $7,750,000, Scott Biethan of Cushman & Wakefield of Washington Inc. stated "after considering all of the physical characteristics of the project, we have concluded that this property has an overall rating that is good when measured against other properties in this marketplace".  Further, Mr. Biethan indicated that the remaining economic life of Debtor's property was 25 years in October 2022.  Economic life is defined as the period for which real estate improvements are expected to generate more income than operating expenses.  Mr. Biethan held that the total economic life of the property is 55 years per he Marshall Valuation Services estimates for similar projects.  My opinion is based on the premise that the remaining economic life of the subject apartment tower is at least 24 years and is maintained using acceptable standards and best practices.  This opinion is supported by Mr. Biethan when he concluded that the effective age of the property was 30 years while the physical age was 36 years.

- b.  Only fourteen months later, in an appraisal dated December 5, 2023, Gregory Wing of North Pacific Advisors LLC concluded that the as-is market value of the property is $9,850,000 (a 27% increase over the October 2022 appraisal by Cushman & Wakefield at a time when interest rates and cap rates have increased), and that the liquidation value of the property is $7,880,000 (a 20% discount).  Mr. Wing estimated that the effective age of the property was 20 years, and that the remaining economic life is at least 30 years.

10. <u>The Location of the Property</u>:  Debtor's property is well located on the periphery of the core of downtown Anchorage, Alaska with good access and visibility.  It is said to be the tallest residential tower in Anchorage.  The tower and annex were purchased in 1999 by Anchorage developer Marc Marlow and later remodeled and brought up to code after significant seismic

reinforcement work was completed.  McKinley Tower was reopened in 2006 and provides market rate apartments to the downtown Anchorage market.  It was listed on the National Register of Historic Places in 2008.

11.  <u>Quality and Performance of Operational Staff</u>:  Marc and Lael Marlow and their staff manage the property on behalf of the Marlow family trust that owns the property.  Through their company, Kenco Building Services, Lael Marlow handles the marketing, leasing and tenant relations efforts.

In addition, Kenco has two full time maintenance employees that perform custodial and maintenance services, and they turn the units to ready them for new tenants as leases expire.  In 1986, Marc and Lael opened an electrical contracting company and worked on numerous projects in Anchorage, Kodiak Island and bush Alaska.  In addition, in 1993, they developed Chester Park, a member owned and run senior living community in Anchorage.

12.  <u>Operational Financial Results</u>:

    a.  The historical net operating income for the property is summarized below for 2020 - 2023.

| | | **Prior Year Operating Results** | | | |
|---|---|---|---|---|---|
| | | **2020** | **2021** | **2022** | **2023** |
| **Income** | | | | | |
| Gross Potential Rent | | 1,033,979 | 1,145,454 | 1,275,877 | 1,373,878 |
| Less: Management office | | - | - | - | - |
| Less: Economic Vacancy | | - | - | - | - |
| Effective Rental Income | | 1,033,979 | 1,145,454 | 1,275,877 | 1,373,878 |
| Laundry and vending revenues | | - | 570 | 300 | - |
| NSF/Late charges/key replacement | | 2,893 | 1,029 | (410) | 850 |
| Damages and cleaning fees | | 910 | 1,880 | 13,917 | 6,640 |
| Cable revenue | | 5,946 | 108 | 2,200 | - |
| Parking revenue | | 4,619 | 5,063 | - | 4,852 |
| Pet deposits (non-refundable) | | 2,100 | 2,800 | 350 | 3,150 |
| Application fees | | 2,750 | 3,465 | 3,985 | 3,555 |
| Other | | 10,350 | 3,176 | 2,518 | 3,305 |
| **Total Ancillary Income** | | 29,568 | 18,091 | 22,859 | 22,352 |
| **Total Income** | | 1,063,547 | 1,163,545 | 1,298,736 | 1,396,230 |
| **Operating Expenses:** | | | | | |
| Administrative Expenses | Travel | 591 | 140 | 414 | - |
| | Advertising/marketing | 7,001 | 6,465 | 6,141 | 6,231 |
| | Office supplies and expenses | 11,512 | 18,529 | 10,568 | 12,518 |
| | Management fees | 88,320 | 88,320 | 88,320 | 88,320 |
| | Bookkeeping and accounting | 11,623 | 11,368 | 10,850 | 10,560 |
| | Legal - operating | - | - | - | - |
| | Telephone | 9,702 | 8,973 | 8,721 | 8,981 |
| | Computer services | 2,547 | 309 | 3,464 | 772 |
| | Misc. / bank fees / credit repts | 388 | 1,850 | 291 | 396 |
| | Other | - | 100 | 1,214 | 2,230 |
| | Total Administrative | 131,684 | 136,054 | 129,983 | 130,008 |
| Utilities | Electricity | 75,844 | 63,820 | 61,783 | 59,552 |
| | Water/sewer | 46,797 | 47,104 | 42,790 | 46,704 |
| | Gas | 50,817 | 32,909 | 43,396 | 40,555 |
| | Cable | 15,869 | 5,624 | - | - |
| | Total Utilities | 189,327 | 149,457 | 147,969 | 146,811 |
| Operating and Maintenance | Janitorial Maint payroll | 149,560 | 147,533 | 147,533 | 147,533 |
| | Janitorial supplies | 535 | - | - | 103 |
| | Janitorial contract labor | 7,391 | 3,561 | 330 | 845 |
| | Exterminating contract | 700 | 4,275 | 16,850 | 3,400 |
| | Garbage and trash | 6,672 | 7,025 | 7,277 | 8,586 |
| | Security | 704 | 2,845 | 464 | 465 |
| | Grounds maintenance | 23,526 | 16,222 | 5,368 | 1,995 |
| | Repair materials | 96,853 | 86,776 | 106,661 | 125,164 |
| | Repair contract labor | 32,396 | 14,955 | 23,533 | 119,757 |
| | Elevator maintenance | 17,694 | 15,963 | 18,514 | 19,451 |
| | Heating / cooling maintenance | 3,129 | (2,007) | - | 726 |
| | Snow removal | (3,863) | 2,400 | - | - |
| | Decorating contract | 4 | - | - | - |
| | Decorating supplies | 650 | - | 300 | - |
| | Vehicle/maint equip repairs | 6,697 | 13,484 | 12,479 | 8,822 |
| | Miscellaneous | 16,580 | 216 | 1,165 | 2,249 |
| | Total Operating & Maintenance | 359,228 | 313,248 | 340,473 | 439,095 |
| Property and liability insurance | | 15,072 | 41,801 | 43,408 | 43,870 |
| Property taxes | | 168,177 | 169,984 | 161,091 | 177,258 |
| Other | | 51 | 88 | - | - |
| | | 183,300 | 211,873 | 204,499 | 221,128 |
| **Total Operating Expenses** | | 863,538 | 810,633 | 822,925 | 937,042 |
| Net Operating Income after Replacements | | 200,008 | 352,912 | 475,811 | 459,188 |

4

b. Occupancy Rate – The property is currently 97% occupied.  Historical occupancies by month for the years 2020 through 2023 are as follows:

| Year | January | February | March | April | May | June | July | August | September | October | November | December | Average |
|------|---------|----------|-------|-------|-----|------|------|--------|-----------|---------|----------|----------|---------|
| 2020 | 82% | 81% | 84% | 81% | 79% | 81% | 82% | 85% | 87% | 89% | 84% | 86% | 83% |
| 2021 | 85% | 84% | 84% | 84% | 88% | 91% | 88% | 89% | 94% | 94% | 96% | 97% | 90% |
| 2022 | 97% | 98% | 97% | 98% | 100% | 99% | 99% | 100% | 99% | 94% | 95% | 95% | 98% |
| 2023 | 95% | 96% | 97% | 98% | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | 99% |
| | | | | | | | | | | | Average 2022 - 2023 | | 98% |

According to Debtor, and in addition to the shortage of housing in the Anchorage, Alaska market, two factors were significant with respect to the increased occupancy noted in the latter part of 2021 and throughout 2023.  Those factors are (a) the impact of the Covid 19 pandemic (tenants were able to move to Anchorage and work remotely) and (b) Anchorage has been working diligently to deal with transients and homeless people that congregated in the area.  The result of these factors, together with the housing shortage, has allowed McKinley Towers to experience strong and consistent occupancy.

For those reasons, the physical occupancy percentage utilized in the operating projections (Exhibit B) is 99%.  However, the economic occupancy ranges from 91.50% (Year 1) up to 95.00% (Year 3 and thereafter) to allow for a lag in achieved rental rates as tenant lease terms expire and rental rates increase as turnover occurs.

c. Following are the current lease rates for the property.

| McKinley Towers Unit Size Information | | Square Feet | # of units | Total SF | Total Rents | Monthly/Per Unit | | Annual | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Average Rent | Avg Rent/SF | Average Rent | Avg Rent/SF |
| 1 | | 767 | 10 | 7,670 | 12,375 | 1,238 | 1.61 | 148,500 | 19.36 |
| 2 | S | 322 | 10 | 3,220 | 9,435 | 944 | 2.93 | 113,220 | 35.16 |
| 3 | | 541 | 10 | 5,410 | 12,425 | 1,243 | 2.30 | 149,100 | 27.56 |
| 4 | | 481 | 10 | 4,810 | 11,600 | 1,160 | 2.41 | 139,200 | 28.94 |
| 5 | | 710 | 10 | 7,100 | 13,125 | 1,313 | 1.85 | 157,500 | 22.18 |
| 6 | | 678 | 10 | 6,780 | 13,325 | 1,333 | 1.97 | 159,900 | 23.58 |
| 7 | S | 329 | 10 | 3,290 | 8,465 | 847 | 2.57 | 101,580 | 30.88 |
| 8 | | 549 | 10 | 5,490 | 12,500 | 1,250 | 2.28 | 150,000 | 27.32 |
| 9 | S | 285 | 10 | 2,850 | 9,140 | 914 | 3.21 | 109,680 | 38.48 |
| 10 | | 777 | 10 | 7,770 | 13,750 | 1,375 | 1.77 | 165,000 | 21.24 |
| | | | 100 | 54,390 | 116,140 | 11,614 | 2.14 | 1,393,680 | 25.62 |
| | S = studio | | | | | | | | |

d. Following are the current monthly rental rates as quoted through the respective internet marketing for the comparable apartment projects used in Mr. Biethan's October 2022 appraisal and Mr. Wing's December 2023 appraisal.

| | Studio | | 1 BR / 1 BA | | Quoted Rent Per Square Foot | | Quoted Rent Per Square Foot - 10/22 | | % Increase Since 10/22 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Unit Size | Quoted Rent | Unit Size | Quoted Rent | Studio | 1 BR / 1 BA | Studio | 1 BR / 1 BA | Studio | 1 BR / 1 BA |
| Century Plaza Apartments | 380 | 1,400 | 613 | 1,660 | 3.68 | 2.71 | 3.22 | 2.32 | 14.42% | 16.72% |
| City View Apartments | 348 | 1,280 | 548 | 1,350 | 3.68 | 2.46 | | | | |
| Country Lane Apartment Homes | 350 | 1,050 | 550 | 1,200 | 3.00 | 2.18 | 2.50 | 1.75 | 20.00% | 24.68% |
| Inlet View Tower | 336 | 1,145 | 588 | 1,475 | 3.41 | 2.51 | 2.51 | 1.57 | 35.77% | 59.78% |
| Knik Arms | | | 540 | 1,350 | | 2.50 | | | | |
| Ladera Villa Apartment Homes | 529 | 1,260 | 552 | 1,230 | 2.38 | 2.23 | 2.00 | 1.93 | 19.00% | 15.45% |
| Park Plaza I | 506 | 1,100 | 611 | 1,130 | 2.17 | 1.85 | | | | |
| Park Plaza II | 425 | 1,545 | 550 | 1,690 | 3.64 | 3.07 | | | | |
| The Village at Calais | 425 | 1,055 | 550 | 1,100 | 2.48 | 2.00 | 2.39 | 1.94 | 3.77% | 3.09% |
| | | | | Low | 2.17 | 1.85 | 2.00 | 1.57 | | |
| | | | | High | 3.68 | 3.07 | 3.22 | 2.32 | | |
| | | | | Average | 3.05 | 2.39 | 2.52 | 1.90 | | |

Given these competitive rates, the following estimated rental rates appear to be achievable relative to the market for the McKinley Tower units for the year beginning with the Plan Effective Date.

| McKinley Towers Unit Size Information | | | | | | ACTUAL | | | | | | PROJECTED TARGET RATES | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Monthly/Per Unit | | | | Annual | | Projected | Gross Potential | Gross Potential |
| | | Square Feet | # of units | Total SF | Total Rents | Average Rent | Avg Rent/SF | | Average Rent | Avg Rent/SF | | Mkt. Rent/SF | Monthly Rent | Annual Rent |
| 1 | | 767 | 10 | 7,670 | 12,375 | 1,238 | 1.61 | | 148,500 | 19.36 | | 2.10 | 16,107 | 193,284 |
| 2 | S | 322 | 10 | 3,220 | 9,435 | 944 | 2.93 | | 113,220 | 35.16 | | 3.05 | 9,837 | 118,042 |
| 3 | | 541 | 10 | 5,410 | 12,425 | 1,243 | 2.30 | | 149,100 | 27.56 | | 2.39 | 12,931 | 155,175 |
| 4 | | 481 | 10 | 4,810 | 11,600 | 1,160 | 2.41 | | 139,200 | 28.94 | | 2.39 | 11,497 | 137,965 |
| 5 | | 710 | 10 | 7,100 | 13,125 | 1,313 | 1.85 | | 157,500 | 22.18 | | 2.15 | 15,265 | 183,180 |
| 6 | | 678 | 10 | 6,780 | 13,325 | 1,333 | 1.97 | | 159,900 | 23.58 | | 2.15 | 14,577 | 174,924 |
| 7 | S | 329 | 10 | 3,290 | 8,465 | 847 | 2.57 | | 101,580 | 30.88 | | 3.05 | 10,051 | 120,608 |
| 8 | | 549 | 10 | 5,490 | 12,500 | 1,250 | 2.28 | | 150,000 | 27.32 | | 2.39 | 13,122 | 157,470 |
| 9 | S | 285 | 10 | 2,850 | 9,140 | 914 | 3.21 | | 109,680 | 38.48 | | 3.21 | 9,149 | 109,782 |
| 10 | | 777 | 10 | 7,770 | 13,750 | 1,375 | 1.77 | | 165,000 | 21.24 | | 2.15 | 16,706 | 200,466 |
| | | | 100 | 54,390 | 116,140 | 11,614 | 2.14 | | 1,393,680 | 25.62 | | 2.38 | 129,241 | 1,550,896 |

e. Based on my understanding of the historical financial information, the project's occupancy history and the rental rates being advertised for properties comparable to McKinley Tower Apartments, the following are the financial projections on which I base my conclusion (Exhibit B).

| | Total Income | Total Operating Expenses | Net Operating Income | Economic Occupancy | Revenue Growth | Expense Growth | DSCR With Mgmt. Fee | DSCR Without Mgmt. Fee | Projected Cash Balance |
|---|---|---|---|---|---|---|---|---|---|
| Year 1 | 1,460,194 | 794,572 | 665,623 | 92.88% | 12.88% | - | 1.27 | 1.41 | 225,439 |
| Year 2 | 1,559,666 | 821,192 | 738,474 | 94.50% | 5.00% | 3.00% | 1.26 | 1.39 | 346,483 |
| Year 3 | 1,630,521 | 847,031 | 783,489 | 95.00% | 4.00% | 3.00% | 1.33 | 1.47 | 512,542 |
| Year 4 | 1,679,436 | 872,442 | 806,994 | 95.00% | 3.00% | 3.00% | 1.37 | 1.52 | 702,106 |
| Year 5 | 1,729,819 | 896,644 | 833,175 | 95.00% | 3.00% | 2.75% | 1.42 | 1.57 | 917,851 |
| Year 6 | 1,781,714 | 921,518 | 860,196 | 95.00% | 3.00% | 2.75% | 1.46 | 1.62 | 1,190,616 |
| Year 7 | 1,835,165 | 947,083 | 888,083 | 95.00% | 3.00% | 2.75% | 1.51 | 1.67 | 1,491,269 |
| Year 8 | 1,885,632 | 970,989 | 914,643 | 95.00% | 2.75% | 2.50% | 1.56 | 1.72 | 1,818,482 |
| Year 9 | 1,937,487 | 995,499 | 941,988 | 95.00% | 2.75% | 2.50% | 1.60 | 1.77 | 2,173,039 |
| Year 10 | 1,990,768 | 1,020,629 | 970,139 | 95.00% | 2.75% | 2.50% | 1.65 | 1.82 | 6,891,785 |

13. Future Financing:

a. The EGAE Plan of Reorganization, as modified, reflects that Reorganized Debtor and MidCap Funding Investment X LLC ("MidCap") have agreed to a Settlement Amount of $7,100,000 if full and final payment is made on or before December 31, 2024 (the "December Settlement Amount") and $7,250,000 if payment is made between January 1, 2025 and March 31, 2025. Monthly installments of $41,000 will be made to Midcap through the date of full and final payment which, for the purposes of this report, has been assumed to be March 31, 2025. Thereafter, the Reorganized Debtor is projected to obtain new financing in the amount of $7,250,000 with a 10 year loan term, a 25 year amortization schedule, an interest rate of 6.50% and monthly principal and interest payments of $48,953 (Exhibit C).

b. To corroborate that the rate was not improper, I researched the rate by inquiring with Northmarq Commercial Real Estate regarding multifamily interest rates (Exhibit D). Based on that research, a 6.50% interest rate, up to a 35 year term and a 35 year amortization schedule all appear to be reasonable and generated by an efficient market for a loan secured by the Debtor's or a similar property.

6

c. As noted in paragraph 8, the factors I have considered include (1) the physical condition and quality of the asset, (2) the property location, (3) the quality and performance of the on-site staff, (4) the historical and projected financial results, (5) the availability of financing and (6) the national, Anchorage, Alaska economic environment.

d. The loan term and amortization schedule are factors I have taken into consideration when assessing loan risk. I am not aware that the Bankruptcy Code sets any limit on the length of time over which payments may be deferred in Chapter 11 except for the considerations related to adequate protection and feasibility of the plan. In this case, the EGAE Plan of Reorganization provides for a 10 year loan term with new financing obtained effective March 31, 2025.

e. I have considered the remaining economic life of the property. Many multifamily projects are productive even after their projected economic life. As the Debtor will properly maintain the facility, it can reasonably be expected that the actual outer limit of the appraisers' claimed remaining economic life of the property will be extended beyond the loan repayment term. I have utilized a 10 year loan repayment term in my updated report which is well within the conclusions drawn by Mr. Biethan in his Cushman & Wakefield appraisal and Mr. Wing in his appraisal.

f. I have considered the Supreme Court's decision in Till v. SCS Credit Corp., 541 U.S. 465 (2003). In Chapter 11 cases, the Till decision acknowledges that attempts should be made to determine what interest rates (and discount factors) exist in an efficient market under similar circumstances. I believe that there is an efficient market for the establishment of interest rates and discount factors in Chapter 11 cases which is one in which bankruptcy court judges are setting the interest rates and discount factors under the teachings of Till and other controlling judicial precedent as opposed to those rates being set by a loan committee.

Using the requirements provided in the Till case, the following table presents a portion of my analysis for determining an appropriate discount factor. Since lenders typically use the U.S. Treasury bill rate, or a rate tied to the SOFR, those rates have been reflected along with the prime rate.

|  | Prime Rate | 20 Year US T-Bill | 30 Year US T-Bill | SOFR Rate |
|---|---|---|---|---|
| Rate as of 7/26/2024 | 8.50% | 4.59% | 4.50% | 5.35% |
| Spread for risk | 3.00% | 3.00% | 3.00% | 3.00% |
| Implied risk adjusted rate | 11.50% | 7.59% | 7.50% | 8.35% |

With respect to these interest rates, it is my opinion that these rates are **not** consistent with those determined by an efficient market. There are multiple reasons why state and national economies have experienced substantial inflation due to the effects of pandemic related stimulus provided by the US and state governments, mandated minimum wage increases, supply chain interruptions and instability, and the multiple increases in the federal funds rate by the Federal Reserve in order to decrease inflation and bring it back to the targeted 2% per annum. For these reasons, the above reflected formula and rates should not be used. Instead, the rates determined by the market should prevail.

I have considered rates established by Bankruptcy Courts in other Chapter 11 cases.  The risk free rate used by the court in the Eastland Partners case was the Treasury Bill rate of equal term.  In Re Eastland Partners Limited Partnership, 129 B.R. 105 (Bankr. E.D. Mich. 1992).  Some of the courts relied upon in Eastland Partners are referenced as follows:

"In re Oaks Partners, Ltd., 135 B.R. 440 (Bankr. N.D. Ga. 1991), a 3% discount factor was added despite the fact that the apartment complex was well managed, had a 96% occupancy and was located in an improving market, because maintenance had been deferred during the bankruptcy.

In re Computer Optics, 126 B.R. 664 (Bankr. D.N.H. 1991), the court approved an interest rate which equaled the contract rate, which was 4% over the Treasury Bill rate.

In re E.I. Parks No. I, Ltd. Partnership, 122 B.R. 549 (Bankr. W.D. Ark. 1990), the court approved a 2% risk factor because the property was not likely to decline in value.

In re Aztec Co., 99 B.R. 388 (Bankr. M.D. Tenn. 1989), the court approved a risk factor of 2% where the property was in poor condition and had a high vacancy rate.

In re Park Avenue Partners Ltd. Partnership, 95 B.R. 605 (Bankr. E.D. Wis. 1988), the court approved a 5.5% risk factor because the plan provided for negative amortization of the loan and the apartment complex was only 81% occupied, had poor management and cash flow, and was in bad condition.

In re Crane Automotive, Inc., 88 B.R. 81 (Bankr. W.D. Pa. 1988), the court approved an interest rate 1.3% over the Treasury Bill rate and 2% over the prime rate.

In re Noe, 76 B.R. 675 (Bankr. N.D. Iowa 1987), the court approved a risk factor of 200 basis points where the debtor had a 30% equity cushion in farmland.

In re Bartlesmeyer, 78 B.R. 975 (Bankr. W.D. Mo. 1987), the court approved an interest rate with a 1% risk factor over the risk free rate, where the only risk was the possibility of the depreciation of the collateral."

In the case of the Reorganized Debtor under the EGAE Plan, the property is in good condition with no significant deferred maintenance.  In addition, the property is not likely to decline in value – it has been appraised at a value significantly below replacement value, the costs of future maintenance (and increasing the remaining economic life) have been included in operating projections and net operating income is projected to increase.

Under the circumstances of this case, it is my belief that a risk factor less than 3.00% should be assessed in this case given (1) the physical condition and quality of the asset, (2) the property location, (3) the quality and performance of the on-site staff, (4) the historical and projected financial results and (5) the availability of financing.  In my opinion, the interest rate applied to the restructured financing should not exceed the 6.50% interest rate that the Debtor has proposed.  In my experience and opinion, a 6.50% interest rate is not below the prevailing market rates for loans of comparable risk and term.

14. Payment of Claims:

    a.   The operating projections provided in Exhibit B are based on the historical operating performance of the property under the Debtor's management.  The currently quoted rental

rates can be increased since they are below currently quoted market rents. Further, without substantial new supplies of housing in the Anchorage market, gross potential rental income can be increased over time consistent with inflation and other market driven factors.

b.  The projected net operating income provides adequate debt service coverage for the Class 3 MidCap claim and the new lender beginning March 31, 2025 and, together with the initial equity contribution, there will be sufficient funds to pay the Debtor's creditors in accordance with the treatment outlined in the Plan (Exhibit E).

c.  Marc and Lael Marlow own Kenco LLC, the property manager for the McKinley Tower Apartments. In addition to the equity contribution to be made on the Effective Date by the Marlow Family Exempt Perpetual Trust, the Marlows have agreed to effectively provide an operating cash flow guarantee by waiving the management fee payable to Kenco LLC if required so that the required Plan payments can be made.

d.  Over the up to 10 years provided in the Plan, as amended, Debtor will be able to either sell the property or refinance it and repay all of its creditors in full (Exhibit F). As projected, Debtor would have sufficient liquidity to be able to repay the allowed Class 3 Midcap Claim as early as the end of the following years.

|  | **Refinancing** | **Sale of Property** |
|---|---|---|
| New Lender Effective March 31, 2025 | Year 2 | Year 1 |

15.  <u>Macro-economic Factors</u>:

a.  Following are key factors that drive real estate performance and values.

- Demographics
- Interest rates
- National, state and local economies
- Government policies and subsidies
- Geographic markets
- Supply and demand

b.  In an August 2023 article entitled "Tackling Alaska's Housing Crisis Together", Megan Cacciola wrote that "Alaskans are feeling the effects of a mounting housing shortage. According to a recent study by Agnew::Beck Consulting, to meet demand, Alaska needs an estimated 27,500 new housing units over the next ten years. In 2022, construction of only 578 new housing units was authorized statewide." At that rate, it will take nearly 50 years to meet that need.

c.  Further, she wrote that "though communities nationwide are experiencing a housing affordability crisis, Alaska's housing challenges are particularly stark, exacerbated by expensive materials and labor costs, a rapidly aging housing stock and a new housing construction market that isn't keeping up with demand. The worker retention and recruitment difficulties caused by the housing shortage further slow construction, renovation, and modernization efforts."

d.  While these factors create hardships for Alaska's population in need of housing, they point to the fact that multifamily rental rates will not generally decline until the issue of housing supply is adequately addressed.

16. Given the depth and duration of the Federal Reserve's efforts to manage inflation, it is increasingly necessary for financial projections to be based on future federal actions with respect to economic, tax, monetary, job creation and fiscal policies.  That said, those tasked to do this have been asked to attempt to chart "where the wind will blow", which we know is an impossible task.  For that reason, we must continue to focus on the primary factors impacting the feasibility of the EGAE Plan of Reorganization, in the belief that national, state and local markets will find equilibrium as long as policy makers are willing to re-implement a sound and rational fiscal foundation, and let market forces work.

17. Based on my review of the facts and circumstances relating to the McKinley Tower Apartments, the Debtor and the proposed sponsor, and my work and research contained in this report, it is my conclusion that the EGAE Plan of Reorganization dated March 27, 2024, is feasible and ensures that Debtor's creditors receive fair value for their claims as required under the Bankruptcy Code.

As previously stated above, it is my belief that a 6.50% interest rate is not below the prevailing market rates for loans of comparable risk and term.

This report is respectfully submitted this 27th day of July, 2024.


Dennis L. Winans

10

# EXHIBIT A



## DENNIS L. WINANS CPA

10908 E. Monument Estates Circle, Tucson, AZ  85748  |  Phone: (520) 907-2889  |  Email: dwinans3@cox.net

### EDUCATION

Bachelor of Science in Accounting, University of Arizona – December, 1982

### LICENSE

Certified Public Accountant in Arizona (#16103-R)

### PROFESSIONAL EXPERIENCE

| Description | Positions Held | Period |
|---|---|---|
| Dennis L. Winans, CPA | Owner | January 2010 - Present |
| Aberdeen Management & Development | Chapter 11 consultant/Chief Financial Officer | October 2010 - Present |
| The Schomac Group, Inc. | Chief Financial Officer | November 1, 2014 – Present |
| ReliantHeart, Inc. | Director/Board Observer | May 2014 – November 2019 |
| MicroMed Technology, Inc. | Sole Director / creditor committee liaison | June 2013 – October 2013 |
| Heritage Advisory Corporation | Mortgage Underwriter | October 2010 – March 2013 |
| The Schomac Group, Inc. | President/CEO/CFO/Tax Manager | June 1987 – December 2009 |
| The Estes Companies | Senior Staff Accountant | May to June, 1987 |
| Harbour & Murphy CPAs | Senior Staff Accountant | December 1982 – April 1987 |

Corporate Experience:

- Administrative, fiscal and operational oversight of real estate development, investment and property management companies with up to 500 employees in seven states and three accounting departments
- Real estate investment analysis, asset management, acquisition, disposition, financing (debt / equity), mortgage underwriting, significant lease renewals, IRC 1031 exchange administration
- Assist in administration of Chapter 11 restructuring of corporate and entities owning self storage and apartments
- Management of lender and partner relationships
- Preparation, analysis and review of offering memorandums, organizational documents and related agreements
- Income tax return preparation – corporate, individual, partnership and trusts
- IRS and state audit representation

Consulting and Experience:

- Income tax return preparation – corporate, individual, partnership and trusts
- IRS and state audit representation
- Provide financial planning, budget preparation and budget to actual analyses
- Oversee client accounting departments
- Provide financial, feasibility and restructuring services to debtors and lenders including cram down interest rate and 1111(b) election and expert testimony on lender and debtor compliance with plan of reorganization
- Asset valuation / debt restructuring / litigation support / feasibility and interest rate expert witness testimony
- Develop business plans, liquidation analyses, detailed feasibility analyses, financial projections
- Assist in drafting plans of reorganization and disclosure statements
- Director-trustee support services / steering committee services

Significant Accomplishments:

◊ Integrally involved in obtaining over $225 million in real estate financing, purchasing over $160 million in self storage, office, multifamily projects and unimproved land.

◊ Negotiated and administered asset sales approximating $430 million in self storage assets, multifamily properties, land and a condominium conversion.  Sale of self storage portfolio to U-Store-It, a publicly traded REIT (YSI) yielded investors IRRs ranging from 7% to 300%, and averaged 27% with up to 24 year holding periods.

◊ Served as sole Director of MicroMed Technology, Inc., worked with lead Delaware and Arizona legal counsel and coordinated Chapter 11 restructuring with sale of HeartAssist5 technology to ReliantHeart Inc.; integral to raising capital for ReliantHeart in the pre and post-bankruptcy periods.

# EXHIBIT B

**MCKINLEY TOWER APARTMENTS**

**337 E 4th Avenue, Anchorage, Alaska 99501**

**Operating Projections**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rentable square feet | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 |
| Average rate per square foot | 28.51 | 29.94 | 31.14 | 32.07 | 33.03 | 34.02 | 35.05 | 36.01 | 37.00 | 38.03 | 38.92 | 39.94 |
| Annual income increase | 13.49% | 5.00% | 4.00% | 3.00% | 3.00% | 3.00% | 3.00% | 2.75% | 2.75% | 2.75% | 2.50% | 2.50% |
| Gross Potential Rent | 1,550,896 | 1,628,440 | 1,693,578 | 1,744,385 | 1,796,717 | 1,850,618 | 1,906,137 | 1,958,556 | 2,012,416 | 2,067,757 | 2,119,451 | 2,172,438 |
| Occupancy - Unit SF | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% |
| Economic occupancy | 92.88% | 94.50% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% |
| Annual Expense Increase | | 3.00% | 3.00% | 3.00% | 2.75% | 2.75% | 2.75% | 2.50% | 2.50% | 2.50% | 2.25% | 2.25% |
| **Income** | | | | | | | | | | | | |
| Gross Potential Rent | 1,550,896 | 1,628,440 | 1,693,578 | 1,744,385 | 1,796,717 | 1,850,618 | 1,906,137 | 1,958,556 | 2,012,416 | 2,067,757 | 2,119,451 | 2,172,438 |
| Less: Management office | - | - | - | - | - | - | - | - | - | - | - | - |
| Less: Economic Vacancy | (110,501) | (89,564) | (84,679) | (87,219) | (89,836) | (92,531) | (95,307) | (97,928) | (100,621) | (103,388) | (105,973) | (108,622) |
| Effective Rental Income | 1,440,394 | 1,538,876 | 1,608,899 | 1,657,166 | 1,706,881 | 1,758,087 | 1,810,830 | 1,860,628 | 1,911,795 | 1,964,369 | 2,013,479 | 2,063,816 |
| | | | | | | | | | | | | |
| Laundry and vending revenues | - | - | - | - | - | - | - | - | - | - | - | - |
| NSF/Late charges/key replacement | 1,000 | 1,050 | 1,092 | 1,125 | 1,159 | 1,193 | 1,229 | 1,263 | 1,298 | 1,333 | 1,367 | 1,401 |
| Damages and cleaning fees | 5,000 | 5,250 | 5,460 | 5,624 | 5,793 | 5,966 | 6,145 | 6,314 | 6,488 | 6,666 | 6,833 | 7,004 |
| Cable revenue | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking revenue | 4,800 | 5,040 | 5,242 | 5,399 | 5,561 | 5,728 | 5,899 | 6,062 | 6,228 | 6,400 | 6,560 | 6,724 |
| Pet deposits (non-refundable) | 2,400 | 2,520 | 2,621 | 2,699 | 2,780 | 2,864 | 2,950 | 3,031 | 3,114 | 3,200 | 3,280 | 3,362 |
| Application fees | 3,600 | 3,780 | 3,931 | 4,049 | 4,171 | 4,296 | 4,425 | 4,546 | 4,671 | 4,800 | 4,920 | 5,043 |
| Other | 3,000 | 3,150 | 3,276 | 3,374 | 3,476 | 3,580 | 3,687 | 3,789 | 3,893 | 4,000 | 4,100 | 4,202 |
| | | | | | | | | | | | | |
| **Total Ancillary Income** | 19,800 | 20,790 | 21,622 | 22,270 | 22,938 | 23,627 | 24,335 | 25,005 | 25,692 | 26,399 | 27,059 | 27,735 |
| | | | | | | | | | | | | |
| **Total Income** | 1,460,194 | 1,559,666 | 1,630,521 | 1,679,436 | 1,729,819 | 1,781,714 | 1,835,165 | 1,885,632 | 1,937,487 | 1,990,768 | 2,040,537 | 2,091,551 |
| **Operating Expenses:** | | | | | | | | | | | | |
| Administrative Expenses | Travel | - | - | - | - | - | - | - | - | - | - | - | - |
| | Advertising/marketing | 6,500 | 6,695 | 6,896 | 7,103 | 7,298 | 7,499 | 7,705 | 7,898 | 8,095 | 8,297 | 8,484 | 8,675 |
| | Office supplies and expenses | 13,500 | 13,905 | 14,322 | 14,752 | 15,157 | 15,574 | 16,003 | 16,403 | 16,813 | 17,233 | 17,621 | 18,017 |
| | Management fees | 73,010 | 77,983 | 81,526 | 83,972 | 86,491 | 89,086 | 91,758 | 94,282 | 96,874 | 99,538 | 102,027 | 104,578 |
| | Bookkeeping and accounting | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 | 13,052 | 13,346 |
| | Legal - operating | - | - | - | - | - | - | - | - | - | - | - | - |
| | Telephone | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 | 13,052 | 13,346 |
| | Computer services | 1,800 | 1,854 | 1,910 | 1,967 | 2,021 | 2,077 | 2,134 | 2,187 | 2,242 | 2,298 | 2,349 | 2,402 |
| | Misc. / bank fees / credit repts | 600 | 618 | 637 | 656 | 674 | 692 | 711 | 729 | 747 | 766 | 783 | 801 |
| | Other | 1,200 | 1,236 | 1,273 | 1,311 | 1,347 | 1,384 | 1,422 | 1,458 | 1,494 | 1,532 | 1,566 | 1,602 |
| | Total Administrative | 116,610 | 122,891 | 127,781 | 131,615 | 135,444 | 139,385 | 143,441 | 147,256 | 151,173 | 155,195 | 158,936 | 162,767 |
| | | | | | | | | | | | | | |
| Utilities | Electricity | 65,000 | 66,950 | 68,959 | 71,027 | 72,981 | 74,987 | 77,050 | 78,976 | 80,950 | 82,974 | 84,841 | 86,750 |
| | Water/sewer | 45,000 | 46,350 | 47,741 | 49,173 | 50,525 | 51,914 | 53,342 | 54,676 | 56,042 | 57,444 | 58,736 | 60,058 |
| | Gas | 42,000 | 43,260 | 44,558 | 45,895 | 47,157 | 48,453 | 49,786 | 51,031 | 52,306 | 53,614 | 54,820 | 56,054 |
| | Cable | - | - | - | - | - | - | - | - | - | - | - | - |
| | Total Utilities | 152,000 | 156,560 | 161,257 | 166,095 | 170,662 | 175,355 | 180,178 | 184,682 | 189,299 | 194,032 | 198,397 | 202,861 |
| | | | | | | | | | | | | | |
| Operating and Maintenance | Janitorial/Maint payroll | 147,600 | 152,028 | 156,589 | 161,287 | 165,722 | 170,279 | 174,962 | 179,336 | 183,819 | 188,415 | 192,654 | 196,989 |
| | Janitorial supplies | 480 | 494 | 509 | 525 | 539 | 554 | 569 | 583 | 598 | 613 | 627 | 641 |
| | Janitorial contract labor | 3,000 | 3,090 | 3,183 | 3,278 | 3,368 | 3,461 | 3,556 | 3,645 | 3,736 | 3,830 | 3,916 | 4,004 |
| | Exterminating contract | 6,000 | 6,180 | 6,365 | 6,556 | 6,737 | 6,922 | 7,112 | 7,290 | 7,472 | 7,659 | 7,831 | 8,008 |
| | Garbage and trash | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 | 13,052 | 13,346 |
| | Security | 500 | 515 | 530 | 546 | 561 | 577 | 593 | 608 | 623 | 638 | 653 | 667 |
| | Grounds maintenance | 5,400 | 5,562 | 5,729 | 5,901 | 6,063 | 6,230 | 6,401 | 6,561 | 6,725 | 6,893 | 7,048 | 7,207 |
| | Repair materials | 90,000 | 92,700 | 95,481 | 98,345 | 101,050 | 103,829 | 106,684 | 109,351 | 112,085 | 114,887 | 117,472 | 120,115 |
| | Repair contract labor | 18,000 | 18,540 | 19,096 | 19,669 | 20,210 | 20,766 | 21,337 | 21,870 | 22,417 | 22,977 | 23,494 | 24,023 |
| | Elevator maintenance | 18,000 | 18,540 | 19,096 | 19,669 | 20,210 | 20,766 | 21,337 | 21,870 | 22,417 | 22,977 | 23,494 | 24,023 |
| | Heating / cooling maintenance | 1,200 | 1,236 | 1,273 | 1,311 | 1,347 | 1,384 | 1,422 | 1,458 | 1,494 | 1,532 | 1,566 | 1,602 |
| | Snow removal | 2,400 | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 | 3,133 | 3,203 |
| | Decorating contract | - | - | - | - | - | - | - | - | - | - | - | - |
| | Decorating supplies | - | - | - | - | - | - | - | - | - | - | - | - |
| | Vehicle/maint equip repairs | 10,000 | 10,300 | 10,609 | 10,927 | 11,228 | 11,537 | 11,854 | 12,150 | 12,454 | 12,765 | 13,052 | 13,346 |
| | Miscellaneous | 2,400 | 2,472 | 2,546 | 2,623 | 2,695 | 2,769 | 2,845 | 2,916 | 2,989 | 3,064 | 3,133 | 3,203 |
| | Total Operating & Maintenance | 314,980 | 324,429 | 334,162 | 344,187 | 353,652 | 363,378 | 373,371 | 382,705 | 392,273 | 402,079 | 411,126 | 420,376 |
| | | | | | | | | | | | | | |
| Property and liability insurance | | 44,000 | 45,320 | 46,680 | 48,080 | 49,402 | 50,761 | 52,157 | 53,461 | 54,797 | 56,167 | 57,431 | 58,723 |
| Property taxes | | 166,982 | 171,991 | 177,151 | 182,465 | 187,483 | 192,639 | 197,937 | 202,885 | 207,957 | 213,156 | 217,952 | 222,856 |
| Other | | - | - | - | - | - | - | - | - | - | - | - | - |
| Replacement reserves (included in Operating and Maintenance) | | - | - | - | - | - | - | - | - | - | - | - | - |
| | | 210,982 | 217,311 | 223,830 | 230,545 | 236,885 | 243,400 | 250,093 | 256,346 | 262,754 | 269,323 | 275,383 | 281,579 |
| Total Operating Expenses and Replacements | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Total Operating Expenses** | | 794,571 | 821,192 | 847,031 | 872,442 | 896,644 | 921,518 | 947,082 | 970,989 | 995,499 | 1,020,629 | 1,043,842 | 1,067,583 |
| | | | | | | | | | | | | | |
| **Net Operating Income after Replacements** | | 665,623 | 738,474 | 783,490 | 806,994 | 833,175 | 860,196 | 888,083 | 914,644 | 941,988 | 970,139 | 996,696 | 1,023,968 |

14

# MCKINLEY TOWER APARTMENTS
## 337 E 4th Avenue, Anchorage, Alaska 99501
## Operating Projections

| | | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20 | Year 21 | Year 22 | Year 23 | Year 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rentable square feet | | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 | 54,390 |
| Average rate per square foot | | 40.94 | 41.86 | 42.80 | 43.77 | 44.64 | 45.53 | 46.45 | 47.37 | 48.32 | 49.29 | 50.27 | 51.28 |
| Annual income increase | | 2.50% | 2.25% | 2.25% | 2.25% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Gross Potential Rent | | 2,226,748 | 2,276,850 | 2,328,079 | 2,380,461 | 2,428,070 | 2,476,632 | 2,526,165 | 2,576,688 | 2,628,222 | 2,680,786 | 2,734,402 | 2,789,090 |
| Occupancy - Unit SF | | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% | 99.00% |
| Economic occupancy | | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% |
| Annual Expense Increase | | 2.25% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| **Income** | | | | | | | | | | | | | |
| Gross Potential Rent | | 2,226,748 | 2,276,850 | 2,328,079 | 2,380,461 | 2,428,070 | 2,476,632 | 2,526,165 | 2,576,688 | 2,628,222 | 2,680,786 | 2,734,402 | 2,789,090 |
| Less: Management office | | - | - | - | - | - | - | - | - | - | - | - | - |
| Less: Economic Vacancy | | (111,337) | (113,843) | (116,404) | (119,023) | (121,404) | (123,832) | (126,308) | (128,834) | (131,411) | (134,039) | (136,720) | (139,454) |
| Effective Rental Income | | 2,115,411 | 2,163,008 | 2,211,675 | 2,261,438 | 2,306,667 | 2,352,800 | 2,399,856 | 2,447,853 | 2,496,810 | 2,546,747 | 2,597,682 | 2,649,635 |
| Laundry and vending revenues | | - | - | - | - | - | - | - | - | - | - | - | - |
| NSF/Late charges/key replacement | | 1,436 | 1,468 | 1,501 | 1,535 | 1,566 | 1,597 | 1,629 | 1,661 | 1,695 | 1,729 | 1,763 | 1,798 |
| Cable revenue | | - | - | - | - | - | - | - | - | - | - | - | - |
| Damages and cleaning fees | | 7,179 | 7,340 | 7,506 | 7,674 | 7,828 | 7,985 | 8,144 | 8,307 | 8,473 | 8,643 | 8,816 | 8,992 |
| Gas | | - | - | - | - | - | - | - | - | - | - | - | - |
| Parking revenue | | 6,892 | 7,047 | 7,205 | 7,367 | 7,515 | 7,665 | 7,818 | 7,975 | 8,134 | 8,297 | 8,463 | 8,632 |
| Pet deposits (non-refundable) | | 3,446 | 3,523 | 3,603 | 3,684 | 3,757 | 3,833 | 3,909 | 3,987 | 4,067 | 4,148 | 4,231 | 4,316 |
| Application fees | | 5,169 | 5,285 | 5,404 | 5,526 | 5,636 | 5,749 | 5,864 | 5,981 | 6,101 | 6,223 | 6,347 | 6,474 |
| Other | | 4,307 | 4,404 | 4,503 | 4,605 | 4,697 | 4,791 | 4,887 | 4,984 | 5,084 | 5,186 | 5,289 | 5,395 |
| **Total Ancillary Income** | | 28,428 | 29,068 | 29,722 | 30,391 | 30,999 | 31,619 | 32,251 | 32,896 | 33,554 | 34,225 | 34,910 | 35,608 |
| **Total Income** | | 2,143,840 | 2,192,076 | 2,241,398 | 2,291,829 | 2,337,666 | 2,384,419 | 2,432,107 | 2,480,750 | 2,530,365 | 2,580,972 | 2,632,591 | 2,685,243 |
| **Operating Expenses:** | | | | | | | | | | | | | |
| Administrative Expenses | Travel | - | - | - | - | - | - | - | - | - | - | - | - |
| | Advertising/marketing | 8,870 | 9,048 | 9,229 | 9,413 | 9,601 | 9,793 | 9,989 | 10,189 | 10,393 | 10,601 | 10,813 | 11,029 |
| | Office supplies and expenses | 18,423 | 18,791 | 19,167 | 19,550 | 19,941 | 20,340 | 20,747 | 21,162 | 21,585 | 22,017 | 22,457 | 22,906 |
| | Legal - operating | - | - | - | - | - | - | - | - | - | - | - | - |
| | Management fees | 107,192 | 109,604 | 112,070 | 114,591 | 116,883 | 119,221 | 121,605 | 124,037 | 126,518 | 129,049 | 131,630 | 134,262 |
| | Bookkeeping and accounting | 13,646 | 13,919 | 14,198 | 14,482 | 14,771 | 15,067 | 15,368 | 15,675 | 15,989 | 16,309 | 16,635 | 16,968 |
| | Telephone | 13,646 | 13,919 | 14,198 | 14,482 | 14,771 | 15,067 | 15,368 | 15,675 | 15,989 | 16,309 | 16,635 | 16,968 |
| | Computer services | 2,456 | 2,505 | 2,556 | 2,607 | 2,659 | 2,712 | 2,766 | 2,822 | 2,878 | 2,936 | 2,994 | 3,054 |
| | Misc. / bank fees / credit repts | 819 | 835 | 852 | 869 | 886 | 904 | 922 | 941 | 959 | 979 | 998 | 1,018 |
| | Other | 1,638 | 1,670 | 1,704 | 1,738 | 1,773 | 1,808 | 1,844 | 1,881 | 1,919 | 1,957 | 1,996 | 2,036 |
| | Total Administrative | 166,690 | 170,292 | 173,972 | 177,732 | 181,286 | 184,912 | 188,610 | 192,382 | 196,230 | 200,155 | 204,158 | 208,241 |
| Utilities | Electricity | 88,702 | 90,476 | 92,285 | 94,131 | 96,014 | 97,934 | 99,893 | 101,890 | 103,928 | 106,007 | 108,127 | 110,289 |
| | Water/sewer | 61,409 | 62,637 | 63,890 | 65,168 | 66,471 | 67,800 | 69,156 | 70,540 | 71,950 | 73,389 | 74,857 | 76,354 |
| | Gas | 57,315 | 58,461 | 59,630 | 60,823 | 62,040 | 63,280 | 64,546 | 65,837 | 67,154 | 68,497 | 69,867 | 71,264 |
| | Cable | - | - | - | - | - | - | - | - | - | - | - | - |
| | Total Utilities | 207,426 | 211,574 | 215,806 | 220,122 | 224,524 | 229,015 | 233,595 | 238,267 | 243,032 | 247,893 | 252,851 | 257,908 |
| Operating and Maintenance | Janitorial/Maint payroll | 201,421 | 205,450 | 209,559 | 213,750 | 218,025 | 222,385 | 226,833 | 231,370 | 235,997 | 240,717 | 245,531 | 250,442 |
| | Janitorial supplies | 655 | 668 | 681 | 695 | 709 | 723 | 738 | 752 | 767 | 783 | 798 | 814 |
| | Janitorial contract labor | 4,094 | 4,176 | 4,259 | 4,345 | 4,431 | 4,520 | 4,610 | 4,703 | 4,797 | 4,893 | 4,990 | 5,090 |
| | Exterminating contract | 8,188 | 8,352 | 8,519 | 8,689 | 8,863 | 9,040 | 9,221 | 9,405 | 9,593 | 9,785 | 9,981 | 10,181 |
| | Garbage and trash | 13,646 | 13,919 | 14,198 | 14,482 | 14,771 | 15,067 | 15,368 | 15,675 | 15,989 | 16,309 | 16,635 | 16,968 |
| | Security | 682 | 696 | 710 | 724 | 739 | 753 | 768 | 784 | 799 | 815 | 832 | 848 |
| | Grounds maintenance | 7,369 | 7,516 | 7,667 | 7,820 | 7,977 | 8,136 | 8,299 | 8,465 | 8,634 | 8,807 | 8,983 | 9,163 |
| | Repair materials | 122,818 | 125,274 | 127,780 | 130,335 | 132,942 | 135,601 | 138,313 | 141,079 | 143,901 | 146,779 | 149,714 | 152,708 |
| | Repair contract labor | 24,564 | 25,055 | 25,556 | 26,067 | 26,588 | 27,120 | 27,663 | 28,216 | 28,780 | 29,356 | 29,943 | 30,542 |
| | Elevator maintenance | 24,564 | 25,055 | 25,556 | 26,067 | 26,588 | 27,120 | 27,663 | 28,216 | 28,780 | 29,356 | 29,943 | 30,542 |
| | Heating / cooling maintenance | 1,638 | 1,670 | 1,704 | 1,738 | 1,773 | 1,808 | 1,844 | 1,881 | 1,919 | 1,957 | 1,996 | 2,036 |
| | Snow removal | 3,275 | 3,341 | 3,407 | 3,476 | 3,545 | 3,616 | 3,688 | 3,762 | 3,837 | 3,914 | 3,992 | 4,072 |
| | Decorating contract | - | - | - | - | - | - | - | - | - | - | - | - |
| | Decorating supplies | - | - | - | - | - | - | - | - | - | - | - | - |
| | Vehicle/maint equip repairs | 13,646 | 13,919 | 14,198 | 14,482 | 14,771 | 15,067 | 15,368 | 15,675 | 15,989 | 16,309 | 16,635 | 16,968 |
| | Miscellaneous | 3,275 | 3,341 | 3,407 | 3,476 | 3,545 | 3,616 | 3,688 | 3,762 | 3,837 | 3,914 | 3,992 | 4,072 |
| | Total Operating & Maintenance | 429,835 | 438,432 | 447,200 | 456,144 | 465,267 | 474,572 | 484,064 | 493,745 | 503,620 | 513,693 | 523,966 | 534,446 |
| Property and liability insurance | | 60,044 | 61,245 | 62,470 | 63,719 | 64,994 | 66,294 | 67,620 | 68,972 | 70,351 | 71,758 | 73,194 | 74,657 |
| Property taxes | | 227,870 | 232,428 | 237,076 | 241,818 | 246,654 | 251,587 | 256,619 | 261,751 | 266,986 | 272,326 | 277,773 | 283,328 |
| Other | | - | - | - | - | - | - | - | - | - | - | - | - |
| Replacement reserves (included in Operating and Maintenance) | | - | - | - | - | - | - | - | - | - | - | - | - |
| | | 287,914 | 293,673 | 299,546 | 305,537 | 311,648 | 317,881 | 324,238 | 330,723 | 337,338 | 344,084 | 350,966 | 357,985 |
| Total Operating Expenses and Replacements | | | | | | | | | | | | | |
| **Total Operating Expenses** | | 1,091,865 | 1,113,971 | 1,136,524 | 1,159,535 | 1,182,725 | 1,206,380 | 1,230,508 | 1,255,118 | 1,280,220 | 1,305,824 | 1,331,941 | 1,358,580 |
| **Net Operating Income after Replacements** | | 1,051,974 | 1,078,105 | 1,104,874 | 1,132,294 | 1,154,940 | 1,178,039 | 1,201,600 | 1,225,632 | 1,250,145 | 1,275,147 | 1,300,650 | 1,326,663 |

15

# EXHIBIT C

**MCKINLEY TOWER APARTMENTS**
**MORTGAGE AMORTIZATION SCHEDULE**

**RESTRUCTURED FINANCING TERMS - NEW LENDER**

| | |
|---|---|
| Principal Balance: | 7,250,000 |
| Term (years): | 10 |
| Amortization Period (Years): | 25 |
| Interest Rate: | 6.50% |
| Monthly Payment: | 48,953 |
| Annual Debt Service: | 587,430 |
| Debt Constant: | 8.10% |

**Annual Summary:**

| Year | Total Payments | Interest | Principal | Ending Balance |
|---|---|---|---|---|
| 1 | 587,430 | 467,726 | 119,705 | 7,130,295 |
| 2 | 587,430 | 459,709 | 127,722 | 7,002,574 |
| 3 | 587,430 | 451,155 | 136,275 | 6,866,298 |
| 4 | 538,478 | 404,836 | 133,642 | 6,720,897 |
| 5 | 587,430 | 432,290 | 155,140 | 6,565,757 |
| 6 | 587,430 | 421,901 | 165,530 | 6,400,227 |
| 7 | 587,430 | 410,815 | 176,616 | 6,223,612 |
| 8 | 587,430 | 398,986 | 188,444 | 6,035,168 |
| 9 | 587,430 | 386,366 | 201,064 | 5,834,103 |
| 10 | 587,430 | 372,900 | 214,530 | 5,619,574 |
| | 5,825,350 | 4,206,683 | 1,618,666 | |

17

# EXHIBIT D

# Current Rates

AS OF 3/27/2024 (10:00 AM CT)

Northmarq.com



## Capital Markets Leader

Northmarq leverages strong, long-term relationships with all sources of capital – including the GSEs, FHA/HUD, life companies, bridge lenders, banks, and CMBS lenders – to create innovative financing solutions. The rates provided here are for informational use only. For specific quotes, contact your local office today.

| Current Index Rates | | Previous Week |
|---|---|---|
| 5 year Treasury | 4.21% | 4.29% |
| 7 year Treasury | 4.22% | 4.30% |
| 10 year Treasury | 4.22% | 4.28% |
| 30-day Avg SOFR | 5.32% | 5.32% |
| 1 Mo Term SOFR | 5.33% | 5.32% |

## Commercial

### Life Companies

| Term | Amortization | LTV | Spread | Rate |
|---|---|---|---|---|
| 5-Year | 25-30 | 60%-75% | 160-220 | 5.80%-6.40% |
| 10-Year | 25-30 | 50%-65% | 150-190 | 5.70%-6.10% |
| 10-Year | 25-30 | 60%-75% | 160-220 | 5.80%-6.40% |
| 15-Year | 25-30 | 60%-75% | 160-220 | 5.85%-6.45% |
| 15-20 Year Fully Amortizing | | 60%-75% | 160-220 | 5.80%-6.40% |

### CMBS

| Term | Amortization | LTV | Spread | Rate |
|---|---|---|---|---|
| 5-Year | 30 | 65%-75% | 275-325 | 7.05%-7.55% |
| 10-Year | 30 | 65%-75% | 235-285 | 6.65%-7.15% |

\* Rate buy downs available on deal by deal basis.

## Multifamily

### Freddie Mac—Conventional

| Term | LTV | DSCR | Spread | Rate |
|---|---|---|---|---|
| 15-Year | 80% | 1.25x | 170-195 | 5.90%-6.15% |
| 10-Year | 55% | 1.55x | 145-150 | 5.65%-5.70% |
| 10-Year | 65% | 1.35x | 150-160 | 5.70%-5.80% |
| 10-Year | 80% | 1.25x | 155-180 | 5.75%-6.00% |
| 7-Year | 55% | 1.55x | 145-155 | 5.65%-5.75% |
| 7-Year | 65% | 1.35x | 150-165 | 5.70%-5.85% |
| 7-Year | 80% | 1.25x | 160-185 | 5.80%-6.05% |
| 5-Year | 75% | 1.25x | 155-180 | 5.75%-6.00% |
| 10-Year ARM | 80% | 1.25x | 220-245 | 7.50%-7.75% |

### Fannie Mae—Conventional

| Term | LTV | DSCR | Spread | Rate |
|---|---|---|---|---|
| 15-Year | 65% | 1.35x | 150-210 | 5.70%-6.30% |
| 10-Year | 55% | 1.55x | 105-165 | 5.25%-5.85% |
| 10-Year | 65% | 1.35x | 115-185 | 5.35%-6.05% |
| 10-Year | 80% | 1.25x | 135-205 | 5.55%-6.25% |
| 7-Year* | 55% | 1.55x | 105-160 | 5.25%-5.80% |
| 7-Year* | 65% | 1.35x | 120-180 | 5.40%-6.00% |
| 7-Year | 80% | 1.25x | 140-215 | 5.60%-6.35% |
| 5-Year | 65% | 1.25x | 140-240 | 5.60%-6.60% |
| 10-Year SARM | 75% | 1.00x | 265-280 | 7.95%-8.10% |

\* For loans less than $6MM, please reach out to your Fannie representative.

### FHA—223(F) Refinancing

| Term | Amortization | LTV | DSCR | Rate |
|---|---|---|---|---|
| 35 | 35 | 85% | 1.176x | 5.50-5.90% |

\* Before MIP.

### FHA—221(D)4 Construction/Permanent

| Term | Amortization | LTC | DSCR | Rate |
|---|---|---|---|---|
| 40 | 40 | 85% | 1.176x | 6.10-6.35% |

\* Before MIP.

### Life Companies

| Term | Amortization | LTV | Spread | Rate |
|---|---|---|---|---|
| 5-Year | 25-30 | 60%-75% | 155-215 | 5.75%-6.35% |
| 10-Year | 25-30 | 50%-65% | 130-175 | 5.50%-5.95% |
| 10-Year | 25-30 | 60%-75% | 155-215 | 5.75%-6.35% |
| 15-Year | 25-30 | 60%-75% | 155-215 | 5.80%-6.40% |
| 15-20 Year Fully Amortizing | | 60%-75% | 155-215 | 5.75%-6.35% |

### CMBS

| Term | Amortization | LTV | Spread | Rate |
|---|---|---|---|---|
| 5-Year | 30 | 65%-75% | 275-325 | 7.05%-7.55% |
| 10-Year | 30 | 65%-75% | 235-285 | 6.65%-7.15% |

\* Rate buy downs available on deal by deal basis.

Rates are general in nature and are for informational use only. Rates are subject to change at any time and the information provided is not a commitment to lend. For specific quotes based on your property, contact a local Northmarq office.

**Commercial Real Estate**
Debt + Equity
Investment Sales
Loan Servicing
Fund Management

**Northmarq**

# Commercial Real Estate Finance
## Current Rates



**Colliers**
Mortgage

As of: 6/26/2024

## Index Rates

| | | | | | |
|---|---|---|---|---|---|
| 5-Year Treasury | 4.34% | 5-Year SOFR Swap | 3.99% | SOFR | 5.31% |
| 7-Year Treasury | 4.32% | 7-Year SOFR Swap | 3.89% | 30-Day Avg. SOFR | 5.34% |
| 10-Year Treasury | 4.31% | 10-Year SOFR Swap | 3.84% | 1-Month Term SOFR | 5.34% |

Comprehensive Capital Distribution Platform Across All Commercial Property Types. **Creating Value by Providing Optimal Capital Solutions.**

## Conventional Fannie Mae Pricing Grid - Multifamily

| Term / Yield Maintenance | 5 YR / 4.5 YM | 7 YR / 6.5 YM | 10 YR / 9.5 YM | 12 YR / 11.5 YM | 15 YR / 14.5 YM |
|---|---|---|---|---|---|
| **Tier / LTV / DCSR** | Note Rates for Loan Amounts > $6MM | | | | |
| Tier 2 / 80% / 1.25x | 6.21 - 6.51 | 5.92 - 6.22 | 5.81 - 6.11 | 5.92 - 6.22 | 6.00 - 6.30 |
| Tier 3 / 65% / 1.35x | 5.67 - 5.97 | 5.61 - 5.91 | 5.61 - 5.91 | 5.72 - 6.02 | 5.80 - 6.10 |
| Tier 4 / 55% / 1.55x | 5.47 - 5.77 | 5.41 - 5.71 | 5.41 - 5.71 | 5.52 - 5.82 | 5.60 - 5.90 |
| **Tier / LTV / DCSR** | Note Rates for Loan Amounts < $6MM | | | | |
| Tier 2 / 80% / 1.25x | 6.62 - 6.92 | 6.33 - 6.63 | 6.22 - 6.52 | 6.33 - 6.63 | 6.41 - 6.71 |
| Tier 3 / 65% / 1.35x | 6.08 - 6.38 | 6.02 - 6.32 | 6.02 - 6.32 | 6.13 - 6.43 | 6.21 - 6.51 |
| Tier 4 / 55% / 1.55x | 5.88 - 6.18 | 5.82 - 6.12 | 5.82 - 6.12 | 5.93 - 6.23 | 6.01 - 6.31 |

## Conventional Freddie Mac Pricing Grid - Multifamily

| Term / Defeasance / Yield Maintenance | 5 YR / 4.5 DYM | 7 YR / 6.5 DYM | 10 YR / 9.5 DYM | 12 YR / 11.5 DYM |
|---|---|---|---|---|
| **Leverage / LTV / DCSR** | Note Rates | | | |
| Full / 80% / 1.25x | 6.01 - 6.21 | 5.90 - 6.10 | 5.75 - 5.95 | 5.82 - 6.02 |
| Moderate / 70% / 1.35x | 5.67 - 5.87 | 5.59 - 5.79 | 5.55 - 5.75 | 5.62 - 5.82 |
| Low / 60% / 1.45x | 5.47 - 5.67 | 5.39 - 5.59 | 5.35 - 5.55 | 5.42 - 5.62 |

## FHA / HUD

| FHA Loan Program | 223(f) | 223(a) | 213 (Co-Op) | 221(d) | 232 / 223(f) | 242 / 223(f) |
|---|---|---|---|---|---|---|
| Max Term | 35 YR | Up to 40 YR | 40 YR | 40 YR | 35 YR | 25 YR |
| Pass-Through Rate | 5.38 - 5.48 | 5.38 - 5.48 | 5.93 - 6.03 | 5.83 - 5.93 | 5.43 - 5.53 | 6.58 - 6.68 |
| GNMA Servicing Fee | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% | 0.25% |
| **Note Rate** | **5.63 - 5.73** | **5.63 - 5.73** | **6.18 - 6.28** | **6.08 - 6.18** | **5.68 - 5.78** | **6.83 - 6.93** |
| Market Rate MIP | 0.60% | 0.50% | 0.70% | 0.65% | 0.65% | 0.65% |
| Green MIP | 0.25% | 0.25% | N/A | 0.25% | N/A | N/A |

*Affordable / Broadly Affordable MIPs available, contact Colliers Mortgage professionals for more information*

| | Life Company | | | CMBS | | Bridge |
|---|---|---|---|---|---|---|
| **Term** | 5-Year | 10-Year | Const / Perm | 5-Year | 10-Year | 2-5 Year |
| Amortization | 15 - 30 | 15 - 30 | IO / 20-40 | 30 (FT IO Avail.) | 30 (FT IO Avail.) | Interest Only |
| LTV | 50% - 75% | 50% - 75% | 50% - 75% | 60% - 75% | 60% - 75% | 65% - 75% LTC |
| Multifamily Spread | 130 - 210 | 120 - 210 | N/A | 215 - 295 | 185 - 255 | 250 - 400 |
| **Multifamily Rate** | 5.64 - 6.44 | 5.51 - 6.41 | 7.10 - 7.60 | 6.14 - 6.94 | 5.69 - 6.39 | Floating |
| Commercial Spread | 150 - 230 | 140 - 230 | N/A | 235 - 305 | 200 - 270 | 250 - 500 |
| **Commercial Rate** | 5.84 - 6.64 | 5.71 - 6.61 | 7.10 - 7.60 | 6.34 - 7.04 | 5.84 - 6.54 | Floating |

Floating rate and flexible prepay options are available.

*Rates are a current indication, subject to changing market conditions. This is not a loan commitment. Contact a Colliers Mortgage professional below for a specific proposal.*

Contact:

**Luke Donahue**
602-654-3439
Luke.Donahue@Colliers.com

**Tom Ryan**
602-654-3432
Tom.Ryan@Colliers.com

**Patrick O'Donnell**
480-690-6010
Patrick.odonnell@Colliers.com

**Thomas Sanderson**
602-654-3430
Thomas.Sanderson@Colliers.com

**Jaron Davila**
602-654-3399
Jaron.Davila@Colliers.com

# EXHIBIT E

**MCKINLEY TOWER APARTMENTS**

**337 E 4th Avenue, Anchorage, Alaska 99501**

**Projected Payments of Claims**

| Year = | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net operating income before management fees | 738,632 | 816,457 | 865,015 | 890,966 | 919,666 | 949,281 | 979,841 | 1,008,925 | 1,038,862 | 1,069,677 | 9,277,324 |
| US Trustee's quarterly fees | (5,274) | - | - | - | - | - | - | - | - | - | (5,274) |
| Administrative claims | (177,500) | - | - | - | - | - | - | - | - | - | (177,500) |
| Class 1 - Priority Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Unsecured Priority Non-tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 3 - MidCap Secured Claim/Replacement Lender | (523,810) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (587,430) | (5,810,682) |
| Class 4 - General Unsecured Claims | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | - | - | - | - | - | (150,000) |
| | | | | | | | | | | | |
| Net cash flow after payment of claims | 2,049 | 199,027 | 247,585 | 273,536 | 302,236 | 361,851 | 392,411 | 421,495 | 451,432 | 482,247 | 3,133,868 |
| Net Management Fee / Marlow Guarantee | (73,010) | (77,983) | (81,526) | (83,972) | (86,491) | (89,086) | (91,758) | (94,282) | (96,874) | (99,538) | (874,520) |
| Estimated net financing proceeds | - | - | - | - | - | - | - | - | - | 4,336,037 | 4,336,037 |
| Retainer remitted for Administrative Claims | 60,000 | - | - | - | - | - | - | - | - | - | 60,000 |
| Effective Date Equity Contribution | 145,000 | - | - | - | - | - | - | - | - | - | 145,000 |
| | | | | | | | | | | | |
| Projected Increase / (Decrease) in Cash | 134,039 | 121,044 | 166,059 | 189,564 | 215,745 | 272,766 | 300,653 | 327,213 | 354,558 | 4,718,746 | 6,800,385 |
| Projected Balance - Beginning of Plan Year | 91,400 | 225,439 | 346,483 | 512,542 | 702,106 | 917,851 | 1,190,616 | 1,491,269 | 1,818,482 | 2,173,039 | 91,400 |
| | | | | | | | | | | | |
| Projected Balance - End of Year | 225,439 | 346,483 | 512,542 | 702,106 | 917,851 | 1,190,616 | 1,491,269 | 1,818,482 | 2,173,039 | 6,891,785 | 6,891,785 |
| | | | | | | | | | | | |
| **Marlow Operating Cash Flow Guarantee:** | | | | | | | | | | | |
| Management fees | (73,010) | (77,983) | (81,526) | (83,972) | (86,491) | (89,086) | (91,758) | (94,282) | (96,874) | (99,538) | (874,520) |
| Operating cash flow guaranteed by Marlow | - | - | - | - | - | - | - | - | - | - | - |
| Net Management Fee / Marlow Guarantee | (73,010) | (77,983) | (81,526) | (83,972) | (86,491) | (89,086) | (91,758) | (94,282) | (96,874) | (99,538) | (874,520) |

22

# EXHIBIT F

# MCKINLEY TOWER APARTMENTS

## 337 E 4th Avenue, Anchorage, Alaska 99501

**REFINANCING:**

| End of Plan Year >>> | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DSC = | | 1.27 | 1.26 | 1.33 | 1.37 | 1.42 | 1.46 | 1.51 | 1.56 | 1.60 | 1.65 |
| Projected NOI | | 665,623 | 738,474 | 783,489 | 806,994 | 833,175 | 860,196 | 888,083 | 914,643 | 941,988 | 970,139 |
| Add back replacements | | - | - | - | - | - | - | - | - | - | - |
| NOI as adjusted | | 665,623 | 738,474 | 783,489 | 806,994 | 833,175 | 860,196 | 888,083 | 914,643 | 941,988 | 970,139 |
| Value at cap rate of | 7.50% | 8,875,000 | 9,846,000 | 10,447,000 | 10,760,000 | 11,109,000 | 11,469,000 | 11,841,000 | 12,195,000 | 12,560,000 | 12,935,000 |
| New Loan Amount at LTV of | 80.00% | 7,100,000 | 7,876,800 | 8,357,600 | 8,608,000 | 8,887,200 | 9,175,200 | 9,472,800 | 9,756,000 | 10,048,000 | 10,348,000 |
| | | | | | | | | | | | |
| New Loan Amount | | 7,100,000 | 7,877,000 | 8,358,000 | 8,608,000 | 8,887,000 | 9,175,000 | 9,473,000 | 9,756,000 | 10,048,000 | 10,348,000 |
| Loan Costs | 2.00% | (142,000) | (157,540) | (167,160) | (172,160) | (177,740) | (183,500) | (189,460) | (195,120) | (200,960) | (206,960) |
| Closing Costs | 0.25% | (17,750) | (19,693) | (20,895) | (21,520) | (22,218) | (22,938) | (23,683) | (24,390) | (25,120) | (25,870) |
| Third party reports | | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) |
| Excess reserves | | - | - | - | - | - | - | - | - | - | - |
| Net loan proceeds | | 6,925,250 | 7,684,768 | 8,154,945 | 8,399,320 | 8,672,043 | 8,953,563 | 9,244,858 | 9,521,490 | 9,806,920 | 10,100,170 |
| | | | | | | | | | | | |
| Refi Year | 10 {end of year} | | | | | | | | | | |
| Balance of restructured loan at end of year | | 7,210,957 | 7,088,638 | 6,958,127 | 6,818,875 | 6,670,297 | 6,511,768 | 6,342,623 | 6,162,149 | 5,969,589 | 5,764,133 |
| Excess refinancing proceeds | | (285,707) | 596,129 | 1,196,818 | 1,580,445 | 2,001,746 | 2,441,794 | 2,902,235 | 3,359,341 | 3,837,331 | 4,336,037 |

**REFINANCE** (Refi Year column 10)

**DISPOSITION:**

| End of Year >>> | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected NOI | | 665,623 | 738,474 | 783,489 | 806,994 | 833,175 | 860,196 | 888,083 | 914,643 | 941,988 | 970,139 |
| Add back replacements | | - | - | - | - | - | - | - | - | - | - |
| NOI as adjusted | | 665,623 | 738,474 | 783,489 | 806,994 | 833,175 | 860,196 | 888,083 | 914,643 | 941,988 | 970,139 |
| Value at cap rate of | 7.50% | 8,874,967 | 9,846,319 | 10,446,526 | 10,759,922 | 11,109,002 | 11,469,277 | 11,841,103 | 12,195,244 | 12,559,837 | 12,935,187 |
| | | | | | | | | | | | |
| Sale Year | 10 {end of year} | | | | | | | | | | |
| Projected sale price | | 8,875,000 | 9,846,000 | 10,447,000 | 10,760,000 | 11,109,000 | 11,469,000 | 11,841,000 | 12,195,000 | 12,560,000 | 12,935,000 |
| Closing Costs | 5.00% | (443,750) | (492,300) | (522,350) | (538,000) | (555,450) | (573,450) | (592,050) | (609,750) | (628,000) | (646,750) |
| Balance of financing at end of year | | (7,210,957) | (7,088,638) | (6,958,127) | (6,818,875) | (6,670,297) | (6,511,768) | (6,342,623) | (6,162,149) | (5,969,589) | (5,764,133) |
| Net sale proceeds | | 1,220,293 | 2,265,062 | 2,966,523 | 3,403,125 | 3,883,253 | 4,383,782 | 4,906,327 | 5,423,101 | 5,962,411 | 6,524,117 |

**SALE** (Sale Year column 10)

24

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing and additionally mailed or e-mailed* copies of the attached document to the following:

Office of the United States Trustee*
700 Stewart Street, Suite 5103
Seattle, Washington 98101-1271
Email: USTPRegion18.ak.ecf@usdoj.gov

Kathryn F. Evans*
Office of the United States Trustee
700 Stewart Street, Suite 5103
Seattle, Washington 98101-1271
Email: Kathryn.Evans@usdoj.gov
Email: cori.gustafson@usdoj.gov
Email: young-mi.petteys@usdoj.gov
Email: tmaurer@usdoj.gov

John Rizzardi*
Binah B. Yeung*
Aditi Paranjpye*
Cairncross & Hempelmann
524 Second Avenue, Suite 500
Seatle, Washington 98104-2323
Email: JRizzardi@cairncross.com
Email: byeung@cairncross.com
Email: aparanjpye@cairncross.com
*Attorneys for MidCap Funding Investment X LLC*

 */s/ Kate Manns*
Kate Manns

36

4866-1227-5409, v. 6